ACCEPTED
12-15-00216-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
10/9/2015 2:42:33 PM
Pam Estes
CLERK

NO. 12-15-00216-CV

IN THE COURT OF APPEALS
FOR THE TWELFTY DISTRICT OF TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
10/9/2015 2:42:33 PM
PAM ESTES
~~Clerk~~

IN RE THOMAS LYTLE AND ELLEN LYTLE,
REALTORS,

V.

THE HONORABLE TERESA DRUM, JUDGE
PRESIDING 29TH JUDICIAL DISTRICT
COURT OF VAN ZANDT COUNTY, TEXAS
RESPONDENT,


Real Parties in Interest:

DAVID C. PETRUSKA
SANDRA L. PETRUSKA
HELMUTH K. GUTZKE AND
ZACKIANN GUTZKE,
DEFENDANTS.


**REAL PARTIES IN INTEREST DAVID C. PETRUSKA'S AND SANDRA L. PETRUSKA'S APPENDIX TO RESPONSE TO PETITION FOR WRIT OF MANDAMUS**

Michael F. Pezzulli
State Bar No. 15881900
michael@courtroom.com
14911 Quorum Drive, Suite 340
Dallas, Texas 75254
Ph: 469-916-7700
Fax: 469-916-7705



**JOHN F. WARREN**
**Dallas County Clerk**
**George Allen Sr. Court Bldg.**
**600 Commerce St, Ste 101**
**Dallas, Texas 75202-3551**

STATE OF TEXAS '

COUNTY OF DALLAS '

I, John F. Warren, Clerk of the County Court of Dallas County Court at Law No. 2, Dallas County, Texas do hereby certify that the foregoing is a true and correct copy of document in Cause No. CC-14-03303-B.

THOMAS LYTLE, **PLAINTIFF (S)**

**VS**

DAVID C. PETRUSKA, **DEFENDANT (S)**

**PLAINTIFF'S ORIGINAL PETITION** filed on 8th day of July, 2014

**REGISTER OF ACTIONS** filed on 8th day of July, 2014 in the Dallas County Court at Law No. 2, Dallas County, Texas.

**WITNESS MY HAND AND SEAL** of said Court this 6th day of October, 2015.

John F. Warren, County Clerk

By: _____

Suprenna Williams, Deputy

RPI 0001

CAUSE NO. CC-14-03303-B

| | | |
|---|---|---|
| THOMAS LYTLE | § | IN THE COUNTY COURT |
| | § | |
| v. | § | COUNTY COURT AT LAW NO. ___ |
| | § | |
| DAVID C. PETRUSKA | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

### TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES** Thomas Lytle, hereinafter called Plaintiff, complaining of and about David C. Petruska, hereinafter called Defendant, and for cause of action show the Court the following:

### DISCOVERY CONTROL PLAN LEVEL

1. Plaintiffs intend that discovery be conducted under Discovery Level 2.

### PARTIES AND SERVICE

2. Plaintiff, Thomas Lytle, is an individual whose address is 1603 Van Zandt County Road 2319, Canton, Texas 75103.

3. Defendant David C. Petruska, an individual who is a resident of Dallas, Texas, may be served with process at his residence 11264 Russwood Circle, Dallas, Texas 75229 or at his place of business at 5944 Luther Lane, Suite 450, Dallas, Texas 75225. Service of said Defendant as described above can be effected by personal delivery.

### JURISDICTION AND VENUE

4. The damages sought are within the jurisdictional limits of this Court.

5. Plaintiff seeks monetary relief of over $200,000 but not more than $1,000,000.00.

6. This court has personal jurisdiction herein because Defendant is a Texas resident.



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

RPI 0002

7. Venue in Dallas County is proper in this cause under Section 15.002(a)(2) of the Texas Civil Practice and Remedies Code because Defendant resides in this county.

**FACTS**

8. Plaintiff and his wife are the owners of certain real property in Van Zandt County. Part of the property is a private driveway from their home entering onto Van Zandt County Road 2319.

9. Unknown to Plaintiff, Defendant Petruska and his wife had fraudulently filed documents in the real property records of Van Zandt County claiming an easement to use Plaintiff's driveway. No such easement existed.

10. On or about February 14, 2014, Defendant Petruska was informed that Plaintiff would be erecting a barrier along the driveway which would preclude any access from Defendant's property to the driveway. On or about February 15, 2014, Plaintiff was on his tractor transporting supplies for fencing on the driveway when he was met on the driveway by Defendant Petruska.

11. Defendant Petruska began arguing with Plaintiff about an alleged right to use the driveway which Plaintiff explicitly stated did not exist. Defendant Petruska then returned to his vehicle to get a weapon, what to Plaintiff appeared to be an AR15 assault weapon. Defendant Petruska walked onto Plaintiff's property and pointed the weapon directly at Plaintiff who was only about ten (10) feet away, declaring he had a right to use Plaintiff's driveway. Defendant Petruska went on to tell Plaintiff that he was a Veteran of the war in Vietnam and suffered from Post Traumatic Stress Disorder. Defendant stated, while pointing the weapon at Plaintiff, "I've killed a lot of men and you have not killed any and I am going to kill you." Plaintiff, in fear for his life, put his arms in the air and told Defendant Petruska he was calling law enforcement on

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

RPI 0003

his mobile phone. In response, Defendant Petruska walked across the property line to his property, still holding his weapon, and dared Plaintiff to call the Sheriff. Plaintiff quickly got on the tractor and drove back to his house and called the Sheriff.

## THREAT OF BODILY INJURY

12. Defendant intentionally and knowingly threatened Plaintiff with imminent bodily injury. Defendant pointed an assault rifle at Plaintiff from less than 10 feet away, and threatened Plaintiff with imminent bodily injury, expressing his intent shoot and to kill Plaintiff. Defendant stated to Plaintiff that Defendant had killed people in the past and that he suffered from a mental disorder, Post-Traumatic Stress Disorder. Plaintiff was in fear that he would be shot.

13. Defendant's threat directly and proximately caused injury to Plaintiff. Plaintiff continues to suffer from apprehension that Defendant will cause him injury. When Defendant visits the property Plaintiff feels forced to stay out of sight and to avoid any contact with Defendant. This fear and apprehension has caused Plaintiff to suffer from nightmares and insomnia, fear of leaving his home and inability to focus on anything other than the incident and safety of his home and his wife at the times Defendant is at his home. Plaintiff now feels the need to sleep with a weapon nearby. This severe apprehension and fear has caused damage including past and future pain and suffering, past and future mental anguish, loss of income, physical impairment, past and future medical expenses and loss of consortium.

## EXEMPLARY DAMAGES

14. Plaintiff would further show that Plaintiff's injuries resulted from Defendant's malice. Defendant acted with the specific intent to cause substantial injury and/or harm to Plaintiff and to intimidate Plaintiff in granting Defendant a right to use Plaintiff's property. It was Defendant's intent to intimidate Plaintiff into believing that an easement existed by utilizing


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

RPI 0004

a deadly weapon to instill fear in Plaintiff, thus causing harm to Plaintiff. Plaintiff seeks recovery from Defendant for exemplary damages as provided by Section 41.003(a) of the Texas Civil Practice and Remedies Code. As Defendant's conduct is described by the Texas Penal Code § 22.02 as an aggravated assault, the limitation of damages in Texas Civil Practice and Remedies Code § 41.008 does not apply.

## JURY DEMAND

15. Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## REQUEST FOR DISCLOSURE

17. Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendant disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Thomas Lytle, respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for the actual damages requested hereinabove in an amount in excess of the minimum jurisdictional limits of the Court, together with exemplary damages, prejudgment and post-judgment interest at the maximum rate allowed by law, costs of court, and such other and further relief to which the Plaintiff may be entitled at law or in equity, whether pled or unpled.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

RPI 0005

Respectfully submitted,

**BELLINGER & SUBERG, L.L.P.**

By: _____

BARBARA L. EMERSON
Texas State Bar No. 06599400
10,000 N. Central Expy, Suite 900
Dallas, Texas 75231
Telephone: 214/954-9540
Facsimile: 214/954-9541
bemerson@bd-law.com

**ATTORNEY FOR PLAINTIFF
THOMAS LYTLE**

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

RPI 0006

Location : All County Courts at Law Civil  Images Help

# REGISTER OF ACTIONS
## CASE NO. CC-14-03303-B

| | |
|---|---|
| THOMAS LYTLE vs.DAVID C PETRUSKA | § § § § § § § |

Case Type: **DAMAGES (NON COLLISION)**
Subtype: **NEGLIGENCE**
Date Filed: **07/08/2014**
Location: **County Court at Law No. 2**

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| DEFENDANT | PETRUSKA, DAVID C | MICHAEL F PEZZULLI |
| | | *Retained* |
| | | 469-916-7700 x104(W) |
| | | |
| PLAINTIFF | LYTLE, THOMAS | BARBARA L EMERSON |
| | | *Retained* |
| | | 214-954-9540(W) |

---

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 07/08/2014 | NEW CASE FILED (OCA) |
| 07/08/2014 | ORIGINAL PETITION |
| | *Plaintiff's Original Petition* |
| 07/08/2014 | ISSUE CITATION |
| 07/08/2014 | JURY TRIAL DEMAND |
| 07/08/2014 | CIVIL CASE INFORMATION SHEET |
| 07/09/2014 | CITATION (SERVICE) |
| | *PLACED IN ATTY PU BOX 7/9/14* |

| | | |
|---|---|---|
| PETRUSKA, DAVID C | Served | 07/09/2014 |
| | Returned | 07/14/2014 |

| | |
|---|---|
| 07/14/2014 | RETURN OF SERVICE |
| | *CITATION SERVED 7/9/14 @ 6:20PM* |
| 08/01/2014 | ORIGINAL ANSWER - GENERAL DENIAL |
| 09/29/2014 | ORDER - MEDIATION |
| 10/10/2014 | CANCELED  DISMISSAL HEARING  (9:00 AM) (Judicial Officer FIFER, KING) |
| | BY COURT ADMINISTRATOR |
| 05/20/2015 | MOTION - QUASH |
| | *DEPOSITION NOTICES OF DAVID PETRUSKA AND SANDRA PETRUSKA* |
| 05/20/2015 | NOTICE - HEARING |
| 06/01/2015 | STIPULATION |
| | *AND RULE 11 AGREEMENT* |
| 06/10/2015 | STIPULATION |
| | *AND RULE 11 AGREEMENT JOINT* |
| 06/15/2015 | CANCELED  MOTION - QUASH  (9:00 AM) () |
| | *REQUESTED BY ATTORNEY/PRO SE* |
| | *06/16/2015  Reset by Court to 06/15/2015* |
| 06/29/2015 | CORRESPONDENCE |
| | *NO SETTLEMENT* |
| 07/16/2015 | MOTION - STAY |
| | *ALL PROCEEDINGS W/ LEGAL AUTHORITIES IN SUPPORT* |
| 07/28/2015 | MOTION - STAY |
| | *PROCEEDINGS WITH LEGAL AUTHORITIES IN SUPPORT* |
| 08/03/2015 | ORDER - STAY |
| | *PROCEEDINGS; AGREED* |
| 08/13/2015 | NOTICE - CHANGE OF ADDRESS |
| 08/18/2015 | CANCELED  JURY TRIAL  (9:00 AM) (Judicial Officer FIFER, KING) |
| | BY COURT ADMINISTRATOR |
| | *08/17/2015  Reset by Court to 08/18/2015* |

---

### FINANCIAL INFORMATION

| | | |
|---|---|---|
| **PLAINTIFF LYTLE, THOMAS** | | |
| Total Financial Assessment | | 294.00 |
| Total Payments and Credits | | 294.00 |
| **Balance Due as of 10/06/2015** | | **0.00** |

| | | | | |
|---|---|---|---|---|
| 07/08/2014 | Transaction Assessment | | | 294.00 |
| 07/08/2014 | CREDIT CARD - TEXFILE (CC) | Receipt # CV-2014-08618 | LYTLE, THOMAS | (294.00) |



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

RPI 0007

has no basis in law upon the admitted facts presented to us. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *see also Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985) (to establish abuse of discretion relator must show that facts and law permit trial court to make only one decision).



**SPACE MASTER INTERNATIONAL, INC., Appellant,**

v.

**PORTA–KAMP MANUFACTURING COMPANY, INC., Appellee.**

No. 01–90–00020–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 16, 1990.

Declaratory judgment action was brought to determine whether contracts could be enforced, or whether enforcement should be denied on ground that contractual interest rates were allegedly usurious. The 125th District Court, Harris County, Don E. Wittig, J., granted defendant's motion to dismiss, but denied plea in abatement, and appeal was taken. The Court of Appeals, Bissett, J. (Retired), held that order dismissing suit for declaratory judgment, on ground that breach of contract actions involving same parties and issues were pending in New Jersey state court

and Massachusetts federal court, was not abuse of discretion.

Affirmed.

1. **Abatement and Revival** ⟨⟩12
Mere pendency of action in federal court involving same parties and issues is not reason for abating subsequent state court proceeding.

2. **Action** ⟨⟩68
**Appeal and Error** ⟨⟩949
Motion to stay court proceeding is directed to discretion of court, and court's decision will not be reversed absent abuse of discretion.

3. **Abatement and Revival** ⟨⟩13
**Courts** ⟨⟩511
Mere pendency of action in one state is not grounds for abating suit in second state involving same parties and same subject matter; however, as matter of comity, it is custom for court in which later action is instituted to stay proceedings therein until prior action is determined or, at least, for a reasonable time.

4. **Declaratory Judgment** ⟨⟩252
Action for declaratory judgment is neither legal nor equitable, but is sui generis.

5. **Declaratory Judgment** ⟨⟩5
Entry of declaratory judgment rests within sound discretion of trial court.

6. **Declaratory Judgment** ⟨⟩8
It is within discretion of trial court to refuse to enter declaratory judgment or decree if judgment or decree would not terminate uncertainty or controversy giving rise to proceeding.

7. **Declaratory Judgment** ⟨⟩8
Declaratory Judgments Act was not intended to provide for piecemeal litigation of lawsuits. V.T.C.A., Civil Practice and Remedies Code § 37.003.

8. **Declaratory Judgment** ⟨⟩361
Consideration in determining whether trial court properly dismissed suit for de-

claratory judgment is whether trial court's exercise of jurisdiction in suit for declaratory judgment would deprive plaintiff of ability to select appropriate forum to hear suit.

**9. Declaratory Judgment ⟺362**

Order dismissing contract debtor's suit for declaratory judgment, that contracts at issue should not be enforced because other party had attempted to charge it usurious interest, was not abuse of discretion, where breach of contract actions involving same parties and issues were pending in New Jersey state court and in Massachusetts federal court.

**10. Declaratory Judgment ⟺45**

Parties should not be allowed to use declaratory relief as forum-shopping device.

---

JoAnn Storey, Houston, for appellant.

G. Wesley Urquhart, Houston, for appellee.

Before SAM BASS, COHEN and BISSETT [1], JJ.

OPINION

BISSETT, Justice (Retired).

This is an appeal from the trial court's order nunc pro tunc dismissing Space Master's suit for declaratory judgment without prejudice. Space Master International Inc., ("Space Master"), in three points of error, contends the trial court erred in dismissing its suit, because the mere pendency of two other actions, in Massachusetts federal court and New Jersey state court, was not a sufficient basis for dismissal. We affirm.

A dispute arose concerning two contracts entered into between Space Master and Porta–Kamp Manufacturing Company, Inc. ("Porta–Kamp"): one for the construction

of modular classroom units in Massachusetts, the other for the construction of modular classroom units in New Jersey. Porta–Kamp, a Texas corporation with its principal place of business in Houston, Texas, sued Space Master for breach of contract and sought money damages, in both the New Jersey state court and the Massachusetts state court. The latter suit was removed to a federal court in Massachusetts. Space Master answered both complaints, asserting by affirmative defenses and a counterclaim that Porta–Kamp had violated the Texas usury statute.

While the suits in Massachusetts federal court and New Jersey state court were pending, Space Master filed suit for declaratory judgment in Texas, alleging the contracts at issue should not be enforced because Porta–Kamp had attempted to charge Space Master usurious interest rates. Porta–Kamp filed a motion to dismiss and a plea in abatement, urging the Texas court to either decline to exercise its jurisdiction or abate the cause of action, in order to avoid interference with litigation involving the same parties and issues in Massachusetts federal court.

Space Master responded to Porta–Kamp's motions to dismiss in the Texas court by asserting the trial judge of the Massachusetts federal court had indicated he was unwilling to apply Texas usury law, and attached a portion of the transcript from the proceedings in Massachusetts, sworn to by Space Master's attorney as accurately reflecting the exchange between counsel and the court. When counsel informed the court that Porta–Kamp could forfeit the principal as well as the interest under Texas law, because it had charged an 18 percent interest rate, the trial judge replied:

I mean, it's ludicrous.... I don't see any judge any place applying that law because it's—it's absolutely inherently ludicrous.... [T]o say that they could

---

1. The Honorable Gerald T. Bissett, Justice, retired, Court of Appeals, Thirteenth District of

Texas at Corpus Christi, sitting by assignment.

RPI 0009

forfeit three quarters of a million dollars because they charged you interest which you haven't paid is just—I mean, you don't even have to be a Cardoza [sic] to know that it's inherently foolish.

Based on this exchange and the assertion by Space Master that the Massachusetts court might not be *able* to enforce the usury statute because it was considered punitive, Space Master urged that the Texas court retain jurisdiction over the suit for declaratory judgment.

In its supplemental response in the Texas action, Space Master alleged the New Jersey court would not rule on Porta–Kamp's motion for summary judgment on Space Master's usury defense and counterclaim, until the Texas court had construed the Texas usury statute.

By order and order nunc pro tunc, the trial court granted Porta–Kamp's motion to dismiss, but denied the plea in abatement. The court denied Space Master's motion for rehearing, or in the alternative, motion for new trial, and this appeal followed.

In essence, Space Master, in its points of error, contends first that the mere pendency of this action in federal court involving the same parties and issues was not a valid reason to abate the instant proceeding. Second, it urges that the mere pendency of this suit in another state did not deprive the trial court in this case of jurisdiction to hear the suit for declaratory judgment. Finally, it asserts that the trial court erroneously relied upon *Texas Liquor Control Board v. Canyon Creek Land Corp.*, 456 S.W.2d 891 (Tex.1970), as authority to dismiss the suit. As a practical matter, all points challenge the authority of the trial court to dismiss a suit for declaratory judgment, filed while proceedings involving the same parties and issues are pending in another state court and federal court.

[1, 2] It is well settled that the mere pendency of an action in federal court involving the same parties and the same issues is not a reason for abating the subsequent state court proceeding. *Williamson v. Tucker*, 615 S.W.2d 881, 885–86 (Tex.Civ. App.—Dallas 1981, writ ref'd n.r.e.); *Byrnes v. University of Houston*, 507 S.W.2d 815, 816 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.). However, a motion to stay is directed to the discretion of the court and the granting or denying of such a motion will only be reviewed for abuse of discretion. *Williamson*, 615 S.W.2d at 886 (trial court did not abuse discretion in refusing to stay state court proceeding, filed after pending federal court proceeding, especially because federal action involved numerous parties that were not parties to state court action, and federal case was instituted by defendant in federal court several years before plaintiff instituted subsequent state court proceeding); *Alpine Gulf, Inc. v. Valentino*, 563 S.W.2d 358, 359 (Tex.App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.) (trial court abused discretion when it refused to stay suit for temporary injunction filed in Texas, when suit between same parties for same ultimate relief had been filed five days earlier in United States district court in New York; trial court should have, as a matter of comity, stayed the action).

[3] It is equally well settled that the mere pendency of an action in one state will not be grounds for abating a suit in another state between the same parties and involving the same subject matter. *Badgett v. Erspan*, 476 S.W.2d 381, 382 (Tex. Civ.App.—Fort Worth 1972, no writ); *Mills v. Howard*, 228 S.W.2d 906, 908 (Tex.Civ. App.—Amarillo 1950, no writ); *see also Safeco Ins. Co. of Am. v. J.L. Henson, Inc.*, 601 S.W.2d 183, 185 (Tex.Civ.App.— Dallas 1980, writ ref'd n.r.e.) (citing *Drake v. Brander*, 8 Tex. 351, 357 (1852)). As a matter of comity, however, it is the custom for the court in which the later action is instituted to stay proceedings therein until the prior action is determined or, at least, for a reasonable time, and the custom has practically grown into a general rule which strongly urges the duty upon the court in which the subsequent action is instituted to do so. *Mills v. Howard*, 228 S.W.2d at 908;

RPI 0010

*Evans v. Evans*, 186 S.W.2d 277, 279 (Tex. Civ.App.—San Antonio 1945, no writ).

[4] Space Master's points of error do not recognize that a declaratory judgment proceeding is unique. An action for declaratory judgment is neither legal nor equitable, but is *sui generis*, i.e. the only one of its kind, peculiar. *Canyon Creek*, 456 S.W.2d at 895; *Cobb v. Harrington*, 144 Tex. 360, 367, 190 S.W.2d 709, 713 (1945); *see also Black's Law Dictionary* 1286 (5th Ed.1979).

[5–7] Section 37.003 of the Texas Civil Practice and Remedies Code authorizes courts of record, acting within their jurisdiction, to grant declaratory relief, where a judgment or decree will terminate the controversy or remove an uncertainty. TEX. CIV.PRAC. & REM.CODE ANN. § 37.003 (Vernon 1986). The entry of a declaratory judgment rests within the sound discretion of the trial court. *Uvalde County v. Barrier*, 710 S.W.2d 740, 745 (Tex.App.—San Antonio 1986, no writ); *K.M.S. Research Laboratories, Inc. v. Willingham*, 629 S.W.2d 173, 174 (Tex.App.—Dallas 1982, no writ); *Southern Nat'l Bank of Houston v. City of Austin*, 582 S.W.2d 229, 237 (Tex. Civ.App.—Tyler 1979, writ ref'd n.r.e.). It is further within the discretion of the trial court to refuse to enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding. *Crawford v. City of Houston*, 600 S.W.2d 891, 894 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.); TEX.CIV.PRAC. & REM.CODE ANN. § 37.008 (Vernon 1986). The Declaratory Judgments Act was never intended to provide for the piecemeal litigation of lawsuits. *United Serv. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 858 (Tex. 1965).

In *Canyon Creek*, the Texas Supreme Court stated:

As a general rule, an action for declaratory judgment will not be entertained if there is pending, at the time it is filed, another action or proceeding between the same parties and in which may be adjudicated the issues involved in the declaratory action.

456 S.W.2d at 895 (citing *Pickens v. Hidalgo County Water Control & Improvement Dist. No. 16*, 284 S.W.2d 784, 784, 786 (Tex.Civ.App.—San Antonio 1955, no writ) (suit for declaratory judgment should have been dismissed where there existed prior condemnation proceeding pending in county court at law)); *see also Hawkins v. Texas Oil and Gas Corp.*, 724 S.W.2d 878, 891 (Tex.App.—Waco 1987, writ ref'd n.r.e.) (a court should refuse to entertain a declaratory judgment action if another action or proceeding is pending involving the same parties and in which may be adjudicated the same issues involved in the action for declaratory judgment).

When the plaintiffs in *Canyon Creek* filed suit for declaratory judgment, there were already pending license suspension proceedings before the Texas Liquor Control Board, the outcome of which could turn on the issue that the plaintiffs had raised in the declaratory judgment action. 456 S.W.2d at 893–94. The supreme court held that it was improper for the trial court to hear the declaratory judgment proceedings in that case:

In so far as plaintiffs are seeking a declaratory judgment for the purpose of overturning the administrative interpretation of the statute so that no further proceedings will be instituted against them, we hold that the facts of these cases do not warrant an exercise of jurisdiction by a civil court.

*Id.* at 896.

Space Master attempts to distinguish *Canyon Creek* on the ground that it involved the construction of a penal statute and a previously filed administrative action by the Texas Liquor Control Board. While Space Master is correct that the statute to be construed in *Canyon Creek* was penal in nature, the court merely stated that the general rule was even more applicable where the construction of a penal statute

was at issue, and a privilege, rather than a personal or property right was at stake in the pending administrative proceeding. 456 S.W.2d at 895. The court noted that the considerations that lead courts of equity to deny injunctive relief apply with equal force to an action for a declaratory judgment construing a penal statute. *Canyon Creek*, 456 S.W.2d at 896. One of those considerations is that a court of equity will not interfere with the attempted enforcement of a criminal statute unless the statute is unconstitutional and its enforcement will result in irreparable injury to vested property rights. *Id.* at 894, 896; *see also Dub Shaw Ford, Inc. v. Comptroller of Pub. Accounts*, 479 S.W.2d 403, 406 (Tex. Civ.App.—Austin 1972, no writ) (suit properly dismissed where there existed pending administrative proceedings between the same parties, that might adjudicate the issues involved in the declaratory judgment). The rule announced in *Canyon Creek* applies whether the proceeding is administrative or legal. *See Hawkins*, 724 S.W.2d at 891.

[8] Another consideration in determining whether the trial court properly dismissed a suit for declaratory judgment is whether the trial court's exercise of jurisdiction in the suit for declaratory judgment would deprive the plaintiff of the ability to select the appropriate forum to hear a suit. In *Abor v. Black*, 695 S.W.2d 564, 566 (Tex.1985), the court stated that the trial court should have declined to exercise jurisdiction over a declaratory judgment filed by a potential defendant in a tort action, seeking a declaration of nonliability. The court declined to grant mandamus relief, but encouraged the trial court to decline to hear the action, because the defendant in effect had chosen "the time and forum for trial by beating the potential plaintiff to the courthouse and filing suit seeking a declaration of non-liability." *Id.* at 565, 567.

In *Byrnes v. University of Houston*, 507 S.W.2d at 817, the court held that the trial court did not abuse its discretion in dismissing a suit for declaratory judgment, where there existed a prior proceeding in federal court involving the same parties and issues:

> Although separate suits including the same parties and issues may be maintained in state and federal courts simultaneously, the applicable declaratory judgment law supports the judicial discretion of the trial court to refuse to entertain jurisdiction of this declaratory action.

*See also Kenny v. Starnes*, 265 S.W.2d 639, 640 (Tex.Civ.App.—El Paso 1954, writ ref'd n.r.e.).

[9, 10] Space Master, in the case at bar, conceded that the suit for declaratory judgment involved the same parties and issues as the proceedings pending in the New Jersey state court and in the Massachusetts federal court. Space Master should not be allowed to use declaratory relief as a forum-shopping device. Based on considerations of comity, the unique nature of declaratory judgments, and the authorities above-cited, we conclude that the trial court did not abuse its discretion in dismissing Space Master's suit for declaratory judgment.

The judgment of the trial court is affirmed.



Peter Durwin WILL, Appellant,

v.

The STATE of Texas, Appellee.

No. 01-89-00393-CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 23, 1990.

Discretionary Review Refused
Oct. 24, 1990.

Defendant was convicted by jury of driving while intoxicated (DWI), enhanced

RPI 0012

Mr. Justice STEVENS took no part in the consideration or decision of this case.

Mr. Justice MARSHALL, with whom Mr. Justice BRENNAN and Mr. Justice WHITE join, concurring.

I dissented in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and I continue to believe that the Court's decision in that case unduly limited the federal courts' broad equitable power to provide effective remedies for official segregation. In this case the Court distinguishes *Milliken* and paves the way for a remedial decree directing the Department of Housing and Urban Development to utilize its full statutory power to foster housing projects in white areas of the greater Chicago metropolitan area. I join the Court's opinion except insofar as it appears to reaffirm the decision in *Milliken.*



425 U.S. 308, 47 L.Ed.2d 810

Joseph BAXTER et al., Petitioners,

v.

Nicholas A. PALMIGIANO.

Jerry J. ENOMOTO et al., Petitioners,

v.

John Wesley CLUTCHETTE et al.

Nos. 74-1187 and 74-1194.

Argued Dec. 15, 1975.

Decided April 20, 1976.

Actions were brought by state prison inmates alleging that procedures used in prison disciplinary proceedings violated their constitutional rights. In one action, the District Court, 328 F.Supp. 767, granted substantial relief, and the Court of Appeals, 497 F.2d 809, 510 F.2d 613, affirmed. In the other, the district court denied relief

and the Court of Appeals, 487 F.2d 1280, reversed. On remand by the Supreme Court, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155, the Court of Appeals, 510 F.2d 534, affirmed prior decision but modified opinion, and the Supreme Court granted certiorari in both actions. The Supreme Court, Mr. Justice White, held that prison inmates do not have right to either retained or appointed counsel in disciplinary hearings; that permitting adverse inference to be drawn from inmate's silence at his disciplinary proceeding is not, on its face, invalid practice; that mandating confrontation and cross-examination of witnesses at prison disciplinary proceedings effectively preempts area that has been left to sound discretion of prison officials; and that where there was no evidence that prison inmates in one action were subject to "lesser penalty" of loss of privileges, but rather it appeared that all were charged with "serious misconduct," requiring procedures such as notice and opportunity to respond even when inmate is faced with temporary suspension of privileges was premature.

Judgments of Courts of Appeals reversed.

Mr. Justice Brennan filed opinion concurring in part and dissenting in part in which Mr. Justice Marshall joined.

**1. Federal Civil Procedure ⚚161**

Without certification of action as class action and identification of class, action is not properly a class action. Fed.Rules Civ. Proc. rule 23(c)(1, 3), 28 U.S.C.A.

**2. Constitutional Law ⚚42.2(1, 2)**

Although one of named plaintiffs in action by state prison inmates alleging that procedures used in disciplinary proceedings at prison violated their rights to due process and equal protection had been paroled and other had died, where parties stipulated to intervention of another inmate as named party plaintiff and further stipulated that such inmate had been brought before disciplinary committee for infraction that could have also lead to state criminal proceedings,

RPI 0013

that he asked for and was denied attorney, and that he was assigned to "segregation" for unspecified number of days for infraction, such inmate had standing to raise issues involved in action before Supreme Court. U.S.C.A.Const. Amend. 14.

**3. Courts ⇐101.5(4), 383(1)**

Where state adult correction authority regulations, although concededly state law, did not even mention right to counsel when charges brought were also crimes under state law and did not suggest whether inmate's silence might be used against him in proceeding itself, complaint by prison inmate claiming that disciplinary hearing violated his due process rights did not mention or challenge any rule or regulation of authority but asked that disciplinary decision be declared invalid and its enforcement enjoined, statute requiring convening of three judge court did not appear to be applicable and thus Supreme Court was not deprived of jurisdiction on ground that case involved issues that should have been heard by three-judge court subject to review on direct appeal. 28 U.S.C.A. § 2281.

**4. Prisons ⇐13**

Prison inmates do not have right to either retained or appointed counsel in disciplinary hearings.

**5. Prisons ⇐13**

State authorities were not in error in failing to advise prison inmate that he was entitled to counsel at disciplinary hearing and that state would furnish counsel if he did not have one of his own since inmates do not have right to either retained or appointed counsel in disciplinary hearings.

**6. Prisons ⇐13**

Prison disciplinary hearings are not criminal proceedings, but if inmates are compelled in such proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered whatever immunity is required to supplant privilege and may not be required to waive such immunity. U.S.C.A. Const. Amend. 5.

**7. Prisons ⇐13**

Where no criminal proceedings were pending against state inmate, state did not insist or ask that inmate waive his Fifth Amendment privilege against self-incrimination but notified him that he was privileged to remain silent if he chose, although his silence could be used against him, and his silence in and of itself was insufficient to support adverse decision by disciplinary board, permitting adverse inference to be drawn from his silence was not invalid practice. U.S.C.A.Const. Amends. 5, 14.

**8. Prisons ⇐13**

Disciplinary proceedings in state prisons involve correctional process and important state interests other than conviction for crime.

**9. Constitutional Law ⇐266.1(1)**

Aside from privilege against compelled self-incrimination, in proper circumstances silence in face of accusation is relevant fact not barred from evidence by the due process clause. U.S.C.A.Const. Amends. 5, 14.

**10. Prisons ⇐13**

Permitting adverse inference to be drawn from prison inmate's silence at disciplinary proceeding is not, on its face, invalid practice.

**11. Prisons ⇐13**

Mandating confrontation and cross-examination of witnesses at prison disciplinary proceedings, except where prison officials could justify their denial of such privileges on grounds that would satisfy court of law, effectively preempted area that had been left to sound discretion of prison officials.

**12. Prisons ⇐13**

Since there is no general right to confront and cross-examine adverse witnesses at prison disciplinary proceedings, and since due to particular environment of prison setting it may be that certain facts relevant to disciplinary determination may not come to light until after formal hearing, such facts need not be excluded from consideration;

RPI 0014

however, allowing consideration of such facts in no way diminishes requirement that there be written statement by fact finder as to evidence relied upon and reason for disciplinary action.

### 13. Prisons ⬌13

Record in action by state prison inmates alleging that procedures used in prison disciplinary proceedings violated their rights to due process and equal protection contained no evidence of abuse of discretion by state prison officials in connection with confrontation and cross-examination of witnesses at disciplinary proceedings. U.S.C.A.Const. Amend. 14.

### 14. Prisons ⬌13

Where there was no evidence that named state prison inmates, who alleged that procedures used in prison disciplinary proceedings violated their rights to due process and equal protection, were subject to "lesser penalty" of loss of privileges but rather were charged with "serious misconduct," Court of Appeals acted prematurely to extent it required procedures such as notice and opportunity to respond even when inmate is faced with temporary suspension of privileges. U.S.C.A.Const. Amend. 14.

### Syllabus *

Respondent state prison inmates in No. 74-1194 filed an action for declaratory and injunctive relief alleging that procedures used in prison disciplinary proceedings violated their rights to due process and equal protection of the laws under the Fourteenth Amendment. The District Court granted relief, and the Court of Appeals affirmed, holding that minimum notice and a right to respond are due an inmate faced even with a temporary suspension of privileges, that an inmate at a disciplinary hearing who is denied the privilege of confronting and cross-examining witnesses must receive written reasons or the denial will be deemed prima facie evidence of abuse of discretion, and that an inmate facing prison discipline for a violation that might also be punishable in state criminal proceedings has a right to counsel (not just counsel-substitute) at the prison hearing. Respondent state prison inmate in No. 74-1187, upon being charged with inciting a prison disturbance, was summoned before prison authorities and informed that he might be prosecuted for a violation of state law, that he should consult an attorney (although the attorney would not be permitted to be present during the disciplinary hearing), and that he had a right to remain silent during the hearing but that if he did so his silence would be held against him. On the basis of the hearing, at which respondent remained silent, he was placed in "punitive segregation" for 30 days. He then filed an action for damages and injunctive relief, claiming that the disciplinary hearing violated the Due Process Clause of the Fourteenth Amendment. The District Court denied relief, but the Court of Appeals reversed, holding that an inmate at a prison disciplinary proceeding must be advised of his right to remain silent, that he must not be questioned further once he exercises that right, that such silence may not be used against him at that time or in future proceedings, and that where criminal charges are a realistic possibility prison authorities should consider whether defense counsel, if requested, should be permitted at the proceeding. *Held:* The procedures required by the respective Courts of Appeals are either inconsistent with the "reasonable accommodation" reached in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, between institutional needs and objectives and the constitutional provisions of general application, or are premature on the basis of the case records. Pp. 1556-1561.

(a) Prison inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." *Wolff, supra,* at 570, 94 S.Ct. at 2981, 41 L.Ed.2d at 959. P. 1556.

(b) Permitting an adverse inference to be drawn from an inmate's silence at his

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499, 505.

RPI 0015

disciplinary proceedings is not, on its face, an invalid practice, and there is no basis in the record for invalidating it as applied to respondent in No. 74–1187. Pp. 1556–1559.

(c) Mandating that inmates should have the privilege of confrontation and cross-examination of witnesses at prison disciplinary proceedings, except where prison officials can justify their denial of such privilege on grounds that would satisfy a court of law, effectively pre-empts the area that *Wolff, supra,* left to the sound discretion of prison officials, and there is no evidence of abuse of such discretion by the prison officials in No. 74–1194. Pp. 1559–1560.

(d) Where there was no evidence that any of the respondents in No. 74–1194 were subject to the "lesser penalty" of loss of privileges, but rather it appeared that all were charged with "serious misconduct," the Court of Appeals acted prematurely to the extent it required procedures such as notice and an opportunity to respond even when an inmate is faced with a temporary suspension of privileges. Pp. 1560–1561.

No. 74–1187, 510 F.2d 534; No. 74–1194, 510 F.2d 613, reversed.

Ronald A. Dwight, Providence, R. I., for petitioners.

Stephen J. Fortunato, Jr., Pawtucket, R. I., for respondent.

Mr. Justice WHITE delivered the opinion of the Court.

These cases present questions as to procedures required at prison disciplinary hearings and as to the reach of our recent decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

I

A. *No. 74–1194*

[1, 2] Respondents are inmates of the California penal institution at San Quentin. They filed an action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief and alleging that the procedures used in disciplinary proceedings at San Quentin violated their rights to due process and equal protection of the laws under the Fourteenth Amendment of the Constitution.[1] After an evidentiary hearing, the District Court granted substantial relief. *Clutchette v. Procunier,* 328 F.Supp. 767 (N.D.Cal.1971). The Court of Appeals for the Ninth Circuit, with one judge dissenting, affirmed, 497 F.2d 809 (1974), holding that an inmate facing a disciplinary proceeding at San Quentin was entitled to notice of the

---

1. Respondents John Wesley Clutchette and George L. Jackson brought suit "on their own behalf, and, pursuant to Rule 23(b)(1) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all other inmates of San Quentin State Prison subject to defendants' jurisdiction and affected by the policies, practices or acts of defendants complained of herein." Plaintiffs' Amended Complaint, 1 Record 33 (No. 74–1194). The District Court treated the suit as a class action, *Clutchette v. Procunier,* 328 F.Supp. 767, 769–770 (N.D.Cal.1971), but did not certify the action as a class action within the contemplation of Fed.Rules Civ. Proc. 23(c)(1) and 23(c)(3). Without such certification and identification of the class, the action is not properly a class action. *Indianapolis School Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). We were advised at oral argument in No. 74–1194 that respondent Clutchette was paroled in 1972, two years after the suit was filed; counsel for respondents conceded that the case is moot as to him. Tr. of Oral Arg. (No. 74–1194), p. 34. We were further advised that respondent Jackson died after the suit was filed. However, the parties stipulated on June 21, 1972, to the intervention of Alejandro R. Ferrel as a named party plaintiff in the suit. 3 Record 285 (No. 74–1194). The parties further stipulated the facts that, like Clutchette and Jackson, Ferrel was an inmate at San Quentin who was brought before a disciplinary committee for an infraction that could have also led to state criminal proceedings, that he asked for and was denied an attorney at the hearing, and that he was assigned to "segregation" for an unspecified number of days for the infraction. Ferrel, we were told at oral argument, is still incarcerated at San Quentin. Tr. of Oral Arg. 34 (No. 74–1194). He thus has standing as a named plaintiff to raise the issues before us in No. 74–1194.

RPI 0016

charges against him, to be heard and to present witnesses, to confront and cross-examine witnesses, to face a neutral and detached hearing body, and to receive a decision based solely on evidence presented at the hearing. The court also held that an inmate must be provided with counsel or a counsel-substitute when the consequences of the disciplinary action are "serious," such as prolonged periods of "isolation." *Id.*, at 821. The panel of the Court of Appeals, after granting rehearing to reconsider its conclusions in light of our intervening decision in *Wolff, supra,* reaffirmed its initial judgment—again with one judge dissenting—but modified its prior opinion in several respects. 510 F.2d 613 (1975). The Court of Appeals held that minimum notice and a right to respond are due an inmate faced even with a temporary suspension of privileges, that an inmate at a disciplinary hearing who is denied the privilege of confronting and cross-examining witnesses must receive written reasons for such denial or the denial "will be deemed prima facie evidence of abuse of discretion," *id.*, at 616, and—reaffirming its initial view—that an inmate facing prison discipline for a violation that might also be punishable in state criminal proceedings has a right to counsel (not just counsel-substitute) at the prison hearing. We granted certiorari and set the case for oral argument with No. 74–1187.

421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

**B.  *No. 74–1187***

Respondent Palmigiano is an inmate of the Rhode Island Adult Correction Institution serving a life sentence for murder. He was charged by correctional officers with "inciting a disturbance and disrupt[ion] of [prison] operations, which might have resulted in a riot." App. 197 (No. 74–1187). He was summoned before the prison Disciplinary Board and informed that he might be prosecuted for a violation of state law, that he should consult his attorney (although his attorney was not permitted by the Board to be present during the hearing), that he had a right to remain silent during the hearing but that if he remained silent his silence would be held against him. Respondent availed himself of the counsel-substitute provided for by prison rules and remained silent during the hearing. The Disciplinary Board's decision was that respondent be placed in "punitive segregation" for 30 days and that his classification status be downgraded thereafter.

[3] Respondent filed an action under 42 U.S.C. § 1983 for damages and injunctive relief, claiming that the disciplinary hearing violated the Due Process Clause of the Fourteenth Amendment of the Constitution.[2] The District Court held an evidentia-

---

2. The United States as *amicus curiae* suggests that No. 74–1187 is not properly before the Court because the case involves the constitutionality of regulations of the Rhode Island Adult Corrections Authority and hence should have been heard by a three-Judge court, subject to review here on direct appeal. The applicable regulations of the Authority when this case was brought had been promulgated as the result of a negotiated settlement of litigation in the District Court for the District of Rhode Island. *Morris v. Travisono,* 310 F.Supp. 857 (1970). It is conceded that they have become state law, and it would appear that they are of statewide effect. The rules on their face, however, although regulating in some detail the procedures required in prison disciplinary hearings, do not expressly grant or deny, or even mention, the right to counsel where charges brought are also a crime under state law. Nor do they suggest, one way or the other, whether

an inmate's silence may be used against him in the proceeding itself. Palmigiano's complaint did not mention or challenge any rule or regulation of the Authority; nor did it seek an injunction against the enforcement of any identified rule. What it asked was that the Board's disciplinary decision be declared invalid and its enforcement enjoined. Neither Palmigiano nor the State asked or suggested that a three-judge court be convened. It would not appear that the District Court considered the validity of any of the Authority's rules to be at stake. That court ruled Palmigiano was not entitled to be represented by counsel, not because the applicable rules forbade it but because it considered the controlling rule under the relevant cases was to this effect. The Court of Appeals, although quite aware that constitutional attacks on the Rhode Island prison rules might necessitate a three-judge court, see *Souza v. Travisono,* 498 F.2d 1120, 1121–1122 (CA1

RPI 0017

ry hearing and denied relief. The Court of Appeals for the First Circuit, with one judge dissenting, reversed, holding that respondent "was denied due process in the disciplinary hearing only insofar as he was not provided with use immunity for statements he might have made within the disciplinary hearing, and because he was denied access to retained counsel within the hearing." 487 F.2d 1280, 1292 (1973). We granted certiorari, vacated the judgment of the Court of Appeals, and remanded to that court for further consideration in light of *Wolff v. McDonnell, supra,* decided in the interim, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974). On remand, the Court of Appeals affirmed its prior decision but modified its opinion. 510 F.2d 534 (1974). The Court of Appeals held that an inmate at a prison disciplinary proceeding must be advised of his right to remain silent, that he must not be questioned further once he exercises that right, and that such silence may not be used against him at that time or in future proceedings. With respect to counsel, the Court of Appeals held:

> "[I]n cases where criminal charges are a realistic possibility, prison authorities should consider whether defense counsel, if requested, should not be let into the disciplinary proceeding, not because *Wolff* requires it in that proceeding, but because *Miranda [v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] requires it in light of future criminal prosecution." *Id.,* at 537.

We granted certiorari and heard the case with No. 74–1194. 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

II

In *Wolff v. McDonnell, supra,* drawing comparisons to *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), we said:

> "The insertion of counsel into the [prison] disciplinary process would inevitably give the proceedings a more adversary

cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." 418 U.S., at 570, 94 S.Ct., at 2981, 41 L.Ed.2d, at 959.

Relying on *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), both Courts of Appeals in these cases held that prison inmates are entitled to representation at prison disciplinary hearings where the charges involve conduct punishable as a crime under state law, not because of the services that counsel might render in connection with the disciplinary proceedings themselves, but because statements inmates might make at the hearings would perhaps be used in later state-court prosecutions for the same conduct.

Neither *Miranda, supra,* nor *Mathis, supra,* has any substantial bearing on the question whether counsel must be provided at "[p]rison disciplinary hearings [which] are not part of a criminal prosecution." *Wolff v. McDonnell, supra,* 418 U.S., at 556, 94 S.Ct., at 2979, 41 L.Ed.2d, at 956. The Court has never held, and we decline to do so now, that the requirements of those cases must be met to render pretrial statements admissible in other than criminal cases.

[4, 5] We see no reason to alter our conclusion so recently made in *Wolff* that inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." 418 U.S., at 570, 94 S.Ct., at 2981, 41 L.Ed.2d, at 959. Plainly, therefore, state authorities were not in error in failing to advise Palmigiano to the contrary, *i. e.,*

1974), evidently did not doubt its jurisdiction in this case. On the record before us, the provi-

sions of 28 U.S.C. § 2281 with respect to three-judge courts would not appear to be applicable.

that he was entitled to counsel at the hearing and that the State would furnish counsel if he did not have one of his own.

### III

Palmigiano was advised that he was not required to testify at his disciplinary hearing and that he could remain silent but that his silence could be used against him. The Court of Appeals for the First Circuit held that the self-incrimination privilege of the Fifth Amendment, made applicable to the States by reason of the Fourteenth Amendment, forbids drawing adverse inferences against an inmate from his failure to testify. The State challenges this determination, and we sustain the challenge.

[6] As the Court has often held, the Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973). Prison disciplinary hearings are not criminal proceedings; but if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered "whatever immunity is required to supplant the privilege" and may not be required to "waive such immunity." *Id.*, at 85, 94 S.Ct., at 326, 38 L.Ed.2d, at 286; *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Sanitation Men v. Sanitation Comm'r*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). In this line of cases from *Garrity* to *Lefkowitz*, the States, pursuant to statute, sought to interrogate individuals about their job performance or about their contractual relations with the State; insisted upon waiver of the Fifth Amendment privilege not to respond or to object to later use of the incriminating statements in criminal prosecutions; and, upon refusal to waive, automatically terminated employment or eligibility to contract with the State. Holding that the State could not constitutionally seek to compel testimony that had not been immunized by threats of serious economic reprisal, we invalidated the challenged statutes.

The Court has also plainly ruled that it is constitutional error under the Fifth Amendment to instruct a jury in a criminal case that it may draw an inference of guilt from a defendant's failure to testify about facts relevant to his case. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). This holding paralleled the existing statutory policy of the United States, *id.*, at 612, 85 S.Ct., at 1232, 14 L.Ed.2d, at 108, and the governing statutory or constitutional rule in the overwhelming majority of the States. 8 J. Wigmore, Evidence 425–439 (McNaughton rev. 1961).

[7] The Rhode Island prison rules do not transgress the foregoing principles. No criminal proceedings are or were pending against Palmigiano. The State has not, contrary to *Griffin*, sought to make evidentiary use of his silence at the disciplinary hearing in any criminal proceeding. Neither has Rhode Island insisted or asked that Palmigiano waive his Fifth Amendment privilege. He was notified that he was privileged to remain silent if he chose. He was also advised that his silence could be used against him, but a prison inmate in Rhode Island electing to remain silent during his disciplinary hearing, as respondent Palmigiano did here, is not in consequence of his silence automatically found guilty of the infraction with which he has been charged. Under Rhode Island law, disciplinary decisions "must be based on substantial evidence manifested in the record of the disciplinary proceeding." *Morris v. Travisono*, 310 F.Supp. 857, 873 (R.I.1970). It is thus undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board. In this respect, this case is very different from the circumstances before the Court in

the *Garrity-Lefkowitz* decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt. Here, Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case. This does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege. The advice given inmates by the decisionmakers is merely a realistic reflection of the evidentiary significance of the choice to remain silent.

Had the State desired Palmigiano's testimony over his Fifth Amendment objection, we can but assume that it would have extended whatever use immunity is required by the Federal Constitution. Had this occurred and had Palmigiano nevertheless refused to answer, it surely would not have violated the Fifth Amendment to draw whatever inference from his silence that the circumstances warranted. Insofar as the privilege is concerned, the situation is little different where the State advises the inmate of his right to silence but also plainly notifies him that his silence will be weighed in the balance.

[8] Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a party to a *civil cause*." 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961). In criminal cases, where the stakes are higher and the State's sole interest is to convict, *Griffin* prohibits

the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt. Disciplinary proceedings in state prisons, however, involve the correctional process and important state interests other than conviction for crime. We decline to extend the *Griffin* rule to this context.

[9] It is important to note here that the position adopted by the Court of Appeals is rooted in the Fifth Amendment and the policies which it serves. It has little to do with a fair trial and derogates rather than improves the chances for accurate decisions. Thus, aside from the privilege against compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause. *Adamson v. California*, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–154, 44 S.Ct. 54, 56, 68 L.Ed. 221, 223 (1923); *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed.2d 1054 (1926); *Twining v. New Jersey*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908). See also *United States v. Hale*, 422 U.S. 171, 176–177, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99, 104 (1975); *Gastelum-Quinones v. Kennedy*, 374 U.S. 469, 479, 83 S.Ct. 1819, 1824, 10 L.Ed.2d 1013, 1020 (1963); *Grunewald v. United States*, 353 U.S. 391, 418–424, 77 S.Ct. 963, 981–984, 1 L.Ed.2d 931, 950–954 (1957). Indeed, as Mr. Justice Brandeis declared, speaking for a unanimous court in the *Tod* case, *supra*, which involved a deportation: "Silence is often evidence of the most persuasive character." 263 U.S., at 153–154, 44 S.Ct., at 56, 68 L.Ed., at 224. And just last Term in *Hale*, *supra*, the Court recognized that "[f]ailure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question." 422 U.S., at 176, 95 S.Ct., at 2136, 45 L.Ed.2d, at 104.[3]

3. The Court based its statement on 3A J. Wigmore, Evidence § 1042 (Chadbourn rev. 1970), which reads as follows:

"Silence, omissions, or negative statements, as inconsistent: (1) Silence, etc., as constituting the impeaching statement. A *failure to assert*

[10] The short of it is that permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice; and there is no basis in the record for invalidating it as here applied to Palmigiano.[4]

## IV

In *Wolff v. McDonnell*, we held that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S., at 566, 94 S.Ct., at 2979, 41 L.Ed.2d, at 956. We noted that "[o]rdinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Ibid.* The right to call witnesses, like other due process rights delineated in *Wolff,* is thus circumscribed by the necessary "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.,* at 556, 94 S.Ct., at 2975, 41

L.Ed.2d, at 950. Within the reasonable limitations necessary in the prison disciplinary context, we suggested, but did not require, that the disciplinary committee "state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.,* at 566, 94 S.Ct., at 2980, 41 L.Ed.2d, at 956.

We were careful to distinguish between this limited right to call witnesses and other due process rights at disciplinary hearings. We noted expressly that, in comparison to the right to call witnesses, "[c]onfrontation and cross-examination present greater hazards to institutional interests." *Id.,* at 567, 94 S.Ct., at 2980, 41 L.Ed.2d, at 957. We said:

"If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability." *Ibid.*

We therefore concluded that "[t]he better course at this time, in a period where prison practices are diverse and somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons." *Id.,* at 569, 94 S.Ct., at 2981, 41 L.Ed.2d, at 958.

***

a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. This is conceded as a general principle of evidence (§ 1071 *infra*). There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie' an inconsistency.

"There are several common classes of cases:

"(1) Omissions *in legal proceedings* to assert what would naturally have been asserted under the circumstances.

"(2) Omissions to assert anything, or to speak with such detail or positiveness, *when formerly narrating,* on the stand or elsewhere, the matter now dealt with.

"(3) *Failure to take the stand* at all, when it would have been natural to do so.

"In all of these much depends on the individual circumstances, and in all of them the underlying test is, would it have been natural for the

person to make the assertion in question?" (Emphasis in original.) (Footnotes omitted.)

4. The record in No. 74–1187 shows that Palmigiano was provided with copies of the Inmate Disciplinary Report and the superior's investigation report, containing the charges and primary evidence against him, on the day before the disciplinary hearing. At the hearing, Captain Baxter read the charge to Palmigiano and summarized the two reports. In the face of the reports, which he had seen, Palmigiano elected to remain silent. The Disciplinary Board's decision was based on these two reports, Palmigiano's decision at the hearing not to speak to them, and supplementary reports made by the officials filing the initial reports. All of the documents were introduced in evidence at the hearing before the District Court in this case. App. 197–202 (No. 74–1187).

RPI 0021

Although acknowledging the strictures of *Wolff* with respect to confrontation and cross-examination, the Court of Appeals for the Ninth Circuit, on rehearing in No. 74–1194, went on to require prison authorities to provide reasons in writing to inmates denied the privilege to cross-examine or confront witnesses against them in disciplinary proceedings; absent explanation, failure to set forth reasons related to the prevention of one or more of the four concerns expressly mentioned in *Wolff* would be deemed prima facie abuse of discretion.

[11–13] This conclusion is inconsistent with *Wolff*. We characterized as "useful," but did not require, written reasons for denying inmates the limited right to call witnesses in their defense. We made no such suggestion with respect to confrontation and cross-examination which, as was there pointed out, stand on a different footing because of their inherent danger and the availability of adequate bases of decision without them. See 418 U.S., at 567–568, 94 S.Ct., at 2980–2981, 41 L.Ed.2d, at 957–958. Mandating confrontation and cross-examination, except where prison officials can justify their denial on one or more grounds that appeal to judges, effectively preempts the area that *Wolff* left to the sound discretion of prison officials.[5] We add that on the record before us there is no evidence of the abuse of discretion by the state prison officials.

**V**

[14] Finally, the Court of Appeals for the Ninth Circuit in No. 74–1194 held that minimum due process—such as notice, opportunity for response, and statement of reasons for action by prison officials—was necessary where inmates were deprived of privileges. 510 F.2d, at 615. We did not reach the issue in *Wolff*; indeed, we said: "We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges." 418 U.S., at 572 n. 19, 94 S.Ct., at 2982, 41 L.Ed.2d, at 960. Nor do we find it necessary to reach the issue now in light of the record before us. None of the named plaintiffs in No. 74–1194 was subject solely to loss of privileges; all were brought before prison disciplinary hearings for allegations of the type of "serious misconduct," 418 U.S., at 558, 94 S.Ct., at 2975, 41 L.Ed.2d, at 952, that we held in *Wolff* to trigger procedures therein outlined. See n. 1, *supra*. Without such a record, we are unable to consider the degree of "liberty" at stake in loss of privileges and thus whether some sort of procedural safeguards are due when only such "lesser penalties" are at stake. To the extent that the Court of Appeals for the Ninth Circuit required any procedures in such circumstances, the Court of Appeals acted prematurely, and its decision on the issue cannot stand.[6]

5. The Court of Appeals also held, in its initial opinion (unmodified in rehearing with respect to this point), that "the disciplinary committee must be required to make its fact finding determinations based solely upon the evidence presented at the hearing" in order "[f]or the right to confront and cross-examine adverse witnesses to be meaningful." 497 F.2d, at 820. Because we have held that there is no general right to confront and cross-examine adverse witnesses, it follows that the Court of Appeals' holding on this point must fall with its rejected premise. Due to the peculiar environment of the prison setting, it may be that certain facts relevant to the disciplinary determination do not come to light until after the formal hearing. It would be unduly restrictive to require that such facts be excluded from consideration, inasmuch as they may provide valuable information with respect to the incident in question and may assist prison officials in tailoring penalties to enhance correctional goals. In so stating, however, we in no way diminish our holding in *Wolff* that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." 418 U.S., at 564, 94 S.Ct., at 2979, 41 L.Ed.2d, at 955.

6. Petitioners in No. 74–1194 have not challenged the holdings of the Court of Appeals for the Ninth Circuit with respect to notice, 497 F.2d, at 818, or to the right to be heard by a "neutral and detached" hearing body, *id.*, at 820. Cf. 418 U.S., at 570–571, 94 S.Ct., at 2981–2982, 41 L.Ed.2d, at 959–960. Because

RPI 0022

We said in *Wolff v. McDonnell:* "As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable accommodation between the interests of the inmates and the needs of the institution." 418 U.S., at 572, 94 S.Ct., at 2982, 41 L.Ed.2d, at 960. We do not retreat from that view. However, the procedures required by the Courts of Appeals in Nos. 74–1187 and 74–1194 are either inconsistent with the "reasonable accommodation" reached in *Wolff,* or premature on the bases of the records before us. The judgments in Nos. 74–1187 and 74–1194 accordingly are *Reversed.*

Judgments reversed.

Mr. Justice STEVENS took no part in the consideration or decision of these cases.

Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL joins, concurring in part and dissenting in part.

I agree that consideration of the procedural safeguards necessary where an inmate is deprived only of privileges is premature on this record, and thus I join Part V of the Court's opinion, which leaves open whether an inmate may be deprived of privileges in the absence of due process safeguards.

Parts II and IV of the Court's opinion simply reaffirm *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935

(1974). I continue to believe that *Wolff* approved procedural safeguards short of the minimum requirements of the Due Process Clause, and I dissent from Parts II and IV for the reasons stated by my Brother Marshall, 418 U.S., at 580, 94 S.Ct., at 2986, 41 L.Ed.2d, at 964.

Part III of the Court's opinion, however, confronts an issue not present in *Wolff*[1] and in my view reaches an erroneous conclusion. The Court acknowledges that inmates have the right to invoke the privilege against compulsory self-incrimination in prison disciplinary proceedings, *ante,* at 1556, but nevertheless holds that "permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice," *ante,* at 1558, and was proper in the circumstances of this case. This conclusion cannot be reconciled with the numerous cases holding that the government is barred from penalizing an individual for exercising the privilege; precedents require the holding that if government officials ask questions of an individual to elicit incriminating information, as happened here, the imposition of any substantial sanction on that individual for remaining silent violates the Fifth Amendment. That principle prohibits reliance on any inference of guilt from the exercise of the privilege in the context of a prison disciplinary hearing.

I

As we have frequently and consistently recognized:

"The constitutional privilege against self-incrimination has two primary in-

these holdings are no longer in issue, it is unnecessary for us to consider them.

1. I agree that No. 74–1194 is not moot, since the intervening plaintiff (Ferrell) has a personal stake in the outcome of this litigation. But the citation of *Indianapolis School Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), is inapposite. We held that case moot because the named plaintiffs no longer had a personal stake in the outcome, and the action had not been formally certified as a class action. *Id.,* at 129, 95 S.Ct., at 849, 43 L.Ed.2d, at 77. We did not, however, hold that without

such formal certification "the action is not properly a class action." *Ante,* at 1554 n. 1. *Jacobs* applies only to the determination of mootness, and did not deal with whether, for example, a court of appeals may treat an action as a class action in the absence of formal certification by the district court. Moreover, the propriety of the certification need not be addressed, since there is a plaintiff with a personal interest in the outcome. *Youakim v. Miller,* 425 U.S. 231, at 236–237 n. 2, 96 S.Ct. 1399, at 1402, 47 L.Ed.2d 701, at 706–707.

RPI 0023

terrelated facets: The Government may not use compulsion to elicit self-incriminating statements, see, *e. g., Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195 [35 L.Ed. 1110], and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion. See, *e. g., Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513." *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 57 n. 6, 84 S.Ct. 1594, 1598, 12 L.Ed.2d 678, 683 (1964). Indeed, only weeks ago we said that "the privilege protects against the use of compelled statements *as well as* guarantees the right to remain silent absent immunity." *Garner v. United States*, 424 U.S. 648, at 653, 96 S.Ct. 1178, at 1182, 47 L.Ed.2d 370, at 376 (1976) (emphasis supplied). *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), held that the Fifth Amendment—the "essential mainstay" of our "American system of criminal prosecution," *id.*, at 7, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659—protects "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Id.*, at 8, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659. See *Spevack v. Klein*, 385 U.S. 511, 514, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). As The Chief Justice noted last Term: "This Court has always broadly construed [the Fifth Amendment] protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action." *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574, 585 (1975). Further, "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)." *Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 282 (1973). See *Maness v. Meyers, supra*, 419 U.S., at 473, 95 S.Ct., at 597, 42 L.Ed.2d, at 592 (White, J., concurring in result).

Thus, the Fifth Amendment not only excludes from use in criminal proceedings any evidence obtained from the defendant in violation of the privilege, but also is operative before criminal proceedings are instituted: it bars the government from using compulsion to obtain incriminating information from any person. Moreover, the protected information "does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution. . . . *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951)." *Maness v. Meyers, supra*, at 461, 95 S.Ct., at 592, 42 L.Ed.2d, at 585. And it is not necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection. " 'The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.' " *Grunewald v. United States*, 353 U.S. 391, 421, 77 S.Ct. 963, 982, 1 L.Ed.2d 931, 953 (1957), quoting *Slochower v. Board of Education*, 350 U.S. 551, 557–558, 76 S.Ct. 637, 641, 100 L.Ed. 692, 699 (1956). See E. Griswold, The Fifth Amendment Today 10–22 (1955); Ratner, Consequences of Exercising the Privilege Against Self-Incrimination, 24 U.Chi.L.Rev. 472 (1957).

Accordingly, the fact that no criminal proceedings were pending against Palmigiano, *ante*, at 1557, does not answer the crucial question posed by this case. The evidentiary use of his statements in a criminal proceeding lurked in the background, but the significant element for this case is that the Fifth Amendment also prohibits the government from compelling an individual to disclose information that might tend to connect him with a crime. *Maness v. Meyers, supra*, pointed up this distinction in its recognition that availability of motions to suppress compelled testimonial evidence

RPI 0024

do not remedy the Fifth Amendment violation. 419 U.S., at 460, 463, 95 S.Ct., at 592, 42 L.Ed.2d, at 584.

## II

It was this aspect of the privilege that we relied on in a line of cases beginning with *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and leading up to *Lefkowitz v. Turley, supra.* The Court says today that "this case is very different," *ante,* at 1557, but in my view the *Garrity-Lefkowitz* cases are compelling authority that drawing an adverse inference from an inmate's exercise of the privilege to convict him of a disciplinary offense violates the Fifth Amendment.

In *Garrity* policemen were summoned to testify in the course of an investigation of police corruption. They were told that they could claim the privilege, but would be discharged if they did. *Garrity* held that imposition of the choice between self-incrimination and job forfeiture denied the constitutionally required "free choice to admit, to deny, or to refuse to answer." *Lisenba v. California,* 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166, 182 (1947). Subsequent criminal convictions were therefore set aside on the ground that the unconstitutionally compelled testimony should not have been admitted in evidence at trial.

In *Spevack v. Klein, supra,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, decided the same day as *Garrity,* an attorney refused to honor a subpoena calling for production of certain financial records; the sole basis for the refusal was the privilege against self-incrimination. He was disbarred for exercising the privilege, and the disbarment was challenged in this Court as infringing the Fifth Amendment. Relying on *Malloy v.*

*Hogan, supra,* 378 U.S., at 8, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659, *Spevack* held that the privilege protects individuals against any penalty for their silence and that its protection bars "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" 385 U.S., at 515, 87 S.Ct., at 629, 17 L.Ed.2d, at 577.[2] See *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106, 109 (1965). *Spevack* expressly stated that "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion," 385 U.S., at 516, 87 S.Ct., at 628, 17 L.Ed.2d, at 578, and therefore held that by inferring professional misconduct, and penalizing that misconduct, solely on the basis of an invocation of the privilege, the State had violated the Fifth Amendment.

*Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), involved a policeman called to testify before a grand jury investigating police corruption. He was warned of his constitutional right to refuse to give any incriminating information, but was also asked to waive immunity, and told that if he refused to do so, a state statute required that he be discharged. He refused to waive immunity and was discharged. *Gardner* invalidated the state statute on the ground that the Fifth Amendment does not permit the government to use its power to discharge employees to coerce disclosure of incriminating evidence. *Id.,* at 279, 88 S.Ct., at 1916, 20 L.Ed.2d, at 1087. *Sanitation Men v. Sanitation Comm'r,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), decided the same day, turned on the same ground.[3]

---

2. Although this quotation is from the plurality opinion of four Justices, Mr. Justice Fortas, who concurred in the judgment, "agree[d] that Spevack could not be disbarred for asserting his privilege against self-incrimination," 385 U.S., at 520, 87 S.Ct., at 631, 17 L.Ed.2d, at 581, thus providing a majority for that proposition. He wrote separately because he was of the view that state employees enjoyed a lesser protection. He agreed with the result, however,

because Spevack—like Palmigiano—was not a state employee. *Ibid.* See *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

3. In *Sanitation Men* 15 sanitation employees called before the Sanitation Commissioner investigating alleged improprieties were told that a claim of the privilege as a basis for refusing to answer questions concerning their official

RPI 0025

*Lefkowitz v. Turley, supra,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274, the most recent decision involving noncriminal penalties for exercising the privilege, concerned two architects summoned to testify before a grand jury investigating charges of corruption relating to state contracts. They refused to waive the privilege, and a state statute provided that such a refusal would result in cancellation of existing state contracts and ineligibility for future contracts for five years. The architects brought suit, claiming that the statute violated the privilege against compulsory self-incrimination. The Court held that in the absence of a grant of immunity the government may not compel an individual to give incriminating answers. 414 U.S., at 79, 94 S.Ct., at 323, 38 L.Ed.2d, at 282.[4] A "substantial economic sanction" in the form of loss of contracts was held sufficient to constitute compulsion within the meaning of the Fifth Amendment. *Id.,* at 82, 94 S.Ct., at 324, 38 L.Ed.2d, at 284. The penalty, again imposed in a noncriminal context, was held to infringe the Fifth Amendment.

It follows that settled jurisprudence until today has been that it is constitutionally impermissible for the government to impose noncriminal penalties as a means of compelling individuals to forgo the privilege. The Court therefore begs the question by "declin[ing] to extend the *Griffin* rule" to prison disciplinary proceedings, *ante,* at 1558. Affirmance of the Court of Appeals' holding that reliance on an inmate's silence is barred by the Fifth Amendment is required

by *Spevack, Gardner, Sanitation Men,* and *Lefkowitz.*

The Court's attempted distinction of those cases plainly will not wash. To be sure, refusal to waive the privilege resulted in automatic imposition of some sanction in all of those cases. The Court reasons that because disciplinary decisions must be based on substantial record evidence, *Morris v. Travisono,* 310 F.Supp. 857, 873 (RI 1970),[5] and Palmigiano's silence "at the hearing in the face of evidence that incriminated him . . . was given no more evidentiary value than was warranted by the facts surrounding his case," *ante,* at 1557, no automatic imposition of a sanction results, and therefore the use of such silence "does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege," *ibid.*

But the premise of the *Garrity-Lefkowitz* line was not that compulsion resulted from the automatic nature of the sanction, but that a sanction was imposed that made costly the exercise of the privilege. Plainly the penalty imposed on Palmigiano—30 days in punitive segregation and a downgraded classification—made costly the exercise of the privilege no less than loss of government contracts or discharge from a state job. Even accepting the Court's assertion that a disciplinary conviction does not automatically follow from an inmate's silence, in sanctioning reliance on silence as probative of guilt of the disciplinary offense charged, the Court allows prison offi-

duties would result in their discharge. Three employees answered and denied the charges, but when later called before grand juries refused to waive immunity and were discharged for doing so. The Court held that to put the employees to a choice between their constitutional rights and their jobs was compulsion that violated the privilege. 392 U.S., at 284, 88 S.Ct., at 1919, 20 L.Ed.2d, at 1092.

4. "[T]he State intended to accomplish what *Garrity* has specifically prohibited—to compel testimony that had not been immunized." 414 U.S. at 82, 94 S.Ct. at 325, 38 L.Ed.2d at 284.

5. Although *Morris* imposes a substantial-evidence standard for appellate review of findings

in disciplinary proceedings, nothing in that case supports the Court's assumption that an inmate's silence alone would not meet this evidentiary standard. *Ante,* at 1557; cf. *ante,* at 1555 n. 2. But if silence alone provides an evidentiary premise sufficient for discipline, the Court's distinction of the *Garrity-Lefkowitz* cases crumbles. I therefore read the Court's opinion to imply that the Fifth Amendment bars conviction of a disciplinary violation based solely on an inmate's silence. In No. 74-1187, petitioners concede that an inmate's silence, without more, would not be substantial evidence.

RPI 0026

cials to make costly the exercise of the privilege, something *Garrity-Lefkowitz* condemned as prohibited by the Fifth Amendment. For it cannot be denied that the disciplinary penalty was imposed to some extent, if not solely,[6] as a sanction for exercising the constitutional privilege. See *Griffin v. California, supra,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; *United States v. Jackson,* 390 U.S. 570, 581–582, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138, 146 (1968). That plainly violates the Fifth Amendment.

It is inconsequential that the State is free to determine the probative weight to be attached to silence. *Garrity-Lefkowitz* did not consider probative value, and other precedents deny the State power to attach any probative weight whatever to an individual's exercise of the privilege, as I develop more fully in Part IV.

The compulsion upon Palmigiano is as obvious as the compulsion upon the individuals in *Garrity-Lefkowitz.* He was told that criminal charges might be brought against him. He was also told that anything he said in the disciplinary hearing could be used against him in a criminal proceeding.[7] Thus, the possibility of self-incrimination was just as real and the threat of a penalty just as coercive. Moreover, the Fifth Amendment does not distinguish among types or degrees of compulsion. It prohib-

its " 'inducement of any sort.' " *Bram v. United States,* 168 U.S. 532, 548, 18 S.Ct. 183, 189, 42 L.Ed. 568, 575 (1897). "We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." *Malloy v. Hogan,* 378 U.S., at 7, 84 S.Ct., at 1493, 12 L.Ed.2d, at 659. Palmigiano was forced to choose between self-incrimination and punitive segregation or some similar penalty. Since the Court does not overrule the *Garrity-Lefkowitz* group of decisions, those precedents compel the conclusion that this constituted impermissible compulsion.

### III

The Court also draws support from the "prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Ante,* at 1558. That rule may prevail, but it did not have the approval of this Court until today. Some commentators have suggested that permitting an adverse inference in some civil cases violates the Fifth Amendment. Comment, Penalizing the Civil Litigant Who Invokes the Privilege Against Self-Incrimination, 24 U.Fla.L.Rev. 541, 546 (1972); Comment, 1968, U.Ill.L.F. 75; Note, Use of

---

6. As the Court notes, the only evidence, other than Palmigiano's silence, before the Disciplinary Board consisted of written reports made by the prison officials who filed the initial charges against Palmigiano. On the whole, the record inspires little confidence that his silence was not the sole basis for his disciplinary conviction. At the hearing a prison official read the disciplinary charges to Palmigiano and then asked him: "What happened here, Nick?" Palmigiano's response was again to request the presence of counsel, which had previously been denied. When the renewed request was denied, Palmigiano stated that he would remain silent on the advice of counsel. The official thereafter asked: "Do you intend to answer any questions for the board?" Consistent with his earlier statement, Palmigiano replied that he did not. The Board excused him from the hearing room; he was called back within five minutes and informed that he had been found guilty and sentenced to 30 days' punitive segre-

gation, with a possible downgrade in his classification.

7. In this respect it is not clear that all of the *Morris* requirements were observed in Palmigiano's disciplinary hearing. Under the prison's rules, each inmate must be advised that "statements he makes in his defense at a disciplinary hearing are probably not admissible for affirmative use by the prosecution at a trial." Brief for Petitioners in No. 74–1187, pp. 4–5. Palmigiano, however, was told that anything he said could be used against him at a criminal trial. In any event, the uncertain warning required by the prison rules would hardly satisfy constitutional requirements. See n. 8, *infra.* In this respect, the Court's holding that the prisoner has no right to counsel exacerbates the difficulty, for surely the advice of counsel is essential in this complex area. See *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

RPI 0027

the Privilege Against Self-Incrimination in Civil Litigation, 52 Va.L.Rev. 322 (1966). I would have difficulty holding such an inference impermissible in civil cases involving only private parties. But I would hold that compulsion violating the privilege is present in any proceeding, criminal or civil, where a *government official* puts questions to an individual with the knowledge that the answers might tend to incriminate him. See *Garner v. United States,* 424 U.S. at 653, 96 S.Ct. at 1181, 47 L.Ed.2d at 376; *Sanitation Men v. Sanitation Comm'r,* 392 U.S., at 284, 88 S.Ct., at 1919, 20 L.Ed.2d, at 1092.

Such a distinction is mandated by one of the fundamental purposes of the Fifth Amendment: to preserve our adversary system of criminal justice by preventing *the government* from circumventing that system by abusing its powers. *Garner v. United States, supra,* 424 U.S. at 653, 96 S.Ct. at 1182, 47 L.Ed.2d at 376. Only a few weeks ago, we said "That system is undermined when a government deliberately seeks to avoid the burdens of independent investigation by compelling self-incriminating disclosures." *Ibid.*

"One of the most important functions of the privilege is to protect all persons, whether suspected of crime or not, from abuse by the government of its powers of investigation, arrest, trial and punishment. It was not solicitude for persons accused of crime but the desire to maintain the proper balance between government and the persons governed that gave rise to the adoption of these constitutional provisions." Ratner, Consequences of Exercising the Privilege Against Self-Incrimination, 24 U.Chi.L.Rev. 472, 484 (1957) (footnote omitted).

In a civil suit involving only private parties, no party brings to the battle the awesome powers of the government, and therefore to permit an adverse inference to be drawn from exercise of the privilege does not implicate the policy considerations underlying the privilege. But where the government "deliberately seeks" the answers to incriminatory questions, allowing it to benefit from the exercise of the privilege aids, indeed encourages, governmental circumvention of our adversary system. In contrast, an affirmance of the judgment in Palmigiano's case would further obedience of the government to the commands of the Fifth Amendment. Cf. *United States v. Karathanos,* 531 F.2d 26, 35 (CA2 1976) (Oakes, J., concurring); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349 (1974).

Nothing in this record suggests that the State does not use the disciplinary procedure as a means to gather evidence for criminal prosecutions. On the contrary, Palmigiano was told that he might be prosecuted, which indicates that criminal proceedings are brought in some instances. And if the State does not intend to initiate criminal proceedings, the Fifth Amendment problem can be readily avoided simply by granting immunity for any testimony given at disciplinary hearings.[8]

---

8. Although my view is that only transactional immunity can remove the self-incrimination problem, *Piccirillo v. New York,* 400 U.S. 548, 562, 91 S.Ct. 520, 527, 27 L.Ed.2d 596, 605 (1971) (Brennan, J., dissenting), that view is not presently the law. See, e. g., *Lefkowitz v. Turley,* 414 U.S. 70, 84, 94 S.Ct. 316, 325, 38 L.Ed.2d 274, 285 (1973); *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

Although Rhode Island prison officials are not authorized by statute to grant immunity, my Brother White has suggested that a witness who fails to persuade a judge that a prospective answer is incriminatory "is nevertheless protected by a constitutionally imposed use im-

munity if he answers in response to the [judge's] order and under threat of contempt." *Maness v. Meyers,* 419 U.S., at 474, 95 S.Ct., at 599, 42 L.Ed.2d, at 592 (concurring in result). See *Fowler v. Vincent,* 366 F.Supp. 1224, 1228 (S.D.N.Y.1973); *Sands v. Wainwright,* 357 F.Supp. 1062, 1093 (M.D.Fla.1973). Although an inmate would not be testifying in response to a court order, his answers in response to questions of prison officials are nevertheless compelled within the meaning of the Fifth Amendment. Thus, there would be immunity for any statements given. The inmate must, however, be informed of the existence of the immunity. As my Brother White said, "a witness may not be required to answer a question if there is some rational basis for believing that

RPI 0028

## IV

I would therefore affirm the judgment of the Court of Appeals in No. 74–1187 insofar as that court held that an inmate's silence may not be used against him in a prison disciplinary proceeding. This would make unnecessary addressing the question whether exercise of the privilege may be treated as probative evidence of guilt. Since the Court, however, indicates that invocation of the privilege is probative in these circumstances, *ante*, at 1558–1559, I express my disagreement. For we have repeatedly emphasized that such an inference has no foundation. Indeed, the very cases relied upon by the Court expose its error and support the conclusion that Palmigiano's silence could not be treated as probative.

*United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), quoted *ante*, at 1558, involved a deportation proceeding in which the deportee failed to deny that he was an alien. But he also failed to claim or attempt to prove that he was a citizen. Alienage was not an element of any crime, and his silence was held probative of his alienage. The inference was plainly permissible since the deportee faced no possibility of incrimination, and there was therefore no implication of the privilege. But Palmigiano's predicament was that answers to the questions put to him by the prison officials could connect him with a crime.

The Court also quotes part of a sentence from *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). We said in *Hale* that "[i]n most circumstances silence is so ambiguous that it is of little probative force." *Id.*, 419 U.S. at 176, 95 S.Ct. at 2136, 45 L.Ed.2d at 104. We also noted that its probative force increases where a person "would be more likely than not to dispute an untrue accusation." *Ibid.* We emphasized that "[f]ailure to contest an assertion, however, is considered evidence of acquies-

cence *only* if it would have been natural under the circumstances to object to the assertion in question." *Ibid.* (emphasis supplied). That was not the case since Hale's silence was in response to notice that he had a right to remain silent, and that any statements he made would be used against him in court. These excerpts from *Hale* require the conclusion that Palmigiano's silence also had no probative force. Palmigiano was also advised that he had a right to remain silent, that he might be prosecuted, and that anything he said could be used against him in court.

Finally, *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), is particularly persuasive authority that Palmigiano's silence is not probative. We there considered whether one Halperin's exercise of the privilege was probative of guilt, and we concluded that his silence, in the circumstances, was "wholly consistent with innocence." *Id.*, at 421, 77 S.Ct., at 982, 1 L.Ed.2d, at 952. "Halperin repeatedly insisted . . . that he was innocent and that he pleaded his Fifth Amendment privilege solely on the advice of counsel." *Id.*, at 422, 77 S.Ct., at 983, 1 L.Ed.2d, at 953. Similarly, Palmigiano here maintained that he was innocent and that he claimed the privilege on the advice of counsel. *Grunewald* was a situation where "the Fifth Amendment claim was made before a grand jury where Halperin was a compelled, and not a voluntary, witness; where he was not represented by counsel; where he could summon no witnesses; and where he had no opportunity to cross-examine witnesses testifying against him." *Ibid.* That was similar to Palmigiano's situation; inmates have only a very limited right to call witnesses, and an even more limited right of cross-examination, *ante*, at 1559. Grunewald is thus most persuasive authority that Palmigiano's silence was not probative. See *Flint v. Mullen*, 499 F.2d 100, 103

---

it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him." *Maness v. Meyers*,

*supra*, 419 U.S., at 473, 95 S.Ct., at 598, 42 L.Ed.2d, at 592. (emphasis in original).

RPI 0029

(CA1), cert. denied, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974).[9]

To accord silence probative force in these cases overlooks the hornbook teaching "that one of the basic functions of the privilege is to protect *innocent* men." *Grunewald v. United States, supra,* 353 U.S. at 421, 77 S.Ct. at 982, 1 L.Ed.2d at 952 (emphasis in original). If this Court's insensitivity to the Fifth Amendment violation present in this case portends still more erosion of the privilege, state courts and legislatures will remember that they remain free to afford protections of our basic liberties as a matter of state law. See *Michigan v. Mosley,* 423 U.S. 96, 120–121, 96 S.Ct. 321, 332, 46 L.Ed.2d 313, 334 (1975) (Brennan, J., dissenting). Contrary to this Court's interpretation of the Federal Constitution's privilege against compulsory self-incrimination in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the California Supreme Court recently construed California's constitutional prohibition to forbid use of an accused's inculpatory statement obtained in violation of custodial interrogation safeguards announced in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court said, *People v. Disbrow,* 16 Cal.3d 101, 113–115, 127 Cal. Rptr. 360, 368, 545 P.2d 272, 280 (1976): "We . . . declare that *Harris* is not persuasive authority in any state prosecution in California. . . . We pause . . . to reaffirm the independent nature of the California Constitution and our responsibility to separately define and protect the rights of California citizens despite conflicting decisions of the United States Supreme Court interpreting the federal Constitution." [10]

The fact that Palmigiano is a prison inmate cannot, of course, distinguish this case from the cases in the *Garrity-Lefkowitz* line, since "a prisoner does not shed his basic constitutional rights at the prison gate." *Wolff v. McDonnell,* 418 U.S., at 581, 94 S.Ct. 2963, at 2987, 41 L.Ed.2d 935, at 965 (Marshall, J., dissenting); see *Jackson v. Bishop,* 404 F.2d 571, 576 (CA8 1968) (Blackmun, J.). I must therefore view today's decision as another regrettable disregard of Mr. Justice Frankfurter's admonition that our interpretation of the privilege

9. The other cases cited by the Court likewise do not support a holding that Palmigiano's silence should have probative force. No self-incrimination problem was presented in *Gastelum-Quinones v. Kennedy,* 374 U.S. 469, 83 S.Ct. 1819, 10 L.Ed.2d 1013 (1963). That case involved a deportation proceeding, and the subject of that proceeding remained silent, but not for Fifth Amendment reasons. Moreover, the Court held that "deportation is a drastic sanction" and "must therefore be premised upon evidence . . . more directly probative than a mere inference based upon the alien's silence." *Id.,* at 479, 83 S.Ct., at 1824, 10 L.Ed.2d, at 1020. We held that particular deportation order not based on substantial evidence. *Id.,* at 480, 83 S.Ct., at 1825, 10 L.Ed.2d, at 1020. Similarly, the Court did not address any self-incrimination issue relevant to the instant case in *Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947), and *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908). Those cases were based on the premise, overruled in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that the Fifth Amendment protection against self-incrimination was not applicable to the States. Finally, whether *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), remains law is subject to much doubt. See *United States v. Hale,* 422 U.S. 171, 175 n. 4, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99, 104 (1975); *United States v. Grunewald,* 233 F.2d 556, 575 (CA2 1956), (Frank, J., dissenting), rev'd, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

10. Other state courts have also rejected *Harris* as a matter of state constitutional law. *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975); *State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971). In addition, admission of incriminating statements for impeachment purposes can be prohibited by statute notwithstanding the decision in *Harris. Butler v. State,* 493 S.W.2d 190 (Tex.Cr.App.1973). See *United States v. Jordan,* 20 U.S.C.M.A. 614, 44 C.M.R. 44 (1971). Finally, it should be noted that there need not be a state constitutional counterpart to the Fifth Amendment or a specific statutory prohibition to reach this result; use of incriminating statements can be prohibited by a state court as a matter of public policy in that State. See *In re Pillo,* 11 N.J. 8, 93 A.2d 176 (1952); *State v. Miller,* 67 N.J. 229, 245 n. 1, 337 A.2d 36, 45 n. 1 (1975) (Clifford, J., concurring in part and dissenting in part).

RPI 0030

is not faithful to the Founding Fathers' purpose when it does not reflect the teaching of history:

"This command of the Fifth Amendment . . . registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States." *Ullmann v. United States,* 350 U.S. 422, 426–427, 76 S.Ct. 497, 500, 100 L.Ed. 511, 518 (1956) (footnotes omitted).



425 U.S. 391, 48 L.Ed.2d 39

Solomon FISHER et al., Petitioners,

v.

UNITED STATES et al.

UNITED STATES et al., Petitioners,

v.

C. D. KASMIR and Jerry A. Candy.

Nos. 74–18, 74–611.

Argued Nov. 3, 1975.

Decided April 21, 1976.

In two cases, enforcement actions were commenced by Government to compel production of accountants' documents in pos-

session of taxpayers' attorneys. In one case, the United States District Court for the Northern District of Texas granted enforcement and the Court of Appeals for the Fifth Circuit reversed the enforcement order, 499 F.2d 444. In a second case, the District Court for the Eastern District of Pennsylvania granted enforcement, 352 F.Supp. 731, and the Court of Appeals for the Third Circuit affirmed, 500 F.2d 683. Certiorari was granted to resolve the conflict created. The Supreme Court, Mr. Justice White, held that taxpayers' Fifth Amendment privilege was not violated by enforcement of documentary summons directed toward their attorneys, for production of accountants' documents which had been transferred to attorneys in connection with an Internal Revenue Service investigation, whether or not the Amendment would have barred a subpoena directing taxpayers to produce documents while they were in taxpayers' hands, and fact that attorneys were agents of taxpayers did not change result; and that compliance with a summons directing taxpayers to produce accountants' documents, which were not taxpayers' "private papers," would involve no incriminating testimony within protection of Fifth Amendment, and thus such documents were not, under theory of attorney-client privilege, immune from production in hands of taxpayers' attorneys to whom they had been transferred in connection with Internal Revenue Service investigation.

Judgment of Court of Appeals for Fifth Circuit in No. 74–611 reversed; judgment of Court of Appeals for Third Circuit in No. 74–18 affirmed.

Mr. Justice Brennan concurred in the judgment and filed an opinion.

Mr. Justice Marshall concurred in the judgment and filed an opinion.

1. Witnesses ⏴=298

Enforcement of a summons to produce documents against a taxpayer's lawyer would not "compel" taxpayer to do anything and would not compel him to be a

RPI 0031

should

**403**

include reasonable counsel fees as part of the costs to be assessed against the respondents. As so modified, the judgment of the Court of Appeals is

Affirmed.

Mr. Justice MARSHALL took no part in the consideration or decision of this case.



**390 U.S. 377**

Thomas Earl SIMMONS et al., Petitioners,

v.

UNITED STATES.

No. 55.

Argued Jan. 15, 1968.

Decided March 18, 1968.

The defendants were convicted of armed robbery of federally insured savings and loan association. The United States District Court for the Northern District of Illinois, Eastern Division, rendered judgment and they appealed. The United States Court of Appeals for the Seventh Circuit, 371 F.2d 296, affirmed in part and reversed in part, and certiorari was granted. The Supreme Court, Mr. Justice Harlan, held that testimony given by defendant to meet standing requirements to raise objection that evidence is fruit of unlawful search and seizure should not be admissible against him at trial on question of guilt or innocence.

Affirmed in part and reversed and remanded in part.

Mr. Justice Black and Mr. Justice White dissented in part.

**1. Criminal Law ⇐339**

Improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals in that witness may have obtained only brief glimpse of criminal or may have seen him under poor conditions; even if police subsequently follow most correct photographic identification procedures and show witness pictures of number of individuals without indicating whom they suspect, there is some danger that witness may make an incorrect identification and this danger will be increased if police display to witness only picture of individual who generally resembles person he saw.

**2. Criminal Law ⇐339**

The danger that initial identification by photograph may result in convictions based on misidentification may be substantially lessened by course of cross-examination at trial which exposes to jury the method's potential for error.

**3. Criminal Law ⇐339**

The Supreme Court is unwilling to prohibit employment of method of initial identification by photograph, either in exercise of court's supervisory power or as a matter of constitutional requirement; instead, each case must be considered on its own facts, and convictions based on eyewitness identification at trial following pretrial identification by photograph will be set aside on that ground only if photographic identification procedure was so impermissibly suggestive as to give rise to very substantial likelihood of irreparable misidentification.

**4. Constitutional Law ⇐266**
**Criminal Law ⇐1169(1)**

Defendant's pretrial identification by means of photographs was not so unnecessarily suggestive and conducive to misidentification as to deny him due process or to require reversal of his conviction, where serious felony had been committed, perpetrators were still at large, inconclusive clues led to defendant, it was essential for FBI agents swiftly

RPI 0032

to determine whether they were on the right track, and there was little chance that the procedure utilized led to mis-identification of defendant.

**5. Criminal Law ⬤441**

"Statement" in Jencks Act providing that after witness has testified for government in federal criminal prosecution the government must, on request of defense, produce any statement of witness in possession of United States which relates to subject matter as to which witness has testified means a written statement made by the witness and signed or otherwise adopted or approved by him.    18 U.S.C.A. § 3500.

> See publication Words and Phrases for other judicial constructions and definitions.

**6. Criminal Law ⬤627.6(2)**

The Jencks Act requires photographs to be produced if they constitute a part of a written statement.    18 U.S. C.A. § 3500.

**7. Criminal Law ⬤627.6(2)**

Photographs were not part of statements which were approved by witnesses and therefore were not producible under Jencks Act where the statements were made on the day of the robbery and at time the FBI and police had no photographs of defendants and the first pictures were not acquired and shown to witnesses until morning of following day.    18 U.S.C.A. § 3500.

**8. Criminal Law ⬤441**

Refusal of district court to order production of photograph of defendant was not abuse of discretion where defense knew that photographs had played role in identification process and there was no attempt to have pictures produced prior to trial under discovery and inspection rule, and when production of pictures was sought at trial the defense did not explain why they were needed but simply argued that production was required under Jencks Act, and strength

of eyewitness identifications of defendant rendered it highly unlikely that non-production of photographs caused him any prejudice.    Fed.Rules Crim.Proc. rule 16, 18 U.S.C.A.;  18 U.S.C.A. § 3500.

**9. Criminal Law ⬤406(4), 1169(12)**

Where defendant moved to suppress as evidence, on ground of illegal search and seizure, a suitcase containing incriminating evidence and, to establish his standing to so move, he admitted ownership of suitcase, it was reversible error to use this testimony against defendant on issue of his guilt.  U.S.C.A. Const. Amend. 4.

**10. Criminal Law ⬤394.6(1)**

In order to effectuate Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, defendants in federal prosecutions have the right, upon motion and proof, to have excluded from trial evidence secured by means of unlawful search and seizure. U.S.C.A.Const. Amend. 4.

**11. Criminal Law ⬤394.4(1)**

The rule excluding evidence secured by means of unlawful search and seizure is essential part of both Fourth and Fourteenth    Amendments.    U.S.C.A. Const. Amends. 4, 14.

**12. Criminal Law ⬤394.5(2)**

Rights assured by Fourth Amendment are personal rights, and may be enforced by exclusion of evidence secured by means of unlawful search and seizure only at instance of one whose own protection was infringed by search and seizure.  U.S.C.A.Const. Amend. 4.

**13. Criminal Law ⬤394.5(2)**

When possession of seized evidence is itself an essential element of offense with which defendant is charged, government is precluded from denying that defendant has requisite possessory interest to challenge admission of evidence as having been secured by means of unlawful search and seizure.  U.S.C.A.Const. Amend. 4.

RPI 0033

**14. Criminal Law ⊂⊃394.5(2)**

Defendant need have no possessory interest in searched premises in order to have standing to object that evidence is inadmissible as having been secured by means of unlawful search and seizure; it is sufficient that he be legitimately on the premises when the search occurs. U.S.C.A.Const. Amend. 4.

**15. Criminal Law ⊂⊃406(4)**

Testimony given by defendant to meet standing requirements to raise objection that evidence is fruit of unlawful search and seizure should not be admissible against him at trial on question of guilt or innocence. U.S.C.A.Const. Amends. 4, 5.

---

Raymond J. Smith for petitioners.

Sol. Gen. Erwin N. Griswold, for respondent.

Mr. Justice HARLAN delivered the opinion of the Court.

This case presents issues arising out of the petitioners' trial and conviction in the United States District Court for the Northern District of Illinois for the armed robbery of a federally insured savings and loan association.

The evidence at trial showed that at about 1:45 p. m.

on February 27, 1964, two men entered a Chicago savings and loan association. One of them pointed a gun at a teller and ordered her to put money into a sack which the gunman supplied. The men remained in the bank about five minutes. After they left, a bank employee rushed to the street and saw one of the men sitting on the passenger side of a departing white 1960 Thunderbird automobile with a large scrape on the right door. Within an hour police located in the vicinity a car matching this description. They dis-

covered that it belonged to a Mrs. Rey, sister-in-law of petitioner Simmons. She told the police that she had loaned the car for the afternoon to her brother, William Andrews.

At about 5:15 p. m. the same day, two FBI agents came to the house of Mrs. Mahon, Andrews' mother, about half a block from the place where the car was then parked.[1] The agents had no warrant, and at trial it was disputed whether Mrs. Mahon gave them permission to search the house. They did search, and in the basement they found two suitcases, of which Mrs. Mahon disclaimed any knowledge. One suitcase contained, among other items, a gun holster, a sack similar to the one used in the robbery, and several coin cards and bill wrappers from the bank which had been robbed.

The following morning the FBI obtained from another of Andrews' sisters some snapshots of Andrews and of petitioner Simmons, who was said by the sister to have been with Andrews the previous afternoon. These snapshots were shown to the five bank employees who had witnessed the robbery. Each witness identified pictures of Simmons as representing one of the robbers. A week or two later, three of these employees identified photographs of petitioner Garrett as depicting the other robber, the other two witnesses stating that they did not have a clear view of the second robber.

The petitioners, together with William Andrews, subsequently were indicted and tried for the robbery, as indicated. Just prior to the trial, Garrett moved to suppress the Government's exhibit consisting of the suitcase containing the incriminating items. In order to establish his standing so to move, Garrett testified that, although he could not identify the suitcase with certainty, it was similar to one he had owned, and

---

1. Mrs. Mahon also testified that at about 8:30 p. m. the same day six men with guns forced their way into and ransacked her house. However, these men were never identified, and they apparently took nothing.

that he was the owner of clothing found inside the suitcase. The District Court denied the motion to suppress. Garrett's testimony at the "suppression" hearing was admitted against him at trial.

During the trial, all five bank employee witnesses identified Simmons as one of the robbers. Three of them identified Garrett as the second robber, the other two testifying that they did not get a good look at the second robber. The District Court denied the petitioners' request under 18 U.S.C. § 3500 (the so-called Jencks Act) for production of the photographs which had been shown to the witnesses before trial.

The jury found Simmons and Garrett, as well as Andrews, guilty as charged. On appeal, the Court of Appeals for the Seventh Circuit affirmed as to Simmons and Garrett, but reversed the conviction of Andrews on the ground that there was insufficient evidence to connect him with the robbery. 371 F.2d 296.

We granted certiorari as to Simmons and Garrett, 388 U.S. 906, 87 S.Ct. 2108, 18 L.Ed.2d 1345, to consider the following claims. First, Simmons asserts that his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to misidentification as to deny him due process of law, or at least to require reversal of his conviction in the exercise of our supervisory power

over the lower federal courts. Second, both petitioners contend that the District Court erred in refusing defense requests for production under 18 U.S.C. § 3500 of the pictures of the petitioners which were shown to eyewitnesses prior to trial. Third, Garrett urges that his constitutional rights were violated when testimony given by him in support of his "suppression" motion was admitted against him at trial. For reasons which follow, we affirm the judgment of the Court of Appeals as to Simmons, but reverse as to Garrett.

I.

The facts as to the identification claim are these. As has been noted previously, FBI agents on the day following the robbery obtained from Andrews' sister a number of snapshots of Andrews and Simmons. There seem to have been at least six of these pictures, consisting mostly of group photographs of Andrews, Simmons, and others. Later the same day, these were shown to the five bank employees who had witnessed the robbery at their place of work, the photographs being exhibited to each employee separately. Each of the five employees identified Simmons from the photographs. At later dates, some of these witnesses were again interviewed by the FBI and shown indeterminate numbers of pictures. Again, all identified Simmons. At trial, the Government did not introduce any of the photographs, but relied upon in-court identification by the five eyewitnesses, each of whom swore that Simmons was one of the robbers.

In support of his argument, Simmons looks to last Term's "lineup" decisions— United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 and Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178—in which this Court first departed from the rule that the manner of an extra-judicial identification affects only the weight, not the admissibility, of identification testimony at trial. The rationale of those cases was that an

accused is entitled to counsel at any "critical stage of the prosecution," and that a post-indictment lineup is such a "critical stage." See 388 U.S., at 236–237, 87 S.Ct., at 1937–1938. Simmons, however, does not contend that he was entitled to counsel at the time the pictures were shown to the witnesses. Rather, he asserts simply that in the circumstances the identification procedure was so unduly prejudicial as fatally to taint his conviction. This is a claim which must be evaluated in light of the totality of surrounding circumstances. See Stovall v. Denno, 388 U.S. 293, at 302,

RPI 0035

87 S.Ct. 1967, at 1972, 18 L.Ed.2d 1199; Palmer v. Peyton, 4 Cir., 359 F.2d 199. Viewed in that context, we find the claim untenable.

[1] It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.[2] The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.[3] Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually

384

seen, reducing the trustworthiness of subsequent lineup or courtroom identification.[4]

[2, 3] Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in

convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972–1973, and with decisions of other courts on the question of identification by photograph.[5]

[4] Applying the standard to this case, we conclude that petitioner Simmons' claim on this score must fail. In the first place, it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this instance. A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to

385

Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities. The justification for this method of procedure was hardly less compelling than that which we found to justify the "one-man lineup" in Stovall v. Denno, supra.

In the second place, there was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took

2. See P. Wall, Eye-Witness Identification in Criminal Cases 74–77 (1965).

3. See id., at 82–83.

4. See id., at 68–70.

5. See, e. g., People v. Evans, 39 Cal.2d 242, 246 P.2d 636.

RPI 0036

place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. Apparently, these consisted primarily of group photographs, with Simmons and Andrews each appearing several times in the series. Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.

Under these conditions, all five eyewitnesses identified Simmons as one of the robbers. None identified Andrews, who apparently was as prominent in the photographs as Simmons. These initial identifications were confirmed by all five witnesses in subsequent viewings of photographs and at trial, where each witness identified Simmons in person. Notwithstanding cross-examination, none of the witnesses displayed any doubt about their respective identifications of Simmons. Taken together, these circumstances leave little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some

388

respects fallen short of the ideal.[6] We hold that in the factual surroundings of this case the identification procedure used was not

such as to deny Simmons due process of law or to call for reversal under our supervisory authority.

## II.

[5]  It is next contended, by both petitioners, that in any event the District Court erred in refusing a defense request that the photographs shown to the witnesses prior to trial be turned over to the defense for purposes of cross-examination. This claim to production is based on 18 U.S.C. § 3500, the so-called Jencks Act. That Act, passed in response to this Court's decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, provides that after a witness has testified for the Government in a federal criminal prosecution the Government must, on request of the defense, produce any "statement * * * of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." For the Act's purposes, as they relate to this case, a "statement" is defined as "a written statement made by said witness and signed or otherwise adopted or approved by him * * *."

387

Written statements of this kind were taken from all five eyewitnesses by the FBI on the day of the robbery. Apparently none were taken thereafter. When these statements were produced by the Government at trial pursuant to § 3500, the defense also claimed the right to look at the photographs "under 3500." The District Judge denied these requests.

[6, 7]  The petitioners' theory seems to be that the photographs were incor-

---

6. The reliability of the identification procedure could have been increased by allowing only one or two of the five eyewitnesses to view the pictures of Simmons. If thus identified, Simmons could later have been displayed to the other eyewitnesses in a lineup, thus permitting the photographic identification to be supplemented by a corporeal identification, which is normally more accurate. See P. Wall, Eye-Witness Identification in Crim-

inal Cases 83 (1965); Williams, Identification Parades, [1955] Crim.L.Rev. 525, 531. Also, it probably would have been preferable for the witnesses to have been shown more than six snapshots, for those snapshots to have pictured a greater number of individuals, and for there to have been proportionally fewer pictures of Simmons. See Wall, supra, at 74–82; Williams, supra, at 530.

RPI 0037

porated in the written statements of the witnesses, and that they therefore had to be produced under § 3500. The legislative history of the Jencks Act does confirm that photographs must be produced if they constitute a part of a written statement.[7] However, the record in this case does not bear out the petitioners' claim that the pictures involved here were part of the statements which were approved by the witnesses and, therefore, producible under § 3500. It appears that all such statements were made on the day of the robbery. At that time, the FBI and police had no pictures of the petitioners. The first pictures were not acquired and shown to the witnesses until the morning of the following day. Hence, they could not possibly have been a part of the statements made and approved by the witnesses the day of the robbery.

[8] The petitioners seem also to suggest that, quite apart from § 3500, the District Court's refusal of their request for the photographs amounted to an abuse of discretion. The photographs were not referred to by the Government in its case-in-chief. They were first asked for by the defense after the direct examination of the first eyewitness, on the second day of the trial. When the defense requested the pictures, counsel for the Government noted that there were a "multitude" of pictures and stated that it might be difficult to identify those which were shown to particular witnesses. However, he indicated that the Government was willing to furnish all of the pictures, if they could be found. The District Court, referring to the fact that production of the photographs was not required under § 3500, stated that it would not stop the trial in order to have the pictures made available.

Although the pictures might have been of some assistance to the defense, and although it doubtless would have been preferable for the Government to have labeled the pictures shown to each witness and kept them available for trial,[8] we hold that in the circumstances the refusal of the District Court to order their production did not amount to an abuse of discretion, at least as to petitioner Simmons.[9] The defense surely knew that photographs had played a role in the identification process. Yet there was no attempt to have the pictures produced prior to trial pursuant to Fed. Rule Crim.Proc. 16. When production of the pictures was sought at trial, the defense did not explain why they were needed, but simply argued that production was required under § 3500. Moreover, the strength of the eyewitness identifications of Simmons renders it highly unlikely that nonproduction of the photographs caused him any prejudice.

III.

[9–11] Finally, it is contended that it was reversible error to allow the Government to use against Garrett on the

---

7. In the discussion of the bill on the floor of the Senate, Senator O'Mahoney, sponsor of the bill in the Senate, stated that photographs *per se* were not required to be produced under the bill, but that "[i]f the pictures have anything to do with the statement of the witness * * * of course that would be part of it * * *." 103 Cong.Rec. 16489.

8. See P. Wall, Eye-Witness Identification in Criminal Cases 84 (1965); Williams, Identification Parades, [1955] Crim.L. Rev. 525, 530.

9. Garrett was also initially identified from photographs, but at a later date than Simmons. He was ident'fied by fewer witnesses than was Simmons, and even those witnesses had less opportunity to see him during the robbery than they did Simmons. The record is opaque as to the number and type of photographs of Garrett which were shown to these witnesses, and as to the circumstances of the showings. However, it is unnecessary to decide whether Garrett was prejudiced by the District Court's failure to order production of the pictures at trial, since we are reversing Garrett's conviction on other grounds.

RPI 0038

issue of guilt the testimony given by him upon his unsuccessful motion to suppress as evidence the suitcase seized from Mrs. Mahon's basement and its contents. That testimony established that Garrett was the owner of the suitcase.[10]

In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652. More recently, this Court has held that "the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments * * *." Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081.

[12–15] However, we have also held that rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure. See, e. g., Jones v. United States, 362 U.S. 257, 260–261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697. At one time a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor of

390

the seized property or that he had a possessory interest in the searched premises.[11] In part to avoid having to resolve the issue presented by this case, we relaxed those standing requirements in two alternative ways in Jones v. United States, supra. First, we held that when, as in *Jones*, possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the Government is precluded from denying that the defendant has the requisite possessory interest to challenge the admission of the evidence. Second, we held alternatively that the defendant need have no possessory interest in the searched premises in order to have standing; it is sufficient that he be legitimately on those premises when the search occurs. Throughout this case, petitioner Garrett has justifiably, and without challenge from the Government, proceeded on the assumption that the standing requirements must be satisfied.[12] On that premise, he contends that testimony given by a defendant to meet such requirements should not be admissible against him at trial on the question of guilt or innocence. We agree.

Under the standing rules set out in *Jones*, there will be occasions, even in prosecutions for nonpossessory offenses, when a defendant's testimony will be needed to establish standing. This case serves as an example.

391

Garrett evidently was not in Mrs. Mahon's house at the time his suitcase was seized from her basement. The only, or at least the most natural, way in which he could found

---

10. Although petitioner Simmons objected at trial to the admission of Garrett's testimony, the claim was not pressed on his behalf here. Garrett did not mention Simmons in his testimony, and the District Court instructed the jury to consider the testimony only with reference to Garrett.

11. See, e. g., Jones v. United States, 362 U.S. 257, at 262, 80 S.Ct. 725, at 731; Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 Nw.U.L.Rev. 471 (1952).

12. It has been suggested that the adoption of a "police-deterrent" rationale for the exclusionary rule, see Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed. 2d 601, logically dictates that a defendant should be able to object to the admission against him of *any* unconstitutionally seized evidence. See Comment, Standing to Object to an Unreasonable Search and Seizure, 34 U.Chi.L.Rev. 342 (1967); Note, Standing to Object to an Unlawful Search and Seizure, 1965 Wash. U.L.Q. 488. However, that argument is not advanced in this case, and we do not consider it.

RPI 0039

standing to object to the admission of the suitcase was to testify that he was its owner.[13] Thus, his testimony is to be regarded as an integral part of his Fourth Amendment exclusion claim. Under the rule laid down by the courts below, he could give that testimony only by assuming the risk that the testimony would later be admitted against him at trial. Testimony of this kind, which links a defendant to evidence which the Government considers important enough to seize and to seek to have admitted at trial, must often be highly prejudicial to a defendant. This case again serves as an example, for Garrett's admitted ownership of a suitcase which only a few hours after the robbery was found to contain money wrappers taken from the victimized bank was undoubtedly a strong piece of evidence against him. Without his testimony, the Government might have found it hard to prove that he was the owner of the suitcase.[14]

The dilemma faced by defendants like Garrett is most extreme in prosecutions for possessory crimes, for then the testimony required for standing itself proves an element of the offense. We eliminated that Hobson's choice in Jones v. United States, supra, by relaxing the standing requirements. This Court has never considered squarely the question whether defendants charged with non-possessory crimes, like Garrett, are entitled to be relieved

392

of their dilemma entirely.[15] The lower courts which have considered the matter, both before and after Jones, have with two exceptions agreed with the holdings of the courts below that the defendant's testimony may be admitted when, as here, the motion to suppress has failed.[16] The reasoning of some of these courts would seem to suggest that the testimony would be admissible even if the motion to suppress had succeeded,[17] but the only court which has actually decided that question held that when the motion to suppress succeeds the testimony given in support if it is excludable as a "fruit" of the unlawful search.[18] The rationale for admitting the testimony when the motion fails has been that the testimony is voluntarily given and relevant, and that it is therefore entitled to admission on the same basis as any other prior testimony or admission of a party.[19]

It seems obvious that a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amendment

393

claim. The likelihood of inhibition is greatest when

---

13. The record shows that Mrs. Mahon, the owner of the premises from which the suitcase was taken, disclaimed all knowledge of its presence there and of its ownership.

14. The Government concedes that there were no identifying marks on the outside of the suitcase. See Brief for the United States at 33.

15. In Jones, the only reference to the subject was a statement that "[The defendant] has been faced * * * with the chance that the allegations made on the motion to suppress may be used against him at the trial, although that they may be by no means an inevitable holding * * *." 362 U.S., at 262, 80 S.Ct., at 731.

16. See Heller v. United States, 7 Cir., 57 F.2d 627; Kaiser v. United States, 8

Cir., 60 F.2d 410; Fowler v. United States, 10 Cir., 239 F.2d 93; Monroe v. United States, 5 Cir., 320 F.2d 277; United States v. Taylor, 4 Cir., 326 F.2d 277; United States v. Airdo, 7 Cir., 380 F.2d 103; United States v. Lindsly, D.C., 7 F.2d 247, rev'd on other grounds, 12 F.2d 771. Contra, see Bailey v. United States, 128 U.S.App.D.C. 354, 389 F.2d 305; United States v. Lewis, D.C., 270 F.Supp. 807, 810, n. 1 (dictum).

17. See, e. g., Heller v. United States, 7 Cir., 57 F.2d 627; Monroe v. United States, 5 Cir., 320 F.2d 277.

18. See Safarik v. United States, 8 Cir., 62 F.2d 892, rehearing denied, 63 F.2d 369. Accord, Fowler v. United States, 10 Cir., 239 F.2d 93 (dictum); cf. Fabri v. United States, 9 Cir., 24 F.2d 185.

19. See cases cited in n. 16, supra.

RPI 0040

the testimony is known to be admissible regardless of the outcome of the motion to suppress. But even in jurisdictions where the admissibility of the testimony depends upon the outcome of the motion, there will be a deterrent effect in those marginal cases in which it cannot be estimated with confidence whether the motion will succeed. Since search-and-seizure claims depend heavily upon their individual facts,[20] and since the law of search and seizure is in a state of flux,[21] the incidence of such marginal cases cannot be said to be negligible. In such circumstances, a defendant with a substantial claim for the exclusion of evidence may conclude that the admission of the evidence, together with the Government's proof linking it to him, is preferable to risking the admission of his own testimony connecting himself with the seized evidence.

The rule adopted by the courts below does not merely impose upon a defendant a condition which may deter him from asserting a Fourth Amendment objection—it imposes a condition of a kind to which this Court has always been peculiarly sensitive. For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him. Those courts which have allowed the admission of testimony given to establish standing have reasoned that there is no violation of the Fifth Amendment's Self-Incrimination Clause because the testimony was voluntary.[22] As an abstract matter, this may well be true. A defendant is "compelled" to testify in support of a motion to suppress only in the sense that if he [394] refrains from testifying he will have to forego a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit.[23] However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit.[24] When this assumption is applied to a situation in which the "benefit" to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

For the foregoing reasons, we affirm the judgment of the Court of Appeals so far as it relates to petitioner Simmons. We reverse the judgment with respect to petitioner Garrett, and as to him remand the case to the Court of Appeals for further proceedings consistent with this opinion.

It is so ordered.

Affirmed in part and reversed and remanded in part.

20. See, e. g., United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 434, 94 L. Ed. 653.

21. E. g., compare Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 with Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; compare Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, with Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877.

22. See, e. g., Heller v. United States, 7 Cir., 57 F.2d 627.

23. For example, testimony given for his own benefit by a plaintiff in a civil suit is admissible against him in a subsequent criminal prosecution. See 4 Wigmore, Evidence § 1066 (3d ed. 1940); 8 id., § 2276 (McNaughton rev. 1961).

24. Ibid.

RPI 0041

Mr. Justice MARSHALL took no part in the consideration or decision of this case.

395

Mr. Justice BLACK, concurring in part and dissenting in part.

I concur in affirmance of the conviction of Simmons but dissent from reversal of Garrett's conviction. I shall first discuss Simmons' case.

1. Simmons' chief claim is that his "pretrial identification [was] so unnecessarily suggestive and conducive to irreparable mistaken identification, that he was denied due process of law." The Court rejects this contention. I agree with the Court but for quite different reasons. The Court's opinion rests on a lengthy discussion of inferences that the jury could have drawn from the evidence of identifying witnesses. A mere summary reading of the evidence as outlined by this Court shows that its discussion is concerned with the weight of the testimony given by the identifying witnesses. The weight of the evidence, however, is not a question for the Court but for the jury, and does not raise a due process issue. The due process question raised by Simmons is, and should be held to be, frivolous. The identifying witnesses were all present in the bank when it was robbed and all saw the robbers. The due process contention revolves around the circumstances under which these witnesses identified pictures of the robbers shown to them, and these circumstances are relevant only to the weight the identification was entitled to be given. The Court, however, considers Simmons' contention on the premise that a denial of due process could be found in the "totality of circumstances" of the picture identification. I do not believe the Due Process Clause or any other constitutional provision vests this Court with any such wide-ranging, uncontrollable power. A trial according to due process of law is a trial according to the "law of the land"—the law as enacted by the Constitution or the Legislative Branch of Government, and not "laws" formulated by the courts according to

396

the "totality of the circumstances." Simmons' due process claim here should be denied because it is frivolous.* For these reasons I vote to affirm Simmons' conviction.

2. I agree with the Court, in part for reasons it assigns, that the District Court did not commit error in declining to permit the photographs used to be turned over to the defense for purposes of cross-examination.

3. The Court makes new law in reversing Garrett's conviction on the ground that it was error to allow the Government to use against him testimony he had given upon his unsuccessful motion to suppress evidence allegedly seized in violation of the Fourth Amendment. The testimony used was Garrett's statement in the suppression hearing that he was the owner of a suitcase which contained money wrappers taken from the bank that was robbed. The Court is certainly guilty of no overstatement in saying that this "was undoubtedly a strong piece of evidence against [Garrett]." Ante, at 975. In fact, one might go further and say that this testimony, along with the statements of the eyewitnesses against him, showed beyond all question that Garrett was one of the bank robbers. The question then is whether the Government is barred from offering a truthful statement made by a defendant at a suppression hearing in order to prevent the defendant from winning an acquittal on the false premise that he is not the owner of the property he has already sworn that he owns. My answer to this question is

* Although Simmons' "question presented" raise no such contention, the Court declines to use its "supervisory power" to hold Simmons' rights were violated by the identification methods. One must look to the Constitution in vain, I think, to find a "supervisory power" in this Court to reverse cases like this on such a ground.

RPI 0042

"No." The Court's answer is "Yes" on the premise that "a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amendment claim." Ante, at 975.

For the Court, though not for me, the question seems to be whether the disadvantages associated with deterring a defendant from testifying on a motion to suppress are significant enough to offset the advantages of permitting the Government to use such testimony when relevant and probative to help convict the defendant of a crime. The Court itself concedes, however, that the deterrent effect on which it relies comes into play, at most, only in "marginal cases" in which the defendant cannot estimate whether the motion to suppress will succeed. Ante, at 975. The value of permitting the Government to use such testimony is, of course, so obvious that it is usually left unstated, but it should not for that reason be ignored. The standard of proof necessary to convict in a criminal case is high, and quite properly so, but for this reason highly probative evidence such as that involved here should not lightly be held inadmissible. For me the importance of bringing guilty criminals to book is a far more crucial consideration than the desirability of giving defendants every possible assistance in their attempts to invoke an evidentiary rule which itself can result in the exclusion of highly relevant evidence.

This leaves for me only the possible contention that Garrett's testimony was inadmissible under the Fifth Amendment because it was compelled. Of course, I could never accept the Court's statement that "testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit." Ante, at 976. No matter what Professor Wigmore may have thought about the subject, it has always been clear to me that any threat of harm or promise of benefit is sufficient to render a defendant's statement involuntary. See, Shotwell Mfg. Co. v. United States, 371 U.S. 341, 367, 83 S.Ct. 448, 463, 9 L.Ed.2d 357 (1963) (dissenting opinion). The reason why the Fifth Amendment poses no bar to acceptance of Garrett's testimony is not, therefore, that a promise of benefit is not generally fatal. Rather, the answer is that the privilege against self-incrimination has always been considered a privilege that can be waived, and the validity of the waiver is, of course, not undermined by the inevitable fact that by testifying, a defendant can obtain the "benefit" of a chance to help his own case by the testimony he gives. When Garrett took the stand at the suppression hearing, he validly surrendered his privilege with respect to the statements he actually made at that time, and since these statements were therefore not "compelled," they could be used against him for any subsequent purpose.

The consequence of the Court's holding, it seems to me, is that defendants are encouraged to come into court, either in person or through other witnesses, and swear falsely that they do not own property, knowing at the very moment they do so that they have already sworn precisely the opposite in a prior court proceeding. This is but to permit lawless people to play ducks and drakes with the basic principles of the administration of criminal law.

There is certainly no language in the Fourth Amendment which gives support to any such device to hobble law enforcement in this country. While our Constitution does provide procedural safeguards to protect defendants from arbitrary convictions, that governmental charter holds out no promises to stultify justice by erecting barriers to the admissibility of relevant evidence voluntarily given in a court of justice. Under the first principles of ethics and morality a defendant who secures a court order by telling the truth should not be allowed to seek a court advantage later based on a premise directly opposite to his prior

solemn judicial oath. This Court should not lend the prestige of its high name to such a justice-defeating stratagem. I would affirm Garrett's conviction.

Mr. Justice WHITE, concurring in part and dissenting in part.

I concur in Parts I and II of the Court's opinion but dissent from the reversal of Garrett's conviction substantially for the reasons given by Mr. Justice BLACK in his separate opinion.



**390 U.S. 404**

**Archie Nathaniel BIGGERS, Petitioner,**

v.

**STATE OF TENNESSEE.**

No. 237.

Argued Jan. 15, 1968.

Decided March 18, 1968.

Rehearing Denied April 22, 1968.

See 390 U.S. 1037, 88 S.Ct. 1401.

Defendant was convicted in the Criminal Court of Davidson County, Tennessee, of rape, and he appealed. The Tennessee Supreme Court, 219 Tenn. 553, 411 S.W.2d 696, affirmed the conviction, and certiorari was granted. The United States Supreme Court affirmed the conviction by an equally divided court.

Judgment affirmed.

Mr. Justice Douglas filed a dissenting opinion.

**Criminal Law** ⊕393(1)

Rape conviction of defendant, who, while at police headquarters, was requested in presence of complaining witness to repeat words which he allegedly used at time of rape, and who was thereafter identified by complaining witness based upon his size, voice, skin texture and hair was affirmed by an equally divided court.

———

Michael Meltsner, New York City, for petitioner.

Thomas E. Fox, Nashville, Tenn., for respondent.

PER CURIAM.

The judgment below is affirmed by an equally divided Court.

Mr. Justice MARSHALL took no part in the consideration or decision of this case.

Mr. Justice DOUGLAS, dissenting.[1]

Petitioner was indicted for a rape committed when he was 16 years old, was convicted, and after a trial by a jury sentenced to 20 years, first to a juvenile facility and later to prison. The Supreme Court of Tennessee affirmed

405

the judgment of conviction. Biggers v. State, 219 Tenn. 553, 411 S.W.2d 696.

On the night of January 22, 1965, Mrs. Beamer was at home sewing, when an intruder with a butcher knife in his hand grabbed her from the rear. Her screams brought her 13-year-old daughter, who, arriving at the scene, also started to scream. The intruder said to Mrs. Beamer, "You tell her to shut up, or I'll kill you both." Mrs. Beamer ordered her daughter to a bedroom, and the intruder took Mrs. Beamer out of the house to a spot two blocks away and raped her.

During the next seven months the police showed Mrs. Beamer numerous police photographs one of which, she

---

1. As respects the practice of Justices setting forth their views in a case where the judgment is affirmed by an equally divided Court, see American Communications Assn. C. J. O., v. Douds, 339 U.S. 382, 412–415, 422, 70 S.Ct. 674, 690–692, 695, 94 L.Ed. 925; Osman v. Douds, 339 U.S. 846, 847, 70 S.Ct. 901, 902, 94 L.Ed. 1328; In re Isserman, 345 U.S. 286, 73 S.Ct. 676, 97 L.Ed. 1013; 348 U.S. 1, 75 S.Ct. 6, 99 L.Ed. 3; Raley v. State of Ohio, 360 U.S. 423, 440, 79 S.Ct. 1257, 1267, 3 L.Ed.2d 1344; Ohio ex rel. Eaton v. Price, 364 U.S. 263, 264, 80 S.Ct. 1463, 1464, 4 L.Ed.2d 1708.

RPI 0044

their witness, and once his competency as an expert is established, they have no right to shore up his credibility until he is impeached or his credibility is attacked. Western Union Telegraph Co. v. Tweed, Tex.Civ.App., 138 S.W. 1155, 1157, affirmed, 107 Tex. 247, 166 S.W. 696; International & G. N. R. Co. v. Lane, Tex. Civ.App., 127 S.W. 1066, 1067, no writ history; 45 Tex.Jur. 40-43, Witnesses, §§ 202, 203. And a decision not to call as a witness one employed to investigate and evaluate facts and report an expert opinion is not a suppression of evidence.



Charles H. MEYER, Relator,

v.

The Honorable Bert TUNKS et al., Respondents.

No. A-9143.

Supreme Court of Texas.

Oct. 3, 1962.

Original petition for mandamus to require the district judge to revoke his order overruling the motion of the petitioner to quash the State's application and notice to take the petitioner's oral deposition in a suit for removal of the petitioner from the office of sheriff. The Supreme Court, Culver, J., held that the State was entitled to take the deposition of the petitioner and the refusal to stay the same while criminal indictment, involving same subject matter, was pending was not an abuse of discretion.

Mandamus denied.

**1. Officers ⊜68, 72(1)**

To justify removal of public official from office allegations of petition must be specific and certain and official misconduct must be willful or, in other words, with evil intent or without reasonable grounds to believe act lawful. Vernon's Ann.Civ. St. arts. 5973, 5977.

**2. Counties ⊜67**

Statutes providing for removal of county officials denominate action as civil proceeding triable in a civil court from which an appeal lies to Court of Civil Appeals with right in prosecution to appeal from an adverse judgment. Vernon's Ann. Civ.St. arts. 5970, 5973, 5976 et seq., 5977, 5981; Vernon's Ann.St.Const. art. 15, § 7.

**3. Counties ⊜67**

Degree of proof necessary for finding a verdict of guilty or judgment of removal of county official is by preponderance of evidence rather than beyond a reasonable doubt. Vernon's Ann.Civ.St. arts. 5970, 5973, 5976 et seq., 5977, 5981; Vernon's Ann.St.Const. art. 15, § 7.

**4. Criminal Law ⊜163**

No question of former jeopardy is involved in action under statute respecting removal of county official for incompetency or official misconduct, and officer may be prosecuted criminally on same charges either before or after removal proceedings. Vernon's Ann.Civ.St. arts. 5970, 5973, 5976 et seq., 5977, 5981; Vernon's Ann.St.Const. art. 15, § 7.

**5. Counties ⊜67**

Object of proceeding under statute for removal of county officials is not to punish officer for his derelictions or for violation of criminal statute, but to protect public in removing from office by speedy and adequate means those who have been faithless and corrupt and who have violated their trust. Vernon's Ann.Civ.St. art. 5976 et seq.

**6. Officers ⊜77**

Officer's property right in office merely applies to privilege of asserting his right to gain and hold office in election contest and in similar political affairs.

RPI 0045

**7. Discovery ⊜43**

Party against whom was pending a suit to remove him from office of sheriff on ground of official misconduct could be required to subject himself to oral deposition before trial subject to right of refusing to answer on ground of self-incrimination. Vernon's Ann.C.C.P. art. 3; Vernon's Ann. St.Const. art. 1, § 10; Vernon's Ann.Civ. St. art. 5976 et seq.

**8. Witnesses ⊜292**

Constitutional prohibition against compelling defendant in criminal case to give evidence against himself affords protection not against propounding of question but protection against being compelled to answer if he claims that privilege. Vernon's Ann.St.Const. art. 1, § 10; U.S.C.A.Const. Amend. 5; Vernon's Ann.C.C.P. art. 710.

**9. Appeal and Error ⊜961**

**Discovery ⊜33**

Where indictment is pending against defendant in civil action which involves same subject matter as that complained of in criminal case, trial judge has judicial discretion to stay taking of deposition of defendant in civil action, and before his ruling may be set aside there must be shown a clear abuse of discretion. Rules of Civil Procedure, rule 186b.

**10. Discovery ⊜33**

Refusal to stay taking of oral deposition of defendant in an action to remove him from office of sheriff, while there was pending a criminal indictment which involved the same matters, was not an abuse of discretion. Vernon's Ann.Civ.St. art. 5976 et seq.; Rules of Civil Procedure, rule 186b.

———

Gilbert T. Adams, Beaumont, for relator.

W. C. Lindsey, Dist. Atty., W. G. Walley, Jr., Beaumont, Will Wilson, Atty. Gen., and Norman V. Suarez, Asst., Austin, for respondents.

CULVER, Justice.

In Jefferson County there is now pending a suit brought by the State of Texas on relation of certain citizens for the removal of Charles H. Meyer from the office of Sheriff of that county. The District Judge in that case overruled the motion filed in behalf of the defendant, Meyer, to quash the State's application and notice to take the defendant's oral deposition, without prejudice to his right to assert his constitutional privilege against answering any question which might tend to incriminate him.

This is an original petition for mandamus to require the District Judge to revoke his order overruling that motion.

The grounds alleged in the petition for the removal of this officer are: (1) that he accepted the sum of $200.00 on two separate occasions from the same person with the understanding that he would permit that person to operate gaming devices; (2) that Meyer was guilty of official misconduct in respect to the use of and duties assigned to prisoners entrusted to his care, appropriating their labor to private use, and permitting others to be at large and to escape; (3) that he knowingly permitted the open and notorious operation of public houses of prostitution and places to which people commonly resort for the purpose of gambling. At all times pertinent herein Meyer has been under five indictments, the first two charging bribery and the last three charging false statements made in his report of election campaign expenses and contributions.

Relator first contends that the notice of intention to take his oral deposition should be quashed because it violates his rights under Art. 3, Vernon's Ann.Code of Criminal Procedure, and Art. 1, § 10 of the State Constitution, Vernon's Ann.St. in that it is tantamount to requiring him to take the stand and testify in a criminal action against him since this removal action charges him with the willful commission of penal offenses. Further he represents that the attempt to take his deposition is in bad faith

RPI 0046

and for the purpose of obtaining evidence to be used in the criminal cases now pending against him.

[1] He relies heavily on State ex rel. v. Alcorn, 78 Tex. 387, 14 S.W. 663, 665, which terms the removal statute as penal in character "and must be construed as though it were one defining a crime and prescribing its punishment." We quoted that statement with approval in State ex rel. Edwards v. Reyna, 160 Tex. 404, 333 S.W.2d 832, 835. Aside from any implications that might be drawn from this statement the court is saying only that to justify removal from office the allegations of the petition shall be specific and certain and the official misconduct must be willful or in other words with evil intent or without reasonable grounds to believe the act lawful. But all of this is no more than is required by Arts. 5973 and 5977, Vernon's Civil Statutes.

[2-4] County officials may be removed from office for incompetency or for official misconduct or for becoming intoxicated. Art. 5970. The State Constitution stipulates that: "The Legislature shall provide by law for the trial and removal from office of all officers of this State, the modes for which have not been provided in this Constitution." Art. 15, § 7. County officials fall into this category. Accordingly the Legislature has enacted the rules governing the trial and removal of those officials.[1] The action may be brought by an individual citizen and must be conducted in the name of "The State of Texas", upon the relation of that person. The verified petition is to be filed in the district court and shall set forth plainly the grounds of removal. The defendant is guaranteed the right of trial by jury. Appeals are given precedence over the ordinary business of the court. Art. 5981 provides that "the trial and all proceedings connected therewith [removal actions] shall be conducted as far as it is possible in accordance with the rules and practice of the court in other civil cases." The Legisla-

ture has thus in effect denominated the action as a civil proceeding. It is one triable in a civil court. An appeal lies to the Court of Civil Appeals. The prosecution has the right to appeal from an adverse judgment. The degree of proof necessary for a finding of a verdict of guilty or judgment of removal is by the preponderance of the evidence rather than "beyond a reasonable doubt". No question of former jeopardy is involved. The officer may be prosecuted criminally on the same charges either before or after the removal proceedings.

[5, 6] While the removal petition will ordinarily charge the officer with the violation of a criminal statute, yet the character of the action is to be determined by the object sought to be accomplished and the nature of the judgment to be entered. It reasonably appears from the constitutional and statutory provisions authorizing this proceeding that the object is not to punish the officer for his derelictions or for the violation of a criminal statute but to protect the public in removing from office by speedy and adequate means those who have been faithless and corrupt and have violated their trust. The law imposes no other penalty. It has been said that an officer has a property right in the office but that applies merely to the privilege of asserting his right to gain and hold the office in an election contest and in similar political affairs. The office belongs to the people and is given to him temporarily in trust. Even so an action to deprive him of this or any other property right would be essentially a civil action.

In McDaniel v. State, (1928) Tex.Civ. App., 9 S.W.2d 478, 481, wr. ref., the court, in pointing out that a removal action is essentially a civil suit although the result may have a punitive effect, says:

"* * * Its determination constitutes no bar to the subsequent indictment and prosecution of the defendant for any criminal offense he may have committed in the misconduct with

1. See Arts. 5976 et seq., Vernon's Ann.Civ.Stats.

RPI 0047

which he is here charged. While his removal from office may cause him an injury, the infliction of that injury is not the primary object of the proceeding. The principal purpose in such proceeding is to relieve the state of an unfit public official. If there were any informality in the manner in which the court in this instance presented the issues to the jury, the defect was not of a fundamental character, and was waived by the failure of the appellant to object at the proper time."

[7] In so far as the terminology applied to this character of proceeding is concerned, the courts of other jurisdictions are not in harmony, some classifying it as a civil action, others, as quasi criminal, and still others, as criminal. Actually the terminology is not altogether important or controlling for the results reached in ruling on the various questions are more uniform than the terminology used would seem to indicate. California in Thurston v. Clark, 107 Cal. 285, 40 P. 435, viewed the matter as equivalent to a criminal prosecution. In that case the removal action was said to be of such a criminal nature that the defendant officer was to be shielded from becoming an enforced witness against himself by reason of constitutional provisions both national and state. On the other hand in Cline v. Superior Court, 184 Cal. 331, 193 P. 929, the same court determined that in such cases the constitutional safeguards do not forbid the denial of a jury trial to the officer and that pronouncement is expressly made regardless of the holding in Thurston v. Clark and in other earlier cases that the proceeding is in effect a criminal prosecution. In fact the general rule seems to be that a public official has no constitutional right to a jury trial in a proceeding to remove him from office. See Gay v. District Court, 41 Nev. 330, 171 P. 156, 3 A.L.R. 224 and other cases annotated in 3 A.L.R. 1089. With that premise in mind it is hardly logical to contend that in a removal action the defendant officer cannot be called to the witness chair since the right of one charged

with a criminal offense to a jury trial is basic in all jurisdictions.

In addition to California, Idaho and Montana are said to take the view that a removal action is criminal in nature while other Western states, namely, Nevada, New Mexico, North Dakota, Oklahoma and Utah consider the matter as a civil action. See 81 A.L.R. 1089.

In Skeen v. Craig (1906) 31 Utah 20, 86 P. 487, the court aligns itself with what it terms the great weight of authority and the better reasoned cases in expressly holding that such actions are civil. State v. Borstad (1914) 27 N.D. 533, 147 N.W. 380, held that the trial court did not err in permitting the examination of the defendant as an adverse party upon the trial, subject of course to his right of refusing to answer on the ground of self incrimination. In North Dakota the statute provides just as in this jurisdiction that the trial shall be conducted in the same manner as a trial by jury in a civil action. Also in that state in civil actions generally a defendant may be compelled to testify.

[8] The gist of Art. 1, § 10 of the State Constitution is the same as that of the Fifth Amendment to the United States Constitution, namely, that the defendant in a criminal case shall not be compelled to give evidence against himself. The protection thus afforded is not against the propounding of the question but is the right to refuse to answer if he claims that privilege.

Article 710, Vernon's Ann.Code of Criminal Procedure, does provide that the failure of a defendant to testify shall not be considered against him nor shall that failure be commented on by opposing counsel. Meyer cannot avail himself of the protection afforded by this article because the Legislature has plainly provided that this case is to be tried under the Rules of Civil Procedure rather than of the Code of Criminal Procedure.

Since this removal cause is a civil action and is to be conducted according to the

360 S.W.2d—33½

RPI 0048

Rules of Civil Procedure we see no reason to make an exception or to say that all the rules will control except that the defendant cannot be called as a witness. We therefore hold that Art. 3 of the Vernon's Ann. Code of Criminal Procedure does not apply in this case nor does § 10, Art. 1 of the State Constitution exempt this officer from being examined as an adverse witness, though he may claim the protection afforded to him by this constitutional provision. Should he later be prosecuted criminally under the indictments now pending or under any that may be subsequently returned he has the protection that the Constitution and Statutes of the State give to a defendant in a criminal case.

Secondly, Meyer contends that the order of the court in refusing to quash the notice to take his deposition is in violation of Rule 186b of our Rules of Civil Procedure and thus constitutes a clear abuse of discretion on the part of the trial judge. Rule 186b effective September 1, 1957, is substantially the same as Federal Rule 30(b), 28 U.S.C.A. Petitioner maintains therefore that we are bound by the construction placed upon that rule by the federal courts. That construction, so it is claimed, is to the effect that while an indictment is pending against one who is a defendant in a civil action which involves the same subject matter complained of in the criminal case, the defendant's deposition may not be taken by the adverse party.

The decisions relied on all issue from a United States District Court. So far as we can ascertain the point has not been tested on appeal.

In Paul Harrigan & Sons, Inc. v. Enterprise Animal Oil Co., Inc. (D.C., 1953) 14 F.R.D. 333, a conspiracy prosecution under the Sherman Anti-Trust Act was pending against persons who were named defendants in a civil action under such Act, based upon the same alleged conspiracy. The court stayed the taking of the depositions of those persons in the civil action on the ground that the same would contravene rights guaranteed by the Fifth Amendment.

In National Discount Corporation v. Holzbaugh, D.C., 13 F.R.D. 236, the court held that where the fabric of the fraud sued upon in the civil proceeding is identical with the fraud embraced in the pending criminal proceeding, to require the defendant to submit to oral examination in the civil case would be oppressive and constitute an indirect invasion of his constitutional rights.

In the third case, United States v. Bridges, D.C., 86 F.Supp. 931, the facts were somewhat in reverse. Bridges was under indictment in a denaturalization proceeding against him based upon substantially identical facts to those forming the criminal indictment, Bridges sought under Rule 33, Federal Rules of Civil Procedure, to take the deposition of the Attorney General of the United States and of the Chief of the Federal Bureau of Investigation. The court stayed all proceedings in the denaturalization case until the final disposition of criminal proceedings on the following ground:

"Apart from the assertion by Government counsel that the defendant, Bridges, is attempting, through the medium of the civil proceedings, to explore and otherwise canvass matters that would not be obtainable in the criminal proceeding, it is manifest from a general outline of the Discovery sought that most, if not all, of the material requested is beyond the scope of rule 33. Federal Rules of Civil Procedure."

[9] Actually the only authoritative construction, we think, given by the Federal courts to Rule 30(b) is that the trial judge is vested with judicial discretion in acting upon a motion to stay the taking of the deposition of a party and before his ruling may be set aside there must be shown a clear abuse of discretion. Whether we are bound by this construction or not is imma-

terial since that is exactly the way we construe our Rule 186b.

In National Bondholders Corporation v. McClintic, 1938, 99 F.2d 595, the Court said:

"* * * the determination of the existence of the sufficiency of the cause against taking the depositions in this case was for the district judge in his judicial discretion. On this application for mandamus to reverse his ruling on an interlocutory matter, we cannot properly substitute our judgment for his as to the determination of what constituted good cause for the order even though if and when the case should ultimately be here on appeal, the court may be of a different opinion."

In Landy v. United States (1960), 283 F.2d 303, the judgment of the trial court requiring Landy to respond to the administrative subpoena of the Internal Revenue Service was affirmed. We quote the holding in that case which we think is quite material to the situation we have before us:

"We hold that the trial court correctly decided that it could not quash the subpoena on the general allegation that it was intended for purposes other than those for which it purported to issue and that it might result in questions which the subpoenaed witness could constitutionally refuse to answer. The privilege of the Fifth Amendment must be exercised in connection with precise questions and not as a general excuse for refusing to appear in response to subpoena. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344."

Since the question of whether the taking of a deposition be stayed or not lies within the judicial discretion of the trial judge, it cannot be said with any degree of certainty that, if the trial judge had not granted the stay in Harrigan v. Enterprise and National Discount Corporation v. Holzbaugh, the Federal appellate courts would have held that the failure to do so would amount to abuse of discretion. Moreover, in the case here the factual situation differs. As pointed out above among the various grounds on which removal of the sheriff is sought only on one, namely, bribery, has he been indicted and Rule 30(b) even as applied by the Federal District Courts would have no application to the remaining charges.

Our Rule 186b as well as the Federal Rule 30(b) gives to the trial court broad powers and discretion to control the time, place and manner of taking the deposition and also the scope of the examination. The movant did not seek in the trial court any limitation or restriction upon the scope of the examination but rather took the position that he must not be examined upon any of the matters or charges specified in the removal action.

We cannot assume that the attempt to take Meyer's deposition is in bad faith and for the purpose of obtaining evidence to be used in the criminal cases now pending against him.

Complaint is made of the fact that attached to the petition for removal is a copy of the indictment charging the defendant with false statements in his report of election contributions and expenses. This exhibit relates only to some alleged statement made by Meyer concerning the judge and the members of the grand jury. It forms no ground for removal. The trial judge will rule on its admissibility when the case comes on for trial. We see no prejudice in this that would result so far as the matter at issue here is concerned.

[10] We hold that the Trial Judge did not abuse his discretion. Mandamus is denied.

RPI 0050

cause to venireperson Weaver. Appellant's fourth point of error is overruled.

We affirm the trial court's judgment finding appellant guilty of capital murder and sentencing him to life in prison.



**Shay GEBHARDT, Relator,**

v.

**Hon. Juan GALLARDO, Respondent.**

No. 04–94–00690–CV.

Court of Appeals of Texas,
San Antonio.

Jan. 9, 1995.

Republican candidate brought negligence and civil conspiracy claims against Democratic party officials and members concerning filing of Democratic candidate's nominating petition. The 150th District Court, Bexar County, Juan Gallardo, J., severed and abated negligence claim pending possibility of or pursuance of criminal changes against any of the defendants, and plaintiff sought review by mandamus. The Court of Appeals, Blair Reeves, C.J. (Retired), held that: (1) defendants' assertion of privilege against self-incrimination alone did not present legal basis for severance and abatement of negligence claim; (2) negligence claim was improperly severed from civil conspiracy claim since the two claims were based upon same facts and circumstances; and (3) where term of abatement of negligence claim was indefinite, Republican candidate had no adequate remedy at law for purposes of determining whether mandamus should issue.

Writ of mandamus conditionally granted.

**1. Mandamus ⚷4(1), 26, 28**

Party seeking mandamus relief must demonstrate that trial court has committed clear abuse of discretion or violated duty imposed by law, and that party has no adequate remedy on appeal.

**2. Mandamus ⚷28**

Although appellate court rarely interferes with trial court's exercise of discretion, clear abuse of discretion warrants correction by mandamus when court issues decision without basis or guiding principles of law.

**3. Witnesses ⚷293½**

Party does not lose Fifth Amendment right against self-incrimination in civil suit, whether or not criminal indictment is pending. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Const. Art. 1, § 10.

**4. Witnesses ⚷305(1), 307**

Each assertion of privilege against self-incrimination rests on its own circumstances and must be raised in response to each specific inquiry or it is waived; blanket assertions of the privilege are not permitted. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Const. Art. 1, § 10.

**5. Abatement and Revival ⚷8(2)**
   **Action ⚷60**

Assertion of privilege against self-incrimination alone did not present legal basis for severance and abatement of negligence claim against defendant while criminal investigation of defendant arising out of same facts was pending, even though, if defendant asserted privilege at trial, plaintiff might request instruction on res ipsa loquitur; abatement would be akin to impermissible blanket assertion of the privilege. U.S.C.A. Const. Amend. 5; Vernon's Ann.Texas Const. Art. 1, § 10.

**6. Abatement and Revival ⚷8(3)**

Pendency of criminal investigation, indictment or other proceeding does not affect contemporaneous civil proceeding based on same facts or parties.

**7. Witnesses ⚷309**

Although it is constitutional error under Fifth Amendment to instruct jury in criminal case that it may draw inference of guilt from defendant's failure to testify about facts relevant to his case, Fifth Amendment does not

RPI 0051

forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. U.S.C.A. Const.Amend. 5.

**8. Action ⬅60**

Claim is properly severable only if controversy involves more than one cause of action, severed claim is one that would be proper subject of lawsuit if independently asserted, and severed claim is not so interwoven with remaining action that they involve same facts and issues. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**9. Action ⬅60**

Trial court is afforded broad discretion in matter of severance. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**10. Action ⬅60**

Controlling reasons for severance are to do justice, avoid prejudice and further convenience. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**11. Action ⬅60**

Negligence claim by Republican candidate against Democratic party officials and members concerning filing of Democratic candidate's nominating petition was improperly severed from Republican candidate's civil conspiracy claim against same parties, since the two claims were based upon same facts and circumstances, and the concerns advanced by Democratic party officials in support of imposing restrictions on proceeding with negligence claim while grand jury investigation was pending would in large measure also be present in conspiracy trial. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**12. Mandamus ⬅32**

Abatement is generally incidental ruling not susceptible to mandamus relief.

**13. Pretrial Procedure ⬅534**

Trial courts generally have discretion in abatement decisions.

**14. Mandamus ⬅4(4)**

Appeal is not appropriate remedy, for purposes of determining whether mandamus should issue, where ability to present viable claim was vitiated by pretrial order.

**15. Mandamus ⬅32**

Abated negligence claim was vitiated, for purposes of determining whether mandamus should issue as to abatement order, where claimant was prohibited from preserving defendants' testimony through oral deposition on negligence issues while abatement order was in effect, so that evidence might become unavailable.

**16. Abatement and Revival ⬅8(2)**

Abatement of negligence claim by Republican candidate against Democratic party officials and members concerning Democratic candidate's filing of nominating petition, pending possibility of or pursuance of criminal changes against any of the defendants, was improper because term of abatement was indefinite due to impossibility of determining which statutes of limitation might apply and when they might expire. Vernon's Ann.Texas Const. Art. 1, § 13; Vernon's Ann.Texas C.C.P. art. 12.05.

**17. Mandamus ⬅32**

Revision of statute concerning authority of courts of appeal to issue writs of mandamus ordering trial judges to go to trial placed abatement under general principles of law applicable to mandamus. V.T.C.A., Government Code § 22.221.

**18. Mandamus ⬅3(3)**

Indefiniteness of abatement of Republican candidate's negligence action against Democratic party officials and members concerning filing of Democratic candidate's nominating petition rendered remedy at law inadequate, so that mandamus was appropriate. V.T.C.A., Government Code § 22.221.

---

John E. Clark, Goode, Casseb & Jones, San Antonio, for appellant.

Steven P. Price, Enrique G. Serna Martinez, The Law Offices of Steven P. Price, Randall C. Jackson, Jr., Speiser, Krause, Madole & Mendelsohn, Dwight P. Mosher, Robert A. Valdez, San Antonio, for appellee.

RPI 0052

Before JAMES F. ONION, Judge, (Ret.), CARLOS C. CADENA and BLAIR REEVES, C.JJ. (Ret.).

## OPINION

BLAIR REEVES, Chief Justice, (ret.).[1]

Shay Gebhardt seeks review by mandamus of an order entered by the Hon. Juan Gallardo, visiting district judge, which severed and abated her negligence claim from an alternative claim of civil conspiracy.[2]

Relator, the Hon. Shay Gebhardt, the Republican candidate for judge of County Court-at-Law No. 3 of Bexar County, sued real party, John Reynolds, and three other Democratic party officials or members. The lawsuit alleges civil conspiracy and, in the alternative, negligence in promoting and certifying the filing of the nominating petition for the Democratic candidate and seeks actual and exemplary damages. Relator alleged that the Democratic candidate did not meet minimum filing standards because a number of the required 250 signatures on his petition were forgeries and/or had been added to the petition after the deadline had expired.

The trial court severed and abated the negligence claim pending the possibility of or pursuance of criminal charges against any of the defendants.[3] Relator seeks a writ of mandamus to order Visiting District Judge Juan Gallardo to rescind the order which severed and abated petitioner's negligence claim on grounds it was an abuse of discretion. Real party argues that his federal and state constitutional rights will be violated if plaintiff is allowed to explore matters in this civil action which are also subject to a grand jury investigation. Neither the transcript nor the statement of facts reveals any source for the court's finding. We are unable to find any legal basis for this ruling. We hold that the order of severance and abatement constitutes a clear abuse of discretion for which relator has no adequate remedy on appeal. Writ of mandamus is conditionally granted for the reasons set forth below.

## MANDAMUS AND THE ABUSE OF DISCRETION

[1] A party seeking mandamus relief must demonstrate that the trial court has committed a clear abuse of discretion or violated a duty imposed by law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). The Supreme Court emphasizes that the petitioner must also show that she has no adequate remedy on appeal. *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992); *State v. Walker*, 679 S.W.2d 484, 485 (Tex.1984).

[2] An appellate court rarely interferes with a trial court's exercise of discretion. However, a clear abuse of discretion war-

---

1. Judge Onion, Justice Cadena and Justice Reeves were assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

2. The original lawsuit is styled and numbered *Shay Gebhardt v. Leo G. Pacheco, John W. Reynolds, Dwight Mosher, and Ramon G. Flores, Sr.*, No. 94-CI-05455, in the 150th District Court of Bexar County, Texas.

3. The order, dated October 4, 1994, states in pertinent part:

   After considering the evidence, the arguments of counsel, and the post-hearing briefs filed by the parties, the court finds that the plaintiff's allegations could be read as a claim that the candidate's petition was altered while in the exclusive possession of some of the defendants, and that such allegations raise the possibility that the plaintiff may rely upon and may seek an instruction on the doctrine of res ipsa loquitur; therefore, the court enters the following order:

   The plaintiff having advised the court that she elects not to amend her pleadings to exclude the claim for negligence comprising paragraph IV of her original petition, it is ORDERED that all of the allegations of paragraph IV of plaintiff's original petition, and all allegations of damage by reason of negligence in paragraph V of plaintiff's original petition be, and the same are hereby, SEVERED from this cause of action and assigned separate docket number 94-CI-14910.

   It is FURTHER ORDERED that after severance, the severed cause number 94-CI-14910 shall be, and it is hereby, ABATED pending the final disposition of any criminal charges that may be brought against any of the defendants based on the allegations of fact contained in the severed paragraph IV of plaintiff's original petition, or until the expiration of the statute of limitations for any criminal offense with which any of the defendants could be charged on the basis of the allegations contained in the severed paragraph IV of the plaintiff's original petition, whichever occurs last.

RPI 0053

rants correction by mandamus when a court issues a decision which is without basis or guiding principles of law. *See Johnson v. Fourth Court of Appeals*, 700 S.W.2d at 917; *Professional Microfilming, Inc. v. Houston*, 661 S.W.2d 767, 769 (Tex.App.—Fort Worth 1983, orig. proceeding). For example, a trial judge has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d at 840. On the contrary, if a judge, by placing a particular construction on the law, deprives a citizen of an unquestioned legal right, and there is no other adequate remedy, mandamus will lie to review his judgment or decision on the question. *Womack v. Berry*, 156 Tex. 44, 291 S.W.2d 677, 683 (1956); *State Farm v. Wilborn*, 835 S.W.2d 260, 261 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding); *see also Joachim v. Chambers*, 815 S.W.2d 234, 240 (Tex.1991) (trial court abused discretion by misinterpreting the Code of Judicial Conduct); *NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989) (trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel); *Eanes Indep. Sch. Dist. v. Logue*, 712 S.W.2d 741, 742 (Tex.1986) (trial court abused discretion by erroneously finding constitutional violation).

## THE FIFTH AMENDMENT PRIVILEGE

Defendant, John W. Reynolds, sought abatement of the lawsuit on the ground that he was a target of a grand jury investigation, that he had asserted his Fifth Amendment right against self-incrimination in this suit and its predecessor bill of discovery, and, according to his attorney, Reynolds did not want to be subjected to the intense light of civil discovery while the criminal investigation was pending.

[3] A party does not lose his Fifth Amendment right against self-incrimination in a civil suit. Whether or not an indictment is pending, a witness is entitled to assert this fundamental constitutional right. *See Maness v. Meyers*, 419 U.S. 449, 464, 95 S.Ct. 584, 594, 42 L.Ed.2d 574, 587 (1975) (Fifth Amendment may be asserted in any proceeding, civil or criminal, administrative or judi-

cial, investigatory or adjudicatory); *Ex parte Butler*, 522 S.W.2d 196, 198 (Tex.1975) (Texas Constitution Art. I, sec. 10, guarantees privilege against self-incrimination, "fact that the inquiry is made in the course of a civil proceeding does not interdict the witness's privilege"); *Burton v. West*, 749 S.W.2d 505, 507 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding) (defendant in drug proceeds forfeiture case permitted to assert Fifth Amendment to discovery); *Smith v. White*, 695 S.W.2d 295, 297 (Tex.App.—Houston [1st Dist.] 1985, orig. proceeding) (defendants under indictment entitled to assert Fifth Amendment rights in civil custody dispute).

[4-6] The assertion of the privilege against self-incrimination must be raised in response to each specific inquiry or it is waived. Each assertion of the privilege rests on its own circumstances. Blanket assertions of the privilege are not permitted. *See United States v. White*, 589 F.2d 1283, 1286–87 (5th Cir.1979); *Meyer v. Tunks*, 360 S.W.2d 518, 523 (Tex.1962). The abatement of the negligence claim while the grand jury investigates potential criminal charges is akin to a blanket assertion of the Fifth Amendment privilege. The rationale for reversals in *White* and *Meyer v. Tunks* would militate against severance and abatement on a vague assertion of constitutional privilege regarding res ipsa loquitur. The pendency of a criminal investigation, indictment, or other proceeding does not affect a contemporaneous civil proceeding based on the same facts or parties. *See McInnis, v. State*, 618 S.W.2d 389, 393 (Tex.App.—Beaumont 1981, writ ref'd n.r.e.) (disbarment suit may proceed while indictment pending against attorney on same grounds for same offense); *see also Meyer v. Tunks*, 360 S.W.2d at 523 (no presumption that attempt to take defendant's deposition in civil case is impermissible attempt to develop evidence in concurrent criminal proceeding). The Fifth Circuit has held that putting a defendant to trial in a civil case while criminal charges arising out of the same conduct were pending did not unconstitutionally force him to choose between preserving his Fifth Amendment privilege and losing his civil suit where there was

RPI 0054

no indication that invocation of the Fifth Amendment would necessarily result in an adverse civil judgment. *See United States v. White*, 589 F.2d 1283, 1286–87 (5th Cir.1979) (decision on whether to testify in civil case is matter of trial strategy). The *McInnis* court stated: "We find no constitutional or statutory provisions granting this appellant the right to choose the case, either criminal or civil, which he desires to first proceed to trial." *McInnis v. State*, 618 S.W.2d at 393.

[7] In this case, the court severed and abated the negligence claim on the ground that plaintiff's pleadings may be construed to support a theory of res ipsa loquitur.[4] One is left, at this early stage in the proceedings, to assume that if the defendant exercises his right to silence under the Fifth Amendment, the plaintiff may, as a trial strategy, request an instruction on res ipsa loquitur on the negligence theory. Be that as it may, the United States Supreme Court distinguishes between a criminal and a civil case as to whether an inference of guilt may be drawn from a defendant's silence. It is clearly constitutional error under the Fifth Amendment to instruct a jury in a criminal case that it may draw an inference of guilt from a defendant's failure to testify about facts relevant to his case. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, 110 (1965). However, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821 (1976). The Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*" 8 J. WIGMORE, EVIDENCE 439 (McNaughton rev. 1961) (emphasis in original). The *Baxter* opinion lists a long line of cases which recognize "that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause." *Baxter*, 425 U.S. at 319, 96 S.Ct. at 1558, 47 L.Ed.2d at 822. Therefore, the assertion of the privilege against self-incrimination alone does not present a legal basis for severance and abatement of the negligence claim, while a criminal investigation proceeds.

## SEVERANCE

[8–11] The severed negligence claim and the civil conspiracy claim are based upon the same factual allegations. A claim is properly severable only if

(1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues.

*Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex.1990) (citing *Saxer v. Nash Phillips-Copus Co. Real Estate*, 678 S.W.2d 736, 739 (Tex.App.—Tyler 1984, writ ref'd n.r.e.)); TEX.R.CIV. PROC. 41. Rule 41 affords the trial court broad discretion in the matter of severance. "The controlling reasons for a severance are to do justice, avoid prejudice and further convenience." *Guaranty Fed. Sav. Bank, supra.* In this case, the third prong of the severance test is clearly missing. Relator has pled alternative theories of recovery. The severed claim is based upon the same facts and circumstances as the remaining claim. The parties are identical. While the elements of each claim are necessarily different, the proof required is all to be drawn from the same events. The severance order is interlocutory and nonappealable while the abatement is in effect.

Moreover, it is observed that the trial court's order leaves the relator free to try her civil conspiracy claim based on the same factual allegations without the restrictions the trial court has placed on the severed and abated negligence claim. The concerns advanced by the respondent to the trial court would in large measure also be present in the conspiracy trial. Severing claims into separate lawsuits without valid and sustaining reasons is not in the interest of judicial economy.

---

4. The record before us does not reflect that this theory is alleged by the plaintiff below.

RPI 0055

## ABATEMENT

The trial court ordered the negligence claim abated pending final disposition of any criminal charges that may be brought against any of the defendants or until the statutes of limitation expire.

[12, 13] Abatement is generally an incidental ruling not susceptible to mandamus relief. *E.g., Abor v. Black,* 695 S.W.2d 564, 567 (Tex.1985) (*citing Pope v. Ferguson,* 445 S.W.2d 950, 954 (Tex.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970)). Further, trial courts generally have discretion in abatement decisions. *E.g., Dolenz v. Continental Nat'l Bank of Fort Worth,* 620 S.W.2d 572, 575 (Tex.1981).

[14, 15] The trial court should consider what effect, if any, the abatement of the negligence claim will have on the plaintiff's ability to prosecute the remaining conspiracy claim. *Walker v. Packer,* 827 S.W.2d 833, 843 (Tex.1992) recognizes that appeal is not an appropriate remedy where the ability to present a viable claim was vitiated by a pretrial order. The negligence claim in this case is vitiated because relator is prohibited from preserving defendants' testimony through oral deposition on the negligence issues while the abatement order is in effect. As time goes on, memories will likely dim and evidence become unavailable.

[16] Abating a case indefinitely, moreover, has been found to violate the open courts provisions of the Texas Constitution. *See Trapnell v. Hunter,* 785 S.W.2d 426, 429 (Tex.App.—Corpus Christi 1990, orig. proceeding). In *Trapnell,* survivors had filed a wrongful death suit against manufacturers of sulfite and foods containing it on a theory of products liability. Several months later they filed a second suit in federal court against the Navy under the Federal Tort Claims Act on theories of negligent food preparation and failure to warn. The federal case was stayed against the Navy pending completion of the products liability state case. However, the manufacturer defendants obtained an order abating the state case so they could seek intervention in the federal case. The federal district court denied their motion to intervene, nevertheless the state district court repeatedly refused to vacate his order of abatement. *Id.* at 427. The issue at the mandamus proceeding was whether the state court had a legal basis to abate the state cause in order to encourage all parties to settle their controversy in federal court. The appellate court held that the state court abatement denied the parties their right to a forum under the "open courts" clause of the Texas Constitution. *Id.* at 429.

The opinion noted that article I, section 13 of the constitution is generally not violated by abatement issued in deference to a pending suit in another court because the plaintiff may still pursue her remedy in the second court. *Id.* In *Trapnell,* both forums had been indefinitely foreclosed to the plaintiffs by court orders. "When the trial court sustains a plea in abatement, ... the plaintiff is effectively denied any other method of challenging the court's action for an indefinite period of time during which the cause of action remains in a suspended state.... A trial judge may not arbitrarily halt trial proceedings." *Id., citing Cleveland v. Ward,* 116 Tex. 1, 285 S.W. 1063, 1068 (1926); *Greenberg, Benson, Fisk and Fielder v. Howell,* 685 S.W.2d 694, 695 (Tex.App.—Dallas 1984, orig. proceeding) (citing the open courts provision of TEX. CONST. art. I, § 19).

[17] The Texas Supreme Court has also reasoned that mandamus would issue to force a trial judge to go to trial because there was no remedy by appeal. *Cleveland v. Ward,* 285 S.W. at 1068. At that time a statute authorized courts of appeal to issue writs of mandamus ordering trial judges to go to trial. Article 1824 was amended in 1984 to eliminate the specific authority to order a trial judge to proceed to trial before it was codified into the current statute providing our general mandamus jurisdiction. This revision places the abatement under the general principles of law applicable to mandamus. *See* TEX. GOV'T CODE § 22.221 (Vernon 1988). However, the *Howell* case cited above, construes this change to expand an appellate court's power to order a judge to proceed to trial in a pending case. *Greenberg, Benson, Fisk and Fielder v. Howell,* 685 S.W.2d at 695.

RPI 0056

[18] The term of abatement in the present case is indefinite. Statutes of limitations vary. The defendant testified that he did not know how long the abatement, if granted, would last. He did not furnish the trial judge with any information as to what crimes might be charged, so it is impossible to tell what statutes of limitations might apply. Moreover, statutes of limitations are tolled while an accused is absent from the state and tolled during the pendency of an indictment. TEX.CRIM.PROC.CODE ANN. art. 12.05 (Vernon 1979). It is, therefore, impossible to determine when the abatement will end. The indefiniteness of the abatement leads us to the conclusion that the relator has no adequate remedy at law.

For these reasons we have concluded that relator is entitled to a writ of mandamus to direct the trial court to rescind its order of severance and abatement. The writ will issue only in the event the trial court fails to act accordingly.



## TEXAS STATE BOARD OF MEDICAL EXAMINERS, Appellant,

### v.

### Dennis H. BIRENBAUM, M.D., Appellee.

### No. 3-93-664-CV.

Court of Appeals of Texas,
Austin.

Jan. 11, 1995.

Rehearing Overruled Feb. 22, 1995.

State Board of Medical Examiners appealed from order of the 250th Judicial District Court, Travis County, Jerry Dellana, J., reversing Board's revocation of oncologist's medical license for persistent and flagrant overcharging of patients. The Court of Appeals, Kidd, J., held that: (1) substantial evidence supported Board's determination that oncologist overcharged patients, but (2) substantial evidence did not support finding that oncologist persistently and flagrantly overcharged patients.

Affirmed.

1. Physicians and Surgeons ⬡13

Physician and patient are free to contract for physician's services on any terms they choose.

2. Physicians and Surgeons ⬡13

Physician and patient are free to contract as they see fit, as long as their agreement does not contravene public policy.

3. Administrative Law and Procedure ⬡791

Physicians and Surgeons ⬡11.3(5)

In reviewing decision of State Board of Medical Examiners, Court of Appeals uses substantial evidence standard defined under the Administrative Procedure Act (APA). V.T.C.A., Government Code § 2001.174(2)(E).

4. Administrative Law and Procedure ⬡793

Court of Appeals is not permitted to substitute its judgment for that of agency as to weight of the evidence. V.T.C.A., Government Code § 2001.174(2)(E).

5. Administrative Law and Procedure ⬡749, 750

Decisions of administrative agency are presumed to be supported by substantial evidence, and burden is on contestant to prove otherwise. V.T.C.A., Government Code § 2001.174(2)(E).

6. Administrative Law and Procedure ⬡790

Physicians and Surgeons ⬡11.3(5)

Court of Appeals must uphold actions of State Board of Medical Examiners if evidence is such that reasonable minds could have reached conclusion that Board must have reached in order to justify its action. V.T.C.A., Government Code § 2001.174(2)(E).

RPI 0057

clearly intended Service records such as the Moorefield file to be exempt under the original FOIA. *Freedom of Information Act Source Book*, Sen.Doc. 93–82, Subcomm. on Administrative Practice & Procedure, Senate Judiciary Comm., 93d Cong., 2d Sess. 107 (1974); *see id.* at 82, 93. Congress could not have wanted to open Service files to the public, which includes potential assassins, merely because they contain protective rather than prosecutorial investigative materials. "[T]he release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against." 437 U.S. at 232, 98 S.Ct. at 2322. In light of our reading of *Robbins Tire* and the legislative history of exemption 7(A), we conclude that the Service's activities in investigating and observing persons who present threats to Service protectees are enforcement proceedings for the purposes of the FOIA.

[7] The remaining question is whether an FOIA disclosure of the Moorefield file would "interfere" with an enforcement proceeding. We conclude that it would. The materials in this file are sensitive; all constitute investigative matter that assists the Service in its efforts to keep track of Moorefield and preclude his harming a Service protectee. As the Service affidavit pointed out, disclosure of these materials could tend generally to inform targets of Service investigations of the means the Service employs to keep abreast of them, and, specifically, to enable Moorefield to elude the scrutiny of the Service, with potentially disastrous results. In our view, disclosure here would constitute an interference much like the one found by the Court in *Robbins Tire*, where it concluded that, on balance, disclosure of the NLRB witness statements would upset the conduct of enforcement proceedings. 437 U.S. at 236–242, 98 S.Ct. at 2324–27. The risk of presidential assassination presented by the forced disclosure of the sort of Service records involved here is at least as great as that of the mere witness intimidation considered in *Robbins Tire*. *See id.* at 239–241, 98 S.Ct. at 2325–26; *1974 Attorney General's Memorandum* at 8.

In summary, we hold here that the records of ongoing, active Secret Service investigations, carried out pursuant to the Service's protective function, may be exempted from FOIA disclosure under section 7(A) without the individualized scrutiny normally given purportedly exempt documents; that such investigations are enforcement proceedings; and that disclosure of the type of records contained in such an investigative file would interfere with such proceedings. Accordingly, the judgment of the district court is AFFIRMED.



Carl D. **WEHLING** and Geraldine D. Wehling, Plaintiffs-Appellants,

v.

**COLUMBIA BROADCASTING SYSTEM,** Defendant-Appellee.

No. 77–2840.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1980.

In a libel action, plaintiff refused to answer certain questions posed by defendant during the oral deposition and then asserted his Fifth Amendment privilege against compelled self-incrimination in response to an order to comply with defendant's discovery request. The United States District Court for the Western District of Texas, John H. Wood, Jr., J., dismissed the action, and plaintiff appealed. The Court of Appeals, 608 F.2d 1084, reversed and remanded. Defendant petitioned for rehearing, and the Court of Appeals held that: (1) the prior opinion of the Court of Appeals did not reflect an intent to restrict discovery of information that was not privi-

RPI 0058

leged under the applicable rule; (2) nothing in the prior opinion precluded defendant from abandoning its questions to plaintiff and to proceeding to an early trial without full discovery; and (3) it was premature to determine whether the stay of discovery should be extended pending resolution of a related criminal case.

Petition for rehearing denied.

### Federal Courts ⚬⇒744

Defendant's petition for rehearing with respect to prior order staying further discovery against civil plaintiff who had asserted his Fifth Amendment privilege in response to discovery order was denied where the arguments submitted by defendant in support of its petition for rehearing were not based on a correct interpretation of the Court of Appeals' prior opinion and where nothing in the prior opinion precluded defendant from abandoning its questions to plaintiff and proceeding to an early trial without full discovery.

---

Joel W. Westbrook, Bruce L. Goldston, San Antonio, Tex., for plaintiffs-appellants.

Thomas R. Phillips, Houston, Tex., for defendant-appellee.

Appeal from the United States District Court for the Western District of Texas.

## ON PETITION FOR REHEARING

(5 Cir., 1979, 608 F.2d 1084)

Before MORGAN, RONEY and GARZA, Circuit Judges.

### PER CURIAM:

On petition for rehearing, CBS points out that our opinion could be interpreted as ordering a stay of all discovery rather than merely staying discovery in those areas where plaintiff has invoked his Fifth Amendment right to silence. When Wehl-

ing brought this appeal he sought to stay only that discovery which exposed him to a risk of self-incrimination. A more expansive stay is neither needed nor requested in this case, and we disavow any intent to restrict discovery of information "not privileged" under Fed.R.Civ.P. 26(b).

CBS also asserts that the opinion deprives it of the option of proceeding to trial without the benefit of the requested discovery. This argument is unfounded. Nothing in our opinion precludes CBS from abandoning its questions to Wehling and proceeding to an early trial without full discovery. Although Wehling could continue to assert his Fifth Amendment rights at trial, it is clear that his invocation of the privilege would be subject to the drawing of an adverse inference by the trier of fact. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

Finally, CBS argues that requiring the trial court to stay discovery until the limitations period has run presupposes that Wehling will not be indicted and leaves the court with no guidance on how to proceed if he is. It is true that we did not specify what action the district court should take if an indictment against Wehling is returned. However, we did outline the proper analysis to be utilized in resolving such questions, and we remain convinced that the trial court can adequately deal with this problem when and if it arises. Furthermore, we believe that it would be premature to attempt to formulate an answer without (1) knowledge of the precise nature of the criminal charges, (2) a familiarity with the trial court's criminal docket and the usual timetable for trying such cases, and (3) some projection as to when the criminal proceedings would likely terminate. Only when these facts are ascertained can the trial judge determine whether the stay should be extended pending resolution of the criminal case.*

---

* Our opinion must not be read as requiring that the discovery stay be extended until the termination of all criminal proceedings, regardless of their duration. Although we have refused to

presume that a three-year stay would necessarily prejudice CBS' efforts to defend against Wehling's claim, we are aware that a point may be reached where the likelihood of preju-

RPI 0059

The other points raised by CBS lack merit. Consequently, the petition for rehearing is DENIED.



Richard BOUDREAUX,
Plaintiff-Appellant,

v.

Pat PUCKETT, d/b/a Pat Puckett Auto
Sales et al., Defendants,

Western Surety Co., Defendant-Appellee.

No. 77-2913.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1980.

A civil action brought by a used car buyer against the surety on a dealer's bond posted pursuant to Louisiana statute was dismissed by order of the United States District Court for the Eastern District of Louisiana, at New Orleans, Charles Schwartz, Jr., J., 433 F.Supp. 650, and the used car buyer appealed. The Court of Appeals, Thornberry, Circuit Judge, held that: (1) factors to be considered as to possibility of pendent party jurisdiction are judicial economy and convenience, whether judicial article of Federal Constitution permits such jurisdiction and whether Congress in statute conferring jurisdiction has expressly or by implication negated existence of such pendent jurisdiction; (2) invoice and bill of sale, though it showed no more than names of buyer and seller, price paid, description of the automobile sold, and signature of only the seller, and purported mileage of vehicle, constituted a "written contract" within Louisiana statute requiring

that, as condition precedent to dealing in automobiles, a bond be posted in favor of the state Motor Vehicle Commission for use and benefit of third parties injured under conditions specified in the statute; (3) in view of fact that the Louisiana statute specifically provided for a bond to indemnify "anyone" who suffers loss as result of violation of "any" provision of the chapter, a civil remedy exists under Louisiana law for inducing purchase of motor vehicle by willful and knowing understatement of true mileage, notwithstanding criminal penalty provided; and (4) the complaint sufficiently alleged violation of the Louisiana Unfair Trade Practice and Consumer Protection Law.

Ruling that bill of sale did not constitute written contract reversed; holding that plaintiff had no civil right of action against surety under Louisiana law reversed; case remanded for exercise of pendent jurisdiction over state law claim against surety.

1. Federal Courts ⟺14

Factors to be considered as to possibility of pendent party jurisdiction are judicial economy and convenience, whether judicial article of Federal Constitution permits such jurisdiction and whether Congress in statute conferring jurisdiction has expressly or by implication negated existence of such pendent jurisdiction. LSA-R.S. 32:718, subd. D; Motor Vehicle Information and Cost Savings Act, § 401, 15 U.S.C.A. § 1981; 28 U.S.C.A. §§ 1343(3), 1346; 42 U.S.C.A. § 1983; Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; U.S.C.A. Const. art. 3, § 1 et seq.

2. Licenses ⟺26

Invoice and bill of sale, though it showed no more than names of buyer and seller, price paid, description of the automobile sold, and signature of only the seller, and purported mileage of vehicle, constituted "written contract" within Louisiana stat-

dice is so great that the trial court would be justified in requiring plaintiff to either submit to discovery or forego his lawsuit. The precise

coordinates of this point cannot be determined until additional information becomes available.

# WestlawNext™

## Librado v. M.S. Carriers, Inc.

United States District Court, N.D. Texas, Dallas Division.   |   November 5, 2002   |   Not Reported in F.Supp.2d   |   2002 WL 31495988    (Approx. 3 pages)

2002 WL 31495988

Only the Westlaw citation is currently available.

United States District Court,

N.D. Texas, Dallas Division.

Cirilia Perez LIBRADO, et al., Plaintiffs,

v.

M.S. CARRIERS, INC., Defendant.

No. Civ.A. 3:02-CV-2095D.   |   Nov. 5, 2002.

MEMORANDUM OPINION AND ORDER

FITZWATER, J.

*1 Defendant M.S. Carriers, Inc. ("MSC") moves the court to abate this action, or to abate it in part, until the conclusion of a pending criminal case against Michael Keith Nichols ("Nichols"). The court grants the motion to the extent that it abates the action in part.

I

Plaintiffs bring this action arising from a tragic vehicular collision that took the life of one person and seriously injured another.[1] According to plaintiffs, Manuel Victor Perez ("Perez") was killed and Juan Cipriano Marcos ("Marcos") was seriously injured when an MSC tractor-trailer rig being driven by Nichols ran a stop sign and collided with a car in which Perez and Marcos were passengers. A state grand jury has indicted Nichols for criminally negligent homicide. MSC moves the court to abate the action in its entirely, or at least with respect to discovery as it relates to Nichols, until the criminal case against him has been concluded.[2] It maintains that Nichols is subject to criminal prosecution, has separate counsel for the criminal case, and has the right to invoke his Fifth Amendment privilege against self-incrimination. MSC argues that plaintiffs' claims against it arise from an alleged agency relationship between it and Nichols, but that Nichols is unable to participate in discovery or in MSC's defense, thereby stymieing its ability to defend itself.

Plaintiffs oppose a stay. They argue that MSC lacks standing to seek abatement, that MSC's motion effectively serves as an impermissible blanket assertion of the Fifth Amendment privilege, and that total abatement is unwarranted, since significant discovery can be taken without Nichols' complete and/or limited participation.[3]

II

"As the Fifth Circuit has instructed, in ruling on requests for stays of the civil side of parallel civil/criminal proceedings, 'Judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other. In some situations it may be appropriate to stay the civil proceeding. In others it may be preferable for the civil suit to proceed-unstayed." ' United States v. Gieger Transfer Serv., Inc., 174 F.R.D. 382, 385 (S.D.Miss.1997) (quoting Campbell v. Eastland, 307 F.2d 478, 487 (5th Cir.1962) (citation omitted)). "Certainly, a district court may stay a civil proceeding during the pendency of a parallel criminal proceeding. Such a stay contemplates 'special circumstances' and the need to avoid 'substantial and irreparable prejudice." ' United States v. Little Al, 712 F.2d 133, 136 (5th Cir.1983) (citing SEC v. First Fin. Group of Tex., Inc., 659 F.2d 660, 668 (5th Cir. Oct. 1981)).

Courts from other jurisdictions have outlined several factors that should be considered in determining whether "special circumstances" warrant a stay, including: (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the criminal case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously, weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest. See, e.g., Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F.Supp. 1134, 1139 (S.D.N.Y.1995) (citing Parallel Civil and Criminal Proceedings, 129 F.R.D. 201, 201-3 (Pollack, J.) ("Parallel Proceedings" )); Volmar Distribs., Inc. v. The New York

## SELECTED TOPICS

Abatement and Revival

    Abatement or Survival of Action

      Death of One of the Joint Tenants

Secondary Sources

**APPENDIX IV GUIDANCE AND TECHNICAL ASSISTANCE MAN**

ADA Compliance Guide Appendix IV

...Under the Americans with Disabilities Act of 1990 (the "ADA"), an employer may ask disability-related questions and require medical examinations of an applicant only after the applicant has been given ...

**¶870 DOJ'S TECHNICAL ASSIS MANUAL ON TITLE II**

ADA Compliance Guide ¶870

...Covering State and Local Government Programs and Services This Technical Assistance Manual addresses the requirements of Title II of the Americans With Disabilities Act, which applies to the operations...

**¶900 SAMPLE JOB CLASSIFIC. SPECIFICATIONS**

Public Employer's Guide to FLSA Em.... ¶900

...The job classification specifications ("class specs") provided in this tab cover a wide range of public employer positions. Classification specifications are not job descriptions; they are broader docu...

See More Secondary Sources

Briefs

**Appellants' Revised Opening B**

2012 WL 831327
Rukhsana CHAUDHRY, et al., Plaint.... Appellants, v. CITY OF LOS ANGELES, et al., Defendants-Appellees.
United States Court of Appeals, Ninth Circuit.
March 05, 2012

...Former Los Angeles Police Department Officer Joseph Cruz alleged that on March 25, 2008, Mohammad Usman Chaudhry ("Usman") attacked him with a knife, prompting Cruz to shoot and kill Usman. However, on...

**Appellants' Revised Opening B**

2012 WL 831325
Rukhsana CHAUDHRY, et al., Plaint.... Appellants, v. CITY OF LOS ANGELES, et al., Defendants-Appellees.
United States Court of Appeals, Ninth Circuit.
March 05, 2012

...Former Los Angeles Police Department Officer Joseph Cruz alleged that on March 25, 2008, Mohammad Usman Chaudhry ("Usman") attacked him with a knife, prompting Cruz to shoot and kill Usman. However, on...

**Appellants' Revised Opening B**

2012 WL 831326
Rukhsana CHAUDHRY, et al., Plaint.... Appellants, v. CITY OF LOS ANGELES, et al., Defendants-Appellees.
United States Court of Appeals, Ninth Circuit.
March 05, 2012

...Former Los Angeles Police Department Officer Joseph Cruz alleged that on March 25, 2008, Mohammad Usman Chaudhry ("Usman") attacked him with a knife, prompting Cruz to shoot and kill Usman. However, on...

See More Briefs

RPI 0061

Post Co., 152 F.R.D. 36, 39 (S.D.N.Y.1993).

C

1

*2 The first question to be resolved is the extent to which the issues in Nichols' criminal case overlap with those in the present case, because self-incrimination is more likely if there is significant overlap. See Volmar Distribs., 152 F.R.D. at 39 (quoting Parallel Proceedings, 129 F.R.D. at 203) ("The most important factor at the threshold is the degree to which the civil issues overlap with the criminal issues."). "If there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay." Trustees, 886 F.Supp. at 1139 (citing Parallel Proceedings, 129 F.R.D. at 203).

The subject matter of the criminal charges against Nichols is substantially, if not precisely, the subject matter of the instant civil suit. The criminal case and this suit both arise from allegations about Nichols' conduct related to the December 11, 2001 accident that took Perez's life and maimed Marcos. The court finds that this overlap of issues between the civil and criminal actions weighs in favor of a stay.

2

The second factor to be considered is the status of the criminal case. "A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to Speedy Trial Act considerations." Trustees, 886 F.Supp. at 1139. Although Nichols is not a party to the instant case, he is a person whose testimony is essential to its fair adjudication, because it is his alleged conduct that serves as the basis for plaintiffs' claims. Since Nichols is under indictment rather than merely under investigation, the court finds that the status of the criminal case weighs in favor of a stay.

3

In ruling on a motion for stay, the court should also weigh the private interests of the plaintiffs in proceeding expeditiously against the prejudice that will be caused by the delay that will result from the stay. Plaintiffs assert that the criminal case against Nichols is proceeding slowly and uncertainly, with no specific trial date. Nevertheless, Texas law recognizes a right to a speedy trial. Therefore, the court concludes that consideration of the burden to be placed on the plaintiffs does not weigh heavily against a stay.

The court recognizes that, even if convicted, Nichols' Fifth Amendment privilege may continue throughout the pendency of his direct appeal. See, e.g., Frank v. United States, 347 F.2d 486, 491 (D.C.Cir.1965). Because the issuance and duration of a stay are committed to the court's sound discretion, and because imposition of a stay lasting throughout the duration of Nichols' direct appeal (if he is convicted) would likely be unduly burdensome to plaintiffs' interests, the court contemplates that the stay granted today will remain in effect only through sentencing. If he is acquitted, the stay will terminate upon the return of a not guilty verdict.

4

*3 The court has also considered the private interest of MSC in securing the stay and the burden on it that would result were the stay denied. As discussed above, absent a stay, Nichols faces a conflict between asserting his Fifth Amendment rights and fulfilling his legal obligations as a witness in this civil action. This conflict may be largely, if not completely, eliminated by granting a stay of appropriate scope. Moreover, the court discerns no substantial prejudice to plaintiffs from granting a partial stay. Therefore, the court finds that MSC's private interest weighs in favor of abatement in part.

5

Because the court concludes that granting a stay will not unduly interfere with the court's management of its docket, it finds that the court's interests do not weigh against a stay. Additionally, the court holds that the interests of the public do not weigh against a stay.

6

MSC seeks abatement of the entire suit, contending that Nichols is unable to participate in discovery or in MSC's defense, thereby compromising its ability to defend itself. The court is not persuaded that all discovery must be halted. There would appear to be a great deal of discovery that both parties could undertake, including that concerning the physical evidence from the accident, the extent, nature, and costs of the medical

Trial Court Documents

Rev. Martin Fry v. Middletown T

2003 WL 26075058
Rev. Martin Fry v. Middletown Tp.
United States District Court, E.D. Pennsylvania.
March 12, 2003

...DATE: March 12, 2003 Now before me is Defendants' Motion for Summary Judgment. For the reasons that follow, this motion will be granted in part and denied in part. In this case, Reverend Martin Fry and...

In re Augusta Apartments, LLC

2011 WL 6779594
In re Augusta Apartments, LLC
United States Bankruptcy Court, N.D. West Virginia.
December 16, 2011

...Chapter 11 THIS MATTER is before the Court on the TRUSTEE'S MOTION FOR ORDER AUTHORIZING THE SALE OF ASSETS PURSUANT TO 11 U.S.C. § 363(b), (f), AND (m) AND § 105(a) (the "Sale Motion"), filed by Rober...

In re Augusta Apartments, LLC

2011 WL 6779589
In re Augusta Apartments, LLC
United States Bankruptcy Court, N.D. West Virginia.
December 16, 2011

...THIS MATTER is before the Court on the TRUSTEE'S MOTION FOR ORDER AUTHORIZING THE SALE OF ASSETS PURSUANT TO 11 U.S.C. § 363(b), (f), AND (m) AND § 105(a) (the "Sale Motion"), filed by Robert L. Johns,...

See More Trial Court Documents

RPI 0062

expenses rendered to Marcos, and the personal injuries that plaintiffs suffered as a result of the death of Perez and the injuries to Marcos.[4] Instead, the court abates the case to the extent that plaintiffs are precluded from taking Nichols' deposition and from conducting any discovery that MSC can show, by motion, will or is likely to subject it to undue prejudice by reason of Nichols' unavailability as a witness to MSC or to assist it in its defense.

Based on its consideration of the above factors, and in the interests of justice, the court grants in part MSC's motion to abate and, to the extent set forth above, abates discovery in this case until such time as a verdict of not guilty has been returned or sentencing has been completed in the criminal action against Nichols.

SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2002 WL 31495988

| Footnotes |
| --- |

1     This case is now pending in its fourth forum. Plaintiffs filed it in state court in Webb County, Texas, MSC removed it to the Southern District of Texas, that court transferred it to the Western District of Texas (while suggesting that it probably should be transferred to the Northern District of Texas but that the court was powerless to make such a transfer), and the Western District of Texas granted an unopposed motion to transfer the case to the Northern District of Texas, Dallas Division. The court is not confident that the case should be pending in this division, because plaintiffs' connection to this court appears to be the Fort Worth Division, not the Dallas Division. Nevertheless, because, at some point, this case must come to rest, the court will not direct that it be transferred still again.

2     MSC filed its motion to abate on July 16, 2002 in the Western District of Texas, where the case was then pending. Plaintiffs filed their response on August 2, 2002. MSC did not file a reply brief. On October 21, 2002 MSC filed in this court a request for ruling by submission, in which it asked the court to decide the motion. On October 30, 2002 plaintiffs filed the response to MSC's request. They join the request that the court decide the motion. The court grants the request for ruling, and decides the motion today.

3     The court will not organize its analysis based on plaintiffs' arguments, because in some respects they misunderstand the apposite jurisprudence. For example, their contention that MSC lacks standing is based erroneously on the personal nature of the Fifth Amendment privilege. While it is true that MSC cannot invoked Nichols' right against self-incrimination, it can certainly rely on the fact that he has that right to seek a stay of discovery.

4     This is intended as an illustrative, nonexclusive list, not a catalogue of the limits of available discovery.

End of Document                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.



RPI 0063

PAGE LEFT BLANK INTENTIONALLY

believing the judge's original charge regarding the requirements of the law was superseded, and there is no reason to believe defendant was harmed in any way.

Since defendant's claims do not constitute reversible error, her conviction is

AFFIRMED.



SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,

v.

FIRST FINANCIAL GROUP OF TEXAS, INC., Defendant,

William H. Howton, et al.,
Defendants-Appellants.

No. 80–1895
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 21, 1981.

Action was brought by Securities and Exchange Commission to enjoin corporation which sold securities to the public and two of its officers from continuing to engage in fraudulent practices in connection with the sale of guaranteed student loans. The United States District Court for the Southern District of Texas, at Houston, Ross N. Sterling, J., held officers in contempt and permanently enjoined them from further violations of federal securities laws, and they appealed. The Court of Appeals, Ainsworth, Circuit Judge, held that: (1) District Court, based upon evidence disclosing officers' persistent refusal to respond to discovery requests made by SEC and to comply with court orders, did not abuse its discretion in entering default judgment against officers; (2) District Court was not required to stay SEC's civil proceedings once federal grand jury began its criminal investigation of same transactions; (3) officers had sufficient notice of possibility that default judgment would be entered against them; and (4) officers' persistent refusal to comply with court orders throughout litigation justified finding of contempt.

Affirmed.

1. Federal Civil Procedure ⟞1278

District courts have broad discretion in determining whether to impose a sanction under rule which specifically empowers entry of judgment by default against disobedient party for failure to obey discovery orders and, if so, what sanctions to impose. Fed.Rules Civ.Proc. Rule 37(b)(2)(C), 28 U.S.C.A.

2. Federal Courts ⟞820

In reviewing district court's entry of discovery sanction, Court of Appeals' role is limited to determination whether important historical findings made by the district court are clearly erroneous and whether district court abused its discretion in imposing particular sanction. Fed.Rules Civ. Proc. Rule 37, 28 U.S.C.A.

3. Federal Courts ⟞792

On appeal from entry of default judgment for failure to obey discovery orders, officers of corporation which engaged in selling securities to the public had burden of demonstrating that district court's factual findings were clearly erroneous. Fed. Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.

4. Securities Regulation ⟞177

Record in action by Securities and Exchange Commission to enjoin corporation and two of its officers from continuing to engage in fraudulent practices in connection with sale of guaranteed student loans supported district court's findings that SEC, magistrate, or district court itself sufficiently notified officers of their attendance and production requirements before default judgment was entered against officers for failure to comply with discovery orders. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

RPI 0065

**5. Federal Civil Procedure ⟵1558**

Corporate officers' contention that district court did not find that they were in possession of records of corporation sought by Securities and Exchange Commission and that records were turned over to temporary receiver for corporation shortly after October 10th did not justify their refusal to produce those records for SEC in response to its numerous discovery requests prior to October 10th when they admittedly did have possession of records. Fed.Rules Civ. Proc. Rule 37, 28 U.S.C.A.

**6. Federal Courts ⟵816**

In determining whether district court abused its discretion in entering default judgment for failure to comply with discovery orders, it was not Court of Appeals' responsibility to say whether it would have chosen more moderate sanction but, rather, it was its responsibility solely to decide whether district court could in its discretion have determined that officers' conduct was so flagrant as to justify entry of default judgment. Fed.Rules Civ.Proc. Rule 37, 28 U.S.C.A.

**7. Federal Civil Procedure ⟵1636**

District court, which based its decision upon evidence of corporate officers' persistent refusal to respond to discovery requests made by Securities and Exchange Commission and to comply with court orders, and which offered officers every opportunity to satisfy their obligations, did not abuse its discretion in entering default judgment against officers in action brought by SEC to enjoin corporation and officers from continuing to engage in fraudulent practices in connection with sale of guaranteed student loans. Fed.Rules Civ.Proc. Rule 37, 28 U.S. C.A.

**8. Abatement and Revival ⟵5**

There is no general federal constitutional, statutory, or common-law rule barring simultaneous prosecution of separate civil and criminal actions by different federal agencies against same defendant involving same transactions; simultaneous prosecution is generally unobjectionable because federal government is entitled to vin-

dicate different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums.

**9. Abatement and Revival ⟵5**
  **Securities Regulation ⟵85**

No per se rule forbids Securities and Exchange Commission and Justice Department from pursuing simultaneous investigations or lawsuits into same transactions allegedly in violation of federal securities laws.

**10. Action ⟵69(5)**

In special circumstances, a district court should stay one of the proceedings pending completion of the other to prevent party from suffering substantial and irreparable prejudice as result of simultaneous investigations or lawsuits by Securities and Exchange Commission and Justice Department into same transactions that allegedly violate federal securities laws.

**11. Witnesses ⟵308**

Requiring a party to object with specificity to information sought from him permits district court to rule on validity of his claim of privilege in connection with discovery requests; party is not entitled to decide for himself whether he is protected by Fifth Amendment privilege and court should decide after conducting particularized inquiry whether privilege is well-founded. U.S.C.A.Const. Amend. 5.

**12. Witnesses ⟵307**

Even where party has legitimate claim of privilege with respect to certain questions or lines of inquiry, that person may not be entitled to invoke his privilege to remain totally silent; it is only where court finds that he could legitimately refuse to answer essentially all relevant questions because of threat of incrimination from any relevant questioning that a person is totally excused from responding to relevant inquiries. U.S.C.A.Const. Amend. 5.

**13. Witnesses ⟵307**

A blanket invocation of the Fifth Amendment privilege is insufficient to relieve a civil litigant of responsibility to an-

RPI 0066

swer questions put to him during civil discovery process and to claim privilege with respect to each inquiry. U.S.C.A.Const. Amend. 5.

**14. Federal Courts ⏝625, 640**

Failure of corporate officers, who neither sought protective order from district court nor objected to specific information sought by Securities and Exchange Commission but instead simply refused to respond at all to SEC's discovery requests, to properly raise their claim of privilege in proceedings before the district court prevented them from relying on this contention on appeal from entry of default judgment against them for failure to obey discovery orders. U.S.C.A.Const. Amend. 5.

**15. Federal Civil Procedure ⏝2419**

Where Securities and Exchange Commission filed motion for default judgment on March 10th and hand delivered copy of motion to counsel for corporate officers that day, where on March 14th, SEC filed application for entry of order of permanent injunction by default and again served copy of its motion on counsel that day, and where district court did not enter its order of permanent injunction by default against officers until March 20th, corporate officers had sufficient notice of possibility that default judgment would be entered against them in action by SEC seeking to enjoin fraudulent practices in sale of guaranteed student loans. Fed.Rules Civ.Proc. Rule 55(b)(2), 28 U.S.C.A.

**16. Contempt ⏝20**

A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.

**17. Federal Civil Procedure ⏝1640**

Where purpose of order was to compel corporate officers to comply with court's previous orders requiring them to submit to discovery by Securities and Exchange Commission rather than to vindicate court's authority without regard for officers' future compliance, and where order itself stated that officers could purge their contempt,

presumably by following prior orders, contempt judgment was civil in nature and consequently validity of order underlying contempt judgment had to be examined since judgment of civil contempt could not stand if basis for judgment was erroneous.

**18. Federal Civil Procedure ⏝1640**

Corporate officers' persistent refusal to comply with district court's discovery orders throughout litigation, in which Securities and Exchange Commission sought to enjoin officers and corporation from continuing to engage in fraudulent practices in connection with sale of guaranteed student loans, justified district court's imposition of civil contempt sanction.

**19. Contempt ⏝28(2), 70**

Reliance upon advice of counsel may be considered in mitigation of contempt sanction but does not constitute defense to contempt of court.

---

Rhett G. Campbell, Houston, Tex., for defendants-appellants.

Michael K. Wolensky, Douglas J. Scheidt, Linda D. Fienberg, Paul Gonson, Asst. Gen. Counsels, Securities & Exchange Comm., Washington, D. C., for plaintiffs-appellees.

Appeal from the United States District Court for the Southern District of Texas.

Before AINSWORTH, REAVLEY and RANDALL, Circuit Judges.

AINSWORTH, Circuit Judge.

William H. Howton and Vining Tower Reynolds, Jr., officers of First Financial Group of Texas, Inc. (First Financial), a Texas corporation engaged in the business of offering and selling securities to the public, appeal from two separate judgments of the United States District Court for the Southern District of Texas which held them in contempt of court and permanently enjoined them from further violations of the federal securities laws. The district court entered these judgments in an action brought by the Securities and Exchange

RPI 0067

Commission (SEC) to enjoin Howton, Reynolds, and First Financial from continuing to engage in fraudulent practices in connection with the sale of guaranteed student loans. We agree with the district court's holdings and affirm.[1]

### I. Statement of the Case

#### A. Background to the District Court Proceedings

Beginning in May 1979, Howton and Reynolds, acting as representatives of First Financial, began to market packages of guaranteed student loans and repurchase agreements totalling approximately nine million dollars to several institutional investors.[2] As part of the agreements reached between First Financial and these investors, First Financial agreed to deposit the loans with a third party, such as a bank, and also agreed to repurchase the loans from the investors either on a specified date or at the option of the investor. First Financial dishonored its obligations under these agreements and the SEC subsequently brought this suit against appellants and First Financial under the federal securities laws.[3]

#### B. Proceedings before the District Court

The SEC filed its complaint against First Financial on August 24, 1979. District Judge Bue issued a temporary restraining order against appellants and First Financial that day restraining the alleged unlawful conduct, and set a hearing on the SEC's motion for a preliminary injunction for August 31. On August 27, the SEC began discovery proceedings by filing a motion under Fed.R.Civ.P. 30(a) to depose appellants and other persons associated with First Financial and to examine First Financial's corporate and financial records. The SEC then served notice that it would depose Reynolds or any other authorized representative of First Financial on August 28 as well as examine certain specified documents of First Financial. The SEC also subpoe-

---

1. Prior to bringing this lawsuit, the SEC began an investigation of the events leading to this case. On April 18, 1979, the SEC issued a subpoena to First Financial requiring it to produce certain financial documents, and on June 18 the SEC applied to the district court for the Southern District of Texas for an order to compel First Financial to comply with the SEC's subpoena. *SEC v. First Financial Group of Texas, Inc.*, No. H-79-1243 (S.D.Tex., filed June 18, 1979). That action was unresolved at the time the SEC filed its complaint in this case, but the SEC has stated in its brief that it voluntarily dismissed that action on February 15, 1980. In an earlier decision by this court involving matters in this case, we affirmed the district court's entry of a preliminary injunction against First Financial as well as the district court's appointment of a temporary receiver for First Financial. We also dismissed as moot Howton's and Reynolds' appeal from the district court's entry of a preliminary injunction against them on the ground that the district court's entry of the permanent injunction involved in this appeal mooted its earlier order. *SEC v. First Financial Group of Texas, Inc.*, 645 F.2d 429 (5th Cir. 1981).

2. In its order granting the SEC's motion for a preliminary injunction, the district court described these securities as follows: "GSLs [guaranteed student loans] consist of student loans made by banks, or other financial institutions, that are guaranteed, if certain conditions are met, by the Office of Education (OE) of the Department of Health, Education and Welfare of the United States Government. Packages of GSLs are groupings of individual student loans which vary in amount. The student loans comprising these packages are made by originating banks to students in institutions of higher education or at certain vocational schools. These loans provide the holder with a seven percent return plus an additional interest increment determined on a quarterly basis by short-term United States Treasury Bill rates." *SEC v. First Financial Group of Texas, Inc.*, No. H-79-1772 slip op. at 2-3 (S.D.Tex., Sept. 28, 1979), *aff'd in part, appeal dismissed as moot in part*, 645 F.2d 429, 440 (5th Cir. 1981).

3. The SEC brought this suit based upon § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated under the 1934 Act, which render unlawful the offer or sale of securities through fraudulent, manipulative, or deceptive schemes or devices, including the use of false or misleading statements of material fact. *SEC v. First Financial Group of Texas, Inc.*, 645 F.2d 429, 431 & n.2 (5th Cir. 1981). Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b), and § 21(d) of the 1934 Act, 15 U.S.C. § 78u(d), authorize the SEC to seek permanent injunctions to prevent violations of the securities laws. *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981).

RPI 0068

naed Howton and Reynolds to be witnesses at the hearing on the SEC's motion for a preliminary injunction on August 31. Reynolds appeared for the August 28 deposition on behalf of First Financial but refused either to testify or to produce any of the subpoenaed documents. Howton and Reynolds both failed either to appear or to produce any of the subpoenaed material for the August 31 hearing.

At that hearing, District Judge Sterling ordered appellants to make themselves available for discovery. The hearing was not completed that day and Judge Sterling set the remainder of the hearing for September 7. The SEC then served notice upon appellants of its intent to depose them as well as examine First Financial's records on September 5. Appellants again failed either to appear for this deposition or to produce the requested documents. The SEC repeated its procedure on September 5, and issued subpoena's directing appellants to appear for testimony and produce First Financial's records at the September 7 continuation of the SEC's motion for a preliminary injunction. Again, appellants failed either to appear or to produce the subpoenaed material.

At the September 7 hearing, the District Judge ordered appellants to appear for depositions and to produce the subpoenaed material within the next two weeks. The SEC noticed a deposition for September 14 at which both appellants failed to appear or produce any documents. The SEC renoticed a deposition for September 20, which was continued until September 21 at the request of appellants' counsel. Reynolds finally appeared for this deposition, but he refused to testify on any substantive matter or to produce any documents of First Financial.

On November 2, the SEC filed a motion seeking to have the district court compel appellants to submit to discovery before a magistrate. The district court granted this motion, without opposition, on February 15, 1980, and ordered appellants to testify before a magistrate on March 3 and produce the records subpoenaed by the SEC. Reyn-

olds appeared at the March 3 deposition but refused either to testify, produce the subpoenaed material, or assert any privilege to justify his noncompliance with the district court's February 15 order. Howton did not appear or provide the SEC with any documents. The magistrate orally directed appellants at the March 3 deposition to appear before the district court on March 10 to show cause why they should not be held in contempt of the district court's February 15 order. Neither appellant appeared for the March 10 hearing. The district court thereupon held appellants in contempt of court for "totally violat[ing] all of the aforesaid orders of the Court" and ordered appellants confined for ten days unless they purged the contempt.

The SEC subsequently filed a motion for default judgment against appellants under Fed.R.Civ.P. 37(b)(2) requesting a permanent injunction. Appellants did not oppose this motion and on March 20 the district court entered a default judgment against appellants, accompanied by findings of fact and conclusions of law, permanently enjoining appellants from engaging in certain conduct in violation of the federal securities laws. Appellants subsequently moved for a new trial, requesting the district court to vacate its default judgment, and Reynolds also requested a new trial on the district court's contempt order. The district court denied both motions and this appeal followed.

## II. Default Judgment

[1, 2] Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure specifically empowers a district court to enter "a judgment by default against the disobedient party" for his failure "to obey an order to provide or permit discovery." See Roadway Express, Inc. v. Piper, 447 U.S. 752, 763, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980); National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curiam). District Courts have broad discretion in determining whether to impose a sanction under Rule 37 and, if so, what

RPI 0069

sanction to impose. *National Hockey League v. Metropolitan Hockey Club, supra,* 427 U.S. at 642, 96 S.Ct. at 2780; *Marshall v. Segona,* 621 F.2d 763, 766 (5th Cir. 1980). In reviewing a district court's entry of a Rule 37 sanction our role is limited to a determination of whether important historical findings made by the district court are clearly erroneous and whether the district court abused its discretion in imposing a particular sanction. *Marshall v. Segona, supra,* 621 F.2d at 766–67. *See National Hockey League v. Metropolitan Hockey Club, supra,* 427 U.S. at 642, 96 S.Ct. at 2780.

Appellants challenge the default judgment on four grounds. First, appellants contend that the district court's factual findings are clearly erroneous. Second, appellants argue that the district court abused its discretion in entering a default judgment. Third, appellants argue that the district court should have stayed this civil SEC proceeding pending the outcome of a grand jury investigation into the same transactions at issue here. Finally, appellants argue that the district court entered the default judgment without affording them adequate notice of its intention to do so. None of these contentions has merit.

A. Factual Findings by the District Court

[3, 4] Appellants argue that the district court's factual findings are "wholly inaccurate and clearly erroneous." Appellants have correctly identified our standard of review on this claim which is "limited by the rule that 'findings of fact shall not be set aside unless clearly erroneous.'" *SEC v. Blatt,* 583 F.2d 1325, 1328 (5th Cir. 1978), quoting Fed.R.Civ.P. 52(a). *See McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); *Stevens v. East-West Towing Co., Inc.,* 649 F.2d 1104, 1106 (5th Cir. 1981). Appellants bear the burden of demonstrating that the district court's factual findings are clearly erroneous. *Gupta v. East Texas State University,* 654 F.2d 411, 413 (5th Cir. 1981). The district court's findings, discussed above, detail the SEC's

unsuccessful attempts to obtain testimony from Howton and Reynolds as well as the records of First Financial. Appellants do not challenge the district court's findings that they neither appeared, testified, nor produced the subpoenaed records. Nor do appellants contend that they did not in fact have notice of their discovery obligations under the various summonses issued by the SEC and orders issued by the district court. Instead, appellants' primary argument is that there is nothing in the record to support the district court's findings that they received notice of the different depositions and hearings that they were required to attend. However, the record fully supports the district court's findings that the SEC, the magistrate, or the district court itself sufficiently notified appellants of their attendance and production requirements. Appellants' arguments to the contrary are either factually inaccurate or legally irrelevant and are therefore rejected.

[5] Appellants also contend that the district court did not find that appellants were in possession of the records of First Financial sought by the SEC. The records, according to appellants' briefs, were turned over to the temporary receiver appointed by Judge Sterling for First Financial shortly after October 10. Appellants, however, did not discuss possession of these records until the March 3 deposition. But, even assuming appellants' tardy representation to be true, it can not justify their refusal to produce these records for the SEC in response to its numerous requests prior to October 10 when they admittedly did have possession of the records. Moreover, the record discloses that the temporary receiver did not obtain these records until late February, 1980.

Finally, appellants contend that the district court's conclusion that they willfully failed to satisfy their discovery obligations finds no support in the record. Their argument proceeds from the assumption, which we have already rejected, that the district court's findings of fact are erroneous. Their conclusion falls with their premise.

RPI 0070

## B. Abuse of Discretion

Appellants contend that the district court abused its discretion in entering a default judgment. Both appellants contend that they did not believe that they were required to attend the March 10 hearing on the magistrate's order to show cause why they should not be held in contempt. In addition, Reynolds argues on his own behalf that he did appear for depositions twice prior to the March 3 deposition and that he never intentionally failed to appear for any deposition or hearing. Therefore, appellants argue that the extreme sanction of a default judgment was inappropriate.

However, the magistrate's oral order directed to the parties and entered in the presence of Reynolds and the attorney for Reynolds and Howton was explicit in its requirement that both appellants appear before the district court on March 10 to show cause why they should not be held in contempt. The magistrate also entered a minute entry into the record requiring the appellants to appear for the show cause hearing. These orders clearly stated that appellants were required to appear before the district court and appellants' argument that the procedure followed by the magistrate was confusing is meritless.

Reynolds' argument that he never intentionally failed to appear for any deposition is similarly contrary to the record. His repeated absences from noticed depositions is well documented by the record and we can not accept his argument that these absences were not intentional.

[6, 7] In determining whether the district court abused its discretion "[i]t is not our responsibility as a reviewing court to say whether we would have chosen a more moderate sanction. It is our responsibility solely to decide whether the district court could, in its discretion, have determined the appellant's conduct to be so flagrant as to justify [entering a default judgment.]" *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976). The district court based its decision upon the entire record of proceedings which amply discloses appellants' persistent refusal to respond to the discovery requests made by the SEC and to comply with the orders of the district court. The evidence demonstrates appellants' willful bad faith and callous disregard for the responsibilities of litigants, contradicting any inference of accidental oversight or confusion on their part. The capstone of appellants' unrelenting and abject refusal to satisfy their obligations is their failure even to appear for the hearing on the magistrate's order to show cause why they should not be held in contempt because of their prior absences and refusals to comply with the SEC's discovery requests. "[W]hen a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities, the district court's choice of the extreme sanction is not an abuse of discretion." *Emerick v. Fenick Industries, Inc., supra*, 539 F.2d at 1381. The district court offered appellants every opportunity to satisfy their obligations and accordingly did not abuse its discretion in entering a default judgment.

## C. Stay of SEC Civil Proceedings

Appellants argue that the district court erred by failing to stay the SEC's civil proceedings once a federal grand jury began its criminal investigation of the same transactions underlying the SEC's suit. According to appellants, "once there is a criminal proceeding regarding the same transactions as are involved in a civil proceeding, the civil discovery against the subject of the criminal proceeding should cease in the civil case." Brief for Appellants at 14. Reynolds also argues that the magistrate and district court both erred in overruling his objection to the SEC's discovery attempts on the ground that the information sought was privileged.

[8] There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions. Parallel civil and criminal proceedings instituted by different federal agencies are not un-

RPI 0071

common occurrences because of the overlapping nature of federal civil and penal laws. The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to vindicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums. The Supreme Court recognized that the federal government may pursue civil and criminal actions either "simultaneously or successively" in 1912 in *Standard Sanitary Manufacturing Co. v. United States*, 226 U.S. 20, 52, 33 S.Ct. 9, 16, 57 L.Ed. 107 [4] and reaffirmed this principle in 1970 in *United States v. Kordel*, 397 U.S. 1, 11, 90 S.Ct. 763, 769, 25 L.Ed.2d 1.[5] In both cases, the Supreme Court observed that prompt investigation and enforcement both civilly and criminally were sometimes necessary in order to protect the public interest and that deferring or foregoing either civil or criminal prosecutions could jeopardize that interest. Accordingly, the Supreme Court declined to create a per se rule forbidding simultaneous civil and criminal actions to enforce the antitrust and food and drug laws at issue in *Standard Sanitary Manufacturing Co.* and *Kordel*.

[9] This principle is fully applicable when the SEC and Justice Department each seek to enforce the federal securities laws through separate civil and criminal actions. The District of Columbia Court of Appeals recently held in a similar context that the need to prosecute simultaneous civil and criminal actions to enforce the federal securities laws could be as pressing as the need to prosecute simultaneous actions to enforce the antitrust or food and drug laws. *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir.), (en banc), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). Protection of the efficient operation of the securities markets and the financial holdings of investors from fraudulent marketing practices may require prompt civil enforcement which can not await the outcome of a criminal investigation. *Id.* at 1375. We agree with the reasoning of the District of Columbia Court of Appeals and decline to create any per se rule forbidding the SEC and Justice Departments from pursuing simultaneous investigations or lawsuits into the same transactions allegedly in violation of the federal securities laws.

The Supreme Court's decision in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), relied upon by appellants, does not require a contrary result. In *LaSalle National Bank* and its precursor *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) the Supreme Court held that the Internal Revenue Service (IRS) may not use its authority to issue summonses under 26 U.S.C. § 7602 (1976) solely for the purpose of gathering information for a criminal prosecution. *See United States v. Davis*, 636 F.2d 1028, 1036 (5th Cir. 1981). But the rule set out in those cases was based upon limitations unique to the IRS

---

4. "The Sherman act provides for a criminal proceeding to punish violations, and suits in equity to restrain such violations, and the suits may be brought simultaneously or successively. The order of their bringing must depend upon the government; the dependence of their trials cannot be fixed by a hard-and-fast rule, or made imperatively to turn upon the character of the suit. Circumstances may determine and are for the consideration of the court. An imperative rule that the civil suit must await the trial of the criminal action might result in injustice or take from the statute a great deal of its power.... It is manifest, therefor, that the most favorable view which can be taken of the rights of defendants in such situation is that they depend upon the discretion of the court in the particular case."

5. "The public interest in protecting consumers throughout the Nation from misbranded drugs requires prompt action by the agency charged with responsibility for administration of the federal food and drug laws. But a rational decision whether to proceed criminally against those responsible for the misbranding may have to await consideration of a fuller record than that before the agency at the time of the civil seizure of the offending products. It would stultify enforcement of federal law to require a governmental agency such as the FDA invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the outcome of a criminal trial."

RPI 0072

resulting from the statutory scheme of the Internal Revenue Code rather than upon any general principles concerning the simultaneous and parallel prosecution of civil and criminal cases by different federal agencies. *See SEC v. Dresser Industries, Inc., supra,* 628 F.2d at 1378–90 & n. 25. The SEC's authority to subpoena material from appellants under Fed.R.Civ.P. 26 is considerably broader than the IRS's authority to subpoena material under § 7602, encompassing the right to discover any non-privileged material relevant to the subject matter of the action. *See Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, 1086 (5th Cir. 1979). Accordingly, the limitations imposed upon the IRS by § 7602 recognized by the Supreme Court in *LaSalle National Bank* are not applicable to this civil suit by the SEC. *Cf. SEC v. Dresser Industries, Inc., supra,* 628 F.2d at 1377–84 (*LaSalle National Bank* not applicable to SEC's issuance of summons).

[10–14] In "special circumstances," however, a district court should stay one of the proceedings pending completion of the other to prevent a party from suffering substantial and irreparable prejudice. *See United States v. Kordel, supra,* 397 U.S. at 11–13, 90 S.Ct. at 769–70, 25 L.Ed.2d 1; *SEC v. Dresser Industries, Inc., supra,* 628 F.2d at 1377. For instance, in *Wehling v. Columbia Broadcasting System, supra,* 608 F.2d 1084, we held that the district court erred by failing to stay a civil libel action pending the outcome of a related criminal investigation and potential prosecution or the running of the applicable statute of limitations after the plaintiff had validly claimed his fifth amendment privilege in response to the defendant's discovery requests and had sought a protective order staying the civil suit. *See also The Black Panther Party v. Smith,* 661 F.2d 1243, 1270–1274 (D.C. Cir. 1981); *United States v. U. S. Currency,* 626 F.2d 11, 14–15 (6th Cir. 1980); *Campbell v. Gerrans,* 592 F.2d 1054 (9th Cir. 1979); *Thomas v. United States,* 531 F.2d 746 (5th Cir. 1976). But in this case appellants neither sought a protective order from the district court nor objected to specific information sought by the

SEC. Instead, appellants simply refused to respond at all to the SEC's discovery requests. Howton never appeared for any deposition or hearing before the district court and never produced any records for the SEC. Reynolds did appear for a few depositions but sought to exercise a blanket privilege by refusing to respond to any questions of any type and also never produced any records. "A blanket refusal to answer questions at deposition on the ground that they are privileged is an improper invocation of the fifth amendment, irrespective of whether such a claim is made by a plaintiff, defendant, or a witness." Note, *Plaintiff as Deponent: Invoking the Fifth Amendment,* 48 U.Chi.L.Rev. 158, 164 (1981); *id.* at 161. This Court has held that such a blanket assertion of the privilege is insufficient to relieve a party of the duty to respond to questions put to him, stating that "even if the danger of self-incrimination is great, [the party's] remedy is not to voice a blanket refusal to produce his records or testify. Instead, he must present himself with his records for questioning, and as to each question and each record elect to raise or not to raise the defense." *United States v. Roundtree,* 420 F.2d 845, 852 (5th Cir. 1969) (footnote omitted). *See United States v. Malnik,* 489 F.2d 682, 685 (5th Cir. 1974); Note, *supra,* 48 U.Chi.L. Rev. at 161. Requiring a party to object with specificity to the information sought from him permits the district court to rule on the validity of his claim of privilege. A party is not entitled to decide for himself whether he is protected by the fifth amendment privilege. Rather, this question is for the court to decide after conducting "a particularized inquiry, deciding, in connection with each specific area that the questioning party seeks to explore, whether or not the privilege is well-founded." *United States v. Melchor Moreno,* 536 F.2d 1042, 1049 (5th Cir. 1976). Even where a party has a legitimate claim of privilege with respect to certain questions or lines of inquiry, that person may not be entitled to invoke his privilege to remain totally silent. Only where the court finds that he could "legitimately

RPI 0073

refuse to answer essentially all relevant questions," *United States v. Gomez-Rojas,* 507 F.2d 1213, 1220 (5th Cir. 1975), because of the threat of incrimination from any relevant questioning is a person totally excused from responding to relevant inquiries. Otherwise, a person is entitled to invoke the privilege "[o]nly as to genuinely threatening questions . . . ." *United States v. Melchor Moreno, supra,* 536 F.2d at 1049. *See generally United States v. Goodwin,* 625 F.2d 693, 700–01 (5th Cir. 1980). Therefore, a blanket invocation of the fifth amendment privilege is insufficient to relieve a civil litigant of the responsibility to answer questions put to him during the civil discovery process and to claim the privilege with respect to each inquiry. *See National Life Insurance Co. v. Hartford Accident & Indemnity Co.,* 615 F.2d 595, 598–600 (3d Cir. 1980); *id.* at 599 (cases cited); *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 873 (7th Cir. 1979) (per curiam); 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2018, at 142–43 (1970 & Supp.1981); Note, *supra,* 48 U.Chi.L.Rev. at 161, 164. Appellants' failure properly to raise their claim of privilege in the proceedings before the district court prevents them from relying on this contention on appeal.

### D. Notice of Default Judgment

[15] Appellants' final challenge to the default judgment states that the district court entered the judgment without proper notice to appellants. This argument is meritless. Rule 55(b)(2) of the federal rules of civil procedure states that "[i]f the party against whom judgment by default is sought has appeared in the action, he (or, if appearing by representative, his representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application." The SEC filed a motion for default judgment on March 10 and hand delivered a copy of the motion to counsel for appellants that day. On March 14, the SEC filed an application for the entry of an order of permanent injunction by default and again served a copy of its motion on counsel for appellants that day. The district court did not enter its order of permanent injunction by default against appellants until March 20. Rule 55(b)(2) does not require the district court to hold either an evidentiary hearing or oral argument on a motion for a default judgment. *Thomas v. United States,* 531 F.2d 746, 748 (5th Cir. 1976). Appellants had sufficient notice of the possibility that a default judgment would be entered against them and their contention is rejected.

### III. Contempt Judgment

[16, 17] As the Supreme Court stated in *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911), "the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *See Roadway Express, Inc. v. Piper, supra,* 447 U.S. at 764, 100 S.Ct. at 2463. A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order. *See Jim Walter Resources, Inc. v. International Union, UMW,* 609 F.2d 165, 168 (5th Cir. 1980); *In re Baum,* 606 F.2d 592, 593 (5th Cir. 1980). In this case, the district court's judgment was an adjudication of civil contempt. The purpose of this order was to compel appellants to comply with the court's previous orders requiring them to submit to discovery by the SEC rather than to vindicate the court's authority without regard for the contemnor's future compliance with the court's orders. *See Smith v. Sullivan,* 611 F.2d 1050, 1053 (5th Cir. 1980). The order itself stated that appellants could purge their contempt, presumably by following the district court's prior orders, and we conclude that the contempt judgment entered by the district court was civil in nature. Consequently, we must examine the validity of the district court's order underlying its contempt judgment because a judgment of civil contempt can not stand if the basis for the judgment is erroneous.

RPI 0074

*ITT Community Development Corp. v. Barton,* 569 F.2d 1351, 1356 (5th Cir. 1978).

Appellants contend that the district court's contempt judgment should be reversed because the district court's factual findings are clearly erroneous and the district court abused its discretion in holding them in contempt. Finally, appellants argue that their refusal to submit to discovery was based upon a valid claim of privilege and the advice of counsel. We can not accept these contentions.

[18, 19] While the district court entered separate findings of fact in connection with its contempt judgment,[6] appellants' argument here is the same as that in regard to the default judgment—that there is nothing in the record to support the finding that appellants received notice of the different depositions and hearings they were required to attend. We have already rejected that argument in connection with our discussion of the default judgment and, for the reasons stated above, we also reject it here. The district court also did not abuse its discretion. Appellants' persistent refusal to comply with the district court's orders throughout this litigation justified the district court's imposition of this sanction. For the reasons stated above, we also reject appellants' argument that they validly invoked their fifth amendment privilege before the district court. Finally, we reject appellants' contention that reliance upon the advice of counsel constitutes an excuse for their refusal to obey a valid court order. Reliance upon advice of counsel may be considered in mitigation of the sanction but does not constitute a defense to contempt of court. *United States v. Seavers,* 472 F.2d 607, 611 (6th Cir. 1973); *In re Door,* 195 F.2d 766, 770 & n. 6 (D.C. Cir. 1952); *United States v. Goldfarb,* 167 F.2d 735, 735 (2d Cir. 1948) (per curiam); *Eustace v. Lynch,*

80 F.2d 652, 656 (9th Cir. 1935); *Spangler v. Pasadena City Board of Education,* 384 F.Supp. 846, 849–50 (C.D.Cal.1974), *vacated as moot,* 537 F.2d 1031 (9th Cir. 1976); *id.* (cases cited); *Theriault v. Carlson,* 353 F.Supp. 1061, 1066 n. 2 (N.D.Ga.1973), *rev'd on other grounds,* 495 F.2d 390 (5th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974).

The judgments of the district court are AFFIRMED.



Carole Hyman BURSTEIN, Plaintiff-Appellant,

v.

The STATE BAR OF CALIFORNIA, Defendant-Appellee.

No. 80–4017

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Oct. 21, 1981.

Suit was brought against the State Bar of California alleging breach of contract and negligence, and deprivation of due process and equal protection in violation of civil rights statute, in connection with grading of plaintiff's bar examination. The United States District Court for the Eastern District of Louisiana, at New Orleans, 503 F.Supp. 227, Charles Schwartz, Jr., J., dismissed for lack of personal jurisdiction, and plaintiff appealed. The Court of Ap-

6. The opinion entered by the district court on March 20 contained factual findings and legal conclusions in connection with the court's entry of a permanent injunction by default judgment. *SEC v. First Financial Group of Texas,* No. H–79–1772 slip op. at 3–5 (S.D.Tex., March 20, 1980). Record on Appeal, Vol. IV at 550–52; *Id.* at 553–55. Contrary to appellants' con-

tention, this opinion was not entered in connection with the district court's contempt order, issued on March 12. The district court issued a separate opinion in connection with that order. *SEC v. First Financial Group of Texas, Inc.,* No. H–79–1772 (S.D.Tex., March 12, 1980). Record on Appeal, Vol. IV, at 539–41.

RPI 0075

Carl D. WEHLING and Geraldine D. Wehling, Plaintiffs-Appellants,

v.

COLUMBIA BROADCASTING SYSTEM, Defendant-Appellee.

No. 77-2840.

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1979.

Rehearing Denied Feb. 14, 1980.
See 611 F.2d 1026.

In a libel action, the plaintiff refused to answer certain questions posed by defendant during his oral deposition and then asserted his Fifth Amendment privilege against compelled self-incrimination in response to order to comply with defendant's discovery request. The United States District Court for the Western District of Texas at San Antonio, John H. Wood, Jr., J., then dismissed action, and plaintiff appealed. The Court of Appeals, Lewis R. Morgan, Circuit Judge, held that: (1) plaintiff's assertion of privilege during pretrial discovery did not automatically require dismissal of his libel action; (2) when plaintiff's silence is constitutionally guaranteed, dismissal of civil action is appropriate only when other, less burdensome remedies would be ineffective means of preventing unfairness to defendant, and (3) where staying discovery until applicable criminal statute of limitations ran would not impose undue hardship on defendant, trial court abused its discretion in denying plaintiff's motion for a protective order seeking such a stay.

Reversed and remanded.

**1. Witnesses ⊂⊃293½**

Fact that Fifth Amendment privilege against self-incrimination is raised in civil proceeding rather than criminal prosecution does not deprive party of its protection, and thus under both federal discovery rules and the Constitution, civil plaintiff in libel action was under no obligation to disclose to defendant information that he reasonably believed might be used against him as accused in criminal prosecution. U.S.C.A. Const. Amend. 5; Fed.Rules Civ.Proc. Rule 26(b)(1), 28 U.S.C.A.

**2. Witnesses ⊂⊃297(1)**

If party reasonably apprehends risk of self-incrimination, he may claim Fifth Amendment privilege though no criminal charges are pending against him and even if risk of prosecution is remote. U.S.C.A. Const. Amend. 5.

**3. Witnesses ⊂⊃309**

Plaintiff who retreats under cloak of Fifth Amendment cannot hope to gain unequal advantage against party he has chosen to sue. U.S.C.A.Const. Amend. 5.

**4. Federal Civil Procedure ⊂⊃1800**

Civil plaintiff's assertion of his Fifth Amendment privilege during pretrial discovery did not automatically require dismissal of his libel action. U.S.C.A.Const. Amend. 5; Fed.Rules Civ.Proc. Rule 26(b)(1), 28 U.S.C.A.

**5. Federal Civil Procedure ⊂⊃1278**

No provision in federal discovery rules authorizes court to impose sanctions on party who resists discovery by asserting valid claim of privilege, and thus district court had no authority to order civil plaintiff to disclose privileged information and should not have imposed sanctions when civil plaintiff declined to answer during pretrial discovery on Fifth Amendment grounds, although district court was not precluded from using dismissal as remedy to prevent unfairness to defendant as last resort. U.S.C.A.Const. Amend. 5; Fed.Rules Civ.Proc. Rule 26(b)(1), 28 U.S.C.A.

**6. Federal Civil Procedure ⊂⊃1741**

Dismissing action by civil plaintiff, who in addition to Fifth Amendment right to silence has due process right to judicial determination of civil action, solely because he exercises his privilege against self-incrimination is constitutionally impermissible. U.S.C.A.Const. Amend. 5.

**7. Federal Civil Procedure ⟨key⟩1741**

A civil plaintiff has no absolute right to both his silence and his lawsuit but neither does civil defendant have absolute right to have action dismissed anytime plaintiff invokes his constitutional privilege, and thus when plaintiff's silence is constitutionally guaranteed, dismissal is appropriate only where other, less burdensome remedies would be ineffective means of preventing unfairness to defendant. U.S.C.A.Const. Amend. 5.

**8. Witnesses ⟨key⟩308**

After civil plaintiff in libel action refused to answer certain questions posed by defendant during plaintiff's oral deposition and asserted his Fifth Amendment privilege against self-incrimination in response to order to comply with discovery request, district court should have measured relative weights of parties' competing interests with view towards accommodating those interests, if possible, thus insuring that rights of both parties were taken into consideration before deciding whose rights predominated. U.S.C.A.Const. Amend. 5.

**9. Federal Civil Procedure ⟨key⟩1271**

Where civil plaintiff was threatened with potential criminal prosecution until approximately September 1, 1980, and where staying discovery would not impose undue hardship on defendant in libel action, permitting three-year hiatus in lawsuit was preferable to requiring plaintiff to choose between his silence and his lawsuit, and thus further discovery should have been stayed until applicable statute of limitations had run with respect to criminal prosecution against plaintiff, who had asserted his Fifth Amendment privilege against compelled self-incrimination in response to discovery order. U.S.C.A.Const. Amend. 5.

**10. Federal Civil Procedure ⟨key⟩1741**

Although dismissal of libel lawsuit was premature following plaintiff's assertion of his Fifth Amendment privilege against compelled self-incrimination in response to discovery order, district court was not precluded from dismissing action if circumstances arose that required use of this drastic remedy and thus, should district court determine that postponing discovery deprived defendant of crucial information that otherwise would have been available and that lack of such information compromised defendant's ability to prove truth, court would be free to fashion whatever remedy was required to prevent prejudice to defendant. U.S.C.A.Const. Amend. 5.

---

Joel W. Westbrook, Bruce L. Goldston, San Antonio, Tex., for plaintiffs-appellants.

Thomas R. Phillips, Houston, Tex., for defendant-appellee.

Appeal from the United States District Court for the Western District of Texas.

Before MORGAN, RONEY and GARZA, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

In this diversity case plaintiff[1] appeals from the dismissal of his libel action under Rule 37, Fed.R.Civ.P., for refusing to answer certain questions posed by CBS during plaintiff's oral deposition. Wehling asserted his Fifth Amendment privilege against compelled self-incrimination in response to the district court's order to comply with defendant's discovery request. The question presented is whether the court abused its discretion in denying Wehling's motion for a protective order and dismissing his complaint with prejudice. For reasons discussed below, we reverse the district court and remand so that the court might enter a protective order temporarily staying further discovery in this action.

1. Both Carl D. Wehling and his wife, Geraldine D. Wehling, were named as plaintiffs in the complaint filed against CBS, and both of the Wehlings are appellants here. Because only Carl Wehling asserted his Fifth Amendment privilege during discovery, we will, for purposes of convenience, refer to appellants as either "Wehling" or "plaintiff."

RPI 0077

## I.

Carl and Geraldine Wehling, the owners of a number of Texas proprietary and trade schools, filed this libel action alleging that they had been defamed by a television news story appearing on the CBS Evening News on August 18, 1975. The broadcast stated that Wehling had defrauded both his own students and the federal government through abuse of federal student loan and grant programs. When CBS sought pretrial discovery from plaintiff concerning the details of the operation of these schools, Wehling invoked his Fifth Amendment privilege against self-incrimination "as to all questions with respect to his operation of the schools."[2]

The district court ordered Wehling to answer the questions posed to him at his deposition or suffer dismissal of his lawsuit for failure to make discovery. Wehling then filed a motion for a protective order asking the court to fashion some type of relief[3] short of outright dismissal which would respect the rights of both parties. The court denied plaintiff's Motion for Protective Order and again ordered him to submit to discovery. Wehling informed CBS that he would continue to claim his Fifth Amendment privilege, and on July 29, 1977, the court dismissed plaintiff's action with prejudice.

Prior to the broadcast, Wehling had been subpoenaed to appear before a federal grand jury investigating federally insured student loan programs. In all five of his appearances before the grand jury, Wehling asserted his Fifth Amendment privilege against self-incrimination. On the date CBS took plaintiff's oral deposition, Wehling's counsel stated that he had reason to believe that the grand jury investigation was continuing, that Wehling was a target of that investigation, and that CBS had

been cooperating with the United States Attorney's office and the Attorney General of Texas.[4] Accordingly, counsel advised Wehling to invoke the Fifth Amendment 19 times during the course of the deposition in response to questions which related to the subject matter of the pending grand jury investigation. In refusing to answer any question regarding his operation of the schools, Wehling deprived CBS of information concerning the accuracy of its broadcast and thus thwarted discovery of issues at the heart of plaintiff's lawsuit.

## II.

[1] Under the federal discovery rules, any party to a civil action is entitled to all information relevant to the subject matter of the action before the court *unless such information is privileged.* Fed.R.Civ.P. 26(b)(1). Even if the rules did not contain specific language exempting privileged information, it is clear that the Fifth Amendment would serve as a shield to any party who feared that complying with discovery would expose him to a risk of self-incrimination. The fact that the privilege is raised in a civil proceeding rather than a criminal prosecution does not deprive a party of its protection. *Lefkowitz v. Cunningham,* 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924). Thus, under both the Federal Rules of Civil Procedure and the Constitution, Wehling was under no obligation to disclose to CBS information that he reasonably believed might be used against him as an accused in a criminal prosecution. *Maness v. Meyers,* 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *Hoffman v. United States,* 341

2. Deposition of Carl D. Wehling, May 23, 1977.

3. The Motion for Protective Order did not specify what relief the court should award plaintiff. However, the accompanying Memorandum Brief indicated that plaintiff desired a stay of further discovery until all threat of criminal liability had terminated.

4. The Attorney General of Texas was, at that time, involved in litigation against Carl Wehling under the Texas Consumer Protection Act concerning Wehling's ownership and operation of proprietary schools. CBS has admitted that it interviewed a number of people at the United States Attorney's office, the state Attorney General's office, and the Department of Health,

U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).[5]

[2] The question here, however, is not whether Wehling had a right to invoke the constitutional privilege against self-incrimination, which he did, but what effect the assertion of this privilege would have on his libel action against CBS. Wehling argues that dismissing his lawsuit because he asserted his self-incrimination privilege in effect penalized him for exercising a fundamental constitutional right. He claims that the district court abused its discretion by making the invocation of the Fifth Amendment privilege "costly." *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). CBS, on the other hand, argues that the district court properly respected the rights of both parties when, though recognizing Wehling's right to assert the self-incrimination privilege, it remedied the resulting unfairness to CBS by dismissing the action. Furthermore, CBS contends that postponing discovery pending termination of the grand jury proceedings or expiration of the limitations period would prejudice its efforts to prepare a defense to Wehling's claim.

[3] We do not dispute CBS's assertion that it would be unfair to permit Wehling to proceed with his lawsuit and, at the same time, deprive CBS of information needed to prepare its truth defense. The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue. To hold otherwise would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as a sword. This he cannot do. *See, e. g., Lyons v. Johnson*, 415 F.2d 540 (9th Cir. 1969); *Kisting v. Westchester Fire Ins. Co.,*

290 F.Supp. 141 (W.D.Wis.1968). Wehling, however, has not claimed the right to proceed to trial without answering the questions posed by CBS during the deposition. Instead, Wehling asks only that discovery be stayed until all threat of criminal liability has ended. We must decide whether, under the circumstances of this case, plaintiff should have been required to forego a valid cause of action in order to exercise his constitutional right to avoid self-incrimination.

[4, 5] We hold that the district court erred in concluding that plaintiff's assertion of his self-incrimination privilege during pretrial discovery automatically required the dismissal of his libel action. First, we find no provision in the federal discovery rules which authorizes a court to impose sanctions on a party who resists discovery by asserting a valid claim of privilege. *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2018 (1970). Rule 26 limits the scope of discovery to matter that is "not privileged." Because CBS had no right to information protected by the privilege against self-incrimination, Wehling did not violate the discovery rules when he declined to answer the questions posed at his deposition. In short, the district court had no authority to order Wehling to disclose privileged information and, consequently, should not have imposed sanctions when Wehling declined to answer.[6]

[6] Second, we believe that dismissing a plaintiff's action with prejudice solely because he exercises his privilege against self-incrimination is constitutionally impermissible. Wehling had, in addition to his Fifth Amendment right to silence, a due process right to a judicial determination of his civil

Education, and Welfare before formulating and broadcasting its news story.

5. If a party reasonably apprehends a risk of self-incrimination, he may claim the privilege though no criminal charges are pending against him, *Savannah Sur. Associates, Inc. v. Master,* 240 Ga. 438, 439, 241 S.E.2d 192, 193 (1978), and even if the risk of prosecution is remote. *In re Master Key Litigation,* 507 F.2d 292, 293 (9th Cir. 1974).

6. While dismissal is unavailable as a *sanction,* the district court is not precluded from using dismissal as a *remedy* to prevent unfairness to the defendant. As we indicate below, however, dismissal may only be used as a remedy of last resort where the plaintiff's refusal to submit to discovery is based on his exercise of a constitutional right.

action. When the district court ordered Wehling to answer CBS' questions or suffer dismissal, it forced plaintiff to choose between his silence and his lawsuit. The Supreme Court has disapproved of procedures which require a party to surrender one constitutional right in order to assert another. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Similarly, the Court has emphasized that a party claiming the Fifth Amendment privilege should suffer no penalty for his silence:

> In this context "penalty" is not restricted to fine or imprisonment. It means, as we said in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the imposition of any sanction which makes assertion of the Fifth Amendment privilege "costly."

*Spevack v. Klein*, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967). We agree with the Ninth Circuit's conclusion in *Campbell v. Gerrans*, 592 F.2d 1054, 1058 (9th Cir. 1979), that dismissing a party's action because he asserts his Fifth Amendment privilege makes resort to that privilege "costly." [7] *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2018 at 148.

[7] We recognize, of course, that Wehling is not the only party to this action who has important rights that must be respected. As we have observed, CBS should not be required to defend against a party who refuses to reveal the very information which might absolve defendant of all liability. "While it may be true that an individual should suffer no penalty for the assertion of a constitutional right, neither should third parties sued by that individual who have no apparent interest in the criminal prosecution, be placed at a disadvantage thereby." *Jones v. B. C. Christopher & Co.*, 466 F.Supp. 213, 227 (D.Kan.1979). Therefore we emphasize that a civil plaintiff has no absolute right to both his silence and his lawsuit. Neither, however, does the civil defendant have an absolute right to have the action dismissed anytime a plaintiff invokes his constitutional privilege. When plaintiff's silence is constitutionally guaranteed, dismissal is appropriate only where other, less burdensome, remedies would be an ineffective means of preventing unfairness to defendant.

[8] The district court's task in this case was complicated by the presence of competing constitutional and procedural rights. In focusing solely on CBS' right to the requested information, the court failed to attribute any weight to Wehling's right to his day in court. Instead of arbitrarily adopting a rule favoring CBS, the court should have measured the relative weights of the parties' competing interests with a view toward accommodating those interests, if possible. This balancing-of-interests approach ensures that the rights of both parties are taken into consideration before the court decides whose rights predominate.[8]

[9] We find that the balance in this case tips in favor of Wehling and against CBS. Wehling filed his suit against CBS on August 17, 1976, the last day before limitations ran on any libel action arising out of the August 18, 1975 broadcast. Wehling had disposed of his last interest in the trade schools in August of 1975 and, under the applicable statute of limitations,[9] was

---

7. CBS distinguishes *Campbell v. Gerrans* on the basis that in that case plaintiffs refused to answer only peripheral questions which defendant had no right to have answered anyway. The court did note that the four unanswered interrogatories "were of a highly questionable nature." 592 F.2d at 1057. It is arguable, therefore, that the court reversed because the questions were irrelevant and not because plaintiffs asserted a constitutional privilege. While the court's discussion of privilege is perhaps unnecessary to its decision, the court's views on this question are clear and there is little doubt as to how the court would hold

were the question of privilege squarely presented.

8. *See generally,* Comment, Penalizing the Civil Litigant Who Invokes the Privilege Against Self-Incrimination 24 U.Fla.L.Rev. 541, 547 (1972); Note, Use of the Privilege Against Self-Incrimination in Civil Litigation, 52 Va.L.Rev. 322, 335 (1966).

9. Counsel informs the court that under 18 U.S.C.A. § 3282 Wehling was subject to a five year statute of limitations for any criminal activity related to his operation of the schools. Al-

threatened with potential criminal prosecution until approximately September 1, 1980. Thus, when Wehling filed his Motion for Protective Order in July 1977, he in effect was asking the court to stay further discovery for approximately three years. Although a three-year hiatus in the lawsuit is undesirable from the standpoint of both the court and the defendant, permitting such inconvenience seems preferable at this point to requiring plaintiff to choose between his silence and his lawsuit. *Dienstag v. Bronsen*, 49 F.R.D. 327, 329 (S.D.N.Y.1970); *Paul Harrigan & Sons, Inc. v. Enterprise Animal Oil Co.*, 14 F.R.D. 333 (E.D.Pa.1953); *National Discount Corp. v. Holzbaugh*, 13 F.R.D. 236 (E.D.Mich.1952).[10] Because staying discovery would not impose undue hardship on defendant and, therefore, would protect the party exercising a constitutional privilege from *unnecessary* adverse consequences, we believe the court abused its discretion in denying Wehling's Motion for a Protective Order and dismissing the lawsuit.

[10] Finally, we wish to emphasize that although dismissal of the lawsuit was premature at this stage of the proceeding, the district court is not precluded from dismissing plaintiff's action if circumstances arise which require the use of this drastic remedy. It is possible that avenues of discovery open to CBS in 1977 will be closed by the time the stay is lifted in 1980. Should the district court determine that postponing discovery has deprived CBS of crucial information which otherwise would have been available and that the lack of such information has compromised CBS' ability to prove truth, the court would be free to fashion

whatever remedy is required to prevent unfairness to defendant. However, prejudice to defendant must be established before any remedies are appropriate.

The dismissal of Wehling's lawsuit is reversed and the case remanded so that the court may enter a protective order staying further discovery until the applicable statute of limitations has run.

REVERSED and REMANDED.



UNITED STATES of America,
Plaintiff-Appellant,

v.

Clifford Jerome MILLER and Kathelyn Vandraiss Miller, Defendants-Appellees.

UNITED STATES of America,
Plaintiff-Appellant,

v.

Clifford Jerome MILLER,
Defendant-Appellee.

Nos. 78-2274, 78-1737, 78-1978
and 78-1979.

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1979.

Rehearing and Rehearing En Banc
Denied Feb. 14, 1980.

The United States District Court for the Western District of Texas, at El Paso,

---

though the Motion for Protective Order did not refer to the date on which the limitations period would expire, the court never suggested that that information would be important in its consideration of plaintiff's motion.

10. We recognize that in each of these cases the self-incrimination privilege was claimed by a civil *defendant*. CBS suggests that such cases are inapplicable where it is a plaintiff who invokes his constitutional right of silence. Although the plaintiff-defendant distinction has its advocates, see, e. g. *Jones v. B. C. Christopher & Co.*, 466 F.Supp. 213 (D.Kan.1979); *Mi-*

*nor v. Minor*, 240 So.2d 301 (Fla.1970), we are unwilling to join their ranks. It is true that, as a voluntary litigant, the civil plaintiff has created the situation which requires him to choose between his silence and his lawsuit. In most cases, however, a party "voluntarily" becomes a plaintiff only because there is no other means of protecting legal rights. As one commentator has observed, although the plaintiff-defendant "distinction is superficially appealing, . . . civil plaintiffs seldom voluntarily seek situations requiring litigation." Comment, *supra* note 8 at 545.

RPI 0081

appeals erred in reversing the trial court's judgment. TEX.R.APP. P. 81(b).

Lemond complains that he was entitled to an instruction on manufacturing defect, and that distributors of natural gas should be held to a higher standard of care because of the dangers that inhere in the product. The court of appeals addressed these complaints fully and, we believe, rejected them correctly.

Accordingly, a majority of the Court, without hearing oral argument, reverses the judgment of the court of appeals to the extent that it reverses the judgment of the trial court, affirms it in all other respects, and renders judgment that Lemond take nothing. TEX.R.APP.P. 170.

ENOCH, J., took no part in the consideration or decision of this case.



**TEXAS DEPARTMENT OF PUBLIC SAFETY OFFICERS ASSOCIATION, Billy Don Ivey, Jerry Moore, Charlie Adams, Mary Pat Becnel (Now Mary Pat Holt), Jeff Heard, Jeff Heard & Co., Petitioners,**

v.

**Lane DENTON, Respondent.**

**No. D–4557.**

**Supreme Court of Texas.**

**Argued Sept. 22, 1994.**

**Decided April 13, 1995.**

Plaintiff, in his civil action against public safety officers association following his termination from the association under suspicion of misappropriating funds, asserted Fifth Amendment privilege against self-incrimination to avoid discovery. The 200th District Court, Travis County, Joe B. Dibrell, Jr., J., dismissed the suit as sanction for plaintiff's refusal to comply with discovery, and plaintiff appealed. The Austin Court of Appeals, Third Judicial District, 862 S.W.2d 785, Mack Kidd, J., reversed and remanded, and association applied for writ of error. The Supreme Court, Enoch, J., held that: (1) plaintiff was engaging in "offensive use" of the privilege under three-pronged *Republic Insurance* test, and thus had exposed himself to discovery sanction by not waiving it; (2) before dismissing civil action as discovery sanction for a plaintiff's offensive use of Fifth Amendment privilege against self-incrimination to avoid discovery, trial court must be convinced that less burdensome remedies would not be effective in preventing unfairness to defendant; and (3) trial court abused its discretion in dismissing the instant action.

Court of Appeals affirmed, and case remanded.

Gonzalez, J., filed concurring opinion in which Gammage and Owen, JJ., joined.

**1. Witnesses ⚖297(4.1)**

Civil plaintiff has right to assert Fifth Amendment privilege against self-incrimination to avoid discovery if he reasonably fears the answers would tend to incriminate him. U.S.C.A. Const.Amend. 5.

**2. Witnesses ⚖293½**

Fifth Amendment can be asserted in both civil and criminal trials wherever the answer might tend to subject to criminal responsibility him who gives it. U.S.C.A. Const.Amend. 5.

**3. Witnesses ⚖309**

Where plaintiff asserts Fifth Amendment privilege against self-incrimination in civil proceeding, general rule against penalizing the assertion of the privilege does not prohibit trial court from taking acts to ensure that the proceeding remains fair, such as barring plaintiff from introducing evidence on the subject of the privilege. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

**4. Pretrial Procedure ⚖33, 44.1**

Civil plaintiff who has valid privilege against discovery will nevertheless be re-

RPI 0082

quired, under "offensive use" doctrine enunciated in *Republic Insurance*, to either waive the privilege or risk discovery sanction, regardless of whether such privilege is evidentiary or constitutional in nature, where (1) plaintiff is seeking affirmative relief, (2) plaintiff is using the privilege to protect outcome determinative information, and (3) the protected information is not otherwise available to defendant. Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Witnesses ⚖️309**

Plaintiff, who was asserting Fifth Amendment privilege against self-incrimination to avoid discovery in his civil action against public safety officers association following his termination from the association under suspicion of misappropriating funds, was engaging in "offensive use" of the privilege under three-pronged *Republic Insurance* test, and thus had exposed himself to discovery sanction by not waiving the privilege, where he was seeking damages and thus was seeking affirmative relief; the discovery questions to which he had asserted the privilege were outcome determinative, as they pertained only to his claims against the association; and some, though not all, of the information sought could be obtained only through him. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

**6. Pretrial Procedure ⚖️33, 44.1**

Civil plaintiff who is seeking damages is seeking "affirmative relief," even if plaintiff is also seeking abatement of the action, pending completion of criminal proceedings, for purposes of the *Republic Insurance* test for determining whether plaintiff's assertion of privilege in response to discovery requests is offensive in nature and thus subjects plaintiff to risk of discovery sanction in absence of waiver. Vernon's Ann.Texas Rules Civ. Proc., Rules 215, 215, subd. 1, par. b.

See publication Words and Phrases for other judicial constructions and definitions.

**7. Witnesses ⚖️309**

In determining the appropriate remedy when civil plaintiff has engaged in offensive use of Fifth Amendment privilege against self-incrimination to avoid discovery and has elected to risk discovery sanction rather than waive the privilege, trial court should consider a number of factors before imposing a sanction, including: the nature of both questions asked and privilege asserted; a weighing of the unfairness resulting to defendant if trial were to proceed without the sought discovery, keeping in mind whether any remedies could be imposed during trial in the event plaintiff continued to assert the privilege; a weighing of the option to delay civil proceedings during pendency of criminal investigations or parallel criminal proceedings; and a recognition that it could impose remedies in future if delay resulted in unanticipated or extraordinary hardships to defendant. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

**8. Witnesses ⚖️309**

Court can allow civil jury to make negative inference from assertion of Fifth Amendment privilege against self-incrimination. U.S.C.A. Const.Amend. 5.

**9. Witnesses ⚖️309**

In imposing discovery sanction on civil plaintiff who has engaged in offensive use of Fifth Amendment privilege against self-incrimination to avoid discovery and has elected to risk such sanction rather than waive the privilege, trial court must ensure that direct relationship exists between the offensive conduct and the sanction imposed, that the sanction is not excessive, and that the sanction is no more severe than necessary to satisfy its legitimate purposes. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

**10. Witnesses ⚖️309**

Before dismissing civil action, as discovery sanction for plaintiff's offensive use of Fifth Amendment privilege against self-incrimination to avoid discovery when plaintiff has elected to risk such sanction rather than waive the privilege, trial court must be convinced that less burdensome remedies would

RPI 0083

not be effective in preventing unfairness to defendant. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

### 11. Witnesses ⬤➞309

Trial court abused its discretion in dismissing plaintiff's civil action against public safety officers association as discovery sanction for his offensive use of Fifth Amendment privilege against self-incrimination to avoid discovery. U.S.C.A. Const.Amend. 5; Vernon's Ann.Texas Rules Civ.Proc., Rules 215, 215, subd. 1, par. b.

---

Earl L. Yeakel, III, Amanda Foote, Clark, Thomas & Winters, Austin, for petitioners Texas Dept. of Public Safety Officers Ass'n, Billy Don Ivey, Jerry Moore, Charlie Adams and Mary Pat Becnel.

Robert C. May, Guy M. Hohmann, Nicholas S. Bressi, Hohmann & Werner, Austin, for petitioners Jeff Heard and Jeff Heard & Co.

Susan Dasher, Kim D. Brown and Paul D. Keeper, Austin, for respondent.

ENOCH, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HIGHTOWER, HECHT, CORNYN and SPECTOR, Justices, join.

We are asked what can a trial court do when a civil plaintiff exercises his Fifth Amendment privilege against self-incrimination and thereupon refuses to comply with discovery. In answering this question, we clarify that a trial court has the authority to respond to an offensive use of an evidentiary privilege by imposing the sanctions authorized by the rules of procedure. TEX. R.CIV.P. 215. The trial court dismissed Lane Denton's cause of action when Denton asserted his Fifth Amendment privilege in response to discovery requests. The court of appeals reversed the trial court and remanded for further proceedings. 862 S.W.2d 785,

787. We affirm, but for different reasons. We conclude that a trial court can ultimately dismiss a party's claims for failing to comply with an order for discovery, but only after first satisfying the procedures governing sanctions. In addition, before imposing a sanction, the trial court must consider whether remedial steps short of sanctions can alleviate the problem. Then, assuming they cannot, the trial court must determine whether a lesser sanction would satisfy the legitimate purpose of the sanction before imposing a death penalty sanction. Consequently we remand the case to the trial court for a reconsideration of the motion to dismiss in light of the factors announced today.

### I. Facts

Lane Denton was terminated by the Texas Department of Public Safety Officers Association (the "Association") under suspicion of misappropriating Association funds. Nineteen months later, on the same day he was subpoenaed to testify before a grand jury, he filed suit against the Association and others on several tort and contract grounds.[1] As discovery proceeded, Denton failed to appear for a scheduled deposition, and the trial court then ordered his appearance for deposition. Subsequently, Denton was indicted for misappropriation of Association property.[2] He attempted to abate his civil case indefinitely until after he was no longer at risk of self-incrimination, but the trial court denied his motion. Although Denton then appeared for his deposition, he refused to answer questions or produce documents. The trial court held another hearing to consider the Association's motions to compel and for sanctions. After the trial court examined the deposition transcript and Denton's answers, it ordered Denton to answer only those questions and produce only those documents that concerned his allegations against the Association. Denton answered some questions, but refused again to answer others directly related to his claim, and the trial court dismissed the action.

On appeal, Denton claimed that the trial court erred because it failed to balance his

---

1. All defendants will be referred to collectively as the Association unless reference to individual parties is appropriate.

2. At oral argument, Denton's attorney explained that the criminal case on the indictment entered against him was set for trial. He also explained

that at the time of the discovery requests, Denton was aware that the DPS was conducting an investigation against him that was broader in scope than the specific indictment handed down. Denton is not aware of the nature of this separate investigation or whether it is still ongoing.

RPI 0084

right against self-incrimination against the harm the Association would suffer if the suit were abated during the pending criminal suit and while the risk of self-incrimination loomed over him. He also claimed that the dismissal violated his due process rights because his Fifth Amendment rights outweighed any inconvenience that would result from an abeyance. The court of appeals reversed, holding that there was no offensive use of a privilege and that Denton's due process rights were violated by the dismissal, and that the dismissal was an impermissible discovery sanction. 862 S.W.2d at 791, 793.

## II. Trial Court's Power to Dismiss

A trial court has limited authority to dismiss a cause of action on its own initiative. The power to dismiss implicated in the present case is the trial court's power under Rule 215. TEX.R.CIV.P. 215(1)(b). In *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991) (orig. proceeding), we held that sanctions imposed by a trial court must be just, there must be a direct relationship between the offensive conduct and the sanction imposed, and the sanction must not be excessive. *Id.*

## III. Denton's Fifth Amendment Claims

[1] Denton had the right to assert his Fifth Amendment privilege to avoid civil discovery if he reasonably feared the answers would tend to incriminate him. *See Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084, 1086 (5th Cir.1979) ("Wehling was under no obligation to disclose to CBS information he reasonably believed might be used against him as an accused in a criminal prosecution."). Nevertheless, the resulting use of the privilege was an offensive use. Denton used a privilege to protect information that was privileged, but also essential to the de-

fense. *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 161 (Tex.1993).

[2, 3] The Fifth Amendment can be asserted in both civil and criminal trials "wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924); *see Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Generally, the exercise of the privilege should not be penalized. *Spevack v. Klein*, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967); *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

The importance of the freedom from self-incrimination notwithstanding, the role of the Fifth Amendment in civil cases when asserted by a plaintiff presents certain problems not found when the privilege is asserted in a criminal context.[3] Because of the difference between the civil and criminal context, the United States Supreme Court has allowed juries in civil cases to make negative inferences based upon the assertion of the privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). Also, when a plaintiff invokes the privilege against self-incrimination, the trial court can subsequently prohibit the plaintiff from introducing evidence on the subject, and such an act of judicial discretion does not constitute penalizing the plaintiff's use of the privilege. *See Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 576 (1st Cir.1989). The rule against penalizing the use of the privilege does not prohibit a trial court from taking acts to ensure that the civil proceeding remains fair.

A plaintiff who uses the privilege to protect relevant information from a defendant

---

3. Several commentators have explained that the privilege may not have as broad an application in civil proceedings between private, nongovernmental parties as it does in criminal prosecutions. *See* Heidt, *The Conjurer's Circle—the Fifth Amendment Privilege in Civil Cases*, 91 YALE L.J. 1062, 1065 ("[T]he policies behind the privilege do not apply with full force in civil cases and do not preclude allowing plaintiffs some remedies to reduce the disadvantage they suffer when the privilege is used against them."); *Penalizing the*

*Civil Litigant Who Invokes the Privilege Against Self-incrimination*, 24 U.FLA.L.REV. 541, 546 (1972) ("[W]here a lawsuit is between two private parties, neither side possesses the broad investigatory power of the government. Thus, since no possibility of abuse of governmental power exists in civil cases, absolute interpretation of the self-incrimination appears not as necessary as in criminal actions where the government is a party.").

RPI 0085

"use[s] his Fifth Amendment shield as a sword." *Wehling*, 608 F.2d at 1087. In other words:

> The plaintiff ... obviously had the right to claim the privilege, but he cannot eat his cake and have it too. The defendant also has certain rights, one of which is to defend this lawsuit and to develop an affirmative defense which may well destroy the plaintiff's right to maintain his action.

*Levine v. Bornstein*, 13 Misc.2d 161, 174 N.Y.S.2d 574, 578 (N.Y.Sup.Ct.1958), *aff'd*, 7 A.D.2d 995, 183 N.Y.S.2d 868, *aff'd*, 6 N.Y.2d 892, 190 N.Y.S.2d 702, 160 N.E.2d 921 (1959). Therefore, at this point we borrow from the offensive use line of cases to determine what type of conduct is susceptible to sanction.

### IV. Offensive Use Doctrine

[4] The offensive use line of cases are subsets of sanctions cases. Even if a party has a valid reason to avoid discovery, such as an evidentiary or constitutional privilege, that party, when appropriately ordered by the trial court, must elect whether to maintain the privilege or risk suffering a sanction. *E.g., Republic Ins.*, 856 S.W.2d at 161; *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 107 (Tex.1985) (orig. proceeding); *Henson v. Citizens Bank of Irving*, 549 S.W.2d 446, 449 (Tex.App.—Eastland 1977, no writ); *Ginsberg*, 686 S.W.2d at 107 (holding that a court may force the party avoiding discovery to choose between maintaining the privilege and risking a sanction or revealing the privileged information) (approving *Henson*, 549 S.W.2d at 449).

The theory underlying the offensive use line of cases is that a plaintiff who is seeking affirmative relief should not be permitted to maintain the action, and at the same time maintain evidentiary privileges that protect from discovery outcome determinative information not otherwise available to the defendant. This Court, in *Republic Insurance v. Davis*, 856 S.W.2d 158 (Tex.1993), defined three elements necessary to conclude whether an offensive use of an evidentiary privilege is occurring: A. a party must be seeking affirmative relief; B. the party is using a privilege to protect outcome determinative information; C. the protected information is not otherwise available to the defendant. 856 S.W.2d at 161. These steps identify situations where it would be unfair to allow a party to both seek relief and deny to the defense essential evidence. Once an offensive use is shown, alternative steps follow which define the courses of action a trial court may then take: Upon a finding of offensive use, the plaintiff either 1. waives the privilege or 2. risks sanction from the trial court. The parties agree that the *Republic Insurance* standard governs in determining whether an offensive use occurs when a civil plaintiff asserts his Fifth Amendment privilege against self-incrimination. The Association argues that the court of appeals misapplied the *Republic Insurance* test and therefore erred in finding that none of the prongs of the test were satisfied. We agree.

#### A. Affirmative Relief

[5, 6] The first prong of the *Republic Insurance* test asks whether the party asserting the privilege is seeking affirmative relief. In *Republic Insurance*, the party exercising the privilege was seeking declaratory judgment which did not implicate any affirmative relief. The court of appeals below, however, attempted to reason by analogy that this prong of the *Republic Insurance* test applied to the facts in this case. 862 S.W.2d at 790. It held that by seeking an abatement, Denton was not seeking affirmative relief as contemplated by *Republic Insurance*. *See Republic Insurance*, 856 S.W.2d at 163. We disagree. Denton was seeking damages as a part of his claims. The first element is satisfied.

#### B. Outcome Determinative

The second prong of the *Republic Insurance* test requires that "the privileged information sought must be such that, if believed by the factfinder, in all probability it would have been outcome determinative of the cause of action asserted.... The confidential communication must go to the very heart of the affirmative relief sought." *Id.* The court of appeals reviewed the questions asked and the documents sought at the June 11, 1992 deposition and determined that while some of the questions in response to which Denton asserted his privilege were

RPI 0086

outcome determinative, others were not. 862 S.W.2d at 790. The court of appeals reviewed the questions asked and the documents sought at the June 11, 1992 deposition and determined that while some of the questions in response to which Denton asserted his privilege were outcome determinative, others were not. 862 S.W.2d at 790. The court then held that since all questions were not outcome determinative, the second prong of the *Republic Insurance* test was not satisfied. This conclusion is incorrect.

First, we note that at the discovery hearing, the trial court narrowed the scope of the questions it ordered Denton to answer to only those questions that pertained to the claims made by Denton against the Association. It was thereafter that Denton, again, asserted his Fifth Amendment privilege against self-incrimination. These questions tracked the language used in Denton's petition. For example:

* What information do you allege that Billy Don Ivey gave the Travis County District Attorney's office?

* What misinformation or false statements do you allege that [Jerry] Moore, a defendant in this action, disseminated about you to members of the board of directors of the [Association]?

* What false and misleading information did Jerry Moore give the Travis County District Attorney's office?

* What false and misleading information do you contend that defendant Charlie Adams gave the Travis County District Attorney's office?

* What false and misleading information do you contend that defendant Frank Holland gave the Travis County District Attorney's office?

* What false and misleading information do you contend that defendant Mary Pat Becnel gave the Travis County District Attorney's office?

* What false and misleading information do you contend that defendant Jack Pate gave the Travis County District Attorney's office?

* What false and misleading information do you contend that defendant Bob Gorsky gave the Travis County District Attorney's office?

* What other employees of the Texas Department of Public Safety Officers Association do you contend gave false and misleading information to the Travis County District Attorney's office?

* What miscellaneous gossip ... do you contend [was used] to violate your right to privacy?

* What public humiliation and emotional distress do you contend that you suffered as a result of the defendants?

* What business relations and contracts did you contend were the subject of interference ...?

* Have you seen a physician with respect to the emotional distress alleged by you ...?

* Are you aware of any such misinformation [disseminated to the Association]?

* Describe ... the lost business opportunities as a lobbyist that you have suffered as a result of defendants.

Several of these questions go directly to the heart of Denton's claims. They asked Denton to specify either what tortious acts the defendants committed, or how he was injured. We hold that the second prong was satisfied. *Republic Insurance*, 856 S.W.2d at 163.

### C. Alternative Sources for Privileged Information

Finally, the court of appeals also erred when it used an all-or-nothing approach in considering the third prong. This prong of the *Republic Insurance* test examines whether the information sought could be obtained without requiring the plaintiff to forgo his privilege: "[D]isclosure of the confidential communication must be the only means by which the aggrieved party may obtain the evidence." *Id.* The court of appeals concluded that because some of the privileged information sought could be obtained from other sources, the third prong was not satisfied. 862 S.W.2d at 791. The court, however, also recognized that some of the requested information sought could only be obtained through Denton. *Id.* This is enough to satisfy the third prong.

RPI 0087

## V.   The Remedy

[7]   Because each prong of the offensive use test is satisfied, we hold that the defendants made the requisite showing of offensive use such that they could properly ask the trial court to put Denton to the election. Denton, having chosen not to waive his Fifth Amendment privilege, therefore exposed himself to remedial action by the court. The question remains, though, whether the sanction imposed by the trial court in this case was an appropriate one under the circumstances.

Due process concerns are implicated when a court dismisses a party's cause of action on the basis of that party's use of the privilege against self-incrimination. In *TransAmerican Natural Gas*, this Court set out guidelines for trial courts to consider when imposing discovery sanctions in general. The Fifth Circuit announced similar standards necessary to satisfy due process when a trial court is faced with a plaintiff asserting the privilege against self-incrimination. *See Wehling*, 608 F.2d at 1084. Together these cases provide a framework to determine what options are available and what options are appropriate.

In determining what remedies are available, the court should consider a number of factors. First, the trial court should consider the nature of both the questions asked and the privilege asserted. If the questions ask for facially incriminating answers, such circumstances would cut against the imposition of a harsh remedy. *Campbell v. Gerrans*, 592 F.2d 1054, 1057 (9th Cir.1979). On the other hand, the court can look at the questions to determine whether more narrow questions could serve the defendant's discovery needs and allow the plaintiff to avoid the self-incrimination dilemma. The court should also consider whether the privilege is being asserted in a bona fide fear of self-incrimination or merely to avoid discovery or to create delay.

[8]   The court could weigh the resulting unfairness to a defendant if trial were to proceed without the sought discovery. *Wehling*, 608 F.2d at 1087. Or, the court could proceed to trial and consider whether any remedies could be imposed during the trial in the event the plaintiff continued to assert the privilege. As an example, the court could prohibit the plaintiff from introducing evidence on matters about which the plaintiff asserted his privilege. In any event, the court can allow a civil jury to make a negative inference from the assertion of the privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976).

Third, the trial court should weigh options for delaying civil proceedings during the pendency of criminal investigations or parallel criminal proceedings. In doing so, the trial court could consider the statutes of limitation for the crimes the plaintiff fears and consider whether and the extent to which the delay would prejudice the defendant's ability to prepare a defense. *Wehling*, 608 F.2d at 1087.



Finally, the trial court should recognize that it would have options to impose remedies in the future if any delay afforded the plaintiff resulted in unanticipated or extraordinary hardships. In other words, if after an extended abatement a defendant cannot prepare a defense, the trial court should determine at that point whether a dismissal is appropriate as the only way to fairly balance the plaintiff's and defendant's rights. *Id.* at 1089.

[9, 10]   These considerations are not unlike those the court should consider before imposing any other sanction. That is to say, a direct relationship must exist between the offensive conduct and the sanction imposed. *TransAmerican*, 811 S.W.2d at 917. Also, to be just, the sanction must not be excessive and should be no more severe than necessary to satisfy its legitimate purposes. *Id.* Consequently, before dismissing a cause of action, the trial court must be convinced that less burdensome remedies would not be effective in preventing unfairness to a defendant. *Id.; Wehling*, 608 F.2d at 1088.

## VI.   Conclusion

[11]   On this record we conclude that the trial court exceeded its discretion by dismissing Denton's lawsuit. We remand the case

to the trial judge for further consideration in accordance with this opinion.

GONZALEZ, Justice, joined by GAMMAGE and OWEN, Justices concurring.

I concur with the Court's order remanding this case to the trial court. Dismissing Denton's suit violated his due process rights and impermissibly sanctioned Denton. I disagree that *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding), and *Republic Insurance Co. v. Davis,* 856 S.W.2d 158 (Tex.1993) (orig. proceeding), supply the standards by which to rule in this case. Therefore, I decline to join the Court's opinion. Our case law regarding sanctions for resisting discovery orders should not be applied to this case, in which Denton asserted his **constitutional** privilege against self-incrimination. Also, I disagree that Denton attempted an "offensive use" of his privilege against self-incrimination as we defined it in *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 107 (Tex. 1985) (orig. proceeding).[1] For these reasons, I would affirm the judgment of the court of appeals. 862 S.W.2d 785.

The Court today assumes that the offensive use doctrine applies to an assertion of the privilege against self-incrimination, and that an offensive use of a privilege is sanctionable as an abuse of discovery. 897 S.W.2d 757, 760–62. The offensive use doctrine bars a plaintiff who seeks affirmative relief from asserting a privilege to avoid disclosing information pertinent to an action or a defense to it. *See Ginsberg,* 686 S.W.2d at 107. The doctrine applies to the rules of privilege created under state law which are subject to exceptions and to waiver. *See, e.g.,* TEX.R.CIV.EVID. 503(d), 504(d), 508(c), 509(d)–(e), 510(d), 511. The offensive use doctrine does not apply to the privilege against self-incrimination, because the privilege does not have its source in the state rules but in the state and federal constitutions. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 10; TEX.R.CIV.EVID. 501 (recognizing the constitutions as sources of privileges apart from the rules of civil evi-

dence). The trial court erred in automatically dismissing Denton's claims upon finding that his assertion of the privilege was an offensive use. In my opinion, this Court similarly errs in subjecting Denton's assertion of a constitutional privilege to analysis as an offensive use and an abuse of discovery, and by concluding that Denton's conduct was sanctionable.

The extended analysis of *TransAmerican* and *Republic Insurance* attempts but fails to justify what the Court allows today—that trial courts may affirmatively penalize a party who asserts the Fifth Amendment privilege so long as the assertion meets the definition of an offensive use. Because Denton was entitled to resist discovery by asserting his constitutional freedom against self-incrimination, he should not be sanctioned. *See Spevack v. Klein,* 385 U.S. 511, 514–15, 87 S.Ct. 625, 627–28, 17 L.Ed.2d 574 (1967) (stating that a court may not penalize a party who asserts the Fifth Amendment privilege). A better course would be to adopt the balancing test the Fifth Circuit Court of Appeals developed in *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084 (5th Cir.1979). Under *Wehling,* a court balances the hardships caused to the parties when one of them asserts a constitutional privilege, but does not threaten sanctions to compel the party to waive his privilege. *See id.* at 1088.

The dangers of compelling Denton or any prospective criminal defendant to testify are real. A prosecutor could use the discovery responses the trial court ordered Denton to make against him in a criminal proceeding. *See United States v. Ballard,* 779 F.2d 287, 291 (5th Cir.) (citing FED.R.EVID. 801(d)(2)), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); Woods & Hair, *Criminal Law Issues in Civil Litigation: Fifth Amendment Considerations for the Civil Practitioner, Management of Parallel Proceedings and Pitfalls of Money Laundering Statutes,* 17TH ANNUAL ADVANCED CIVIL TRIAL COURSE U–1, U–1 (1994) (citing *S.E.C. v. Dresser Industries, Inc.,* 628 F.2d 1368, 1376 (D.C.Cir.) (en banc), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)).

---

1. I agree with the court of appeals "that Denton did not use the self-incrimination privilege as a

sword to thwart the discovery process or the civil proceeding as a whole." 862 S.W.2d 785, 790.

RPI 0089

Denton's testimony might give a prosecutor a dress rehearsal of Denton's defense to criminal charges. *See* Woods & Hair, *supra*, at U–1. Also, the scope of discovery allowed in a civil trial may exceed what a prosecutor would be permitted in a criminal proceeding. *Id.* at U–4. Therefore, compelling Denton to waive his Fifth Amendment privilege against self-incrimination could prejudice his right to a fair trial in a subsequent criminal case. *See id.* For this Court to ask the trial court to second-guess Denton's fear of prosecution by "[a]ttempting to assess how state and federal prosecutors and their successors will exercise their discretion" is a request for it to engage in idle speculation. *See* Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases,* 91 YALE L.J. 1062, 1092 (1982).

The trial court's dismissal of Denton's claims because he asserted the privilege against self-incrimination was a disproportionate response. The trial court forced Denton to choose between his right to a day in court and the right to avoid self-incrimination. The Court's opinion does not relieve the punitive pressure on Denton to waive his privilege. Upon remand, the trial court will again make him choose between asserting his constitutional right to be silent at the cost of the right to prosecute his claims. *See Wehling,* 608 F.2d at 1088 (citing *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), and *Spevack,* 385 U.S. at 515, 87 S.Ct. at 628) (stating that assertion of one constitutional right should not be at the cost of another).

I concur with the Court's general proposition that in some circumstances a trial court may craft remedies if a party's assertion of the Fifth Amendment privilege constitutes an abuse or causes hardship to the opposing party. 897 S.W.2d at 763; *see Wehling,* 608 F.2d at 1089 (noting that a court should "be free to fashion whatever remedy is required to prevent unfairness to [the] defendant"). A party may only assert the Fifth Amendment privilege in good faith. Asserting the privilege could be in bad faith, such as if Denton is asserting the privilege and at the same time prolonging the time that criminal proceedings are pending. I would allow Denton to assert his privilege for as long as he does so in good faith. When a civil plaintiff asserts the Fifth Amendment privilege, a trial court should steer wide of judicially compelling waiver of the privilege. It should not force him to choose between giving up his constitutional right against self-incrimination or forgoing his claims.

For these reasons, I join the Court's order remanding this case to the trial court, but I would do so for the reasons set forth in the court of appeals' opinion.



OWENS–ILLINOIS, INC., Fibreboard Corp., Keene Corp. and Pittsburgh–Corning Corp., Petitioners

v.

ESTATE OF Otis BURT, Mable Burt, and Ronald Burt et al., Respondents.

OWENS–ILLINOIS, INC., Fibreboard Corp., Keene Corp. and Pittsburgh–Corning Corp., Petitioners

v.

Erma Rae FRILEY, Individually and as Representative of the Estate of Joseph Friley, Respondents.

Nos. 94–0259, 94–0262.

Supreme Court of Texas.

Argued Nov. 16, 1994.

Decided April 27, 1995.

In action involving exposure to asbestos-containing products, the 270th District Court, Harris County, Ann Tyrrell Cochran, J., entered judgment on jury verdicts for plaintiffs, and plaintiffs appealed with regard to calculation of prejudgment interest. The Court of Appeals, 870 S.W.2d 556, found that interest accrued six months from last day of exposure to asbestos, and further review was sought. The Supreme Court, Hightower, J., held

RPI 0090

dice which would necessitate an order of severance.

The other portion of defendants' attack on a verdict solely based, in their estimation, upon guilt by association is a challenge to the court's failure to hold a pretrial *James* hearing. *United States v. James,* 590 F.2d 575 (5th Cir.1978) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 288 (1979), however, does not require such a hearing. Rather, the case simply recommends this procedure but provides that

> [r]egardless of whether the proof has been made in the preferred order, or the coconspirator's statement has been admitted subject to later connection, on appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. Rule 801(d)(2)(E).

590 F.2d at 582.

[16] After trial, the district court ruled that only certain statements by Punch about Caceres were even entitled to a *James* hearing. The court also held that the prosecution had borne its burden of proof under *James* and the statements were, therefore, properly admitted. The court committed no error in so ruling.[4] The court had previously instructed the jury that the conversations between Punch and the DEA agents were admitted only against Punch.

For the above-stated reasons, the defendants' convictions are affirmed.

AFFIRMED.

4. Although this challenge is couched in terms of objecting to the admission of evidence pursuant to the co-conspiratorial exception of Federal Rule of Evidence 801(d)(2)(E), defendants actually contend that the admission of all discussions between Punch and DEA agents prior

---

UNITED STATES of America,
Plaintiff-Appellee,

v.

LITTLE AL, a/k/a Texas Ranger, Etc.,
et al., Defendants,

Charles Thomas Pollard,
Claimant-Appellant.

No. 82–2300
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1983.

Claimant of vessels that Government sought to have forfeited appealed from a summary judgment of the United States District Court for the Southern District of Texas, Hugh Gibson, J., in favor of the Government. The Court of Appeals, Reavley, Circuit Judge, held that: (1) district court did not abuse its discretion in denying claimant's motion for a continuance during pendency of claimant's appeal from a criminal conviction that stemmed from his part in marijuana importation scheme during which vessels were seized, giving rise to forfeiture action, and (2) in absence of any exercise by claimant of right to come forward and show that facts constituting probable cause, that is, that reasonable grounds existed to believe that claimant's vessels were used or intended to be used for prohibited purposes, did not actually exist, Government was entitled to forfeiture of vessels.

Affirmed.

1. Federal Courts ⚖819
  Moving for a continuance invokes discretion of district court, and only an abuse

to March 20 prejudiced them by painting Punch as a big-time drug dealer and making them appear guilty by association. That argument was addressed in this court's discussion of the severance issue.

RPI 0091

of that discretion will justify reversal. Fed. Rules Civ.Proc.Rule 56(f), 28 U.S.C.A.

**2. Action ⚖=69(5)**

A district court may stay a civil proceeding during pendency of a parallel criminal proceeding.

**3. Drugs and Narcotics ⚖=194**

Affidavit of counsel of claimant of ownership interest in vessels for which United States sought forfeiture seeking continuance of forfeiture proceeding during pendency of individual's appeal from a criminal conviction that stemmed from his part in marijuana importation scheme which resulted in arrest of individual and seizure of vessels amounted to nothing more than blanket assertion of Fifth Amendment privilege against compulsory self-incrimination in light of lack of explanation as to how filing of affidavit in response to forfeiture proceeding would have prejudiced criminal appeals of claimant, and, as such, did not present type of circumstances or prejudice that required a stay. U.S.C.A. Const.Amend. 5; Fed.Rules Civ. Proc.Rule 56(f), 28 U.S.C.A.

**4. Drugs and Narcotics ⚖=191**

Under forfeiture statutes, property is subject to forfeiture if it was used in any manner to facilitate sale or transportation of controlled substances. Tariff Act of 1930, §§ 596, 615, as amended, 19 U.S.C.A. §§ 1595a, 1615; Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 511, 511(b)(4), 21 U.S.C.A. §§ 881, 881(b)(4); Contraband Seizure Act, §§ 1, 2, 4, 49 U.S.C.A. §§ 781, 782, 784.

**5. Forfeitures ⚖=5**

Any claimant of property sought to be forfeited must establish either that property is not subject to forfeiture, or that a defense to forfeiture applies. Tariff Act of 1930, §§ 596, 615, as amended, 19 U.S.C.A. §§ 1595a, 1615; Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 511, 511(b)(4), 21 U.S.C.A. §§ 881, 881(b)(4); Contraband Seizure Act, §§ 1, 2, 4, 49 U.S.C.A. §§ 781, 782, 784.

**6. Forfeitures ⚖=5**

If unrebutted, a showing of probable cause alone will support a forfeiture.

**7. Forfeitures ⚖=5**

In absence of any exercise by claimant of property which Government sought to have forfeited under forfeiture laws of right to come forward and show that facts constituting probable cause on issue of whether claimant's vessels were used or intended to be used for prohibited purposes did not actually exist, Government was entitled to forfeiture of vessels. Tariff Act of 1930, §§ 596, 615, as amended, 19 U.S.C.A. §§ 1595a, 1615; Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 511, 511(b)(4), 21 U.S.C.A. §§ 881, 881(b)(4); Contraband Seizure Act, §§ 1, 2, 4, 49 U.S.C.A. §§ 781, 782, 784.

---

Michael A. Maness, Mark Vela, Houston, Tex., for claimant-appellant.

Frances H. Stacy, Jack Shepherd, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before REAVLEY, GARWOOD and JOLLY, Circuit Judges.

REAVLEY, Circuit Judge:

This case concerns the forfeiture of three vessels allegedly used in a scheme to import marijuana. Appellant Charles Pollard, who claims an ownership interest in the vessels, appeals from the entry of judgment in favor of the government. He argues that the district court punished his exercise of the privilege against self-incrimination by refusing to continue the action during the pendency of Pollard's appeal from a criminal conviction that stemmed from his part in the importation scheme. We affirm.

The factual background of the seizure of the three vessels appears in detail in *United States v. Scott*, 678 F.2d 606 (5th Cir.1982) cert. denied, —— U.S. ——, 103 S.Ct. 304, 74 L.Ed.2d 285 (1982). We reiterate the

RPI 0092

essential facts. The U.S. Coast Guard boarded the unmanned fishing vessel LITTLE AL on April 6, 1981 and discovered over fifteen tons of marijuana aboard. The coast guard, based on prior surveillance, stopped the other two vessels, TYRANT III and DORADO, and arrested their crews and passengers. The twelve men found on board, including appellant Pollard, were convicted of conspiring to import and to possess with intent to distribute the marijuana found on LITTLE AL. We affirmed Pollard's conviction, but reversed the convictions of seven of his codefendants.

The government filed this forfeiture action on October 13, 1981. While the convictions were awaiting appellate review, the government filed a motion for summary judgment in the forfeiture action and supported the motion with affidavits by coast guard personnel who had participated in the seizure of the three vessels. Pollard filed no opposing affidavits.

Pollard, however, did invoke the continuance procedure under Fed.R.Civ.P. 56(f), which empowers the district court to continue or deny a summary judgment motion when the nonmoving party cannot present opposing affidavits. Pollard's counsel averred that he could not obtain affidavits from Pollard or his codefendants for fear of "substantial prejudice" to their criminal appeals. The affidavit did not specify the nature of the prejudice or the nature of the evidence that might become available if the court granted the continuance.

The district court granted summary judgment, noting that Pollard had not made a sufficient showing of inability to present facts. The affidavit of Pollard's counsel, in the court's view, merely evinced reluctance to oppose the motion during the pendency of the criminal appeals.

1. Denial of the Continuance

[1] Moving for a continuance under Rule 56(f) invokes the discretion of the district court, and only an abuse of that discretion will justify reversal. *American Lease Plans v. Silver Sand Co.*, 637 F.2d 311, 317-18 (5th Cir.1981). The party seeking the continuance bears the burden of demonstrating the need for a continuance. As we have observed:

> Because the burden on a party resisting summary judgment is not a heavy one, one must conclusively justify his entitlement to the shelter of rule 56(f) by presenting specific facts explaining the inability to make a substantive response as required by rule 56(e) and by specifically demonstrating "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." The nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts.

*SEC v. Spence & Green*, 612 F.2d 896, 901 (5th Cir.1980) (citations omitted), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981).

Pollard does not diminish this burden by resting his request for a continuance on the privilege against self-incrimination. As the Supreme Court has noted recently:

> [W]hile the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness ... declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production. We think the view of the Court of Appeals [that invocation of the privilege satisfies a burden of production] would convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his. None of our cases support this view.

*United States v. Rylander*, — U.S. —, 103 S.Ct. 1548, 1552-53, 75 L.Ed.2d 521 (1983). Accordingly, a blanket assertion of the privilege neither excuses the burden under rule 56(e) of controverting the government's affidavits nor carries the burden under rule 56(f) of explaining either the

RPI 0093

inability to respond or the benefit to be derived from postponement.

The affidavit submitted by Pollard's counsel amounts to nothing more than blanket assertion of the privilege. No explanation appears concerning how the filing of an affidavit would have prejudiced the criminal appeals of Pollard or his codefendants. No explanation appears concerning what the affidavits could have disclosed. No explanation appears concerning why affidavits would have been any more available after termination of the criminal appeal.

[2, 3] Certainly, a district court may stay a civil proceeding during the pendency of a parallel criminal proceeding. *See SEC v. First Financial Group of Texas, Inc.,* 659 F.2d 660, 668 (5th Cir.1981). Such a stay contemplates "special circumstances" and the need to avoid "substantial and irreparable prejudice." *Id.* The very fact of a parallel criminal proceeding, however, did not alone undercut Pollard's privilege against self-incrimination, even though the pendency of the criminal action "forced him to choose between preserving his privilege against self-incrimination and losing the civil suit." *Hoover v. Knight,* 678 F.2d 578, 581 (5th Cir.1982). This case hardly presents the type of circumstances or prejudice that require a stay.

### 2. Propriety of Summary Judgment

Pollard argues, alternatively, that the court erred by entering summary judgment even if its procedures did not infringe the privilege against self-incrimination. In Pollard's view, the government's affidavits do not demonstrate that the vessels were used or intended to be used to smuggle marijuana. Pollard argues that the affidavits depend upon conflicting inferences that the court could have drawn and that entry of judgment contravened the principle of drawing all inferences favorable to the non-moving party.

1. Under 19 U.S.C. § 1615(3), the contact among the vessels provides prima facie evidence of "visits" among the vessels.

2. The district court ordered the forfeiture under four statutes, 19 U.S.C. § 1595a; 49 U.S.C.

The government affidavits do depend on inferences from these facts: (1) the LITTLE AL contained over fifteen tons of marijuana; (2) coast guard surveillance established that the TYRANT III had been alongside LITTLE AL early in the day and that TYRANT III, in turn, had been alongside DORADO;[1] (3) the fingerprints of two passengers on board TYRANT III were discovered on nautical maps found on board LITTLE AL; (4) the coast guard had observed someone on board TYRANT III pass a roll of plastic wrap to someone on board DORADO; and (5) no other vessels were observed in contact with LITTLE AL, TYRANT III or DORADO.

[4, 5] If the government bore the burden of proving by a preponderance of the evidence that the vessels were used or intended to be used in importing the marijuana, the judgment as to these vessels might be in question. The forfeiture statutes, however, place the government's burden at a lower threshold. It must establish only that reasonable grounds exist to believe that the vessels were used or intended to be used for prohibited purposes. 21 U.S.C.A. § 881(b)(4) (West 1981);[2] *See United States v. 1964 Beechcraft Baron Aircraft,* 691 F.2d 725, 727 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983). The property is subject to forfeiture if it was used "in any manner" to facilitate sale or transportation. *Id.* Any claimant of the property must establish either that the property is not subject to forfeiture, or that a defense to the forfeiture applies. *See United States v. $364,-960.00 in U.S. Currency,* 661 F.2d 319, 325 (5th Cir.1981).

[6, 7] If unrebutted, a showing of probable cause alone will support a forfeiture. *See United States v. One 1975 Ford Pickup Truck,* 558 F.2d 755, 756–57 (5th Cir.1977) (upholding forfeiture based on unrebutted showing of probable cause). If Pollard had

§§ 781, 782; and 21 U.S.C. § 881. The procedures under these statutes are substantially similar; a showing of probable cause likewise shifts the burden of proof. *See* 19 U.S.C. § 1615; 49 U.S.C. § 784.

controverted facts upon which the probable cause showing relied, summary judgment would have been improper. *United States v. One 1944 Steel Hull Freighter*, 697 F.2d 1030, 1031–32 (11th Cir.1983). As the Court of Appeals for the Sixth Circuit, however, has noted:

> While we cannot agree with the government's insistence that probable cause is all that is needed by way of proof to justify a forfeiture even in the face of overwhelming proof that the cause, though probable, was not ultimately sustained, it is apparent to us that a showing of probable cause is sufficient to warrant a forfeiture and that summary judgment was properly entered in the absence of any exercise by the claimant of her right to come forward and show that the facts constituting probable cause did not actually exist.

*United States v. One 1975 Mercedes 280S*, 590 F.2d 196, 199 (6th Cir.1978); *see United States v. One 1974 Porsche 911–S*, 682 F.2d 283, 285–86 (1st Cir.1982).

Even drawing inferences favorable to Pollard, we perceive no genuine issue of material fact as to probable cause. He has not undercut the factual basis shown by the government.

AFFIRMED.



Edward C. CARTER, Plaintiff-Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 83–4231

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1983.

Disability benefits claimant brought action to obtain review of a final decision of the Secretary of Health and Human Services denying claimant's application for disability insurance benefits and supplemental security. The United States District Court for the Northern District of Mississippi, William C. Keady, J., granted judgment in favor of the Secretary, and claimant appealed. The Court of Appeals, Reavley, Circuit Judge, held that: (1) administrative law judge's conclusions that claimant had ability to return to prior work as gas station attendant or assembling pinball machines were not supported by substantial evidence; (2) administrative law judge's credibility finding on claimant's allegations of pain did not adequately cover issue of pain as possible factor limiting type of work that claimant could perform and thus reconsideration was required; (3) record did not provide basis for definitive ruling on claimant's present exertional limitations and thus remand was required for reconsideration of whether claimant could perform substantially all activities required for light work; and (4) Court of Appeals had no jurisdiction to review Secretary's decision not to reopen previous disability determination on res judicata grounds.

Reversed and remanded.

**1. Social Security and Public Welfare ⬅147**

On review of decision of Secretary of Health and Human Services on claim for disability benefits, Court of Appeals requires more than mere scintilla of evidence in support of Secretary's findings, but may not substitute its judgment for that of Secretary. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

**2. Social Security and Public Welfare ⬅148**

Upon finding substantial evidence to support findings of Secretary of Health and Human Services on claim for disability benefits, Court of Appeals may only review whether Secretary has applied proper legal

RPI 0095

achieved fully comports with the letter and the spirit of our constitutional traditions.

I would affirm the judgments in both cases.



**378 U.S. 1**
William MALLOY, Petitioner,
v.
Patrick J. HOGAN, Sheriff of Hartford County.

No. 110.

Argued March 5, 1964.

Decided June 15, 1964.

Prisoner, who had been committed to jail for contempt for refusal to answer certain questions in state gambling inquiry, brought habeas corpus proceeding. The Superior Court, Hartford County, Connecticut, entered judgment adverse to the prisoner, and he appealed. The Connecticut Supreme Court of Errors, 150 Conn. 220, 187 A.2d 744, held that there was no error, and the prisoner brought certiorari. The United States Supreme Court, Mr. Justice Brennan, held that the Fifth Amendment's exception from compulsory self-incrimination is protected by the Fourteenth Amendment against abridgement by the States, and that Fifth Amendment was properly invoked by the prisoner, who had previously been convicted of pool-selling, when he was asked as witness in state gambling inquiry questions seeking to elicit the identity of one who ran the pool-selling operation, where it was apparent that the prisoner might apprehend that if that person were

84 S.Ct.—94

still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the prisoner with a more recent crime for which he might still be prosecuted.

Reversed.

Mr. Justice Harlan, Mr. Justice White, Mr. Justice Clark, and Mr. Justice Stewart, dissented.

**1. Constitutional Law ⚖️266**

Fifth Amendment's exception from compulsory self-incrimination is protected by Fourteenth Amendment against abridgement by States. U.S.C.A.Const. Amends. 5, 14.

**2. Criminal Law ⚖️520(1), 522(1)**

Test in determining whether conduct of state officers in obtaining confession violates privilege against self-incrimination is not whether conduct of state officers was shocking, but whether confession is "free and voluntary," that is, that it was not extracted by any sort of threats or violence and was not obtained by any direct or implied promises, however slight, or by exertion of any improper influence. U.S.C.A.Const. Amends. 5, 14.

See publication Words and Phrases
for other judicial constructions and
definitions.

**3. Witnesses ⚖️297(1)**

One cannot be compelled to incriminate himself. U.S.C.A.Const. Amend. 5.

**4. Criminal Law ⚖️393(1)**
**Witnesses ⚖️300**

American system of criminal prosecution is accusatorial, not inquisitorial, and its essential mainstay is provision of Fifth Amendment that no person shall be compelled in any criminal case to be witness against himself. U.S.C.A.Const. Amend. 5.

**5. Criminal Law ⚖️393(1)**

Governments, state and federal, are compelled to establish guilt by evidence

RPI 0096

independently and freely secured and may not by coercion prove charge against accused out of his own mouth. U.S.C.A. Const. Amend. 5.

**6. Constitutional Law ⊜266**

Fourteenth Amendment prohibits States from inducing person to confess through sympathy falsely aroused or other like inducement far short of compulsion by torture, and forbids States to resort to imprisonment to compel accused to answer questions that might incriminate him. U.S.C.A.Const. Amends. 5, 14.

**7. Constitutional Law ⊜266**

Fourteenth Amendment secures against state invasion the right of accused to remain silent unless he chooses to speak in unfettered exercise of his own will and to suffer no penalty for such silence. U.S.C.A.Const. Amends. 5, 14.

**8. Witnesses ⊜300**

Same standards must determine whether silence of accused in either federal or state proceeding is justified under the privilege against self-incrimination. U.S.C.A.Const. Amends. 5, 14.

**9. Witnesses ⊜297(7)**

The Fifth Amendment applies to witness in statutory inquiry as well as to defendant in criminal prosecution. U.S.C.A.Const. Amend. 5.

**10. Witnesses ⊜297(10)**

The privilege against self-incrimination could be invoked by witness, who had previously been convicted of pool-selling, when asked in state gambling inquiry questions seeking to elicit identity of one who ran the pool-selling operation,

where it was apparent that witness might apprehend that if such person were still engaged in unlawful activity, disclosure of his name might furnish link in chain of evidence sufficient to connect witness with more recent crime for which he might still be prosecuted; refusal to answer could not be punished as contempt. U.S.C.A.Const. Amends. 5, 14.

———◆———

**2**

Harold Strauch, Hartford, Conn., for petitioner.

John D. LaBelle, Manchester, Conn., for respondent.

Mr. Justice BRENNAN delivered the opinion of the Court.

In this case we are asked to reconsider prior decisions holding that the privilege against self-incrimination is not safeguarded against state action by the Fourteenth Amendment. Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903.[1]

**3**

The petitioner was arrested during a gambling raid in 1959 by Hartford, Connecticut, police. He pleaded guilty to the crime of pool selling, a misdemeanor, and was sentenced to one year in jail and fined $500. The sentence was ordered to be suspended after 90 days, at which time he was to be placed on probation for two years. About 16 months after his guilty plea, petitioner was ordered to testify before a referee appointed by the Superior Court of Hartford County to conduct an inquiry into alleged gambling and other criminal ac-

---

[1] In both cases the question was whether comment upon the failure of an accused to take the stand in his own defense in a state prosecution violated the privilege. It was assumed, but not decided, in both cases that such comment in a federal prosecution for a federal offense would infringe the provision of the Fifth Amendment that "[n]o person * * * shall be compelled in any criminal case

to be a witness against himself." For other statements by the Court that the Fourteenth Amendment does not apply the federal privilege in state proceedings, see Cohen v. Hurley, 366 U.S. 117, 127–129, 81 S.Ct. 954, 960–961, 6 L.Ed. 2d 156; Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674.

RPI 0097

tivities in the county. The petitioner was asked a number of questions related to events surrounding his arrest and conviction. He refused to answer any question "on the grounds it may tend to incriminate me." The Superior Court adjudged him in contempt, and committed him to prison until he was willing to answer the questions. Petitioner's application for a writ of habeas corpus was denied by the Superior Court, and the Connecticut Supreme Court of Errors affirmed. 150 Conn. 220, 187 A.2d 744. The latter court held that the Fifth Amendment's privilege against self-incrimination was not available to a witness in a state proceeding, that the Fourteenth Amendment extended no privilege to him, and that the petitioner had not properly invoked the privilege available under the Connecticut Constitution. We granted certiorari. 373 U.S. 948, 83 S.Ct. 1680, 10 L.Ed.2d 704. We reverse. We hold that the Fourteenth Amendment guaranteed the petitioner the protection of the Fifth Amendment's privilege against self-incrimination, and that under the applicable federal standard, the Connecticut Supreme Court of Errors erred in holding that the privilege was not properly invoked.

4

The extent to which the Fourteenth Amendment prevents state invasion of rights enumerated in the first eight Amendments has been considered in numerous cases in this Court since the Amendment's adoption in 1868. Although many Justices have deemed the Amendment to incorporate all eight of the Amendments,[2] the view which has thus far prevailed dates from the decision in 1897 in Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L. Ed. 979, which held that the Due Process Clause requires the States to pay just compensation for private property taken for public use.[3] It was on the authority of that decision that the Court said in 1908 in Twining v. New Jersey, supra, that "it is possible that some of the personal rights safeguarded by the first eight Amendments

5

against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law." 211 U.S., at 99, 29 S.Ct., at 19.

---

2. Ten Justices have supported this view. See Gideon v. Wainwright, 372 U.S. 335, 346, 83 S.Ct. 792, 797, 9 L.Ed.2d 799, (opinion of MR. JUSTICE DOUGLAS). The Court expressed itself as unpersuaded to this view in In re Kemmler, 136 U.S. 436, 448-449, 10 S.Ct. 930, 934, 34 L. Ed. 519; McElvaine v. Brush, 142 U.S. 155, 158-159, 12 S.Ct. 156, 157, 35 L.Ed. 971; Maxwell v. Dow, 176 U.S. 581, 597-598, 20 S.Ct. 448, 454-455, 44 L.Ed. 597; Twining v. New Jersey, supra, 211 U.S. p. 96, 29 S.Ct. p. 18. See Spies v. Illinois, 123 U.S. 131, 8 S.Ct. 21, 22, 31 L.Ed. 80. Decisions that particular guarantees were not safeguarded against state action by the Privileges and Immunities Clause or other provision of the Fourteenth Amendment are: United States v. Cruikshank, 92 U.S. 542, 551, 23 L.Ed. 588; Prudential Ins. Co. of America v. Check, 259 U.S. 530, 543, 42 S.Ct. 516, 522 (First Amendment); Presser v. Illinois, 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (Second Amendment); Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 348,

58 L.Ed. 652 (Fourth Amendment); Hurtado v. California, 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed. 232 (Fifth Amendment requirement of grand jury indictments); Palko v. Connecticut, 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (Fifth Amendment double jeopardy); Maxwell v. Dow, 176 U.S., at 595, 20 S.Ct., at 454 (Sixth Amendment jury trial); Walker v. Sauvinet, 92 U.S. 90, 92, 23 L.Ed. 678 (Seventh Amendment jury trial); In re Kemmler, supra; McElvaine v. Brush, supra; O'Neil v. Vermont, 144 U.S. 323, 332, 12 S.Ct. 693, 697, 36 L.Ed. 450 (Eighth Amendment prohibition against cruel and unusual punishment).

3. In Barron, for Use of Tiernan v. Mayor and City Council of City of Baltimore, 7 Pet. 243, 8 L.Ed. 672, decided before the adoption of the Fourteenth Amendment, Chief Justice Marshall, speaking for the Court, held that this right was not secured against state action by the Fifth Amendment's provision: "Nor shall private property be taken for public use, without just compensation."

RPI 0098

The Court has not hesitated to re-examine past decisions according the Fourteenth Amendment a less central role in the preservation of basic liberties than that which was contemplated by its Framers when they added the Amendment to our constitutional scheme. Thus, although the Court as late as 1922 said that "neither the Fourteenth Amendment nor any other provision of the Constitution of the United States imposes upon the States any restrictions about 'freedom of speech' * * *," Prudential Ins. Co. of America v. Cheek, 259 U.S. 530, 543, 42 S.Ct. 516, 522, 66 L.Ed. 1044, three years later Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, initiated a series of decisions which today hold immune from state invasion every First Amendment protection for the cherished rights of mind and spirit—the freedoms of speech, press, religion, assembly, association, and petition for redress of grievances.[4]

Similarly, Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, decided in 1937, suggested that the rights secured by the Fourth Amendment were not protected against state action, citing 302 U.S., at 324, 58 S.Ct., at 151, the statement of the Court in 1914 in Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 346, that "the 4th Amendment is not directed to individual misconduct of [state] officials." In 1961, however, the

Court held that in the light of later decisions,[5] it was taken as settled that "* * * the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth * * *." Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081. Again, although the Court held in 1942 that in a state prosecution for a non-capital offense, "appointment of counsel is not a fundamental right," Betts v. Brady, 316 U.S. 455, 471, 62 S.Ct. 1252, 1261, 86 L.Ed. 1595; cf. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, only last Term this decision was re-examined and it was held that provision of counsel in all criminal cases was "a fundamental right, essential to a fair trial," and thus was made obligatory on the States by the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 343–344, 83 S.Ct. 792, 796.[6]

[1] We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States. Decisions of the Court since Twining and Adamson have departed from the contrary view expressed in those cases. We discuss

---

4. E. g., Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 629 (speech and press); Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (speech and press); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (speech and press); Staub v. City of Baxley, 355 U.S. 313, 321, 78 S.Ct. 277, 281, 2 L.Ed.2d 302 (speech); Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (press); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (religion); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (assembly); Shelton v. Tucker, 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (association); Louisiana ex rel. Gremillion v. N. A. A. C. P., 366 U.S. 293, 296, 81 S.Ct. 1333, 1335,

6 L.Ed.2d 301 (association); N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (association and speech); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (association).

5. See Wolf v. Colorado, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782; Elkins v. United States, 364 U.S. 206, 213, 80 S.Ct. 1437, 1441, 4 L.Ed.2d 1669.

6. See also Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, which, despite In re Kemmler, supra; McElvaine v. Brush, supra; O'Neil v. Vermont, supra, made applicable to the States the Eighth Amendment's ban on cruel and unusual punishments.

RPI 0099

first the decisions which forbid the use of coerced confessions in state criminal prosecutions.

[2, 3]   Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, was the first case in which the Court held that the Due Process Clause prohibited the States from using the accused's coerced confessions against him. The Court in Brown felt impelled, in light of Twining, to say that its conclusion did not involve the privilege against self-incrimination. "Compulsion by torture to extort a confession is a different matter." 297 U.S., at 285, 56 S.Ct., at 464. But this distinction was soon

7

abandoned, and today the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" Id., 168 U.S. at 542, 18 S.Ct. at 187. Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * *" Id., 168 U.S. at 542-543, 18 S.Ct. at 186-187; see also Hardy v. United States, 186 U.S. 224, 229, 22 S.Ct. 889, 891, 46 L.Ed. 1137; Ziang Sun Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 3, 69 L.Ed. 131; Smith v. United States, 348 U.S. 147, 150, 75 S.Ct. 194, 196, 99 L.Ed. 192. In other words the person must not have been

compelled to incriminate himself. We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513.

[4-7]   The marked shift to the federal standard in state cases began with Lisenba v. California, 814 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166, where the Court spoke of the accused's "free choice to admit, to deny, or to refuse to answer." Id., 314 U.S. at 241, 62 S.Ct. at 292. See Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Spano v. New York, 860 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Lynumn v. Illinois, 872 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922; Haynes v. Washington, 373 U.S. 503. The shift reflects recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. Rogers v. Richmond, 365 U.S. 534,

8

541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760. Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth. Since the Fourteenth Amendment prohibits the States from inducing a person to confess through "sympathy falsely aroused," Spano v. New York, supra, 360 U.S., at 823, 79 S.Ct., at 1207, or other like inducement far short of "compulsion by torture," Haynes v. Washington, supra, it follows a fortiori that it also forbids the States to resort to imprisonment, as here, to compel him to answer questions that might incriminate him. The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and

RPI 0100

to suffer no penalty, as held in Twining, for such silence.

This conclusion is fortified by our recent decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, which had held "that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure," 338 U.S., at 33, 69 S.Ct., at 1364. Mapp held that the Fifth Amendment privilege against self-incrimination implemented the Fourth Amendment in such cases, and that the two guarantees of personal security conjoined in the Fourteenth Amendment to make the exclusionary rule obligatory upon the States. We relied upon the great case of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, decided in 1886, which, considering the Fourth and Fifth Amendments as running "almost into each other," id., 116 U.S., at 630, 6 S.Ct., at 532, held that "Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within

the condemnation of [those Amendments] * * *." 116 U.S., at 630, 6 S.Ct., at 532. We said in Mapp:

"We find that, as to the Federal Government the Fourth and Fifth Amendments and, as to the States,

the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty [secured] * * * only after years of struggle.' Bram v. United States, 1897, 168 U.S. 532, 543–544, 18 S.Ct. 183 * * *. The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence." 367 U. S., at 656–657, 81 S.Ct., at 1692.

In thus returning to the Boyd view that the privilege is one of the "principles of a free government," 116 U.S., at 632, 6 S.Ct., at 533,[7] Mapp necessarily repudiated the Twining concept of the privilege as a mere rule of evidence "best defended not as an unchangeable principle of universal justice, but as a law proved by experience to be expedient." 211 U.S., at 113, 29 S.Ct., at 25.

[8] The respondent Sheriff concedes in its brief that under our decisions, particularly those involving coerced confessions, "the accusatorial system has become a fundamental part of the fabric of our society and, hence, is enforceable against the States."[8] The State urges, however, that the availability of the fed-

---

7. Boyd had said of the privilege, " * * * any compulsory discovery by extorting the party's oath * * * to convict him of crime * * * is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom." 116 U.S., at 631–632, 6 S.Ct., at 533.

Dean Griswold has said: "I believe the Fifth Amendment is, and has been through this period of crisis, an expression of the moral striving of the com-

munity. It has been a reflection of our common conscience, a symbol of the America which stirs our hearts." The Fifth Amendment Today 73 (1955).

8. The brief states further:

"Underlying the decisions excluding coerced confessions is the implicit assumption that an accused is privileged against incriminating himself, either in the jail house, the grand jury room, or on the witness stand in a public trial. * * *

" * * * It is fundamentally inconsistent to suggest, as the Court's opinions now suggest, that the State is en-

eral privilege to a witness in a state inquiry is to be determined according to a less stringent standard than is applicable in a federal proceeding. We disagree. We have held that the guarantees of the First Amendment, Gitlow v. New York, supra; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; Louisiana ex rel. Gremillion v. N.A.A.C.P., 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed. 2d 301, the prohibition of unreasonable searches and seizures of the Fourth Amendment, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, and the right to counsel guaranteed by the Sixth Amendment, Gideon v. Wainwright, supra, are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment. In the coerced confession cases, involving the policies of the privilege itself, there has been no suggestion that a confession might be considered coerced if used in a federal but not a state tribunal. The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a "watered-down, subjective version of the individual

11

guarantees of the Bill of Rights," Ohio ex rel. Eaton v. Price, 364 U.S. 263, 275, 80 S. Ct. 1463, 1470, 4 L.Ed.2d 1708 (dissenting opinion). If Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, and Adamson v. California, supra, suggest such an application of the privilege against self-incrimination, that suggestion cannot survive recognition of the degree to which the Twining view of the privilege has been eroded. What is accorded is a privilege of refusing to incriminate one's self, and the feared prosecution may be by either federal or state authorities. Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594. It

would be incongruous to have different standards determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in a state or federal court. Therefore, the same standards must determine whether an accused's silence in either a federal or state proceeding is justified.

[9, 10] We turn to the petitioner's claim that the State of Connecticut denied him the protection of his federal privilege. It must be considered irrelevant that the petitioner was a witness in a statutory inquiry and not a defendant in a criminal prosecution, for it has long been settled that the privilege protects witnesses in similar federal inquiries. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158; Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118. We recently elaborated the content of the federal standard in Hoffman:

"The privilege afforded not only extends to answers that would in themselves support a conviction * * * but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute. * * * [I]f the witness, upon interposing his claim, were required to prove the hazard * * * he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is

12

asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injuri-

tirely free to compel an accused to incriminate himself before a grand jury, or at the trial, but cannot do so in the police station. Frank recognition of the fact that the Due Process Clause prohibits the States from enforcing their laws by compelling the accused to con-

fess, regardless of where such compulsion occurs, would not only clarify the principles involved in confession cases, but would assist the States significantly in their efforts to comply with the limitations placed upon them by the Fourteenth Amendment."

RPI 0102

ous disclosure could result." 341 U. S., at 486–487, 71 S.Ct. at 818.

We also said that, in applying that test, the judge must be

"'*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." 341 U.S., at 488, 71 S.Ct., at 819.

The State of Connecticut argues that the Connecticut courts properly applied the federal standards to the facts of this case. We disagree.

The investigation in the course of which petitioner was questioned began when the Superior Court in Hartford County appointed the Honorable Ernest A. Inglis, formerly Chief Justice of Connecticut, to conduct an inquiry into whether there was reasonable cause to believe that crimes, including gambling, were being committed in Hartford County. Petitioner appeared on January 16 and 25, 1961, and in both instances he was asked substantially the same questions about the circumstances surrounding his arrest and conviction for pool selling in late 1959. The questions which petitioner refused to answer may be summarized as follows: (1) for whom did he work on September 11, 1959; (2) who selected and paid his counsel in connection with his arrest on that date and subsequent conviction; (3) who selected and paid his bondsman; (4) who paid his fine; (5) what was the name of the tenant of the apartment in which he was arrested; and (6) did he know John

Bergoti. The Connecticut Supreme Court of Errors ruled that the answers to these questions could not tend to incriminate him because the defenses of double jeopardy and the running of the one-year statute of limitations on misdemeanors would defeat any prosecution growing out of his answers to the first

12

five questions. As for the sixth question, the court held that petitioner's failure to explain how a revelation of his relationship with Bergoti would incriminate him vitiated his claim to the protection of the privilege afforded by state law.

The conclusions of the Court of Errors, tested by the federal standard, fail to take sufficient account of the setting in which the questions were asked. The interrogation was part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the State at oral argument—and indeed it is obvious from the questions themselves—that the State desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted.[8]

Analysis of the sixth question, concerning whether petitioner knew John Bergoti, yields a similar conclusion. In the context of the inquiry, it should have been apparent to the referee that Ber-

---

9. See Greenberg v. United States, 343 U.S. 918, 72 S.Ct. 674, 96 L.Ed. 1332, reversing per curiam, 3 Cir., 192 F.2d 201; Singleton v. United States, 343 U.S. 944, 72 S.Ct. 1041, 96 L.Ed. 1349, reversing per curiam, 3 Cir., 193 F.2d 464. In United States v. Coffey, 198 F.2d 438 (C.A.3d Cir.), cited with approval in Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997, the Court

of Appeals for the Third Circuit stated: "in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical; rather must he be acutely aware that in the deviousness of crime and its detection incrimination may be approached and achieved by obscure and unlikely lines of inquiry." 198 F.2d, at 440–441.

RPI 0103

goti was suspected by the State to be involved in some way in the subject matter of the investigation. An affirmative answer to the question 14 might well have either connected petitioner with a more recent crime, or at least have operated as a waiver of his privilege with reference to his relationship with a possible criminal. See Rogers v. United States, 340 U.S. 867, 71 S.Ct. 438, 95 L.Ed. 344. We conclude, therefore, that as to each of the questions, it was "evident from the implications of the question, in the setting in which it [was] asked, that a responsive answer to the question or an explanation of why it [could not] be answered might be dangerous because injurious disclosure could result," Hoffman v. United States, 341 U.S., at 486–487, 71 S.Ct. 818; see Singleton v. United States, 343 U.S. 944, 72 S.Ct. 1041.

Reversed.

While Mr. Justice DOUGLAS joins the opinion of the Court, he also adheres to his concurrence in Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 797.

Mr. Justice HARLAN, whom Mr. Justice CLARK joins, dissenting.

Connecticut has adjudged this petitioner in contempt for refusing to answer questions in a state inquiry. The courts of the State, whose laws embody a privilege against self-incrimination, refused to recognize the petitioner's claim of privilege, finding that the questions asked him were not incriminatory. This Court now holds the contempt adjudication unconstitutional because, it is decided: (1) the Fourteenth Amendment makes the Fifth Amendment privilege against self-incrimination applicable to the States; (2) the federal standard justifying a claim of this privilege likewise applies to the States; and (3) judged by that standard the petitioner's claim of privilege should have been upheld.

Believing that the reasoning behind the Court's decision carries extremely mischievous, if not dangerous, consequences for our federal system in the realm of criminal 15 law enforcement, I must dissent. The importance of the issue presented and the serious incursion which the Court makes on time-honored, basic constitutional principles justify a full exposition of my reasons.

I.

I can only read the Court's opinion as accepting in fact what it rejects in theory: the application to the States, via the Fourteenth Amendment, of the forms of federal criminal procedure embodied within the first eight Amendments to the Constitution. While it is true that the Court deals today with only one aspect of state criminal procedure, and rejects the wholesale "incorporation" of such federal constitutional requirements, the logical gap between the Court's premises and its novel constitutional conclusion can, I submit, be bridged only by the additional premise that the Due Process Clause of the Fourteenth Amendment is a shorthand directive to this Court to pick and choose among the provisions of the first eight Amendments and apply those chosen, freighted with their entire accompanying body of federal doctrine, to law enforcement in the States.

I accept and agree with the proposition that continuing re-examination of the constitutional conception of Fourteenth Amendment "due process" of law is required, and that development of the community's sense of justice may in time lead to expansion of the protection which due process affords. In particular in this case, I agree that principles of justice to which due process gives expression, as reflected in decisions of this Court, prohibit a State, as the Fifth Amendment prohibits the Federal Government, from imprisoning a person *solely* because he refuses to give evidence which may incriminate him under the laws of the

RPI 0104

State.[1] I do not understand, however, how this process of re-examination, which must refer always to the guiding standard of due process of law, including, of course, reference to the particular guarantees of the Bill of Rights, can be short-circuited by the simple device of incorporating into due process, without critical examination, the whole body of law which surrounds a specific prohibition directed against the Federal Government. The consequence of such an approach to due process as it pertains to the States is inevitably disregard of all relevant differences which may exist between state and federal criminal law and its enforcement. The ultimate result is compelled uniformity, which is inconsistent with the purpose of our federal system and which is achieved either by encroachment on the States' sovereign powers or by dilution in federal law enforcement of the specific protections found in the Bill of Rights.

## II.

As recently as 1961, this Court reaffirmed that "the Fifth Amendment's privilege against self-incrimination," ante, p. 1491, was not applicable against the States. Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954. The question had been most fully explored in Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14. Since 1908, when Twining was decided, this Court has adhered to the view there expressed that "the exemption from compulsory self-incrimination in the courts of the states is not secured by any part of the Federal Constitution," 211 U.S., at 114, 29 S.Ct., at 26; Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330; Brown v. Mississippi, 297 U.S. 278, 285, 56 S.Ct. 461, 464; Palko v. Connecticut, 302 U.S. 319, 324, 58 S.Ct. 149, 151; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L. Ed. 1903; Knapp v. Schweitzer, 357 U.S. 371, 374, 78 S.Ct. 1302, 1304, 2 L.Ed.2d 1393; Cohen, supra. Although none of these cases involved a commitment to prison for refusing to incriminate oneself under state law, and they are relevantly distinguishable from this case on that narrow ground,[2] it is perfectly clear from them that until today it has been regarded as settled law that the Fifth Amendment privilege did not, by any process of reasoning, apply *as such* to the States.

The Court suggests that this consistent line of authority has been undermined by the concurrent development of constitutional doctrine in the areas of coerced confessions and search and sei-

---

1. That precise question has not heretofore been decided by this Court. Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, and the cases which followed it, see infra, p. 1498, all involved issues not precisely similar. Although the Court has stated broadly that an individual could "be required to incriminate himself in * * * state proceedings," Cohen v. Hurley, 366 U.S. 117, 127, 81 S.Ct. 954, 960, the context in which such statements were made was that the State had in each case recognized the right to remain silent. In Twining, supra, until now the primary authority, the Court noted that "all the states of the Union have, from time to time, with varying form, but uniform meaning, included the privilege in their Constitutions, except the states of New Jersey and Iowa, and in those states it is held to be part of the existing law." 211 U.S., at 92, 29 S.Ct., at 16.

While I do not believe that the coerced confession cases furnish any basis for incorporating the Fifth Amendment into the Fourteenth, see infra, pp. 1498–1500, they do, it seems to me, carry an implication that coercion to incriminate oneself, even when under the forms of law, cf. Brown v. Mississippi, 297 U.S. 278, 285, 56 S.Ct. 461, 464, discussed infra, p. 1499, is inconsistent with due process. Since every State already recognizes a privilege against self-incrimination so defined, see VIII Wigmore, Evidence (McNaughton rev. 1961), § 2252, the effect of including such a privilege in due process is only to create the possibility that a federal question, to be decided under the Due Process Clause, would be raised by a State's refusal to accept a claim of the privilege.

2. See note 1, supra.

RPI 0105

zure. That is *post facto* reasoning at best. Certainly there has been no intimation until now that Twining has been tacitly overruled.

It was in Brown v. Mississippi, supra, that this Court first prohibited the use of a coerced confession in a state criminal trial. The petitioners in Brown had been tortured

until they confessed. The Court was hardly making an artificial distinction when it said:

" * * * [T]he question of the right of the state to withdraw the privilege against self-incrimination is not here involved. The compulsion to which the quoted statements [from Twining and Snyder, supra,] refer is that of the *processes of justice* by which the accused may be called as a witness and required to testify. *Compulsion by torture to extort a confession is a different matter.*" [3] 297 U.S., at 285, 56 S.Ct. at 464. (Emphasis supplied.)

The majority is simply wrong when it asserts that this perfectly understandable distinction "was soon abandoned," ante, p. 1493. In none of the cases cited, ante pp. 1493–1494, in which was developed the full sweep of the constitutional prohibition against the use of coerced confessions at state trials, was there anything to suggest that the Fifth Amendment was being made applicable to state

proceedings. In Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, the privilege against self-incrimination is not mentioned. The relevant question before the Court was whether "the evidence [of coercion] requires that we set aside the finding of two courts and a jury and adjudge the admission of the confessions so fundamentally unfair, so contrary to the common concept of ordered liberty as to amount to a taking of life without due process of law." Id., 314 U.S. at 238, 62 S.Ct. at 291. The question was the same in Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; the Court there adverted to the "third degree," e. g., id., 322 U.S. at 150, note 5, 64 S.Ct. at 924, and "secret inquisitorial practices,"

id., 322 U.S. at 152, 64 S.Ct. at 925. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, is the same; the privilege against self-incrimination is not mentioned.[4] So too in Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202; Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917; and Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336. Finally, in Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, although the Court did recognize that "ours is an accusatorial and not an inquisitorial system," id., 365 U.S. at 541, 81 S.Ct. at 739, it is clear that the Court was concerned only with the problem of coerced confessions, see ibid.; the opinion includes nothing to support the Court's assertion here, ante, p. 1493, that

3. Nothing in the opinion in Brown supports the Court's intimation here, ante, p. 1493, that if Twining had not been on the books, reversal of the convictions would have been based on the Fifth Amendment. The Court made it plain in Brown that it regarded the trial use of a confession extracted by torture as on a par with domination of a trial by a mob, see, e. g., Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, where the trial "is a mere pretense," 207 U.S., at 286, 56 S.Ct., at 465.

4. "And so, when a conviction in a state court is properly here for review, under a claim that a right protected by the Fourteenth Amendment has been de-

nied, the question is not whether the record can be found to disclose an infraction of one of the specific provisions of the first eight amendments. To come concretely to the present case, the question is not whether the record permits a finding, by a tenuous process of psychological assumptions and reasoning, that Malinski by means of a confession was forced to self-incrimination in defiance of the Fifth Amendment. The exact question is whether the criminal proceedings which resulted in his conviction deprived him of the due process of law by which he was constitutionally entitled to have his guilt determined." Malinski, supra, 324 U.S. at 416, 65 S.Ct. at 788 (opinion of Frankfurter, J.).

RPI 0106

"the Fifth Amendment privilege is * * [the] essential mainstay" of our system.

In Adamson, supra, the Court made it explicit that it did not regard the increasingly strict standard for determining the admissibility at trial of an out-of-court confession as undermining the holding of Twining. After stating that "the due process clause does not protect, by virtue of its mere existence the accused's freedom from giving testimony by compulsion in state trials that is secured to him against federal interference by the Fifth Amendment," the Court said: "The due process clause forbids compulsion to testify by fear of hurt, torture or exhaustion. It forbids any other type of coercion that falls within the scope of due process." 332 U.S., at 54, 67 S.Ct. at 1676.

[20] (footnotes omitted). Plainly, the Court regarded these two lines of cases as distinct. See also Palko v. Connecticut, supra, 302 U.S., at 326, 58 S.Ct. at 152, to the same effect.[5] Cohen, supra, which adhered to Twining, was decided after all but a few of the confession cases which the Court mentions.

The coerced confession cases are relevant to the problem of this case not because they overruled Twining *sub silentio*, but rather because they applied the same standard of fundamental fairness which is applicable here. The recognition in them that federal supervision of state criminal procedures must be directly based on the requirements of due process is entirely inconsistent with the theory here espoused by the majority. The parallel treatment of federal and state cases involving coerced confessions resulted from the fact that the same demand of due process was applicable in both; it was not the consequence of the automatic engrafting of federal law construing constitutional provisions inapplicable to the States onto the Fourteenth Amendment.

The decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, that evidence unconstitutionally seized, see Wolf v. Colorado, 338 U.S. 25, 28, 69 S.Ct. 1359, 1361, may not be used in a state criminal trial furnishes no "fortification," see ante, p. 1494, for today's decision. The very passage from the Mapp opinion which the Court quotes, ante, p. 1494 makes explicit the distinct bases of the exclusionary rule as applied in federal and state courts:

"We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation'

[21] in their perpetuation of 'principles of humanity and civil liberty [secured] * * * only after years of struggle,' Bram v. United States, 1897, 168 U.S. 532, 543–544, 18 S. Ct. 183, 187." 367 U.S., at 656–657, 81 S.Ct., at 1692 (footnote omitted). See also id., 367 U.S. at 655, 81 S. Ct., at 1691.

Although the Court discussed Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, a federal case involving both the Fourth and Fifth Amendments, nothing in Mapp supports the statement, ante, p. 1494, that the Fifth Amendment was part of the basis for extending the exclusionary rule to the States. The elaboration of Mapp in Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, did in my view make the Fourth Amendment applicable to the States through the Fourteenth; but there is nothing in it to suggest that the Fifth Amendment went along as baggage.

### III.

The previous discussion shows that this Court's decisions do not dictate the "incorporation" of the Fifth Amend-

---

5. In Adamson and Palko, supra, which adhered to the rule announced in Twining, supra, the Court cited some of the very cases now relied on by the majority to show that Twining was gradually being eroded. 332 U.S., at 54, notes 12, 13, 67 S.Ct., at 1676; 302 U.S., at 325, 326, 58 S.Ct., at 151, 152.

RPI 0107

ment's privilege against self-incrimination into the Fourteenth Amendment. Approaching the question more broadly, it is equally plain that the line of cases exemplified by Palko v. Connecticut, supra, in which this Court has reconsidered the requirements which the Due Process Clause imposes on the States in the light of current standards, furnishes no general theoretical framework for what the Court does today.

The view of the Due Process Clause of the Fourteenth Amendment which this Court has consistently accepted and which has "thus far prevailed," ante, p. 1491, is that its requirements are as "old as a principle of civilized government," Munn v. Illinois, 94 U.S. 113, 123, 24 L.Ed. 77, the specific applications of which must be ascertained "by the gradual process of judicial inclusion and exclusion * * *," Davidson v. New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616. Due process requires "observance of those general rules established in our system of jurisprudence for the security of private rights." Hagar v. Reclamation District No. 108, 111 U.S. 701, 708, 4 S.Ct. 663, 667, 28 L.Ed. 569. See Hurtado v. California, 110 U.S. 516, 537, 4 S.Ct. 111, 121.

"This court has never attempted to define with precision the words 'due process of law' * * *. It is sufficient to say that there are certain immutable principles of justice, which inhere in the very idea of free government, which no member of the Union may disregard * * *." Holden v. Hardy, 169 U.S. 366, 389, 18 S.Ct. 383, 387, 42 L.Ed. 780.

It followed from this recognition that due process encompassed the fundamental safeguards of the individual against the abusive exercise of governmental power that some of the restraints on the Federal Government which were specifically enumerated in the Bill of Rights applied also against the States. But, while inclusion of a particular provision in the Bill of Rights might provide historical evidence that the right involved was traditionally regarded as fundamental, inclusion of the right in due process was otherwise entirely independent of the first eight Amendments:

"* * * [I]t is possible that some of the personal rights safeguarded by the first eight Amendments against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. * * * *If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law."* Twining, supra, 211 U.S. at 99, 29 S.Ct. at 19. (Emphasis supplied.)

Relying heavily on Twining, Mr. Justice Cardozo provided what may be regarded as a classic expression of this approach in Palko v. Connecticut, supra. After considering a number of individual rights (including the right not to incriminate oneself) which were "not of the very essence of a scheme of ordered liberty," id., 302 U.S. at 325, 58 S.Ct. at 152, he said:

"We reach a different plane of social and moral values when we pass to the privileges and immunities that have been taken over from the earlier articles of the Federal Bill of Rights and brought within the Fourteenth Amendment by a process of absorption. These in their origin were effective against the federal government alone. If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed." Id., 302 U.S. at 326, 58 S.Ct. at 152.

Further on, Mr. Justice Cardozo made the independence of the Due Process

RPI 0108

Clause from the provisions of the first eight Amendments explicit:

"Fundamental * * * in the concept of due process, and so in that of liberty, is the thought that condemnation shall be rendered only after trial. Scott v. McNeal, 154 U.S. 34, 14 S.Ct. 1108, 38 L.Ed. 896; Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 875. The hearing, moreover, must be a real one, not a sham or a pretense. Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. For that reason, ignorant defendants in a capital case were held to have been condemned unlawfully when in truth, though not in form, they were refused the aid of counsel. Powell v. Alabama, supra, 287 U.S. 45, at pages 67, 68, 53 S.Ct. 55, 63, 77 L.Ed. 158, 84 A.L.R. 527. The decision did not turn upon the fact that the benefit of counsel would have been guaranteed to the defendants by the provisions of the Sixth Amendment if they had been prosecuted in a federal court. The decision turned upon the fact that in the particular situation laid before us in the evidence the benefit of counsel was essential to the substance of a hearing." Id., 302 U.S. at 327, 58 S.Ct. at 153.

24

It is apparent that Mr. Justice Cardozo's metaphor of "absorption" was not intended to suggest the transplantation of case law surrounding the specifics of the first eight Amendments to the very different soil of the Fourteenth Amendment's Due Process Clause. For, as he made perfectly plain, what the Fourteenth Amendment requires of the States does not basically depend on what the first eight Amendments require of the Federal Government.

Seen in proper perspective, therefore, the fact that First Amendment protections have generally been given equal scope in the federal and state domains or that in some areas of criminal procedure the Due Process Clause demands as much of the States as the Bill of Rights demands of the Federal Government, is only tangentially relevant to the question now before us. It is toying with constitutional principles to assert that the Court has "rejected the notion that the Fourteenth Amendment applies to the states only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights,'" ante, p. 1495. What the Court has with the single exception of the Ker case, supra, p. 1500; see infra, p. 1503, consistently rejected is the notion that the Bill of Rights, as such, applies to the States in any aspect at all.

If one attends to those areas to which the Court points, ante, p. 1494, in which the prohibitions against the state and federal governments have moved in parallel tracks, the cases in fact reveal again that the Court's usual approach has been to ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments. Although more recently the Court has referred to the First Amendment to describe the protection of free expression against state infringement, earlier cases leave no doubt that such references are "shorthand" for doctrines developed by another

25

route. In Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, for example, the Court said:

"For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."

The Court went on to consider the extent of those freedoms in the context of state

RPI 0109

interests. Mr. Justice Holmes, in dissent, said:

"The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States." Id., 268 U.S. at 672, 45 S.Ct. at 632.

Chief Justice Hughes, in De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 260, gave a similar analysis:

"Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. * * * The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this Court said in United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588: 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' The First Amendment of the Federal Constitution expressly guarantees that right against abridgment by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions—principles which the Fourteenth Amendment embodies in the general terms of its due process clause."

The coerced confession and search and seizure cases have already been considered. The former, decided always directly on grounds of fundamental fairness, furnish no support for the Court's present views. Ker v. California, supra, did indeed incorporate the Fourth Amendment's protection against invasions of privacy into the Due Process Clause. But that case should be regarded as the exception which proves the rule.[6] The right to counsel in state criminal proceedings, which this Court assured in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, does not depend on the Sixth Amendment. In Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, this Court had said:

"Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against state action in identical words by the Fourteenth. The phrase formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." (Footnote omitted.)

Although Gideon overruled Betts, the constitutional approach in both cases was the same. Gideon was based on the Court's conclusion, contrary to that reached in Betts, that the appointment of counsel for an indigent criminal defendant *was* essential to the conduct of a fair trial, and was therefore part of due process. 372 U.S., at 342–345, 83 S.Ct. at 795–797.

6. Cf. the majority and dissenting opinions in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509.

The Court's approach in the present case is in fact nothing more or less than "incorporation" in snatches. If, however, the Due Process Clause *is* something more than a reference to the Bill of Rights and protects only those rights which derive from fundamental principles, as the majority purports to believe, it is just as contrary to precedent and just as illogical to incorporate the provisions of the Bill of Rights one at a time as it is to incorporate them all at once.

## IV.

The Court's undiscriminating approach to the Due Process Clause carries serious implications for the sound working of our federal system in the field of criminal law.

The Court concludes, almost without discussion, that "the same standards must determine whether an accused's silence in either a federal or state proceeding is justified," ante, p. 1495. About all that the Court offers in explanation of this conclusion is the observation that it would be "incongruous" if different standards governed the assertion of a privilege to remain silent in state and federal tribunals. Such "incongruity," however, is at the heart of our federal system. The powers and responsibilities of the state and federal governments are not congruent; under our Constitution, they are not intended to be. Why should it be thought, as an *a priori* matter, that limitations on the investigative power of the States are in all respects identical with limitations on the investigative power of the Federal Government? This certainly

does not follow from the fact that we deal here with constitutional requirements; for the provisions of the Constitution which are construed are different.

As the Court pointed out in Abbate v. United States, 359 U.S. 187, 195, 79 S.Ct. 666, 671, 3 L.Ed.2d 729, "the States under our federal system have the principal responsibility for defining and prosecuting crimes." The Court endangers this

allocation of responsibility for the prevention of crime when it applies to the States doctrines developed in the context of federal law enforcement, without any attention to the special problems which the States as a group or particular States may face. If the power of the States to deal with local crime is unduly restricted, the likely consequence is a shift of responsibility in this area to the Federal Government, with its vastly greater resources. Such a shift, if it occurs, may in the end serve to weaken the very liberties which the Fourteenth Amendment safeguards by bringing us closer to the monolithic society which our federalism rejects. Equally dangerous to our liberties is the alternative of watering down protections against the Federal Government embodied in the Bill of Rights so as not unduly to restrict the powers of the States. The dissenting opinion in Aguilar v. Texas, 378 U.S., p. 116, 84 S.Ct., p. 1515, evidences that this danger is not imaginary. See my concurring opinion in Aguilar, ibid.

Rather than insisting, almost by rote, that the Connecticut court, in considering the petitioner's claim of privilege, was required to apply the "federal standard," the Court should have fulfilled its responsibility under the Due Process Clause by inquiring whether the proceedings below met the demands of fundamental fairness which due process embodies. Such an approach may not satisfy those who see in the Fourteenth Amendment a set of easily applied "absolutes" which can afford a haven from unsettling doubt. It is, however, truer to the spirit which requires this Court constantly to re-examine fundamental

principles and at the same time enjoins it from reading its own preferences into the Constitution.

The Connecticut Supreme Court of Errors gave full and careful consideration to the petitioner's claim that he would incriminate himself if he answered the questions put to him. It noted that its decisions "from a time antedating the

RPI 0111

adoption of * * * [the Connecticut] constitution in 1818" had upheld a privilege to refuse to answer incriminating questions. 150 Conn. 220, 223, 187 A.2d 744, 746. Stating that federal cases treating the Fifth Amendment privilege had "persuasive force" in interpreting its own constitutional provision, and citing Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, in particular, the Supreme Court of Errors described the requirements for assertion of the privilege by quoting from one of its own cases, id., 150 Conn., at 225, 187 A.2d, at 747:

"[A] witness * * * has the right to refuse to answer any question which would tend to incriminate him. But a mere claim on his part that the evidence will tend to incriminate him is not sufficient. * * * [He having] made his claim, it is then * * * [necessary for the judge] to determine in the exercise of a legal discretion whether, from the circumstances of the case and the nature of the evidence which the witness is called upon to give, there is reasonable ground to apprehend danger of criminal liability from his being compelled to answer. That danger 'must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by,

should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding inter alios, protection against being brought by means of his own evidence within the penalties of the law.

84 S.Ct.—95

But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.' Cockburn, C. J., in Regina v. Boyes, 1 B. & S. 311, 330 * * *." McCarthy v. Clancy, 110 Conn. 482, 488–489, 148 A. 551, 555.

The court carefully applied the above standard to each question which the petitioner was asked. It dealt first with the question whether he knew John Bergoti. The court said:

"Bergoti is nowhere described or in any way identified, either as to his occupation, actual or reputed, or as to any criminal record he may have had. * * * Malloy made no attempt even to suggest to the court how an answer to the question whether he knew Bergoti could possibly incriminate him. * * * On this state of the record the question was proper, and Malloy's claim of privilege, made without explanation, was correctly overruled. Malloy 'chose to keep the door tightly closed and to deny the court the smallest glimpse of the danger he apprehended. He cannot then complain that we see none.' In re Pillo, 11 N.J. 8, 22, 93 A.2d 176, 183 * * *." 150 Conn., at 226–227, 187 A.2d, at 748.

The remaining questions are summarized in the majority's opinion, ante, p. 1496. All of them deal with the circumstances surrounding the petitioner's conviction on a gambling charge in 1959. The court declined to decide

"whether, on their face and apart from any consideration of Malloy's immunity from prosecution, the questions should or should not have been answered in the light of his failure to give any hint of explanation as to how answers to them could incriminate him." 150 Conn., at 227, 187 A.2d, at 748. The court considered the State's

RPI 0112

claim that the petitioner's prior conviction was sufficient to clothe him with immunity from prosecution for other crimes to which the questions might pertain, but declined to rest its decision on that basis. Id., 150 Conn., at 227–229, 187 A.2d, at 748–749. The court concluded, however, that the running of the statute of limitations on misdemeanors committed in 1959 and the absence of any indication that Malloy had engaged in any crime other than a misdemeanor removed all appearance of danger of incrimination from the questions propounded concerning the petitioner's activities in 1959. The court summarized this conclusion as follows:

"In all this, Malloy confounds vague and improbable possibilities of prosecution with reasonably appreciable ones. Under claims like his, it would always be possible to work out some finespun and improbable theory from which an outside chance of prosecution could be envisioned. Such claims are not enough to support a claim of privilege, at least where, as here, a witness suggests no rational explanation of his fears of incrimination, and the questions themselves, under all the circumstances, suggest none." Id., 150 Conn., at 230–231, 187 A.2d, at 750.

Peremptorily rejecting all of the careful analysis of the Connecticut court, this Court creates its own "finespun and improbable theory" about how these questions might have incriminated the petitioner. With respect to his acquaintance with Bergoti, this Court says only:

"In the context of the inquiry, it should have been apparent to the referee that Bergoti was suspected by the State to be involved in some way in the subject matter of the investigation. An affirmative answer to the question might well have either connected petitioner with a more recent crime, or at least have operated as a waiver of his privilege

with reference to his relationship with a possible criminal." Ante, pp. 1496–1497.

The other five questions, treated at length in the Connecticut court's opinion, get equally short shrift from this Court; it takes the majority, unfamiliar with Connecticut law and far removed from the proceedings below, only a dozen lines to consider the questions and conclude that they were incriminating:

"The interrogation was a part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the State at oral argument—and indeed it is obvious from the questions themselves—that the State desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted." (Footnote omitted.) Ante, p. 1496.

I do not understand how anyone could read the opinion of the Connecticut court and conclude that the state law which was the basis of its decision or the decision itself was lacking in fundamental fairness. The truth of the matter is that under any standard—state or federal—the commitment for contempt was proper. Indeed, as indicated above, there is every reason to believe that the Connecticut court did apply the Hoffman standard quoted approvingly in the majority's opinion. I entirely agree with my Brother WHITE, post, pp. 1508–1509, that if the matter is viewed only from the standpoint of the federal standard, such standard was fully satisfied. The Court's reference to a federal standard is, to put it bluntly, simply an excuse for the Court to

RPI 0113

substitute its own superficial assessment of the facts and state law for the careful and better informed conclusions of the state court. No one who scans the two opinions with an objective eye will, I think, reach any other conclusion.

I would affirm.

Mr. Justice WHITE, with whom Mr. Justice STEWART joins, dissenting.

### I.

The Fifth Amendment safeguards an important complex of values, but it is difficult for me to perceive how these values are served by the Court's holding that the privilege was properly invoked in this case. While purporting to apply the prevailing federal standard of incrimination—the same standard of incrimination that the Connecticut courts applied—the Court has all but stated that a witness' invocation of the privilege to any question is to be automatically, and without more, accepted. With deference, I prefer the rule permitting the judge rather than the witness to determine when an answer sought is incriminating.

The established rule has been that the witness' claim of the privilege is not final, for the privilege qualifies a citizen's general duty of disclosure only when his answers would subject him to danger from the criminal law. The privilege against self-incrimination or any other evidentiary privilege does not protect silence which is solely an expression of political protest, a desire not to inform, a fear of social obloquy or economic disadvantage or fear of prosecution for future crimes. Smith v. United States,

**84**

**337**

U.S. 137, 147, 69 S.Ct. 1000, 1005, 93 L.Ed. 1264; Brown v. Walker, 161 U.S. 591, 605, 16 S.Ct. 644, 650, 40 L. Ed. 819. If the general duty to testify when subpoenaed is to remain and the privilege is to be retained as a protection against compelled incriminating answers, the trial judge must be permitted to make a meaningful determination of when answers tend to incriminate. See

The Queen v. Boyes, 1 B. & S. 311, 329-330 (1861); Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198. I do not think today's decision permits such a determination.

Answers which would furnish a lead to other evidence needed to prosecute or convict a claimant of a crime—clue evidence—cannot be compelled, but "this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S. 479, at 486, 71 S.Ct. 814, at 818; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621. Of course the witness is not required to disclose so much of the danger as to render his privilege nugatory. But that does not justify a flat rule of no inquiry and automatic acceptance of the claim of privilege. In determining whether the witness has a reasonable apprehension, the test in the federal courts has been that the judge is to decide from the circumstances of the case, his knowledge of matters surrounding the inquiry and the nature of the evidence which is demanded from the witness. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621. Cf. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438. This rule seeks and achieves a workable accommodation between what are obviously important competing interests. As Mr. Chief Justice Marshall said: "The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. * * * When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness." In

**85**

re Willie, 25 Fed.Cas.No.14,692e, at 39-40. I would not only retain this rule but apply it in its present form. Under this test, Malloy's refusals to answer some, if not all, of the questions put to him were clearly not privileged.

RPI 0114

## II.

In November 1959, Malloy was arrested in a gambling raid in Hartford and was convicted of pool selling, an offense defined as occupying and keeping a building containing gambling apparatus. After a 90-day jail term, his one-year sentence was suspended and Malloy was placed on probation for two years. In early 1961, Malloy was summoned to appear in an investigation into whether crimes, including gambling, had been committed in Hartford County, and was asked various questions obviously and solely designed to ascertain who Malloy's associates were in connection with his pool-selling activities in Hartford in 1959. Malloy initially refused to answer virtually all the questions put to him, including such innocuous ones as whether he was the William Malloy arrested and convicted of pool selling in 1959. After he was advised to consult with counsel and did so, he declined to answer each one of the following questions on the ground that it would tend to incriminate him:

"Q. Now, on September 11, 1959, when you were arrested at 600 Asylum Street, and the same arrest for which you were convicted in the Superior Court on November 5, 1959, for whom were you working?

* * * * * *

"Q. On September 11, 1959, when you were arrested, and the same arrest for which you were convicted in the Superior Court on November 5, 1959, who furnished the money to pay your fine when you were convicted in the Superior Court?

* * * * *

"Q. After your arrest on September 11, 1959, and the same arrest for which you were convicted on November 5, 1959, who selected your bondsman?

* * * * * *

"Q. As a result of your arrest on September 11, 1959, and the same arrest for which you were convicted

on November 5, 1959, who furnished the money to pay your fine?

* * * * * *

"Q. Do you know whose apartment it was [that you were arrested in on September 11, 1959]?

* * * * * *

"Q. Do you know John Bergoti?

* * * * *

"Q. I ask you again, Mr. Malloy, now, so there will be no misunderstanding of what I want to know. When you were arrested on September 11, 1959, at 600 Asylum Street in Hartford, and the same arrest for which you were convicted in Superior Court on November 5, 1959, for whom were you working?"

It was for refusing to answer these questions that Malloy was cited for contempt, the Connecticut courts noting that the privilege does not protect one against informing on friends or associates.

These were not wholly innocuous questions on their face, but they clearly were in light of the finding, of which Malloy was told, that he was immune from prosecution for any pool-selling activities in 1959. As the Connecticut Supreme Court of Errors found, the State bore its burden of proving that the statute of limitations barred any prosecution for any type of violation of the state pool-selling statute in 1959. Malloy advanced the claim before the Connecticut courts, and again before this Court, that he could perhaps be prosecuted for a conspiracy and that the statute of limitations on a felony was

37

five years. But the Connecticut courts were unable to find any state statute which Malloy's gambling activities in 1959 in Hartford, the subject of the inquiry, could have violated and Malloy has not yet pointed to one. Beyond this Malloy declined to offer any explanation or hint at how the answers sought could have incriminated him. In these circumstances it is wholly speculative to find that the questions about others, not Malloy, posed a substantial hazard of criminal prosecution to Malloy.

RPI 0115

Theoretically, under some unknown but perhaps possible conditions any fact is potentially incriminating. But if this be the rule, there obviously is no reason for the judge, rather than the witness, to pass on the claim of privilege. The privilege becomes a general one against answering distasteful questions.

The Court finds that the questions were incriminating because petitioner "might apprehend that if [his associates in 1959] were still engaged in unlawful activity, disclosure of [their names] might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted." Ante, p. 1496. The assumption necessary to the above reasoning is that all persons, or all who have committed a misdemeanor, are continuously engaged in crime. This is but another way of making the claim of privilege automatic. It is not only unrealistic generally but peculiarly inappropriate in this case. Unlike cases relied on by the Court, like Hoffman v. United States, supra, where the claimant was known to be involved in rackets in the area, which were the subject of the inquiry, and had a "broadly published police record," Malloy had no record as a felon. He had engaged once in an unlawful activity—pool selling—a misdemeanor and was given a suspended sentence. He had been on probation since that time and was on probation at the time of the inquiry. Again, unlike Hoffman, nothing in these questions indicates petitioner was called because he was suspected of criminal activities after 1959. There is no support at all in this record for the cynical assumption that he had committed criminal acts after his release in 1960.

Even on the Court's assumption that persons convicted of a misdemeanor are necessarily suspect criminals, sustaining the privilege in these circumstances is unwarranted, for Malloy placed no reliance on this theory in the courts below or in this Court. In order to allow the

judge passing on the claim to understand how the answers sought are incriminating, I would at least require the claimant to state his grounds for asserting the privilege to questions seemingly irrelevant to any incriminating matters.

Adherence to the federal standard of incrimination stated in Mason and Hoffman, supra, in form only, while its content is eroded in application, is hardly an auspicious beginning for application of the privilege to the States. As was well stated in a closely analogous situation, "[t]o continue a rule which is honored by this Court only with lip service is not a healthy thing and in the long run will do disservice to the federal system." Gideon v. Wainwright, 372 U.S. 335, at 351, 83 S.Ct. 792, at 800 (HARLAN, J., concurring).

I would affirm.



378 U.S. 108

Nick Alford AGUILAR, Petitioner,

v.

STATE OF TEXAS.

No. 548.

Argued March 25, 26, 1964.

Decided June 15, 1964.

Defendant was convicted, in the Criminal District Court, Harris County, Texas, of illegal possession of heroin, and the Texas Court of Criminal Appeals, 172 Tex.Cr.R. 629, 362 S.W.2d 111, affirmed. On certiorari granted, the United States Supreme Court, Mr. Justice Goldberg, held that affidavit for search warrant may be based on hearsay information and need not reflect direct personal observations of affiant but magistrate must be informed of some of underlying circumstances on which informant based his

RPI 0116

sioned to devise it. Instead, we defer to the defendants' interpretations of the Amendments. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 406, 541 F.2d 1, 34 (1976) (court must presume the agency's actions are valid); *Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 345, 540 F.2d 1114, 1124 (1976), *vacated on other grounds,* 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977); *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 184–85, 454 F.2d 1018, 1027–28 (1971).

### III.

[6] The plaintiffs also ask this court to reverse or remand the District Court's judgment because of its failure to make detailed findings of fact and conclusions of law. This argument ignores the procedural context of the court's action which disposed of the case on a motion for summary judgment under Fed.R.Civ.P. 56. Fed.R.Civ.P. 52(a) provides: "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)." *See, e. g., Hindes v. United States,* 326 F.2d 150, 152 (5th Cir.), *cert. denied,* 377 U.S. 908, 84 S.Ct. 1168, 12 L.Ed.2d 178 (1964) (only finding necessary is that there are no genuine issues of material fact); *Gurley v. Wilson,* 99 U.S.App.D.C. 336, 337, 239 F.2d 957, 958 (1956); *Simpson Bros., Inc. v. District of Columbia,* 85 U.S.App.D.C. 275, 179 F.2d 430 (1949), *cert. denied,* 338 U.S. 911, 70 S.Ct. 850, 94 L.Ed. 561 (1950). There were no genuine issues of material fact, and this court can easily decide the legal questions on the basis of the statute, regulations, and the preamble to the regulations explaining the reasoning supporting the defendants' policies.

### IV.

[7] The decision in this case does not preclude further review of the blind ven-

accounting for, vending machine income from vending machines on Federal property under his control . . . ." However, this is a logical delegation of the authority granted to the head of each department, agency, and instrumentality of the United States in 20 U.S.C. § 107d–3(b)(2). Plaintiffs also seem to chal-

dors program as applied in specific cases. The program requires many discretionary acts on the part of the Secretary, the agency heads, and agency property managers. These acts may of course be reviewed under the Administrative Procedure Act. In fact, the regulations set up an internal arbitration procedure for dispute resolution, culminating in judicial review of the final agency action. *See* 45 C.F.R. § 1369.37. Thus there is no bar to review of any further actions by the pertinent government agencies which conflict with the policies set out in the Randolph-Sheppard Amendments and the regulations.

*Affirmed.*



## SECURITIES AND EXCHANGE COMMISSION,

v.

## DRESSER INDUSTRIES, INC., Appellant,

United States, Intervenor.

## SECURITIES AND EXCHANGE COMMISSION,

v.

## DRESSER INDUSTRIES, INC., Edward R. Luter, Appellant,

United States, Intervenor.

Nos. 78–1702, 78–1705.

United States Court of Appeals, District of Columbia Circuit.

Argued en banc April 15, 1980.

Decided July 16, 1980.

Certiorari Denied Nov. 17, 1980.

See 101 S.Ct. 529.

Corporation appealed from decision of the United States District Court for the

lenge the percentage disbursements of vending machine income to blind vendors determined by whether or not the vending machines are in direct competition with the blind vending facilities. 45 C.F.R. § 1369.32(b), (c), (d). However, these disbursements parallel those set in 20 U.S.C. § 107d–3(b)(1).

RPI 0117

District of Columbia, 453 F.Supp. 573, Thomas A. Flannery, J., requiring obedience to subpoena duces tecum issued by Securities and Exchange Commission and denying motion by the corporation to quash the subpoena. The Court of Appeals, J. Skelly Wright, Chief Judge, held that parallel investigation into alleged "questionable foreign payments" conducted by grand jury under guidance of Justice Department did not preclude Securities and Exchange Commission from being entitled to enforcement of subpoena issued in connection with investigation into use by corporation of funds to make such payments, contrary to claims that enforcement would improperly broaden right of Department of Justice to criminal litigation discovery and would infringe role of grand jury, and the corporation was not entitled to protective order prohibiting SEC from providing Justice Department with fruits of its civil discovery.

Affirmed.

Edwards, Circuit Judge, concurred specially and filed opinion.

**1. Federal Courts �086 1150**

Constitution does not ordinarily require stay of civil proceedings pending outcome of criminal proceedings; nevertheless, court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions when interests of justice seem to require such action. U.S.C.A.Const. Amend. 5.

**2. Administrative Law and Procedure �C 341**

Parallel investigations by Justice Department and other agencies should not be blocked in absence of "special circumstances" in which nature of the proceedings demonstrably prejudices substantial rights of investigated party or of government. U.S.C.A.Const. Amend. 5.

**3. Securities Regulation �C 86**

Parallel investigation into alleged "questionable foreign payments" conducted by grand jury under guidance of Justice Department did not preclude Securities and

Exchange Commission from being entitled to enforcement of subpoena issued in connection with investigation into use by corporation of funds to make such payments, contrary to claims that enforcement would improperly broaden right of Department of Justice to criminal litigation discovery and would infringe role of grand jury, and the corporation was not entitled to protective order prohibiting SEC from providing Justice Department with fruits of its civil discovery. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**4. Grand Jury �C 36.4(1)**

Fact that grand jury has subpoenaed documents concerning particular matter does not insulate such matter from investigation in another forum. Fed.Rules Cr. Proc. Rule 6(e), 18 U.S.C.A.

**5. Securities Regulation �C 86**

Enforcing Securities and Exchange Commission subpoena issued in connection with SEC investigation into use by corporation of funds to make "questionable foreign payments" would not breach alleged agreement of confidentiality where the SEC, throughout "voluntary disclosure program," reserved its rights to pursue formal investigation and issue subpoenas. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**6. Federal Civil Procedure �C 1272**

Discovery may be available in some subpoena enforcement proceedings where circumstances indicate that further information is necessary for courts to discharge their duties; however, district court must be cautious in granting such discovery right, lest they transform subpoena enforcement proceedings into exhaustive inquisitions into practices of regulatory agencies; discovery should be permitted only where respondent is able to distinguish himself from class of ordinary subjects of subpoena. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as

RPI 0118

amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**7. Securities Regulation ☞86**

District court acted within its discretion in denying corporation discovery in SEC subpoena enforcement proceedings. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**8. Federal Civil Procedure ☞316, 321**

Applicant to intervene need only show that representation of his interest may be inadequate; burden of proof rests on those resisting intervention.

**9. Securities Regulation ☞86**

Individual corporate officer was not entitled to intervene in proceedings in which order enforcing Securities and Exchange Commission subpoena issued was sought where record established that the corporation adequately represented interests of its employees.

---

Appeals from the United States District Court for the District of Columbia (D.C. Miscellaneous No. 78–0141).

David R. MacDonald, Chicago, Ill., with whom Francis D. Morrissey, Chicago, Ill., and Edward E. Dyson, Washington, D. C., were on brief, for appellant Dresser Industries, Inc.

Raymond G. Larroca, Herbert J. Miller, Jr., and Thomas B. Carr, Washington, D. C., were on supplemental memorandum for appellant Edward R. Luter.

Paul Gonson, Principal Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Ralph C. Ferrara, Gen. Counsel, Michael K. Wolensky, Associate Gen. Counsel, and James H. Schropp and John P. Sweeney, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., were on brief, for appellee.

Irvin B. Nathan, Deputy Asst. Atty. Gen., Washington, D. C., with whom Phillip B. Heymann, Asst. Atty. Gen., Washington, D. C., and Stephen G. Milliken, Atty., Dept. of Justice, Providence, R. I., were on brief, for intervenor.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the court filed by Chief Judge WRIGHT.

**J. SKELLY WRIGHT, Chief Judge:**

Dresser Industries, Inc. (Dresser) appeals from a decision of the District Court[1] requiring obedience to a subpoena *duces tecum* issued by the Securities and Exchange Commission (SEC) on April 21, 1978, and denying Dresser's motion to quash the subpoena.[2] The subpoena was issued in connection with an SEC investigation into Dresser's use of corporate funds to make what are euphemistically called "questionable foreign payments," and into the adequacy of Dresser's disclosures of such payments under the securities laws.

The principal issue facing this *en banc* court is whether Dresser is entitled to special protection against this SEC subpoena because of a parallel investigation into the same questionable foreign payments now being conducted by a federal grand jury under the guidance of the United States Department of Justice (Justice). Dresser argues principally that the SEC subpoena abuses the civil discovery process of the SEC for the purpose of criminal discovery and infringes the role of the grand jury in independently investigating allegations of criminal wrongdoing. On November 19, 1979 a panel of this court issued a decision affirming the District Court but, with Judge Robb dissenting, attaching a condition prohibiting the SEC from providing

---

1. *Reported at* 453 F.Supp. 573 (D.D.C.1978).

2. In No. 78–1705 Mr. Edward R. Luter, a senior vice president of Dresser, appeals from an order denying his motion to intervene in the subpoena enforcement proceeding. *See* text *infra*, 628 F.2d at 1384.

RPI 0119

Justice with the information received from Dresser under this subpoena. Because of the importance of this issue to enforcement of the regulatory laws of the United States, this court voted to vacate the panel opinions and rehear the case *en banc*.

## I. BACKGROUND

### A. *Origin of the Investigations*

Illegal and questionable corporate payments surfaced as a major public problem in late 1973, when several major scandals implicated prominent American corporations in improper use of corporate funds to influence government officials in the United States and foreign countries. The exposure of these activities disrupted public faith in the integrity of our political system and eroded international trust in the legitimacy of American corporate operations abroad.[3] SEC investigation revealed that many corporate officials were falsifying financial records to shield questionable foreign and domestic payments from exposure to the public and even, in many cases, to corporate directors and accountants. Since the completeness and accuracy of corporate financial reporting is the cornerstone of federal regulation of the securities markets, such falsification became a matter of grave concern to the SEC.[4]

Beginning in the spring of 1974 the SEC brought a series of injunctive actions against certain American corporations. It obtained consent decrees prohibiting future violations of the securities laws and establishing internal corporate procedures for investigation, disclosure, and prevention of illegal corporate payments. However, the problem of questionable foreign payments proved so widespread that the SEC devised a "Voluntary Disclosure Program" to encourage corporations to conduct investigations of their past conduct and make appropriate disclosures without direct SEC coercion.[5] Participation in the Voluntary Disclosure Program would not insulate a corporation from an SEC enforcement action, but the Commission would be less likely to exercise its discretion to initiate enforcement actions against participants.[6] The most important elements of the Voluntary Disclosure Program were (1) an independent committee of the corporation would conduct a thorough investigation into questionable foreign and domestic payments made by the corporation; (2) the committee would disclose the results of this investigation to the board of directors in full; (3) the corporation would disclose the substance of the report to the public and the SEC on Form 8–K; and (4) the corporation would issue a policy statement prohibiting future questionable and illegal payments and maintenance of false or incomplete records in connection with them.[7] Except in "egregious cases" the SEC would not require that public disclosures include specific names, dates, and places. Rather, the disclosures might be "generic" in form.[8] Thus companies participating in the Voluntary Disclosure Program would ordinarily be spared the conse-

---

3. The Senate Committee on Banking, Housing, and Urban Affairs reported in May 1977:

     Recent investigations by the SEC have revealed corrupt foreign payments by over 300 U.S. companies involving hundreds of millions of dollars. These revelations have had severe adverse effects. Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people. The image of American democracy abroad has been tarnished. Confidence in the financial integrity of our corporations has been impaired. The efficient functioning of our capital markets has been hampered.

   S.Rep.No. 114, 95th Cong., 1st Sess. 3 (1977).

4. The history of the SEC's involvement with questionable and illegal foreign payments is recounted briefly in *Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices*, submitted to the Senate Committee on Banking, Housing, and Urban Affairs, 94th Cong., 2d Sess. (Comm.Print 1976), *reprinted in* CCH Federal Securities Law Reports, No. 642 (May 19, 1976) (hereinafter cited as Report).

5. The Voluntary Disclosure Program is described in *id.* at 8–13.

6. *Id.* at 8 n.7.

7. *See id.* at 8–10.

8. *Id.* at 32.

RPI 0120

quences to their employees, property, and business that might result from public disclosure of specific instances of foreign bribery or kickbacks. However, companies participating in the Voluntary Disclosure Program had to agree to grant SEC requests for access to the final report and to the unexpurgated underlying documentations.[9]

### B.   *The Dresser Investigations*

On January 27, 1976 an attorney and other representatives of Dresser met with members of the SEC staff to discuss a proposed filing. At the meeting Dresser agreed to conduct an internal inquiry into questionable foreign payments, in accordance with the terms of the Voluntary Disclosure Program.[10] The next day Dresser submitted a Form 8–K describing, in generic terms, one questionable foreign payment. Joint Appendix (JA) 100–102. On November 11, 1976 Dresser filed a second Form 8–K reporting the results of the internal investigation. JA 103–108. On February 10, 1977 the company supplemented this report with a third Form 8–K concerning a questionable payment not reported in the earlier reports. JA 109–113. The reports concerned Dresser's foreign activities after November 1, 1973. All disclosures were in generic, not specific, terms.

As part of its general monitoring program the SEC staff requested access to the documents underlying Dresser's report. On July 15, 1977 Dresser refused to grant such access. The company argued that allowing the staff to make notes or copies might subject its documents to public disclosure through the Freedom of Information Act.[11] Dresser stated that such disclosure could endanger certain of its employees working abroad.[12] During the ensuing discussions with the staff Dresser attempted to impose conditions of confidentiality upon any SEC

examination of its documents, but the staff did not agree.[13] Instead, it issued a recommendation to the Commission for a formal order of investigation in the Dresser case. This recommendation was predicated on the staff's conclusions that Dresser:

1. may have used corporate funds for non-corporate purposes;

2. may have made false and misleading statements concerning the existence of and circumstances surrounding material obligations of Dresser to certain foreign governments and to other entities; and

3. may have made false entries and caused false entries to be made upon the books and records of Dresser, and its affiliates and subsidiaries with respect to, among other things, payments to foreign government officials.

JA 7–8 (order directing private investigation and designating officers to take testimony). Moreover, the staff reported that Dresser's proxy soliciting materials, reports, and statements may have been misleading with respect to the potential risks involved in its conduct of business through questionable foreign payments, and may have included false statements in connection with such payments. JA 8. Dresser vigorously opposed issuance of an order of investigation.[14]

Meanwhile, the Department of Justice had established a task force on transnational payments to investigate possible criminal violations arising from illegal foreign payments. Two SEC attorneys participated in the task force. In the summer of 1977 the Justice task force requested access to SEC files on the approximately 400 companies, including Dresser, that had participated in

---

9.   *Id.* at 9 n.8.

10.   The meeting is described by Mr. W. Lyall Milde in a deposition *reprinted in* Joint Appendix (JA) 64–66.

11.   JA 71–76.

12.   JA 74.

13.   The staff offered to give Dresser 10 days notice before releasing any Dresser documents to the public, to enable the company to challenge such release in court. JA 12.

14.   *See* JA 77 *et seq.*

RPI 0121

the Voluntary Disclosure Program.[15] Pursuant to Commission authorization the SEC staff transmitted all such files to the Justice task force in August 1977.[16] After its preliminary investigation of the Form 8-K's submitted by Dresser under the Voluntary Disclosure Program, Justice presented Dresser's case to a grand jury in the District of Columbia on January 25, 1978.

Before any summons or subpoena had issued in either the SEC or the grand jury investigation, Dresser filed suit in the Southern District of Texas against the SEC and Justice to enjoin any further investigation of it by either agency.[17] While Dresser's suit was pending in the Southern District of Texas, the District of Columbia grand jury subpoenaed Dresser's documents on April 21, 1978. At roughly the same time the SEC issued a formal order of private investigation, authorizing the staff to subpoena the documents and to obtain other relevant evidence. JA 7–9 (April 11, 1978). Pursuant to that order the staff issued a subpoena *duces tecum*, returnable on May 4, 1978. JA 14–16 (April 21, 1978). This subpoena covered substantially the same documents and materials subpoenaed by the grand jury, and more. Dresser did not respond to the subpoena.[18]

On May 1, 1978 the District Court in Houston, Texas dismissed Dresser's suit against Justice without opinion. Three days later, after the period for compliance with its subpoena had lapsed, the SEC applied to the District Court for the District of Columbia for enforcement. In the meantime, Dresser had appealed the adverse judgment in the Texas action to the Fifth Circuit, and sought interim relief. On May 5 Judge Coleman of the Fifth Circuit enjoined further prosecution of the SEC subpoena enforcement action until after the District Court for the Southern District of Texas had ruled on Dresser's action against

the SEC. Judge Coleman also obtained a stipulation from Justice that Justice would not require Dresser or its agents to appear before the grand jury until after the Company had filed a motion to quash the grand jury subpoena in the District of Columbia and had received a ruling on such motion.

On May 8, 1978 Dresser filed a motion to quash the grand jury subpoena in the District Court for the District of Columbia. On May 19 the District Court (Parker, J.) denied Dresser's motion to quash, but imposed a protective order requiring strict confidentiality in accordance with Rule 6(e) of the Federal Rules of Criminal Procedure. In imposing the protective order the court stated that the "concern of Dresser and especially its employees is not illusory and should not be lightly considered." *See* JA 163. This was in reference to Dresser's argument that public disclosures of the names, places, and dates connected with its questionable foreign payments could endanger the lives of its employees in certain turbulent foreign countries. Dresser thereafter complied with this grand jury subpoena.

On May 26, 1978 the Southern District of Texas dismissed Dresser's action against the SEC without reaching the merits. Dresser appealed to the Fifth Circuit and on June 8 obtained an order from the court that:

> Until the appeal in this case shall have been decided in this court, and except for proceedings before the Grand Jury in the District of Columbia, the Securities and Exchange Commission, its officers and employees, are enjoined to preserve inviolate the confidentiality of any information obtained by the subpoena here in issue. This order is not intended to interfere with pending proceedings in the District of Columbia to enforce the SEC subpoenas.

---

15. JA 295–296 (statement by Marvin G. Pickholz).

16. *Id.*

17. *Dresser Industries, Inc. v. United States,* Civil Action No. H–78–405 (S.D.Tex.).

18. The procedural history of this case is recounted in Dresser's motion to quash the SEC subpoena, JA 160–163.

JA 202. On June 2, 1978 the District Court for the District of Columbia issued an order to Dresser to show cause why it should not be required to appear, give testimony, and produce records in obedience to the SEC subpoena. JA 141. On June 7 Dresser filed a motion for leave to obtain discovery from the SEC concerning the agency's alleged bad faith and attempted abuse of the judicial process, JA 27, and on June 13 filed a motion to quash the SEC subpoena. JA 160.

The District Court (Flannery, J.) denied Dresser's motion to compel discovery on June 16, without opinion. Judge Flannery explained in court that he had carefully examined the papers filed by Dresser, that discovery is rarely necessary in subpoena enforcement cases, and that he did not think this was an appropriate case for it. JA 256. Then, on June 30, 1978, the District Court (Flannery, J.) issued a memorandum opinion and order rejecting all of Dresser's objections to the SEC subpoena and requiring Dresser to comply with the subpoena within ten days after notice from the SEC. JA 301, *reported at* 453 F.Supp. 573 (D.D.C.1978). Rehearing was denied on July 15. This appeal followed.

Meanwhile, the United States Court of Appeals for the Fifth Circuit affirmed the decisions of the District Court for the Southern District of Texas dismissing Dresser's actions against Justice and the SEC in that court, largely on ripeness grounds. *Dresser Industries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 781, 62 L.Ed.2d 730 (1980). Accordingly, the interlocutory injunction requiring the SEC to preserve inviolate the confidentiality of Dresser's materials pending a decision on appeal was dissolved.

Having set forth the complicated procedural history of this case, we turn now to the principles that govern parallel administrative and criminal proceedings concerning the same conduct.

19. *See generally* Note, *Concurrent Civil and Criminal Proceedings*, 67 Colum.L.Rev. 1277 (1967).

## II. GENERAL PRINCIPLES

### A. *Parallel Investigations*

The civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous.[19] In the absence of substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable under our jurisprudence. As long ago as 1912 the Supreme Court recognized that under one statutory scheme—that of the Sherman Act—a transaction or course of conduct could give rise to both criminal proceedings and civil suits. *Standard Sanitary Manufacturing Co. v. United States*, 226 U.S. 20, 52, 33 S.Ct. 9, 16, 57 L.Ed. 107 (1912). The Court held that the government could initiate such proceedings either "simultaneously or successively," with discretion in the courts to prevent injury in particular cases. *Id.* It explained:

> The Sherman Act provides for a criminal proceeding to punish violations and suits in equity to restrain such violations, and the suits may be brought simultaneously or successively. The order of their bringing must depend upon the Government; the dependence of their trials cannot be fixed by a hard and fast rule or made imperatively to turn upon the character of the suit. Circumstances may determine and are for the consideration of the court. An imperative rule that the civil suit must await the trial of the criminal action might result in injustice or take from the statute a great deal of its power. * * *

*Id.*

The Supreme Court returned to this theme in *United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). In that case the Food and Drug Administration (FDA) investigated a company and certain of its officers in connection with possible

RPI 0123

violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* Early in the investigation the FDA recommended and the United States Attorney filed an *in rem* action in federal district court seeking civil seizure of certain products. In connection with this suit the FDA filed extensive interrogatories with the company. Before the company had responded the FDA notified it that the agency was contemplating a criminal proceeding against it in connection with the same alleged violations of the statute. The company therefore moved to stay civil proceedings or, in the alternative, to extend the time for answering the interrogatories until after disposition of the criminal proceedings. The District Court denied this motion. Thereafter, but still before the company had filed its answers to the interrogatories, the regional and divisional offices of the FDA formally recommended criminal prosecution to the General Counsel. After it received the answers, the Department of Health, Education, and Welfare formally recommended criminal prosecution to the Justice Department. Justice obtained an indictment, and subsequently convictions. The case reached the Supreme Court upon appeal of the convictions of several of the company's officers.

The officers in *Kordel* argued that use of the civil discovery process to compel answers to interrogatories that could be used to build the government's case in a parallel criminal proceeding "reflected such unfairness and want of consideration for justice" as to require reversal. 397 U.S. at 11, 90 S.Ct. at 769. The Supreme Court did not agree. The Court noted that the government had not brought the civil action "solely to obtain evidence for its criminal prosecution," *id.* at 11–12, 90 S.Ct. at 769, or without notice to the defendants that it contemplated a criminal action, *id.* at 12, 90 S.Ct. at 769. Moreover, the defendant was not unrepresented by counsel, *id.*, and had no reason to fear "prejudice from adverse pretrial publicity or other unfair injury," *id.* Nor were there any other "special circumstances" suggesting that the parallel pro-

ceedings were unconstitutional or improper. *Id.* In the absence of such "special circumstances" the Court recognized that prompt investigation of both civil and criminal claims can be necessary to the public interest. It said:

> The public interest in protecting consumers throughout the Nation from misbranded drugs requires prompt action by the agency charged with responsibility for administration of the federal food and drug laws. But a rational decision whether to proceed criminally against those responsible for the misbranding may have to await consideration of a fuller record than that before the agency at the time of the civil seizure of the offending products. It would stultify enforcement of federal law to require a governmental agency such as the FDA invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial.

*Id.* at 11, 90 S.Ct. at 769 (footnote omitted).

[1] The Constitution, therefore, does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings. *See Baxter v. Palmigiano,* 425 U.S. 308, 98 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *DeVita v. Sills,* 422 F.2d 1172, 1181 (3d Cir. 1970). Nevertheless, a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions "when the interests of justice seem[] to require such action, sometimes at the request of the prosecution, * * * sometimes at the request of the defense[.]" *United States v. Kordel, supra,* 397 U.S. at 12 n.27, 90 S.Ct. at 770 (citations omitted); *see Horne Brothers, Inc. v. Laird,* 463 F.2d 1268, 1271–1272 (D.C.Cir.1972). The court must make such determinations in the light of the particular circumstances of the case.

Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for

RPI 0124

deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case.[20] If delay of the noncriminal proceeding would not seriously injure the public interest, a court may be justified in deferring it. *See, e.g., United States v. Henry,* 491 F.2d 702 (6th Cir. 1974); *Texaco, Inc. v. Borda,* 383 F.2d 607, 608–609 (3d Cir. 1967); *Silver v. McCamey,* 221 F.2d 873, 874–875 (D.C.Cir. 1955).[21] Such cases have frequently arisen in the tax field, following the leading case of *United States v. O'Connor,* 118 F.Supp. 248 (D.Mass.1953). *Cf. Boren v. Tucker,* 239 F.2d 767, 772–773 (9th Cir. 1956) (distinguishing IRS summons enforcement before and after indictment). In some such cases, however, the courts may adequately protect the government and the private party by merely deferring civil discovery or entering an appropriate protective order. *Gordon v. FDIC,* 427 F.2d 578, 580–581 (D.C.Cir.1970). The case at bar is a far weaker one for staying the administrative investigation. No indictment has been returned; no Fifth Amendment privilege is threatened; Rule 16(b) has not come into effect; and the SEC subpoena does not require Dresser to reveal the basis for its defense.

20. In some cases the government seeks postponement of the noncriminal proceeding, to prevent the criminal defendant from broadening his rights of criminal discovery against the government. *E.g., Campbell v. Eastland,* 307 F.2d 478 (5th Cir. 1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963).

21. *Silver v. McCamey,* 221 F.2d 873 (D.C.Cir. 1955), held that "due process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him." *Id.* at 874–875. As we have noted in

### B.  SEC Investigations

The case at bar concerns enforcement of the securities laws of the United States, especially the Securities Act of 1933 ('33 Act), 48 Stat. 74, 15 U.S.C. § 77a *et seq.* (1976), and the Securities Exchange Act of 1934 ('34 Act), 48 Stat. 881, 15 U.S.C. § 78a *et seq.* (1976). These statutes explicitly empower the SEC to investigate possible infractions of the securities laws with a view to both civil and criminal enforcement, and to transmit the fruits of its investigations to Justice in the event of potential criminal proceedings. The '34 Act provides in relevant part: "The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter[.]" Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976). This investigative authority includes the power to administer oaths and affirmations, subpoena witnesses, take evidence, and require production of any books, papers, correspondence, memoranda, or other records which the SEC deems relevant or material. *Id.,* Section 21(b), 15 U.S.C. § 78u(b). If it determines that a person "is engaged or is about to engage in acts or practices constituting a violation" of the Act, the SEC may bring an action in federal district court to enjoin such acts or practices. *Id.,* Section 21(d), 15 U.S.C. § 78u(d). Under the same subsection of the '34 Act the SEC may "transmit such evidence as may be available concerning such acts or practices * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter." *Id.* The '33 Act is to similar effect. *See* Sections 19(b), 20(a), (b)

text, cases decided since *Silver* have established that, as a general matter, due process is not infringed merely because an accused person is subjected, without his consent, to an administrative hearing concerning matters involved in a pending criminal proceeding. Nevertheless, as *Silver* recognized and more recent cases have affirmed, such an administrative proceeding can in some circumstances prejudice the rights of a citizen or the government. In such cases the agencies and courts may have a duty to take appropriate corrective action.

RPI 0125

of the '33 Act, 15 U.S.C. §§ 77s(b), 77t(a), (b) (1976).[22]

[2] Effective enforcement of the securities laws requires that the SEC and Justice be able to investigate possible violations simultaneously. Dissemination of false or misleading information by companies to members of the investing public may distort the efficient workings of the securities markets and injure investors who rely on the accuracy and completeness of the company's public disclosures. If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions. If Justice moves too slowly the statute of limitations may run, witnesses may die or move away, memories may fade, or enforcement resources may be diverted. *See United States v. Fields,* 592 F.2d 638, 646 (2d Cir. 1978), *cert. denied,* 442

U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). The SEC cannot always wait for Justice to complete the criminal proceedings if it is to obtain the necessary prompt civil remedy; neither can Justice always await the conclusion of the civil proceeding without endangering its criminal case. Thus we should not block parallel investigations by these agencies in the absence of "special circumstances" in which the nature of the proceedings demonstrably prejudices substantial rights of the investigated party or of the government. *See United States v. Kordel, supra,* 397 U.S. at 11-13, 90 S.Ct. at 769-770.

## III. APPLICABILITY OF
### *United States v. LaSalle Nat'l Bank*

[3] Dresser principally relies on an analogy to *United States v. LaSalle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978),[23] in which the Supreme Court said in dictum that the Internal Revenue Service (IRS) may not use its summons authority to investigate possible violations of the tax laws after it has referred those violations to

---

22. Sections 20(a) and 19(b) of the '33 Act provide the basis for the SEC's investigative authority:

  Whenever it shall appear to the Commission, either upon complaint or otherwise, that the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, have been or are about to be violated, it may, in its discretion, either require or permit such person to file with it a statement in writing, under oath, or otherwise, as to all the facts and circumstances concerning the subject matter which it believes to be in the public interest to investigate, and may investigate such facts.

Section 20(a) of the '33 Act, 15 U.S.C. § 77t(a) (1976).

  For the purpose of all investigations which, in the opinion of the Commission, are necessary and proper for the enforcement of this subchapter, any member of the Commission or any officer or officers designated by it are empowered to administer oaths and affirmations, subpena witnesses, take evidence, and require the production of any books, papers, or other documents which the Commission deems relevant or material to the inquiry. * * *

*Id.* § 19(b), 15 U.S.C. § 77s(b). From § 20(b) derives the authority to initiate civil injunctive actions and to transmit evidence to Justice:

  Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may[,] in its discretion, bring an action in any district court of the United States or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General who may, in his discretion, institute the necessary criminal proceedings under this subchapter. * * *

*Id.* § 20(b), 15 U.S.C. § 77t(b).

23. Dresser's other arguments, in summary, are (1) that the SEC subpoena breached an enforceable agreement of confidentiality with Dresser; (2) Dresser was erroneously denied certain discovery rights; and (3) enforcement of the subpoena might violate Dresser's attorney-client privilege. *See* brief of respondent-appellant at 11-12. These arguments are discussed in Part V *infra.*

RPI 0126

Justice for criminal prosecution. *See id.* at 311–313, 98 S.Ct. at 2365.[24] Dresser argues that the SEC's transmittal of Dresser's file to Justice was equivalent to a "referral" under *LaSalle*, and thus that the SEC's power to enforce investigative subpoenas against Dresser in connection with that file lapsed at that time. Alternatively, Dresser suggests that, even if transmittal of the file was not analogous to a "referral" under *LaSalle*, initiation of the grand jury investigation precluded subsequent enforcement of SEC investigative subpoenas into the same matters.

These two alternatives are vulnerable to the same objection: the *LaSalle* rule applies solely to the statutory scheme of the Internal Revenue Code, in which the IRS's civil authority ceases for all practical purposes upon referral of a taxpayer's case to Justice; it does not apply to the securities laws, in which the SEC's civil enforcement authority continues undiminished after Jus-

tice initiates a criminal investigation by the grand jury.[25]

The IRS summons authority derives from Section 7602 of the Internal Revenue Code, 26 U.S.C. § 7602 (1976). Its authority is restricted to the terms and purposes of that provision. The Supreme Court said in *LaSalle*:

> In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability." Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. * *

24. This portion of *LaSalle* is properly characterized as dictum, because the controversy concerned investigation of a taxpayer *prior* to referral to Justice. The Court held that a taxpayer challenging an IRS summons prior to such referral bears the heavy burden of showing that the summons was issued in "bad faith," 437 U.S. at 316, 98 S.Ct. at 2367, which the Court interpreted as being "solely [for] criminal purposes." *Id.* The Supreme Court has never decided a case concerning an IRS summons issued after referral to Justice but before indictment. *See* note 25 *infra.*

25. The *LaSalle* rule—prohibiting enforcement of an IRS summons after the IRS had referred the case to Justice for criminal prosecution— derives from *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed. 580 (1971). In *Donaldson* the Court said:

> We hold that under § 7602 [of the Internal Revenue Code, 26 U.S.C. § 7602 (1970)] an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution.

*Id.* at 536, 91 S.Ct. at 545. The *Donaldson* Court recognized that under prior precedent the limitation on the IRS summons authority came into effect only in "the situation of a *pending criminal charge* or, at most, of an investigation solely for criminal purposes." *Id.* at 533, 91 S.Ct. at 544 (emphasis added). *See Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964) (*citing Boren v. Tucker*, 239 F.2d 767, 772–773 (9th Cir. 1956)). "Any other holding," according to the *Donald-*

*son* Court, "would thwart and defeat the appropriate investigatory powers that the Congress has placed in 'the Secretary or his delegate.' " 400 U.S. at 533, 91 S.Ct. at 544. Nevertheless, after a detailed discussion of the enforcement scheme of the Internal Revenue Code, the Court reiterated the rule in modified form: instead of prohibiting enforcement of an IRS summons if there is a *pending criminal charge,* the Court prohibited such enforcement if there had been a *referral to Justice for criminal prosecution. Compare* 400 U.S. at 533, 91 S.Ct. at 543, *with id.* at 536, 91 S.Ct. at 545. Obviously, the difference between these two formulations is substantial. The Court did not explicitly state why it shifted from the one to the other, but the best available explanation lies in its discussion of the statutory scheme, which appears between the two conflicting statements of the rule. In *LaSalle* Justice Blackmun, who also wrote the opinion for the Court in *Donaldson*, explained that the decision in *Donaldson* was not predicated on its analysis of precedent. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 307, 98 S.Ct. 2357, 2362, 57 L.Ed.2d 221 (1978). Rather, the decision relied on its review of the statutory scheme. *Id.* "The validity of the summonses depended ultimately on whether they were among those authorized by Congress," the Justice said. *Id.* This emphasizes that the rule espoused in *LaSalle* and *Donaldson* is not based on principles generally applicable to parallel civil and criminal proceedings, but on limitations unique to the IRS.

RPI 0127

*United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316–317 n.18, 98 S.Ct. at 2367 n.18 (first ellipsis in original).

In the pre-referral stage of an IRS investigation the civil and criminal elements of the investigation are intertwined. *Id.* at 308–311, 98 S.Ct. at 2363–2364. The same information is useful in negotiating with the taxpayer, in suing in court for additional taxes, or in deciding whether to recommend criminal prosecution. Thus the IRS at that stage is empowered to issue investigative summonses under Section 7602, even though the fruits of such summonses may be useful for the illegitimate purpose of "filing criminal charges against citizens" as well as the legitimate purposes of determining and collecting taxes.

However, upon referral of the case to Justice with a recommendation for criminal prosecution, "the criminal and civil aspects of a tax fraud case begin to diverge." *Id.* at 311, 98 S.Ct. at 2365. After that point the IRS loses its ability to compromise the case, either criminally or civilly. All such authority devolves upon Justice. *Id.* at 312, 98 S.Ct. at 2365. Although theoretically the IRS might use its summons power during the pendency of the criminal proceeding to discover information for the purpose of a future civil tax suit, *id.* at 311–312, 98 S.Ct. at 2364–2365, in practice the IRS holds all civil action in abeyance until the criminal proceeding is completed.[26] Only then does the IRS turn its attention again to the civil aspects of the case.

Thus, in the *LaSalle* Court's view, the authorized purposes for summonses under Section 7602 cease as a practical matter during the pendency of the criminal proceeding. Because of this the Court was willing to impose a "prophylactic" rule flatly forbidding *any* use of the Section 7602 authority once a case has been referred to Justice for criminal prosecution. *Id.* at 312, 98 S.Ct. at 2365. This rule restricts the IRS within the confines of its statutory authority and also "safeguards * * * two poli-

cy interests," *id.* at 313, 98 S.Ct. at 2365. These interests are to avoid broadening the Justice Department's right of criminal litigation discovery and to avoid infringing on the role of the grand jury as a principal tool of criminal accusation. *Id.* at 312, 98 S.Ct. at 2365.

Dresser asks this court to extend the reasoning of *LaSalle* to govern the conduct of the SEC under the securities laws. But IRS investigative and enforcement proceedings are not analogous to those of the SEC. The language of the securities laws and the nature of the SEC's civil enforcement responsibilities require that the SEC retain full powers of investigation and civil enforcement action, even after Justice has begun a criminal investigation into the same alleged violations.

The investigative provisions of the securities laws are far broader than Section 7602 of the Internal Revenue Code, as interpreted in *LaSalle. See SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1022–1024 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 87 (1979). SEC investigations are not confined to "four purposes only." *Cf. United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316 n.18, 98 S.Ct. at 2367 n.18. Rather, the SEC may, *"in its discretion,* make such investigations as *it deems necessary* to determine whether any person has violated, is violating, or is about to violate any provision" of the '34 Act, Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976) (emphasis added). Moreover, the SEC is "authorized *in its discretion* * * * to investigate *any* facts, conditions, practices, or matters which *it may deem necessary or proper* to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning matters to which this chapter relates." *Id.* (emphasis added). *See also* Section 19(b) of the '33 Act, 15 U.S.C. § 77s(b) (1976). Given this broad statutory mandate, there is

---

26. *See* Policies of the IRS Handbook, P–4–84, *reprinted in* 1 CCH Internal Revenue Manual 1305–1310 (1978); Office of the Chief Counsel, IRS, Civil Considerations in Pending Criminal Matters, Order No. 3050.1 (March 23, 1978).

RPI 0128

virtually no possibility that in issuing this subpoena the SEC was acting *ultra vires*. The investigation of Dresser—based as it was on the staff's conclusion that Dresser may have engaged in conduct seriously contravening the securities laws[27]—falls squarely within the Commission's explicit investigatory authority.[28] Unlike the Internal Revenue Code as interpreted in *LaSalle*, the securities laws offer no suggestion that the scope of the SEC's investigative authority shrinks when a grand jury begins to investigate the same matters. Since the validity of summonses or subpoenas "depend[s] ultimately on whether they were among those authorized by Congress," *United States v. LaSalle Nat'l Bank, supra*, 437 U.S. at 307, 98 S.Ct. at 2362, we conclude that this subpoena is enforceable under the rule of that case.[29]

Fulfillment of the SEC's civil enforcement responsibilities requires this conclusion. Unlike the IRS, which can postpone collection of taxes for the duration of parallel criminal proceedings without seriously injuring the public, the SEC must often act quickly, lest the false or incomplete statements of corporations mislead investors and infect the markets. Thus the Commission must be able to investigate possible securities infractions and undertake civil enforcement actions even after Justice has begun a criminal investigation. For the SEC to stay its hand might well defeat its purpose.

Dresser attempts to prevent enforcement of this subpoena by invoking the "policy interests" identified by the *LaSalle* Court: to avoid broadening Justice's right of criminal litigation discovery and to avoid infringing the role of the grand jury as a principal tool of criminal accusation. Brief of respondent-appellant at 21–23; supplemental brief of appellant Dresser Industries, Inc. at 10–21; *see United States v. LaSalle Nat'l Bank, supra*, 437 U.S. at 312, 98 S.Ct. at 2365. We reject this argument for two reasons.

First, Dresser disregards the context in which these "policy interests" arose in *LaSalle*. Only after the Court had determined that the IRS had no practical authorized purpose for issuing a summons after referral of a case to Justice did it direct its attention to these "policy interests." Then it did so solely to explain its imposition of a "prophylactic" rule forbidding *any use* of the IRS summons authority after referral to Justice, as opposed to forbidding only such uses as are unrelated to the purposes of Section 7602.[30] The Court did not impose such a "prophylactic" rule in any situation where it would significantly restrict the legitimate investigative authority of the

---

27. *See* text at note 14 *supra*.

28. Dresser argued unsuccessfully in the District Court that the SEC had exceeded its authority by issuing the subpoena where there was no likelihood that a violation had been or was about to be committed. 453 F.Supp. at 575. On appeal Dresser makes this argument only obliquely, in the form of an objection to the denial of discovery. Brief of respondent-appellant at 39–42. In any event, the argument is without merit. Our task is merely to ensure that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1024 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979) (*quoting United States v. Morton Salt Co.*, 338 U.S. 632, 652–653, 70 S.Ct. 357, 368–369, 94 L.Ed. 401 (1950)); *see also SEC v. Howatt*, 525 F.2d 226, 229 (1st Cir. 1975). We agree with the District Court that "[t]his investigation has a

legitimate purpose and the inquiry is relevant to that purpose." 453 F.Supp. at 576.

29. *Cf. SEC v. OKC Corp.*, 474 F.Supp. 1031, 1038 (N.D.Tex.1979) (SEC subpoena enforced although Department of Energy had made criminal reference to Justice in related matter).

30. *See United States v. LaSalle Nat'l Bank, supra* note 25, 437 U.S. at 311–312, 98 S.Ct. at 2365:

> We recognize, of course, that even upon recommendation to the Justice Department, the civil and criminal elements do not separate completely. The Government does not sacrifice its interest in unpaid taxes just because a criminal prosecution begins. Logically, then, the IRS could use its summons authority under § 7602 to uncover information about the tax liability created by a fraud regardless of the status of the criminal case. But the rule forbidding such is a prophylactic intended to safeguard the following policy interests.

RPI 0129

IRS.[31] In the case of an SEC investigation there is no call for a "prophylactic rule," and thus no need to ponder the import of these "policy interests," because the SEC's authority to issue the subpoena remains undiminished after the start of a grand jury investigation.

Second, the "policy interests" of *LaSalle* have little practical significance in this context. The first—to avoid broadening Justice's right to criminal discovery—is flatly inapplicable, as Dresser admits.[32] The strict limitations on discovery in criminal cases, embodied in Federal Rules of Criminal Procedure 15–17, do not take effect until after a grand jury has returned an indictment. Until then there is no danger that Justice might broaden its discovery rights, because the subpoena power of the grand jury is as broad as—perhaps broader than—that of the SEC. Justice can procure from Dresser directly whatever materials it might procure indirectly through the SEC.[33] In fact, a party investigated under SEC rules instead of grand jury procedures is accorded far greater procedural protection, and has no cause to complain. *See* 17 C.F.R. §§ 203.6–203.7 (1979).[34]

In its brief Dresser has concentrated upon the second "policy interest" identified in *LaSalle*: avoiding infringement upon the role of the grand jury. Dresser sug-

---

31. The *LaSalle* Court underscored, in a footnote, its belief that a "prophylactic" rule need not be imposed in every circumstance presenting the potentiality for infringement of the grand jury's role or broadening of Justice's right to criminal discovery. The Court disapproved the position adopted by the Third Circuit in *United States v. Lafko*, 520 F.2d 622, 625 (3d Cir. 1975), which it characterized as holding that the IRS summons authority must cease at the point when the special agent recommends prosecution to the district office, rather than at the point when the IRS recommends prosecution to Justice. 437 U.S. at 313 n.15, 98 S.Ct. at 2365 n.15. The Supreme Court admitted that "the potential for expanding the criminal discovery rights of the Justice Department or for the usurping the role of the grand jury exists at the point of the recommendation by the special agent." *Id.* But it called the possibilities of abuse "remote," *id.*, and stated that they "do not justify imposing an absolute ban on the use of the summons before that point." *Id.*

32. Supplemental brief of appellant Dresser Industries, Inc. at 19 n.16.

33. *See Developments in the Law—Corporate Crime: Regulating Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1312–1313 (1979). Obtaining the approval of the grand jury itself is not a serious impediment to Justice's efforts; indeed, the common practice is for grand jury subpoenas to be issued in blank, with the contents to be filled in by the prosecutor. *See In re Grand Jury Proceedings*, 486 F.2d 85, 87 (3d Cir. 1973).

34. 17 C.F.R. §§ 203.6–203.7 (1979) provide in relevant part:

§ 203.6 Transcripts.

* * * A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

§ 203.7 Rights of witnesses.

(a) Any person who is compelled or requested to furnish documentary evidence or testimony at a formal investigative proceeding shall upon request be shown the Commission's order of investigation. * * *

(b) Any person compelled to appear, or who appears by request or permission of the Commission, in person at a formal investigative proceeding may be accompanied, represented and advised by counsel * * *.

(c) The right to be accompanied, represented and advised by counsel shall mean the right of a person testifying to have an attorney present with him during any formal investigative proceeding and to have this attorney (1) advise such person before, during and after the conclusion of such examination, (2) question such person briefly at the conclusion of the examination to clarify any of the answers such person has given, and (3) make summary notes during such examination solely for the use of such person.

(d) Unless otherwise ordered by the Commission, in any public formal investigative proceeding, if the record shall contain implications of wrongdoing by any person, such person shall have the right to appear on the record; and in addition to the rights afforded other witnesses hereby, he shall have a reasonable opportunity of cross-examination and production of rebuttal testimony or documentary evidence. * * *

RPI 0130

gests two ways in which the SEC civil investigation might infringe the role of the grand jury. First, it argues that enforcement of the SEC subpoena would undermine the secrecy protections of the grand jury because the SEC subpoena covers many or all of the Dresser documents that have already been subpoenaed by the grand jury.[35] In this argument Dresser misconceives the nature of the secrecy protections of the grand jury.

**[4]** Federal Rule of Criminal Procedure 6(e) provides in relevant part:

(e) Secrecy of Proceedings and Disclosure

(1) *General rule.* A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the Government, or any person to whom disclosure is made under paragraph (2)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secre-

cy may be imposed on any person except in accordance with this rule. * * *

We note that the Rule prohibits disclosure of "matters occurring before the grand jury[.]" This serves to protect the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like. It does not require, however, that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.[36] It is well established that

when testimony or data is sought for its own sake—for its intrinsic value in the furtherance of a lawful investigation—rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same information was revealed to a grand jury or that the same documents had been, or were presently being, examined by a grand jury. * * *

*United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Cir. 1960).[37] Dress-

---

35. Supplemental brief of appellant Dresser Industries, Inc. at 13–17.

36. The rationales for grand jury secrecy are well established:

"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."
*Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219 n.10, 99 S.Ct. 1667, 1673 n.10, 60 L.Ed. 156 (1979) (brackets in original) (*quoting United States v. Rose,* 215 F.2d 617, 628–629 (3d Cir. 1954), *approved in United States v. Proctor & Gamble Co.,* 356 U.S. 677, 681 n.6, 78 S.Ct. 983, 986 n.6, 2 L.Ed.2d 1077 (1958)). *See also* Note, *Administrative Agency Access to Grand Jury Materials,* 75 Colum.L.Rev. 162, 166 (1975) (suggesting a further rationale: "to prevent the grand jury from being diverted

from its primary concern—the investigation of criminal activity"). None of these rationales has any application to an independent agency subpoena of corporate documents. No witnesses or targets will be frightened from testifying fully, no grand jurors will be threatened or suborned, no target will be embarrassed—any more than it might be embarrassed by any other SEC subpoena. Since the fact that Dresser is the target of a grand jury investigation is already public knowledge—as witness this case—there is no danger of exposing the identity of an innocent grand jury target.

37. *Accord, United States v. Stanford,* 589 F.2d 285, 290–291 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); *In re Search Warrant for Second Floor Bedroom,* 489 F.Supp. 207 (D.R.I.1980); *In re Grand Jury Investigation of Ven-Fuel,* 441 F.Supp. 1299, 1302–1303 (M.D.Fla.1977); *Brink v. DaLesio,* 82 F.R.D. 664, 668–669 (D.Md. 1979); *Michelin Tire Corp. v. United States,* 453 F.Supp. 897, 898 (Cust.Ct.1978); *see also In re Grand Jury Investigation (Lance),* 610 F.2d 202, 217 (5th Cir. 1980); *State of Illinois v. Sarbaugh,* 552 F.2d 768, 771–772 (7th Cir.), *cert. denied,* 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977). Some courts have adopted a broad interpretation of "matters occurring before the grand jury" as documents that "may tend to reveal what transpired before the grand jury." *United States v. Armco Steel Corp.,* 458

er's documents at issue here were created for an independent corporate purpose, not directly related to the prospect of a grand jury investigation. The SEC has subpoenaed them directly from Dresser, without mention of the grand jury. They do not reveal what has occurred before the grand jury; they reveal only what has occurred in Dresser's foreign operations. *See United States v. Stanford*, 589 F.2d 285, 291 (7th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). The fact that a grand jury has subpoenaed documents concerning a particular matter does not insulate that matter from investigation in another forum.[38] In fact, if the grand jury proceedings are genuinely secret, other agencies and courts will not know the subject matter of the grand jury investigation and thus will not be able to determine whether their own inquiry would overlap that of the grand jury.

In this case Dresser is obligated under the securities laws to provide documents to the SEC in obedience to a lawful subpoena. The existence of a grand jury proceeding neither adds to nor detracts from Dresser's rights before the SEC. Whatever rights to secrecy or confidentiality Dresser may have are the product solely of the laws governing the SEC; they are unaffected by the parallel grand jury proceeding.

The second way in which Dresser argues that enforcement of this subpoena might infringe the role of the grand jury is that the SEC could interpret and selectively disclose parts of the subpoenaed information to the grand jury through Justice, thereby undermining the independence of the grand jury's inquiry.[39] Of course, this argument is purely speculative since, as Dresser is well aware,[40] the SEC's general policy is to grant Justice continuing access to the entirety of a given investigative file once the Commission formally grants access.[41] As of now the SEC has not received any confidential documents from Dresser, and thus we have had no opportunity to see how this policy operates in practice. It would be altogether inappropriate for this court to presume that the SEC will pre-select documents for release to Justice in order to prejudice the grand jury.

In another sense Dresser's complaint on this score has little practical significance. No one would suggest that the grand jurors, unassisted by accountants, lawyers, or others schooled in the arcana of corporate financial accounting, could sift through the masses of Dresser's corporate documents and arrive at a coherent picture of the company's foreign payments and disclosure practices. In this area, as in many areas of great complexity, the grand jurors are assisted—guided and influenced, in fact—not only by the United States Attorneys assigned to the investigation, but also by experts provided by the federal regulatory agencies with experience in the particular subject areas. This expert assistance is permitted under Rule 6(e), and it promotes the efficiency and rationality of the criminal investigative process. *See In re Perlin*, 589 F.2d 260 (7th Cir. 1978); *Robert Hawthorne, Inc. v. Director of IRS*, 406 F.Supp. 1098, 1106–1107 (E.D.Pa.1975); *Developments in the Law—Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1314–1315 (1979). In this case two SEC agents have been assigned to Justice's task force on transnational payments to assist in the investigation of companies possibly involved

---

F.Supp. 784, 790 (W.D.Mo.1978); *accord, In re Grand Jury Investigation (Lance), supra,* 610 F.2d at 216. Even under this test courts should permit disclosure of documents in the hands of private parties, independently identified and sought for a lawful and independent purpose.

38. We recognize that in some circumstances the courts have protected materials not technically within the range of Rule 6(e) where disclosure would jeopardize the effective functioning of the grand jury. *See In re Search Warrant for Second Floor Bedroom, supra* note 37, 489 F.Supp. at 211. This case presents no such problem.

39. Supplemental brief of appellant Dresser Industries, Inc. at 17–18.

40. *See id.* at 5 n.10.

41. *See* letter from James H. Schropp to this court dated April 3, 1979.

RPI 0132

in illegal foreign payments.[42] There can be little doubt that the grand jury's deliberations will be influenced by the work of these SEC agents. Any additional influence that might arise as a result of enforcement of the SEC subpoena and transmittal of documents to Justice thereafter is likely to be inconsequential.[43]

Finally, we note that if Dresser is genuinely worried that the SEC might disclose only those documents prejudicial to the company, it may provide the grand jury with copies of *all* the documents it provides to the SEC, thereby obviating the danger. Alternatively, if Dresser obtains evidence that the SEC is in fact abusing its power to transmit documents to Justice, and is thereby distorting the grand jury's perception of the case, Dresser may apply to the courts at that time for appropriate relief.

We conclude that the danger that enforcement of this subpoena might infringe the role of the grand jury is too speculative and remote at this point to justify so extreme an action as denying enforcement of this subpoena.[44]

In essence, Dresser has launched this attack on the parallel SEC and Justice proceedings in order to obtain protection against the bare SEC proceeding, which it fears will result in public disclosure of sensitive corporate documents. The prejudice Dresser claims it will suffer from the parallel nature of the proceedings is speculative and undefined—if indeed Dresser would suffer any prejudice from it at all.[45] Any entitlement to confidential treatment of its documents must arise under the laws pertaining to the SEC; the fortuity of a parallel grand jury investigation cannot expand Dresser's rights in this SEC enforcement action. Thus Dresser's invocation of *LaSalle* can avail the company nothing.

## IV. COOPERATION BETWEEN SEC AND JUSTICE

In its initial decision in this case a panel of this court ruled that "the broad prophy-

---

42. *See* text following note 14 *supra*.

43. Dresser implicitly admits that it would be proper for the SEC to conduct and complete a civil investigation, and then to transmit all relevant materials to Justice for possible criminal prosecution. *See* supplemental brief of appellant Dresser Industries, Inc. at 22–24. Yet such a procedure would create as severe a problem of grand jury infringement as the procedure complained of in this case.

44. Dresser seeks to minimize the effect an order denying enforcement of this subpoena would have on the SEC's ability to carry out its mandate by suggesting that the SEC could continue its civil enforcement efforts through obtaining access to the grand jury materials under Rule 6(e)(2)(C)(i), which permits disclosure "when so directed by a court preliminarily to or in connection with a judicial proceeding[.]" This disregards the fact that some courts have held that the SEC must demonstrate a "particularized need" for grand jury materials in order to obtain access to them, *e.g., In re Grand Jury Investigation*, 414 F.Supp. 74, 76 (S.D.N.Y. 1976), and that administrative investigative proceedings may not be considered preliminary to or in connection with a judicial proceeding for purposes of the Rule. *See United States v. Bates*, —— F.2d —— (D.C.Cir. No. 79–1930, decided April 18, 1980) (*per curiam*) (concerning a Federal Maritime Commission investigation).

45. During oral argument before the panel Dresser's attorney was asked what prejudice the company suffered from the parallel proceedings. Transcript of oral argument at 49 (Dec. 11, 1978). He responded that Dresser was prejudiced in two ways. First, he complained that "the SEC does not have anywhere near the confidentiality protection that Rule 6(e) provides." Of course, this complaint is properly addressed to Congress, which explicitly granted the SEC the power to "publish" the results of its investigations. Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976). We do not express any opinion on whether the SEC would be justified in exercising the power to publish in this case; we merely note that the Commission is not governed, and is not intended to be governed, by Rule 6(e). Second, the attorney invoked Dresser's "right to a fair criminal investigation, including the fact that the Rules of Discovery of the Federal Rules of Criminal Procedure apply to it." Transcript of oral argument at 49 (Dec. 11, 1978). If he was referring to Rule 16(b), then he was mistaken, for Rule 16(b) comes into play only after indictment. In fact, the grand jury's investigative powers are as broad as or broader than those of the SEC. Dresser cannot claim to be prejudiced by the breadth of the SEC investigative authority.

RPI 0133

lactic rule enunciated in *LaSalle* is inappropriate where the SEC and the Justice Department are simultaneously pursuing civil and criminal investigations." Slip opinion at 18. The panel therefore affirmed the District Court and ordered enforcement of the SEC subpoena. Out of a concern that the SEC subpoena might somehow "subvert the limitations of criminal discovery," *id.*, however, the panel, with one judge dissenting, modified the terms of the subpoena enforcement order. It required that "once the Justice Department initiates criminal proceedings by means of a grand jury, the SEC may not provide the Justice Department with the fruits of the Commission's civil discovery gathered after the decision to prosecute." *Id.* at 22.[46] We affirm the judgment of the District Court and reject the panel's modification.

First, we note that no party to this case had suggested or requested a modification such as that imposed by the panel majority, either in the District Court or in this court.[47] In supplemental briefs submitted to the *en banc* court both the SEC and Justice vigorously oppose the modification, while Dresser's support for it is lukewarm at most. Dresser had argued that the SEC investigation is flatly prohibited by the rule of *LaSalle*; the panel's modification, according to Dresser, "may have had a similar effect" to that of *LaSalle*—"though not as assured in its operation." Supplemental brief of appellant Dresser Industries, Inc. at 30. Dresser characterized the panel's decision to "relax" the *LaSalle* rule as "unsound," *id.* at 29, and described the motivating factor in the panel's decision—the supposed need to protect the "criminal discovery process * * * of the grand jury," slip opinion at 22—as "irrelevant to

this litigation." Supplemental brief of appellant Dresser Industries, Inc. at 9 n.16. The reactions of the parties, therefore, suggest that the panel's modification might serve more to impede securities law enforcement than to protect the interests of Dresser.

Second, we note that there is no support for the panel's modification in either the relevant statutes or legislative history. Both the '33 Act and the '34 Act—and other statutes related to securities law enforcement as well[48]—expressly authorize the SEC to "transmit such evidence as may be available * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this subchapter." Section 20(b) of the '33 Act, 15 U.S.C. § 77t(b) (1976); Section 21(d) of the '34 Act, 15 U.S.C. § 78u(d) (1976). The statutes impose no limitation on when this transmittal may occur. The parties have not cited any portions of the legislative histories of these Acts relevant to this question, nor have we found any. But the SEC and Justice find considerable support for their interpretation in the legislative history of the Foreign Corrupt Practices Act of 1977, 91 Stat. 1494, Title I, 15 U.S.C. §§ 78a, 78m, 78dd–1, 78dd–2, 78ff (Supp. I 1977).

The Foreign Corrupt Practices Act outlaws corporate bribery of foreign officials and associated inaccurate or misleading financial recordkeeping. In passing the statute Congress recognized the role of the SEC in combatting such practices under the '33 and '34 Acts, and sought to "strengthen the Commission's ability to enforce compliance with the existing requirements [sic] of the securities laws[.]" S.Rep.No. 114, 95th Cong., 1st Sess. 12 (1977). Both the Senate and the House reports on the bill acknowl-

---

46. Under the panel's terminology the decision to prosecute and the beginning of "criminal discovery" occur at the time when Justice begins to present its case to the grand jury. *See* slip op. at 21. After indictment by the grand jury, when genuine criminal discovery under Rule 16(b) begins, different considerations would govern. *See* text and notes at notes 20–21 *supra*; supplemental brief of the SEC at 23–24; supplemental brief of appellant Dresser Industries, Inc. at 9 n.16.

47. Mr. Luter, appellant in No. 78–1705, has taken no position regarding the panel's modification of the District Court's order.

48. Investment Company Act of 1940, § 42(e), 15 U.S.C. § 80a–41(e) (1976); Investment Advisers Act of 1940, § 209(e), 15 U.S.C. § 80b–9(e) (1976); Public Utility Holding Company Act of 1935, § 18(f), 15 U.S.C. § 79r(f) (1976).

RPI 0134

edged the SEC's dual investigative role in preparing cases for civil and criminal enforcement actions. They also recognize the necessity of close cooperation between the SEC and Justice in preparing such cases. The Senate Committee said:

> The committee expects that close cooperation will develop between the SEC and the Justice Department at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale. * * *

*Id.* at 12. It stated that it expected the SEC and Justice to "work out" between themselves certain "arrangements * * * on criminal matters" that would preserve the authority of each within its jurisdiction. *Id.* The House Committee said:

> Traditionally, there has been a close working relationship between the Justice Department and the SEC. The Committee fully expects that this cooperation between the two agencies will continue with respect to the enforcement of the provisions of this bill.

H.R.Rep.No. 640, 95th Cong., 1st Sess. 10 (1977).

Although the legislative history of the Foreign Corrupt Practices Act is not directly probative of congressional intent governing the '33 and '34 Acts, these statements by the 95th Congress are nevertheless entitled to some weight. The remarks in the committee reports concerning the investigative practices of the SEC and Justice were not intended to change, but to reaffirm, past practice. This indicates that Congress understands and approves of the "close working relationship" between the agencies in their investigative capacities. Since such a "close working relationship" will govern the activities of the agencies in enforcing the laws against questionable foreign payments under the new statute, it would be impractical for us to attempt to screen the agencies from each other when they are investigating the same sort of offense under the former statutes.

Congress manifestly did not intend that the SEC be forbidden to share information with Justice at this stage of the investigation. Under the panel majority's theory of the case the SEC would be foreclosed from sharing the fruits of its investigation with Justice as soon as Justice begins its own investigation through a grand jury. Only by waiting until the close of the SEC proceeding before initiating its own grand jury investigation could Justice obtain access to the evidence procured by the SEC. In view of Congress' concern that the agencies share information "at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale," S.Rep.No. 114, *supra*, at 12, and that the agencies avoid "a costly duplication of effort," H.R.Rep.No. 640, *supra*, at 9, it would be unreasonable to prevent a sharing of information at this point in the investigation.

Third, we note that there is little or no judicial precedent for the panel's modification. The only support adduced by the panel opinion is a District Court opinion in *SEC v. Gilbert*, 79 F.R.D. 683 (S.D.N.Y.1978). In that case, which arose on the defendant's request for a protective order under the discovery rules of the Federal Rules of Civil Procedure—as contrasted to an investigative subpoena enforcement proceeding as in this case—the court ordered the SEC "not to furnish the U.S. Attorney specially with any information procured in the course of discovery in this case." *Id.* at 687. The court offered no authority for this order nor, indeed, any reason for its application. While we recognize the similarity of *Gilbert* to this case in many respects, its lack of reasoning and its distinguishable procedural posture make it but weak authority.[49]

In fact, the reasoning of the Supreme Court in *LaSalle* is contrary to that of the panel in two respects, and should govern this case in lieu of *Gilbert*. The *LaSalle*

---

49. The panel majority did not deal directly with two decisions much closer to the instant case on their facts. Both were decided in favor of the SEC without modification. *SEC v. Druck-*
er*, [Transfer Binder 1979] Fed.Sec.L.Rep. (CCH) ¶ 96,821 (S.D.N.Y. March 30, 1979); *Gellis v. Casey*, 338 F.Supp. 651 (S.D.N.Y. 1972). *See* panel slip op. at 12 n.29, 14 n.31.

RPI 0135

Court considered, and explicitly rejected, the course adopted by the panel majority: "[I]t is unrealistic to attempt to build a partial information barrier between the two branches of the executive." *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 312, 98 S.Ct. at 2365. More fundamentally, the *LaSalle* Court conceived of the controversy before it as an analysis of the good or bad faith of the IRS investigation. A bad faith investigation, in the Court's conception, is one conducted solely for criminal enforcement purposes. *See id.* at 307–308, 316, & 316 n.18, 98 S.Ct. at 2362–2363, 2367 & 2367 n.18. Where the agency has a legitimate noncriminal purpose for the investigation, it acts in good faith under the *La-Salle* conception even if it might use the information gained in the investigation for criminal enforcement purposes as well.[50] In the present case the SEC plainly has a legitimate noncriminal purpose for its investigation of Dresser. It follows that the investigation is in good faith, in the absence of complicating factors. There is, therefore, no reason to impose a protective order such as that imposed by the panel majority.

Finally, we note that the panel's modification would serve no compelling purpose, and might interfere with enforcement of the securities laws by the SEC and Justice. As the Second Circuit has said, the procedure permitting the SEC to communicate with Justice during the preliminary stages of an investigation has "significant advantages." *United States v. Fields, supra,* 592 F.2d at 646.

Allowing early participation in the case by the United States Attorney minimizes statute of limitations problems. The more time a United States Attorney has, the easier it is for him to become familiar with the complex facts of a securities fraud case, to prepare the case, and to present it to a grand jury before expiration of the applicable statute of limitations. Earlier initiation of criminal proceedings moreover is consistent with a defendant's right to a speedy trial. \* \*

*Id.* The panel's modification would "interfere with this commendable example of inter-agency cooperation," *id.*, to the detriment of securities law enforcement and in contravention of the will of Congress.[51] On the other side of the balance, the panel's concern for preserving the limitations on criminal discovery is largely irrelevant at this stage of the proceedings, as Dresser agrees.[52] Thus this would be an inappropriate situation to impose a "prophylactic" rule against cooperation between the agencies. We believe the courts can prevent any injustice that may arise in the particular circumstances of parallel investigations in the future. We decline to adopt the position of the panel majority.

### V. OTHER ISSUES

Several issues remain.

[5] First, Dresser argues that enforcing the SEC subpoena would breach an agreement of confidentiality made at the January 27, 1976 meeting between SEC and Dresser representatives. The District Court held that "[t]hroughout the voluntary disclosure program the SEC reserved its

---

50. So long as the Commission evinces no other indicium of bad faith. *See United States v. LaSalle Nat'l Bank, supra* note 25, 437 U.S. at 317 n.19, 98 S.Ct. at 2368 n.19.

51. In its brief Justice suggests a number of practical problems that might ensue from the panel's modification: (1) that Justice might have to forego any assistance from the SEC in enforcing the Foreign Corrupt Practices Act or other regulatory laws involving parallel investigations; (2) that agency attorneys might not be legitimately appointed as special assistant United States Attorneys to assist in preparing cases for grand juries; (3) that a grand jury witness might gain effective immunity from criminal prosecution by providing sole, original copies of inculpatory documents to the SEC; (4) that prosecutors might be unable to learn of prior testimony by grand jury witnesses; (5) that prosecutors might be denied access to exculpatory information, evidence of perjury, or a prior inculpatory statement; and (6) that the prosecutor might find it impossible to comply with his responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

52. *See* text at notes 33–34 *supra.*

RPI 0136

rights to pursue a formal investigation and issue subpoenas if necessary. It is readily apparent that the SEC never agreed to completely forego its rights to subpoena the material in question." 453 F.Supp. at 575. We have examined the record and do not find that the District Court's determination on this point was clearly erroneous.

Second, Dresser argues that the District Court erred in granting judgment for the SEC without permitting Dresser to conduct discovery into the propriety of the SEC investigation. Although the precise nature of Dresser's desired discovery is not clear, the company apparently would investigate: (1) the SEC criminal referral and the concurrent criminal investigation, with a view to the possibility that the SEC has proceeded in bad faith; (2) the ethical propriety of SEC agents' participation in the criminal investigation; (3) the existence of an SEC commitment of confidentiality; and (4) the basis for the SEC staff's decision to request a formal investigation of Dresser. *See* brief of respondent-appellant at 36–42.

[6] We recognize that discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty. *United States v. Fensterwald,* 553 F.2d 231 (D.C.Cir.1977) (*per curiam*); *United States v. Wright Motor Co.,* 536 F.2d 1090 (5th Cir. 1976). For example, the Supreme Court in *LaSalle* apparently contemplated some degree of discovery in IRS summons cases to determine the institutional good faith of the IRS in issuing such summonses. *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316–317, 98 S.Ct. at 2367; *id.* at 320, 98 S.Ct. at 2369 (dissenting opinion); *United States v. Marine Midland Bank,* 585 F.2d 36, 38–39 (2d Cir. 1978) (*per curiam*). However, district courts must be cautious in granting such discovery rights, lest they transform subpoena enforcement proceedings into exhaustive inquisitions into the practices of the regulatory agencies. *See FTC v. Anderson,* 631 F.2d 741, at 747 (D.C.Cir. 1979). Discovery should be per-

mitted only where the respondent is able to distinguish himself from "the class of the ordinary [respondent]," *United States v. Fensterwald, supra,* 553 F.2d at 231–232, by citing special circumstances that raise doubts about the agency's good faith. Even then, district courts must limit discovery to the minimum necessary in the interests of justice by requiring specific interrogatories or affidavits rather than "full-dress discovery and trial." *United States v. Marine Midland Bank, supra,* 585 F.2d at 39; *see United States v. Fensterwald, supra,* 553 F.2d at 232–233.

[7] We conclude that the District Court acted within its discretion in denying Dresser discovery in this case, and that it properly granted judgment to the SEC on the record before it. There was nothing improper about the SEC's decision to transmit the files of the participants in the Voluntary Disclosure Program to Justice, or about the subsequent concurrent investigations by the two agencies. Nor does the participation of two SEC attorneys in the Justice task force cast doubt upon the good faith of the Commission. Dresser's allegations of an agreement by the SEC not to subpoena the documents underlying its voluntary report are not substantiated by any writing, and are directly contrary to the published terms of the Voluntary Disclosure Program.[53] Finally, Dresser's suggestion that the order of investigation is improper because there was no "likelihood that a violation has been or is about to be committed," *see* 17 C.F.R. § 202.5 (1979), does not distinguish Dresser from any other recalcitrant subpoena respondent. At this stage of the investigation neither this court nor the SEC could know whether Dresser has violated the law. The Commission's discretion concerning which potential violators to investigate is, while not unbounded, extremely broad. Dresser has suggested no improper motive for the SEC investigation, *cf. United States v. Fensterwald, supra,* 553 F.2d at 232 (respondent's political and pro-

---

53. Report, *supra* note 4, at 32; *see* text at note 8 *supra.*

fessional activities "could easily have spurred the Internal Revenue Service to take an extraordinary interest in this particular taxpayer"). Dresser's bare protestations of innocence do not suffice to call the SEC's bona fides into question.[54]. We therefore affirm the District Court's decision on this point.

Two remaining substantive issues raised by Dresser do not require decision by this court at this time. Those issues are: the asserted right of Dresser or its employees to protect portions of the documents from public disclosure because of the possibility of hostile and injurious foreign reaction, and the asserted attorney-client privilege of Dresser or its employees with respect to some of the documents. Despite Dresser's suggestion to the contrary, see brief of respondent-appellant at 42-47, we conclude that the District Court did not reach the merits of Dresser's claims on these points.

With respect to confidentiality, the court noted that the SEC had offered to give Dresser ten days notice in advance of disclosure of the documents to the public, to enable the company to challenge the decision to disclose. This offer the court found to be "adequate" to protect Dresser's interests at this stage of the proceeding. 453 F.Supp. at 576.[55] With respect to the attorney-client privilege, the District Court properly declined to evaluate Dresser's claims in generality, stating that such claims at this point are "vague and conclusory." *Id.* The court further said that "[c]ertainly not all of the material sought is privileged," and indicated that the investigative report prepared by Dresser as part of the Voluntary Disclosure Program is not privileged. *Id.* Dresser apparently does not dispute either

of these specific conclusions. Brief of respondent-appellant at 43, 44.

We agree with the District Court that Dresser's claims of confidentiality and of attorney-client privilege cannot be judged by the courts on this record at this stage of the proceeding. Rather, once the subpoena has been enforced the SEC will have the opportunity to rule on specific requests for confidential treatment and assertions of attorney-client privilege. This procedure will follow the outlines described by this court in *FTC v. Texaco, Inc.*, 55 F.2d 862, 883-885 (D.C.Cir.) (*en banc*), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), and the Supreme Court in *FCC v. Schreiber*, 381 U.S. 279, 290-291, 295-296, 85 S.Ct. 1459, 1467-1468, 1470, 14 L.Ed.2d 383 (1965).

We recognize that Judge Parker in the grand jury investigation of Dresser said that Dresser's concern for the lives of its employees and their families and property abroad in the event of public disclosure of portions of the documents is "not illusory and should not be lightly considered," see JA 163, but we believe that the SEC will be in a better position to evaluate this claim than the courts are now. This court has commented before that the danger that confidential materials might be wrongfully released to the public through the Freedom of Information Act is "by no means frivolous," *FTC v. Anderson, supra*, 631 F.2d at 748 n.11. Courts have held an offer of ten days notice before release of information to be adequate protection in several cases involving business information. *Id.*, 631 F.2d at 748; *FTC v. Texaco, Inc., supra*, 555 F.2d at 884-885; *SEC v. Wheeling-Pittsburgh Steel Corp.*, 482 F.Supp. 555,

54. Dresser's allegation that the staff "repeatedly told Dresser that it knew of no securities violation," brief of respondent-appellant at 41, does not alter the case. By the time the Commission decided to issue the order of investigation, the staff had officially concluded otherwise. *See* order directing private investigation and designating officers to take testimony, JA 7-9.

55. The court said:
Furthermore, the Commission has offered to give Dresser ten days notice in the event that

there is a FOIA request and the SEC determines the material is not exempt and must be disclosed. These assurances of confidentiality are adequate and Dresser is entitled to no more. * * *
453 F.Supp. at 576. We interpret the SEC's offer as encompassing any decision to release the documents, whether or not pursuant to the FOIA. Moreover, we assume that, upon examination of particular documents or groups of documents, the SEC has the authority to stiffen the confidentiality or notice agreement.

RPI 0138

563 (W.D.Pa.1979). The District Court approved a similar arrangement in this case with respect to Dresser's subpoenaed documents in general. We do not read the opinion as approving such a procedure with respect to all documents in this case, no matter how sensitive they may prove to be. The decision whether to accord greater protection to certain documents where release might endanger employees' lives abroad must be made in the first instance by the Commission, which will be able to inspect the documents and hear argument on the issue.[56]

The question of the attorney-client privilege must be resolved in a similar manner: viewed initially by the Commission with later review in the courts if necessary.

We see no ground for reversal in the District Court's determinations on the confidentiality and attorney-client privilege issues.

The final issue in this case is that raised in No. 78–1705: whether the District Court erred in its decision of June 23, 1978, JA 532, *reconsideration denied*, JA 559, denying Mr. Edward R. Luter, a senior vice president of Dresser, the right to intervene in this enforcement proceeding on behalf of himself and other employees of Dresser. Mr. Luter claims an interest in the proceeding on bases of an alleged confidentiality interest on the part of the employees in certain documents and an alleged attorney-client privilege. The District Court rejected Mr. Luter's motion to intervene, saying:

> Mr. Luter has failed to demonstrate any proper basis for reconsideration, for intervention as a matter of right, or for intervention as a matter of discretion. Even if there was an attorney-client privilege to be invoked in this case, it would be the corporation's and not the employees'. In addition, the employees had no constitutional right of privacy concerning the communications in question. * * *

JA 559 (order denying reconsideration).

[8] We are somewhat troubled by the District Court's treatment of Mr. Luter's

motion. It appears that the court rejected his claim on the merits without first allowing him to pass the threshold. In this circuit an applicant to intervene need only show that the representation of his interest may be inadequate; the burden of proof rests on those resisting intervention. *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C.Cir. 1967). In cases of alleged corporate misconduct it is especially important for the courts to be alert to the possibilities of conflict between the interests of the corporation and those of its employees.

[9] In this case, however, we need not judge whether the court was correct in its conclusion that Mr. Luter has asserted no cognizable interest in the proceedings. With the benefit of hindsight, and informed by the arguments Mr. Luter has made on his behalf in this appeal, we are able to conclude that Dresser has adequately represented the interests of its employees through this stage of the litigation. So far, the disputes have centered on the enforceability of the SEC subpoena, not on particular questions of confidentiality or privilege pertaining to individual documents. We do not understand the District Court as having rejected the right of Mr. Luter or any other Dresser employees to intervene in future proceedings concerning this investigation. On the understanding that Mr. Luter or his fellow employees may seek to intervene in future SEC proceedings concerning confidentiality and the attorney-client privilege, and in any court proceedings that might follow, and that the SEC and the courts will evaluate any such motions to intervene afresh and on their merits, we affirm the judgment of the District Court in No. 78–1705. As previously indicated we affirm the judgment of the District Court in No. 78–1702 as well.

The judgments of the District Court are

*Affirmed.*

---

56. We note that, except in "egregious cases," the SEC has stated it would not require more than "generic" disclosure to the public of questionable foreign payments. Report, *supra* note 4, at 9 n.8.

EDWARDS, Circuit Judge, concurring:

I concur in the opinion of the court in this case. I wish to point out, however, that I do not read the court's opinion as expressing any view as to the proper outcome in a case of this sort *once an indictment has issued*. *See* text of opinion at notes 33–34, *supra*. Once an indictment has issued, the policy interest expressed in *United States v. LaSalle National Bank*, 437 U.S. 298, 312, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978), concerning the impermissibility of broadening the scope of criminal discovery through the summons authority of an agency, may come into play. I express no opinion as to whether or not the summons authority of a government agency may continue once an indictment has been issued or, if it may, whether protective conditions need be placed on the exercise of that power. These issues raise questions which are not presented here. The resolution of these questions, therefore, must await another day.



achieved fully comports with the letter and the spirit of our constitutional traditions.

I would affirm the judgments in both cases.



William MALLOY, Petitioner,

v.

Patrick J. HOGAN, Sheriff of Hartford County.

No. 110.

Argued March 5, 1964.

Decided June 15, 1964.

Prisoner, who had been committed to jail for contempt for refusal to answer certain questions in state gambling inquiry, brought habeas corpus proceeding. The Superior Court, Hartford County, Connecticut, entered judgment adverse to the prisoner, and he appealed. The Connecticut Supreme Court of Errors, 150 Conn. 220, 187 A.2d 744, held that there was no error, and the prisoner brought certiorari. The United States Supreme Court, Mr. Justice Brennan, held that the Fifth Amendment's exception from compulsory self-incrimination is protected by the Fourteenth Amendment against abridgement by the States, and that Fifth Amendment was properly invoked by the prisoner, who had previously been convicted of pool-selling, when he was asked as witness in state gambling inquiry questions seeking to elicit the identity of one who ran the pool-selling operation, where it was apparent that the prisoner might apprehend that if that person were

84 S.Ct.—94

still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the prisoner with a more recent crime for which he might still be prosecuted.

Reversed.

Mr. Justice Harlan, Mr. Justice White, Mr. Justice Clark, and Mr. Justice Stewart, dissented.

1. Constitutional Law ⟐266

Fifth Amendment's exception from compulsory self-incrimination is protected by Fourteenth Amendment against abridgement by States. U.S.C.A.Const. Amends. 5, 14.

2. Criminal Law ⟐520(1), 522(1)

Test in determining whether conduct of state officers in obtaining confession violates privilege against self-incrimination is not whether conduct of state officers was shocking, but whether confession is "free and voluntary," that is, that it was not extracted by any sort of threats or violence and was not obtained by any direct or implied promises, however slight, or by exertion of any improper influence. U.S.C.A.Const. Amends. 5, 14.

> See publication Words and Phrases for other judicial constructions and definitions.

3. Witnesses ⟐297(1)

One cannot be compelled to incriminate himself. U.S.C.A.Const. Amend. 5.

4. Criminal Law ⟐393(1)
   Witnesses ⟐300

American system of criminal prosecution is accusatorial, not inquisitorial, and its essential mainstay is provision of Fifth Amendment that no person shall be compelled in any criminal case to be witness against himself. U.S.C.A.Const. Amend. 5.

5. Criminal Law ⟐393(1)

Governments, state and federal, are compelled to establish guilt by evidence

independently and freely secured and may not by coercion prove charge against accused out of his own mouth. U.S.C.A. Const. Amend. 5.

**6. Constitutional Law ⊜266**

Fourteenth Amendment prohibits States from inducing person to confess through sympathy falsely aroused or other like inducement far short of compulsion by torture, and forbids States to resort to imprisonment to compel accused to answer questions that might incriminate him. U.S.C.A.Const. Amends. 5, 14.

**7. Constitutional Law ⊜266**

Fourteenth Amendment secures against state invasion the right of accused to remain silent unless he chooses to speak in unfettered exercise of his own will and to suffer no penalty for such silence. U.S.C.A.Const. Amends. 5, 14.

**8. Witnesses ⊜300**

Same standards must determine whether silence of accused in either federal or state proceeding is justified under the privilege against self-incrimination. U.S.C.A.Const. Amends. 5, 14.

**9. Witnesses ⊜297(7)**

The Fifth Amendment applies to witness in statutory inquiry as well as to defendant in criminal prosecution. U.S.C.A.Const. Amend. 5.

**10. Witnesses ⊜297(10)**

The privilege against self-incrimination could be invoked by witness, who had previously been convicted of pool-selling, when asked in state gambling inquiry questions seeking to elicit identity of one who ran the pool-selling operation, where it was apparent that witness might apprehend that if such person were still engaged in unlawful activity, disclosure of his name might furnish link in chain of evidence sufficient to connect witness with more recent crime for which he might still be prosecuted; refusal to answer could not be punished as contempt. U.S.C.A.Const. Amends. 5, 14.

———————

Harold Strauch, Hartford, Conn., for petitioner.

John D. LaBelle, Manchester, Conn., for respondent.

Mr. Justice BRENNAN delivered the opinion of the Court.

In this case we are asked to reconsider prior decisions holding that the privilege against self-incrimination is not safeguarded against state action by the Fourteenth Amendment. Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903.[1]

The petitioner was arrested during a gambling raid in 1959 by Hartford, Connecticut, police. He pleaded guilty to the crime of pool selling, a misdemeanor, and was sentenced to one year in jail and fined $500. The sentence was ordered to be suspended after 90 days, at which time he was to be placed on probation for two years. About 16 months after his guilty plea, petitioner was ordered to testify before a referee appointed by the Superior Court of Hartford County to conduct an inquiry into alleged gambling and other criminal ac-

———————

1. In both cases the question was whether comment upon the failure of an accused to take the stand in his own defense in a state prosecution violated the privilege. It was assumed, but not decided, in both cases that such comment in a federal prosecution for a federal offense would infringe the provision of the Fifth Amendment that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." For other statements by the Court that the Fourteenth Amendment does not apply the federal privilege in state proceedings, see Cohen v. Hurley, 366 U.S. 117, 127–129, 81 S.Ct. 954, 960–961, 6 L.Ed. 2d 156; Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674.

RPI 0142

tivities in the county. The petitioner was asked a number of questions related to events surrounding his arrest and conviction. He refused to answer any question "on the grounds it may tend to incriminate me." The Superior Court adjudged him in contempt, and committed him to prison until he was willing to answer the questions. Petitioner's application for a writ of habeas corpus was denied by the Superior Court, and the Connecticut Supreme Court of Errors affirmed. 150 Conn. 220, 187 A.2d 744. The latter court held that the Fifth Amendment's privilege against self-incrimination was not available to a witness in a state proceeding, that the Fourteenth Amendment extended no privilege to him, and that the petitioner had not properly invoked the privilege available under the Connecticut Constitution. We granted certiorari. 373 U.S. 948, 83 S.Ct. 1680, 10 L.Ed.2d 704. We reverse. We hold that the Fourteenth Amendment guaranteed the petitioner the protection of the Fifth Amendment's privilege against self-incrimination, and that under the applicable federal standard, the Connecticut Supreme Court of Errors erred in holding that the privilege was not properly invoked.

**4**

The extent to which the Fourteenth Amendment prevents state invasion of rights enumerated in the first eight Amendments has been considered in numerous cases in this Court since the Amendment's adoption in 1868. Although many Justices have deemed the Amendment to incorporate all eight of the Amendments,[2] the view which has thus far prevailed dates from the decision in 1897 in Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979, which held that the Due Process Clause requires the States to pay just compensation for private property taken for public use.[3] It was on the authority of that decision that the Court said in 1908 in Twining v. New Jersey, supra, that "it is possible that some of the personal rights safeguarded by the first eight Amendments

**5**

against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law." 211 U.S., at 99, 29 S.Ct., at 19.

---

2. Ten Justices have supported this view. See Gideon v. Wainwright, 872 U.S. 335, 346, 83 S.Ct. 792, 797, 9 L.Ed.2d 799, (opinion of MR. JUSTICE DOUGLAS). The Court expressed itself as unpersuaded to this view in In re Kemmler, 136 U.S. 436, 448-449, 10 S.Ct. 930, 934, 34 L.Ed. 519; McElvaine v. Brush, 142 U.S. 155, 158-159, 12 S.Ct. 156, 157, 35 L.Ed. 971; Maxwell v. Dow, 176 U.S. 581, 597-598, 20 S.Ct. 448, 454-455, 44 L.Ed. 597; Twining v. New Jersey, supra, 211 U.S. p. 96, 29 S.Ct. p. 18. See Spies v. Illinois, 123 U.S. 131, 8 S.Ct. 21, 22, 31 L.Ed. 80. Decisions that particular guarantees were not safeguarded against state action by the Privileges and Immunities Clause or other provision of the Fourteenth Amendment are: United States v. Cruikshank, 92 U.S. 542, 551, 23 L.Ed. 588; Prudential Ins. Co. of America v. Cheek, 259 U.S. 530, 543, 42 S.Ct. 516, 522 (First Amendment); Presser v. Illinois, 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (Second Amendment); Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 348,

58 L.Ed. 652 (Fourth Amendment); Hurtado v. California, 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed. 232 (Fifth Amendment requirement of grand jury indictments); Palko v. Connecticut, 302 U.S. 319, 323, 58 S.Ct. 149, 153, 82 L.Ed. 288 (Fifth Amendment double jeopardy); Maxwell v. Dow, 176 U.S., at 595, 20 S.Ct., at 454 (Sixth Amendment jury trial); Walker v. Sauvinet, 92 U.S. 90, 92, 23 L.Ed. 678 (Seventh Amendment jury trial); In re Kemmler, supra; McElvaine v. Brush, supra; O'Neil v. Vermont, 144 U.S. 323, 332, 12 S.Ct. 693, 697, 36 L.Ed. 450 (Eighth Amendment prohibition against cruel and unusual punishment).

3. In Barron, for Use of Tiernan v. Mayor and City Council of City of Baltimore, 7 Pet. 243, 8 L.Ed. 672, decided before the adoption of the Fourteenth Amendment, Chief Justice Marshall, speaking for the Court, held that this right was not secured against state action by the Fifth Amendment's provision: "Nor shall private property be taken for public use, without just compensation."

RPI 0143

The Court has not hesitated to re-examine past decisions according the Fourteenth Amendment a less central role in the preservation of basic liberties than that which was contemplated by its Framers when they added the Amendment to our constitutional scheme. Thus, although the Court as late as 1922 said that "neither the Fourteenth Amendment nor any other provision of the Constitution of the United States imposes upon the States any restrictions about 'freedom of speech' * * *," Prudential Ins. Co. of America v. Cheek, 259 U.S. 530, 543, 42 S.Ct. 516, 522, 66 L.Ed. 1044, three years later Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, initiated a series of decisions which today hold immune from state invasion every First Amendment protection for the cherished rights of mind and spirit—the freedoms of speech, press, religion, assembly, association, and petition for redress of grievances.[4]

Similarly, Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, decided in 1937, suggested that the rights secured by the Fourth Amendment were not protected against state action, citing 302 U.S., at 324, 58 S.Ct., at 151, the statement of the Court in 1914 in Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 346, that "the 4th Amendment is not directed to individual misconduct of [state] officials." In 1961, however, the

*

Court held that in the light of later decisions,[5] it was taken as settled that "* * * the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth * * *." Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081. Again, although the Court held in 1942 that in a state prosecution for a noncapital offense, "appointment of counsel is not a fundamental right," Betts v. Brady, 316 U.S. 455, 471, 62 S.Ct. 1252, 1261, 86 L.Ed. 1595; cf. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, only last Term this decision was re-examined and it was held that provision of counsel in all criminal cases was "a fundamental right, essential to a fair trial," and thus was made obligatory on the States by the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 343-344, 83 S.Ct. 792, 796.[6]

[1] We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States. Decisions of the Court since Twining and Adamson have departed from the contrary view expressed in those cases. We discuss

---

4. E. g., Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 629 (speech and press); Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (speech and press); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (speech and press); Staub v. City of Baxley, 355 U.S. 313, 321, 78 S.Ct. 277, 281, 2 L.Ed.2d 302 (speech); Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (press); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (religion); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (assembly); Shelton v. Tucker, 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (association); Louisiana ex rel. Gremillion v. N. A. A. C. P., 366 U.S. 293, 296, 81 S.Ct. 1333, 1335,

6 L.Ed.2d 301 (association); N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (association and speech); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (association).

5. See Wolf v. Colorado, 338 U.S. 25, 27-28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782; Elkins v. United States, 364 U.S. 206, 213, 80 S.Ct. 1437, 1441, 4 L.Ed.2d 1669.

6. See also Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, which, despite In re Kemmler, supra; McElvaine v. Brush, supra; O'Neil v. Vermont, supra, made applicable to the States the Eighth Amendment's ban on cruel and unusual punishments.

RPI 0144

first the decisions which forbid the use of coerced confessions in state criminal prosecutions.

[2, 3] Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, was the first case in which the Court held that the Due Process Clause prohibited the States from using the accused's coerced confessions against him. The Court in Brown felt impelled, in light of Twining, to say that its conclusion did not involve the privilege against self-incrimination. "Compulsion by torture to extort a confession is a different matter." 297 U.S., at 285, 56 S.Ct., at 464. But this distinction was soon

7

abandoned, and today the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' " Id., 168 U.S. at 542, 18 S.Ct. at 187. Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * *" Id., 168 U.S. at 542–543, 18 S.Ct. at 186–187; see also Hardy v. United States, 186 U.S. 224, 229, 22 S.Ct. 889, 891, 46 L.Ed. 1137; Ziang Sun Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 3, 69 L.Ed. 181; Smith v. United States, 348 U.S. 147, 150, 75 S.Ct. 194, 196, 99 L.Ed. 192. In other words the person must not have been

compelled to incriminate himself. We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513.

[4–7] The marked shift to the federal standard in state cases began with Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166, where the Court spoke of the accused's "free choice to admit, to deny, or to refuse to answer." Id., 314 U.S. at 241, 62 S.Ct. at 292. See Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Lynumn v. Illinois, 372 U.S. 528, 83 S. Ct. 917, 9 L.Ed.2d 922; Haynes v. Washington, 373 U.S. 503. The shift reflects recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. Rogers v. Richmond, 365 U.S. 534,

8

541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760. Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth. Since the Fourteenth Amendment prohibits the States from inducing a person to confess through "sympathy falsely aroused," Spano v. New York, supra, 360 U.S., at 323, 79 S.Ct., at 1207, or other like inducement far short of "compulsion by torture," Haynes v. Washington, supra, it follows a fortiori that it also forbids the States to resort to imprisonment, as here, to compel him to answer questions that might incriminate him. The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and

RPI 0145

to suffer no penalty, as held in Twining, for such silence.

This conclusion is fortified by our recent decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1859, 93 L.Ed. 1782, which had held "that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure," 338 U.S., at 33, 69 S.Ct., at 1364. Mapp held that the Fifth Amendment privilege against self-incrimination implemented the Fourth Amendment in such cases, and that the two guarantees of personal security conjoined in the Fourteenth Amendment to make the exclusionary rule obligatory upon the States. We relied upon the great case of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, decided in 1886, which, considering the Fourth and Fifth Amendments as running "almost into each other," id., 116 U.S., at 630, 6 S.Ct., at 532, held that "Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within

the condemnation of [those Amendments] * * *." 116 U.S., at 630, 6 S.Ct., at 532. We said in Mapp:

"We find that, as to the Federal Government the Fourth and Fifth Amendments and, as to the States,

the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty [secured] * * * only after years of struggle.' Bram v. United States, 1897, 168 U.S. 532, 543–544, 18 S.Ct. 183 * * *. The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence." 367 U.S., at 656–657, 81 S.Ct., at 1692.

In thus returning to the Boyd view that the privilege is one of the "principles of a free government," 116 U.S., at 632, 6 S.Ct., at 533,[7] Mapp necessarily repudiated the Twining concept of the privilege as a mere rule of evidence "best defended not as an unchangeable principle of universal justice, but as a law proved by experience to be expedient." 211 U.S., at 113, 29 S.Ct., at 25.

[8] The respondent Sheriff concedes in its brief that under our decisions, particularly those involving coerced confessions, "the accusatorial system has become a fundamental part of the fabric of our society and, hence, is enforceable against the States."[8] The State urges, however, that the availability of the fed-

---

7. Boyd had said of the privilege, "* * * any compulsory discovery by extorting the party's oath * * * to convict him of crime * * * is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom." 116 U.S., at 631–632, 6 S.Ct., at 533.

Dean Griswold has said: "I believe the Fifth Amendment is, and has been through this period of crisis, an expression of the moral striving of the community. It has been a reflection of our common conscience, a symbol of the America which stirs our hearts." The Fifth Amendment Today 73 (1955).

8. The brief states further:

"Underlying the decisions excluding coerced confessions is the implicit assumption that an accused is privileged against incriminating himself, either in the jail house, the grand jury room, or on the witness stand in a public trial. * * *

"* * * It is fundamentally inconsistent to suggest, as the Court's opinions now suggest, that the State is en-

eral privilege to a witness in a state inquiry is to be determined according to a less stringent standard than is applicable in a federal proceeding. We disagree. We have held that the guarantees of the First Amendment, Gitlow v. New York, supra; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; Louisiana ex rel. Gremillion v. N.A.A. C.P., 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed. 2d 301, the prohibition of unreasonable searches and seizures of the Fourth Amendment, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, and the right to counsel guaranteed by the Sixth Amendment, Gideon v. Wainwright, supra, are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment. In the coerced confession cases, involving the policies of the privilege itself, there has been no suggestion that a confession might be considered coerced if used in a federal but not a state tribunal. The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a "watered-down, subjective version of the individual

11

guarantees of the Bill of Rights," Ohio ex rel. Eaton v. Price, 364 U.S. 263, 275, 80 S. Ct. 1463, 1470, 4 L.Ed.2d 1708 (dissenting opinion). If Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, and Adamson v. California, supra, suggest such an application of the privilege against self-incrimination, that suggestion cannot survive recognition of the degree to which the Twining view of the privilege has been eroded. What is accorded is a privilege of refusing to incriminate one's self, and the feared prosecution may be by either federal or state authorities. Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594. It

would be incongruous to have different standards determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in a state or federal court. Therefore, the same standards must determine whether an accused's silence in either a federal or state proceeding is justified.

[9, 10] We turn to the petitioner's claim that the State of Connecticut denied him the protection of his federal privilege. It must be considered irrelevant that the petitioner was a witness in a statutory inquiry and not a defendant in a criminal prosecution, for it has long been settled that the privilege protects witnesses in similar federal inquiries. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158; Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118. We recently elaborated the content of the federal standard in Hoffman:

"The privilege afforded not only extends to answers that would in themselves support a conviction * * * but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute. * * * [I]f the witness, upon interposing his claim, were required to prove the hazard * * * he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is

12

asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injuri-

tirely free to compel an accused to incriminate himself before a grand jury, or at the trial, but cannot do so in the police station. Frank recognition of the fact that the Due Process Clause prohibits the States from enforcing their laws by compelling the accused to con-

fess, regardless of where such compulsion occurs, would not only clarify the principles involved in confession cases, but would assist the States significantly in their efforts to comply with the limitations placed upon them by the Fourteenth Amendment."

RPI 0147

ous disclosure could result." 341 U. S., at 486-487, 71 S.Ct. at 818.

We also said that, in applying that test, the judge must be

"'*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." 341 U.S., at 488, 71 S.Ct., at 819.

The State of Connecticut argues that the Connecticut courts properly applied the federal standards to the facts of this case. We disagree.

The investigation in the course of which petitioner was questioned began when the Superior Court in Hartford County appointed the Honorable Ernest A. Inglis, formerly Chief Justice of Connecticut, to conduct an inquiry into whether there was reasonable cause to believe that crimes, including gambling, were being committed in Hartford County. Petitioner appeared on January 16 and 25, 1961, and in both instances he was asked substantially the same questions about the circumstances surrounding his arrest and conviction for pool selling in late 1959. The questions which petitioner refused to answer may be summarized as follows: (1) for whom did he work on September 11, 1959; (2) who selected and paid his counsel in connection with his arrest on that date and subsequent conviction; (3) who selected and paid his bondsman; (4) who paid his fine; (5) what was the name of the tenant of the apartment in which he was arrested; and (6) did he know John

Bergoti. The Connecticut Supreme Court of Errors ruled that the answers to these questions could not tend to incriminate him because the defenses of double jeopardy and the running of the one-year statute of limitations on misdemeanors would defeat any prosecution growing out of his answers to the first [12] five questions. As for the sixth question, the court held that petitioner's failure to explain how a revelation of his relationship with Bergoti would incriminate him vitiated his claim to the protection of the privilege afforded by state law.

The conclusions of the Court of Errors, tested by the federal standard, fail to take sufficient account of the setting in which the questions were asked. The interrogation was part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the State at oral argument—and indeed it is obvious from the questions themselves—that the State desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted.[*]

Analysis of the sixth question, concerning whether petitioner knew John Bergoti, yields a similar conclusion. In the context of the inquiry, it should have been apparent to the referee that Ber-

9. See Greenberg v. United States, 343 U.S. 918, 72 S.Ct. 674, 96 L.Ed. 1332, reversing per curiam, 3 Cir., 192 F.2d 201; Singleton v. United States, 343 U.S. 944, 72 S.Ct. 1041, 96 L.Ed. 1349, reversing per curiam, 3 Cir., 193 F.2d 464. In United States v. Coffey, 198 F.2d 438 (C.A.3d Cir.), cited with approval in Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997, the Court

of Appeals for the Third Circuit stated: "in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical; rather must he be acutely aware that in the deviousness of crime and its detection incrimination may be approached and achieved by obscure and unlikely lines of inquiry." 198 F.2d, at 440-441.

RPI 0148

goti was suspected by the State to be involved in some way in the subject matter of the investigation. An affirmative answer to the question

14

might well have either connected petitioner with a more recent crime, or at least have operated as a waiver of his privilege with reference to his relationship with a possible criminal. See Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344. We conclude, therefore, that as to each of the questions, it was "evident from the implications of the question, in the setting in which it [was] asked, that a responsive answer to the question or an explanation of why it [could not] be answered might be dangerous because injurious disclosure could result," Hoffman v. United States, 341 U.S., at 486-487, 71 S.Ct. 818; see Singleton v. United States, 343 U.S. 944, 72 S.Ct. 1041.

Reversed.

While Mr. Justice DOUGLAS joins the opinion of the Court, he also adheres to his concurrence in Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 797.

Mr. Justice HARLAN, whom Mr. Justice CLARK joins, dissenting.

Connecticut has adjudged this petitioner in contempt for refusing to answer questions in a state inquiry. The courts of the State, whose laws embody a privilege against self-incrimination, refused to recognize the petitioner's claim of privilege, finding that the questions asked him were not incriminatory. This Court now holds the contempt adjudication unconstitutional because, it is decided: (1) the Fourteenth Amendment makes the Fifth Amendment privilege against self-incrimination applicable to the States; (2) the federal standard justifying a claim of this privilege likewise applies to the States; and (3) judged by that standard the petitioner's claim of privilege should have been upheld.

84 S.Ct.—94½

Believing that the reasoning behind the Court's decision carries extremely mischievous, if not dangerous, consequences for our federal system in the realm of criminal

15

law enforcement, I must dissent. The importance of the issue presented and the serious incursion which the Court makes on time-honored, basic constitutional principles justify a full exposition of my reasons.

I.

I can only read the Court's opinion as accepting in fact what it rejects in theory: the application to the States, via the Fourteenth Amendment, of the forms of federal criminal procedure embodied within the first eight Amendments to the Constitution. While it is true that the Court deals today with only one aspect of state criminal procedure, and rejects the wholesale "incorporation" of such federal constitutional requirements, the logical gap between the Court's premises and its novel constitutional conclusion can, I submit, be bridged only by the additional premise that the Due Process Clause of the Fourteenth Amendment is a shorthand directive to this Court to pick and choose among the provisions of the first eight Amendments and apply those chosen, freighted with their entire accompanying body of federal doctrine, to law enforcement in the States.

I accept and agree with the proposition that continuing re-examination of the constitutional conception of Fourteenth Amendment "due process" of law is required, and that development of the community's sense of justice may in time lead to expansion of the protection which due process affords. In particular in this case, I agree that principles of justice to which due process gives expression, as reflected in decisions of this Court, prohibit a State, as the Fifth Amendment prohibits the Federal Government, from imprisoning a person *solely* because he refuses to give evidence which may incriminate him under the laws of the

RPI 0149

State.[1] I do not understand, however, how this process of re-examination, which must refer always to the guiding standard of due process of law, including, of course, reference to the particular guarantees of the Bill of Rights, can be short-circuited by the simple device of incorporating into due process, without critical examination, the whole body of law which surrounds a specific prohibition directed against the Federal Government. The consequence of such an approach to due process as it pertains to the States is inevitably disregard of all relevant differences which may exist between state and federal criminal law and its enforcement. The ultimate result is compelled uniformity, which is inconsistent with the purpose of our federal system and which is achieved either by encroachment on the States' sovereign powers or by dilution in federal law enforcement of the specific protections found in the Bill of Rights.

II.

As recently as 1961, this Court reaffirmed that "the Fifth Amendment's privilege against self-incrimination," ante, p. 1491, was not applicable against the States. Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954. The question had been most fully explored in Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14. Since 1908, when Twining was decided, this Court has adhered to the view there expressed that "the exemption from compulsory self-incrimination in the courts of the states is not secured by any part of the Federal Constitution," 211 U.S., at 114, 29 S.Ct., at 26; Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330; Brown v. Mississippi, 297 U.S. 278, 285, 56 S.Ct. 461, 464; Palko v. Connecticut, 302 U.S. 319, 324, 58 S.Ct. 149, 151; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903; Knapp v. Schweitzer, 357 U.S. 371, 374, 78 S.Ct. 1302, 1304, 2 L.Ed.2d 1393; Cohen, supra. Although none of these cases involved a commitment to prison for refusing to incriminate oneself under state law, and they are relevantly distinguishable from this case on that narrow ground,[2] it is perfectly clear from them that until today it has been regarded as settled law that the Fifth Amendment privilege did not, by any process of reasoning, apply as such to the States.

The Court suggests that this consistent line of authority has been undermined by the concurrent development of constitutional doctrine in the areas of coerced confessions and search and sei-

---

1. That precise question has not heretofore been decided by this Court. Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, and the cases which followed it, see infra, p. 1498, all involved issues not precisely similar. Although the Court has stated broadly that an individual could "be required to incriminate himself in * * * state proceedings," Cohen v. Hurley, 366 U.S. 117, 127, 81 S.Ct. 954, 960, the context in which such statements were made was that the State had in each case recognized the right to remain silent. In Twining, supra, until now the primary authority, the Court noted that "all the states of the Union have, from time to time, with varying form, but uniform meaning, included the privilege in their Constitutions, except the states of New Jersey and Iowa, and in those states it is held to be part of the existing law," 211 U.S., at 92, 29 S.Ct., at 16.

While I do not believe that the coerced confession cases furnish any basis for incorporating the Fifth Amendment into the Fourteenth, see infra, pp. 1498–1500, they do, it seems to me, carry an implication that coercion to incriminate oneself, even when under the forms of law, cf. Brown v. Mississippi, 297 U.S. 278, 285, 56 S.Ct. 461, 464, discussed infra, p. 1499, is inconsistent with due process. Since every State already recognizes a privilege against self-incrimination so defined, see VIII Wigmore, Evidence (McNaughton rev. 1961), § 2252, the effect of including such a privilege in due process is only to create the possibility that a federal question, to be decided under the Due Process Clause, would be raised by a State's refusal to accept a claim of the privilege.

2. See note 1, supra.

RPI 0150

zure. That is *post facto* reasoning at best. Certainly there has been no intimation until now that Twining has been tacitly overruled.

It was in Brown v. Mississippi, supra, that this Court first prohibited the use of a coerced confession in a state criminal trial. The petitioners in Brown had been tortured

until they confessed. The Court was hardly making an artificial distinction when it said:

"* * * [T]he question of the right of the state to withdraw the privilege against self-incrimination is not here involved. The compulsion to which the quoted statements [from Twining and Snyder, supra,] refer is that of the *processes of justice* by which the accused may be called as a witness and required to testify. *Compulsion by torture to extort a confession is a different matter.*"[3] 297 U.S., at 285, 56 S.Ct. at 464. (Emphasis supplied.)

The majority is simply wrong when it asserts that this perfectly understandable distinction "was soon abandoned," ante, p. 1493. In none of the cases cited, ante pp. 1493-1494, in which was developed the full sweep of the constitutional prohibition against the use of coerced confessions at state trials, was there anything to suggest that the Fifth Amendment was being made applicable to state

proceedings. In Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, the privilege against self-incrimination is not mentioned. The relevant question before the Court was whether "the evidence [of coercion] requires that we set aside the finding of two courts and a jury and adjudge the admission of the confessions so fundamentally unfair, so contrary to the common concept of ordered liberty as to amount to a taking of life without due process of law." Id., 314 U.S. at 238, 62 S.Ct. at 291. The question was the same in Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; the Court there adverted to the "third degree." e. g., id., 322 U.S. at 150, note 5, 64 S.Ct. at 924, and "secret inquisitorial practices,"

id., 322 U.S. at 152, 64 S.Ct. at 925. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, is the same; the privilege against self-incrimination is not mentioned.[4] So too in Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202; Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917; and Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336. Finally, in Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, although the Court did recognize that "ours is an accusatorial and not an inquisitorial system," id., 365 U.S. at 541, 81 S.Ct. at 739, it is clear that the Court was concerned only with the problem of coerced confessions, see ibid.; the opinion includes nothing to support the Court's assertion here, ante, p. 1493, that

3. Nothing in the opinion in Brown supports the Court's intimation here, ante, p. 1493, that if Twining had not been on the books, reversal of the convictions would have been based on the Fifth Amendment. The Court made it plain in Brown that it regarded the trial use of a confession extracted by torture as on a par with domination of a trial by a mob, see. e. g., Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, where the trial "is a mere pretense," 297 U.S., at 286, 56 S.Ct., at 465.

4. "And so, when a conviction in a state court is properly here for review, under a claim that a right protected by the Fourteenth Amendment has been de-

nied, the question is not whether the record can be found to disclose an infraction of one of the specific provisions of the first eight amendments. To come concretely to the present case, the question is not whether the record permits a finding, by a tenuous process of psychological assumptions and reasoning, that Malinski by means of a confession was forced to self-incrimination in defiance of the Fifth Amendment. The exact question is whether the criminal proceedings which resulted in his conviction deprived him of the due process of law by which he was constitutionally entitled to have his guilt determined." Malinski, supra, 324 U.S. at 416, 65 S.Ct. at 788 (opinion of Frankfurter, J.).

RPI 0151

"the Fifth Amendment privilege is * * [the] essential mainstay" of our system.

In Adamson, supra, the Court made it explicit that it did not regard the increasingly strict standard for determining the admissibility at trial of an out-of-court confession as undermining the holding of Twining. After stating that "the due process clause does not protect, by virtue of its mere existence the accused's freedom from giving testimony by compulsion in state trials that is secured to him against federal interference by the Fifth Amendment," the Court said: "The due process clause forbids compulsion to testify by fear of hurt, torture or exhaustion. It forbids any other type of coercion that falls within the scope of due process." 332 U.S., at 54, 67 S.Ct. at 1676.

20

(footnotes omitted). Plainly, the Court regarded these two lines of cases as distinct. See also Palko v. Connecticut, supra, 302 U.S., at 326, 58 S.Ct. at 152, to the same effect.[5] Cohen, supra, which adhered to Twining, was decided after all but a few of the confession cases which the Court mentions.

The coerced confession cases are relevant to the problem of this case not because they overruled Twining sub silentio, but rather because they applied the same standard of fundamental fairness which is applicable here. The recognition in them that federal supervision of state criminal procedures must be directly based on the requirements of due process is entirely inconsistent with the theory here espoused by the majority. The parallel treatment of federal and state cases involving coerced confessions resulted from the fact that the same demand of due process was applicable in both; it was not the consequence of the automatic engrafting of federal law construing constitutional provisions inapplicable to the States onto the Fourteenth Amendment.

The decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, that evidence unconstitutionally seized, see Wolf v. Colorado, 338 U.S. 25, 28, 69 S.Ct. 1359, 1361, may not be used in a state criminal trial furnishes no "fortification," see ante, p. 1494, for today's decision. The very passage from the Mapp opinion which the Court quotes, ante, p. 1494 makes explicit the distinct bases of the exclusionary rule as applied in federal and state courts:

"We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation'

21

in their perpetuation of 'principles of humanity and civil liberty [secured] * * * only after years of struggle,' Bram v. United States, 1897, 168 U.S. 532, 543–544, 18 S. Ct. 183, 187." 367 U.S., at 656–657, 81 S.Ct., at 1692 (footnote omitted). See also id., 367 U.S. at 655, 81 S. Ct., at 1691.

Although the Court discussed Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, a federal case involving both the Fourth and Fifth Amendments, nothing in Mapp supports the statement, ante, p. 1494, that the Fifth Amendment was part of the basis for extending the exclusionary rule to the States. The elaboration of Mapp in Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, did in my view make the Fourth Amendment applicable to the States through the Fourteenth; but there is nothing in it to suggest that the Fifth Amendment went along as baggage.

### III.

The previous discussion shows that this Court's decisions do not dictate the "incorporation" of the Fifth Amend-

---

5. In Adamson and Palko, supra, which adhered to the rule announced in Twining, supra, the Court cited some of the very cases now relied on by the majority to show that Twining was gradually being eroded. 332 U.S., at 54, notes 12, 13, 67 S.Ct., at 1676; 302 U.S., at 325, 326, 58 S.Ct., at 151, 152.

RPI 0152

ment's privilege against self-incrimination into the Fourteenth Amendment. Approaching the question more broadly, it is equally plain that the line of cases exemplified by Palko v. Connecticut, supra, in which this Court has reconsidered the requirements which the Due Process Clause imposes on the States in the light of current standards, furnishes no general theoretical framework for what the Court does today.

The view of the Due Process Clause of the Fourteenth Amendment which this Court has consistently accepted and which has "thus far prevailed," ante, p. 1491, is that its requirements are as "old as a principle of civilized government," Munn v. Illinois, 94 U.S. 113, 123, 24 L.Ed. 77, the specific applications of which must be ascertained "by the gradual process of judicial inclusion and exclusion * * *," Davidson v. New Orleans, 96 U.S. 97, 104, 24 L.Ed. 616. Due process requires "observance of those general rules established in our system of jurisprudence for the security of private rights." Hagar v. Reclamation District No. 108, 111 U.S. 701, 708, 4 S.Ct. 663, 667, 28 L.Ed. 569. See Hurtado v. California, 110 U.S. 516, 537, 4 S.Ct. 111, 121.

"This court has never attempted to define with precision the words 'due process of law' * * *. It is sufficient to say that there are certain immutable principles of justice, which inhere in the very idea of free government, which no member of the Union may disregard * * *." Holden v. Hardy, 169 U.S. 366, 389, 18 S.Ct. 383, 387, 42 L.Ed. 780.

It followed from this recognition that due process encompassed the fundamental safeguards of the individual against the abusive exercise of governmental power that some of the restraints on the Federal Government which were specifically enumerated in the Bill of Rights applied also against the States. But, while inclusion of a particular provision in the Bill of Rights might provide historical evidence that the right involved was traditionally regarded as fundamental, inclusion of the right in due process was otherwise entirely independent of the first eight Amendments:

"* * * [I]t is possible that some of the personal rights safeguarded by the first eight Amendments against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. * * * If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law." Twining, supra, 211 U.S. at 99, 29 S.Ct. at 19. (Emphasis supplied.)

Relying heavily on Twining, Mr. Justice Cardozo provided what may be regarded as a classic expression of this approach in Palko v. Connecticut, supra. After considering a number of individual rights (including the right

23

not to incriminate oneself) which were "not of the very essence of a scheme of ordered liberty," id., 302 U.S. at 325, 58 S.Ct. at 152, he said:

"We reach a different plane of social and moral values when we pass to the privileges and immunities that have been taken over from the earlier articles of the Federal Bill of Rights and brought within the Fourteenth Amendment by a process of absorption. These in their origin were effective against the federal government alone. If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed." Id., 302 U.S. at 326, 58 S.Ct. at 152.

Further on, Mr. Justice Cardozo made the independence of the Due Process

RPI 0153

Clause from the provisions of the first eight Amendments explicit:

"Fundamental * * * in the concept of due process, and so in that of liberty, is the thought that condemnation shall be rendered only after trial. Scott v. McNeal, 154 U.S. 34, 14 S.Ct. 1108, 38 L.Ed. 896; Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375. The hearing, moreover, must be a real one, not a sham or a pretense. Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. For that reason, ignorant defendants in a capital case were held to have been condemned unlawfully when in truth, though not in form, they were refused the aid of counsel. Powell v. Alabama, supra, 287 U.S. 45, at pages 67, 68, 53 S.Ct. 55, 63, 77 L.Ed. 158, 84 A.L.R. 527. The decision did not turn upon the fact that the benefit of counsel would have been guaranteed to the defendants by the provisions of the Sixth Amendment if they had been prosecuted in a federal court. The decision turned upon the fact that in the particular situation laid before us in the evidence the benefit of counsel was essential to the substance of a hearing." Id., 302 U.S. at 327, 58 S.Ct. at 153.

It is apparent that Mr. Justice Cardozo's metaphor of "absorption" was not intended to suggest the transplantation of case law surrounding the specifics of the first eight Amendments to the very different soil of the Fourteenth Amendment's Due Process Clause. For, as he made perfectly plain, what the Fourteenth Amendment requires of the States does not basically depend on what the first eight Amendments require of the Federal Government.

Seen in proper perspective, therefore, the fact that First Amendment protections have generally been given equal scope in the federal and state domains or that in some areas of criminal procedure the Due Process Clause demands as much of the States as the Bill of Rights demands of the Federal Government, is only tangentially relevant to the question now before us. It is toying with constitutional principles to assert that the Court has "rejected the notion that the Fourteenth Amendment applies to the states only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights,'" ante, p. 1495. What the Court has with the single exception of the Ker case, supra, p. 1500; see infra, p. 1503, consistently rejected is the notion that the Bill of Rights, as such, applies to the States in any aspect at all.

If one attends to those areas to which the Court points, ante, p. 1494, in which the prohibitions against the state and federal governments have moved in parallel tracks, the cases in fact reveal again that the Court's usual approach has been to ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments. Although more recently the Court has referred to the First Amendment to describe the protection of free expression against state infringement, earlier cases leave no doubt that such references are "shorthand" for doctrines developed by another route. In Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, for example, the Court said:

"For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."

The Court went on to consider the extent of those freedoms in the context of state

RPI 0154

interests. Mr. Justice Holmes, in dissent, said:

"The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States." Id., 268 U.S. at 672, 45 S.Ct. at 632.

Chief Justice Hughes, in De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 260, gave a similar analysis:

"Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. * * * The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this Court said in United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588: 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' The First Amendment of the Federal Constitution expressly guarantees that right against abridgment

by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions—principles which the Fourteenth Amendment embodies in the general terms of its due process clause."

The coerced confession and search and seizure cases have already been considered. The former, decided always directly on grounds of fundamental fairness, furnish no support for the Court's present views. Ker v. California, supra, did indeed incorporate the Fourth Amendment's protection against invasions of privacy into the Due Process Clause. But that case should be regarded as the exception which proves the rule.[6] The right to counsel in state criminal proceedings, which this Court assured in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, does not depend on the Sixth Amendment. In Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, this Court had said:

"Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against state action in identical words by the Fourteenth. The phrase formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." (Footnote omitted.)

Although Gideon overruled Betts, the constitutional approach in both cases was the same. Gideon was based on the Court's conclusion, contrary to that reached in Betts, that the appointment of counsel for an indigent criminal defendant *was* essential to the conduct of a fair trial, and was therefore part of due process. 372 U.S., at 342–345, 83 S.Ct. at 795–797.

6. Cf. the majority and dissenting opinions in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509.

RPI 0155

The Court's approach in the present case is in fact nothing more or less than "incorporation" in snatches. If, however, the Due Process Clause *is* something more than a reference to the Bill of Rights and protects only those rights which derive from fundamental principles, as the majority purports to believe, it is just as contrary to precedent and just as illogical to incorporate the provisions of the Bill of Rights one at a time as it is to incorporate them all at once.

### IV.

The Court's undiscriminating approach to the Due Process Clause carries serious implications for the sound working of our federal system in the field of criminal law.

The Court concludes, almost without discussion, that "the same standards must determine whether an accused's silence in either a federal or state proceeding is justified," ante, p. 1495. About all that the Court offers in explanation of this conclusion is the observation that it would be "incongruous" if different standards governed the assertion of a privilege to remain silent in state and federal tribunals. Such "incongruity," however, is at the heart of our federal system. The powers and responsibilities of the state and federal governments are not congruent; under our Constitution, they are not intended to be. Why should it be thought, as an *a priori* matter, that limitations on the investigative power of the States are in all respects identical with limitations on the investigative power of the Federal Government? This certainly

does not follow from the fact that we deal here with constitutional requirements; for the provisions of the Constitution which are construed are different.

As the Court pointed out in Abbate v. United States, 359 U.S. 187, 195, 79 S.Ct. 666, 671, 3 L.Ed.2d 729, "the States under our federal system have the principal responsibility for defining and prosecuting crimes." The Court endangers this

allocation of responsibility for the prevention of crime when it applies to the States doctrines developed in the context of federal law enforcement, without any attention to the special problems which the States as a group or particular States may face. If the power of the States to deal with local crime is unduly restricted, the likely consequence is a shift of responsibility in this area to the Federal Government, with its vastly greater resources. Such a shift, if it occurs, may in the end serve to weaken the very liberties which the Fourteenth Amendment safeguards by bringing us closer to the monolithic society which our federalism rejects. Equally dangerous to our liberties is the alternative of watering down protections against the Federal Government embodied in the Bill of Rights so as not unduly to restrict the powers of the States. The dissenting opinion in Aguilar v. Texas, 378 U.S., p. 116, 84 S.Ct., p. 1515, evidences that this danger is not imaginary. See my concurring opinion in Aguilar, ibid.

Rather than insisting, almost by rote, that the Connecticut court, in considering the petitioner's claim of privilege, was required to apply the "federal standard," the Court should have fulfilled its responsibility under the Due Process Clause by inquiring whether the proceedings below met the demands of fundamental fairness which due process embodies. Such an approach may not satisfy those who see in the Fourteenth Amendment a set of easily applied "absolutes" which can afford a haven from unsettling doubt. It is, however, truer to the spirit which requires this Court constantly to re-examine fundamental

principles and at the same time enjoins it from reading its own preferences into the Constitution.

The Connecticut Supreme Court of Errors gave full and careful consideration to the petitioner's claim that he would incriminate himself if he answered the questions put to him. It noted that its decisions "from a time antedating the

RPI 0156

adoption of * * * [the Connecticut] constitution in 1818" had upheld a privilege to refuse to answer incriminating questions. 150 Conn. 220, 223, 187 A.2d 744, 746. Stating that federal cases treating the Fifth Amendment privilege had "persuasive force" in interpreting its own constitutional provision, and citing Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, in particular, the Supreme Court of Errors described the requirements for assertion of the privilege by quoting from one of its own cases, id., 150 Conn., at 225, 187 A.2d, at 747:

"[A] witness * * * has the right to refuse to answer any question which would tend to incriminate him. But a mere claim on his part that the evidence will tend to incriminate him is not sufficient. * * [He having] made his claim, it is then * * * [necessary for the judge] to determine in the exercise of a legal discretion whether, from the circumstances of the case and the nature of the evidence which the witness is called upon to give, there is reasonable ground to apprehend danger of criminal liability from his being compelled to answer. That danger 'must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by,

should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios*, protection against being brought by means of his own evidence within the penalties of the law.

84 S.Ct.—95

But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.' Cockburn, C. J., in Regina v. Boyes, 1 B. & S. 311, 330 * * *.'" McCarthy v. Clancy, 110 Conn. 482, 488–489, 148 A. 551, 555.

The court carefully applied the above standard to each question which the petitioner was asked. It dealt first with the question whether he knew John Bergoti. The court said:

"Bergoti is nowhere described or in any way identified, either as to his occupation, actual or reputed, or as to any criminal record he may have had. * * * Malloy made no attempt even to suggest to the court how an answer to the question whether he knew Bergoti could possibly incriminate him. * * * On this state of the record the question was proper, and Malloy's claim of privilege, made without explanation, was correctly overruled. Malloy 'chose to keep the door tightly closed and to deny the court the smallest glimpse of the danger he apprehended. He cannot then complain that we see none.' In re Pillo, 11 N.J. 8, 22, 93 A.2d 176, 183 * * *.'" 150 Conn., at 226–227, 187 A.2d, at 748.

The remaining questions are summarized in the majority's opinion, ante, p. 1496. All of them deal with the circumstances surrounding the petitioner's conviction on a gambling charge in 1959. The court declined to decide

"whether, on their face and apart from any consideration of Malloy's immunity from prosecution, the questions should or should not have been answered in the light of his failure to give any hint of explanation as to how answers to them could incriminate him." 150 Conn., at 227, 187 A.2d, at 748. The court considered the State's

claim that the petitioner's prior conviction was sufficient to clothe him with immunity from prosecution for other crimes to which the questions might pertain, but declined to rest its decision on that basis. Id., 150 Conn., at 227–229, 187 A.2d, at 748–749. The court concluded, however, that the running of the statute of limitations on misdemeanors committed in 1959 and the absence of any indication that Malloy had engaged in any crime other than a misdemeanor removed all appearance of danger of incrimination from the questions propounded concerning the petitioner's activities in 1959. The court summarized this conclusion as follows:

> "In all this, Malloy confounds vague and improbable possibilities of prosecution with reasonably appreciable ones. Under claims like his, it would always be possible to work out some finespun and improbable theory from which an outside chance of prosecution could be envisioned. Such claims are not enough to support a claim of privilege, at least where, as here, a witness suggests no rational explanation of his fears of incrimination, and the questions themselves, under all the circumstances, suggest none." Id., 150 Conn., at 230–231, 187 A.2d, at 750.

Peremptorily rejecting all of the careful analysis of the Connecticut court, this Court creates its own "finespun and improbable theory" about how these questions might have incriminated the petitioner. With respect to his acquaintance with Bergoti, this Court says only:

> "In the context of the inquiry, it should have been apparent to the referee that Bergoti was suspected by the State to be involved in some way in the subject matter of the investigation. An affirmative answer to the question might well have either connected petitioner with a more recent crime, or at least have operated as a waiver of his privilege

with reference to his relationship with a possible criminal." Ante, pp. 1496–1497.

The other five questions, treated at length in the Connecticut court's opinion, get equally short shrift from this Court; it takes the majority, unfamiliar with Connecticut law and far removed from the proceedings below, only a dozen lines to consider the questions and conclude that they were incriminating:

> "The interrogation was a part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the State at oral argument—and indeed it is obvious from the questions themselves—that the State desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted." (Footnote omitted.) Ante, p. 1496.

I do not understand how anyone could read the opinion of the Connecticut court and conclude that the state law which was the basis of its decision or the decision itself was lacking in fundamental fairness. The truth of the matter is that under any standard—state or federal— the commitment for contempt was proper. Indeed, as indicated above, there is every reason to believe that the Connecticut court did apply the Hoffman standard [33] quoted approvingly in the majority's opinion. I entirely agree with my Brother WHITE, post, pp. 1508–1509, that if the matter is viewed only from the standpoint of the federal standard, such standard was fully satisfied. The Court's reference to a federal standard is, to put it bluntly, simply an excuse for the Court to

RPI 0158

substitute its own superficial assessment of the facts and state law for the careful and better informed conclusions of the state court. No one who scans the two opinions with an objective eye will, I think, reach any other conclusion.

I would affirm.

Mr. Justice WHITE, with whom Mr. Justice STEWART joins, dissenting.

### I.

The Fifth Amendment safeguards an important complex of values, but it is difficult for me to perceive how these values are served by the Court's holding that the privilege was properly invoked in this case. While purporting to apply the prevailing federal standard of incrimination—the same standard of incrimination that the Connecticut courts applied—the Court has all but stated that a witness' invocation of the privilege to any question is to be automatically, and without more, accepted. With deference, I prefer the rule permitting the judge rather than the witness to determine when an answer sought is incriminating.

The established rule has been that the witness' claim of the privilege is not final, for the privilege qualifies a citizen's general duty of disclosure only when his answers would subject him to danger from the criminal law. The privilege against self-incrimination or any other evidentiary privilege does not protect silence which is solely an expression of political protest, a desire not to inform, a fear of social obloquy or economic disadvantage or fear of prosecution for future crimes. Smith v. United States,

337 U.S. 137, 147, 69 S.Ct. 1000, 1005, 93 L.Ed. 1264; Brown v. Walker, 161 U.S. 591, 605, 16 S.Ct. 644, 650, 40 L.Ed. 819. If the general duty to testify when subpoenaed is to remain and the privilege is to be retained as a protection against compelled incriminating answers, the trial judge must be permitted to make a meaningful determination of when answers tend to incriminate. See

The Queen v. Boyes, 1 B. & S. 311, 329-330 (1861); Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198. I do not think today's decision permits such a determination.

Answers which would furnish a lead to other evidence needed to prosecute or convict a claimant of a crime—clue evidence—cannot be compelled, but "this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S. 479, at 486, 71 S.Ct. 814, at 818; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621. Of course the witness is not required to disclose so much of the danger as to render his privilege nugatory. But that does not justify a flat rule of no inquiry and automatic acceptance of the claim of privilege. In determining whether the witness has a reasonable apprehension, the test in the federal courts has been that the judge is to decide from the circumstances of the case, his knowledge of matters surrounding the inquiry and the nature of the evidence which is demanded from the witness. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621. Cf. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438. This rule seeks and achieves a workable accommodation between what are obviously important competing interests. As Mr. Chief Justice Marshall said: "The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. * * * When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness." In

re Willie, 25 Fed.Cas.No.14,692e, at 89-40. I would not only retain this rule but apply it in its present form. Under this test, Malloy's refusals to answer some, if not all, of the questions put to him were clearly not privileged.

RPI 0159

## II.

In November 1959, Malloy was arrested in a gambling raid in Hartford and was convicted of pool selling, an offense defined as occupying and keeping a building containing gambling apparatus. After a 90-day jail term, his one-year sentence was suspended and Malloy was placed on probation for two years. In early 1961, Malloy was summoned to appear in an investigation into whether crimes, including gambling, had been committed in Hartford County, and was asked various questions obviously and solely designed to ascertain who Malloy's associates were in connection with his pool-selling activities in Hartford in 1959. Malloy initially refused to answer virtually all the questions put to him, including such innocuous ones as whether he was the William Malloy arrested and convicted of pool selling in 1959. After he was advised to consult with counsel and did so, he declined to answer each one of the following questions on the ground that it would tend to incriminate him:

"Q. Now, on September 11, 1959, when you were arrested at 600 Asylum Street, and the same arrest for which you were convicted in the Superior Court on November 5, 1959, for whom were you working?

\* \* \* \* \* \*

"Q. On September 11, 1959, when you were arrested, and the same arrest for which you were convicted in the Superior Court on November 5, 1959, who furnished the money to pay your fine when you were convicted in the Superior Court?

\* \* \* \* \*

"Q. After your arrest on September 11, 1959, and the same arrest for which you were convicted on November 5, 1959, who selected your bondsman?

\* \* \* \* \* \*

"Q. As a result of your arrest on September 11, 1959, and the same arrest for which you were convicted

on November 5, 1959, who furnished the money to pay your fine?

\* \* \* \* \* \*

"Q. Do you know whose apartment it was [that you were arrested in on September 11, 1959]?

\* \* \* \* \* \*

"Q. Do you know John Bergoti?

\* \* \* \* \*

"Q. I ask you again, Mr. Malloy, now, so there will be no misunderstanding of what I want to know. When you were arrested on September 11, 1959, at 600 Asylum Street in Hartford, and the same arrest for which you were convicted in Superior Court on November 5, 1959, for whom were you working?"

It was for refusing to answer these questions that Malloy was cited for contempt, the Connecticut courts noting that the privilege does not protect one against informing on friends or associates.

These were not wholly innocuous questions on their face, but they clearly were in light of the finding, of which Malloy was told, that he was immune from prosecution for any pool-selling activities in 1959. As the Connecticut Supreme Court of Errors found, the State bore its burden of proving that the statute of limitations barred any prosecution for any type of violation of the state pool-selling statute in 1959. Malloy advanced the claim before the Connecticut courts, and again before this Court, that he could perhaps be prosecuted for a conspiracy and that the statute of limitations on a felony was

37

five years. But the Connecticut courts were unable to find any state statute which Malloy's gambling activities in 1959 in Hartford, the subject of the inquiry, could have violated and Malloy has not yet pointed to one. Beyond this Malloy declined to offer any explanation or hint at how the answers sought could have incriminated him. In these circumstances it is wholly speculative to find that the questions about others, not Malloy, posed a substantial hazard of criminal prosecution to Malloy.

RPI 0160

Theoretically, under some unknown but perhaps possible conditions any fact is potentially incriminating. But if this be the rule, there obviously is no reason for the judge, rather than the witness, to pass on the claim of privilege. The privilege becomes a general one against answering distasteful questions.

The Court finds that the questions were incriminating because petitioner "might apprehend that if [his associates in 1959] were still engaged in unlawful activity, disclosure of [their names] might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted." Ante, p. 1496. The assumption necessary to the above reasoning is that all persons, or all who have committed a misdemeanor, are continuously engaged in crime. This is but another way of making the claim of privilege automatic. It is not only unrealistic generally but peculiarly inappropriate in this case. Unlike cases relied on by the Court, like Hoffman v. United States, supra, where the claimant was known to be involved in rackets in the area, which were the subject of the inquiry, and had a "broadly published police record," Malloy had no record as a felon. He had engaged once in an unlawful activity—pool selling—a misdemeanor and was given a suspended sentence. He had been on probation since that time and was on probation at the time of the inquiry. Again, unlike Hoffman, nothing in these questions indicates petitioner was called because he was suspected of criminal activities after 1959. There is no support at all in this record for the cynical assumption that he had committed criminal acts after his release in 1960.

Even on the Court's assumption that persons convicted of a misdemeanor are necessarily suspect criminals, sustaining the privilege in these circumstances is unwarranted, for Malloy placed no reliance on this theory in the courts below or in this Court. In order to allow the judge passing on the claim to understand how the answers sought are incriminating, I would at least require the claimant to state his grounds for asserting the privilege to questions seemingly irrelevant to any incriminating matters.

Adherence to the federal standard of incrimination stated in Mason and Hoffman, supra, in form only, while its content is eroded in application, is hardly an auspicious beginning for application of the privilege to the States. As was well stated in a closely analogous situation, "[t]o continue a rule which is honored by this Court only with lip service is not a healthy thing and in the long run will do disservice to the federal system." Gideon v. Wainwright, 872 U.S. 385, at 351, 83 S.Ct. 792, at 800 (HARLAN, J., concurring).

I would affirm.



878 U.S. 108

Nick Alford AGUILAR, Petitioner,

v.

STATE OF TEXAS.

No. 548.

Argued March 25, 26, 1964.

Decided June 15, 1964.

Defendant was convicted, in the Criminal District Court, Harris County, Texas, of illegal possession of heroin, and the Texas Court of Criminal Appeals, 172 Tex.Cr.R. 629, 362 S.W.2d 111, affirmed. On certiorari granted, the United States Supreme Court, Mr. Justice Goldberg, held that affidavit for search warrant may be based on hearsay information and need not reflect direct personal observations of affiant but magistrate must be informed of some of underlying circumstances on which informant based his

RPI 0161

sioned to devise it. Instead, we defer to the defendants' interpretations of the Amendments. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 406, 541 F.2d 1, 34 (1976) (court must presume the agency's actions are valid); *Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 345, 540 F.2d 1114, 1124 (1976), *vacated on other grounds,* 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977); *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 184–85, 454 F.2d 1018, 1027–28 (1971).

### III.

[6] The plaintiffs also ask this court to reverse or remand the District Court's judgment because of its failure to make detailed findings of fact and conclusions of law. This argument ignores the procedural context of the court's action which disposed of the case on a motion for summary judgment under Fed.R.Civ.P. 56. Fed.R.Civ.P. 52(a) provides: "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)." *See, e. g., Hindes v. United States,* 326 F.2d 150, 152 (5th Cir.), *cert. denied,* 377 U.S. 908, 84 S.Ct. 1168, 12 L.Ed.2d 178 (1964) (only finding necessary is that there are no genuine issues of material fact); *Gurley v. Wilson,* 99 U.S.App.D.C. 336, 337, 239 F.2d 957, 958 (1956); *Simpson Bros., Inc. v. District of Columbia,* 85 U.S.App. D.C. 275, 179 F.2d 430 (1949), *cert. denied,* 338 U.S. 911, 70 S.Ct. 850, 94 L.Ed. 561 (1950). There were no genuine issues of material fact, and this court can easily decide the legal questions on the basis of the statute, regulations, and the preamble to the regulations explaining the reasoning supporting the defendants' policies.

### IV.

[7] The decision in this case does not preclude further review of the blind ven-

accounting for, vending machine income from vending machines on Federal property under his control . . . ." However, this is a logical delegation of the authority granted to the head of each department, agency, and instrumentality of the United States in 20 U.S.C. § 107d–3(b)(2). Plaintiffs also seem to chal-

dors program as applied in specific cases. The program requires many discretionary acts on the part of the Secretary, the agency heads, and agency property managers. These acts may of course be reviewed under the Administrative Procedure Act. In fact, the regulations set up an internal arbitration procedure for dispute resolution, culminating in judicial review of the final agency action. *See* 45 C.F.R. § 1369.37. Thus there is no bar to review of any further actions by the pertinent government agencies which conflict with the policies set out in the Randolph-Sheppard Amendments and the regulations.

*Affirmed.*



**SECURITIES AND EXCHANGE COMMISSION,**

v.

**DRESSER INDUSTRIES, INC.,**
**Appellant,**

**United States, Intervenor.**

**SECURITIES AND EXCHANGE COMMISSION,**

v.

**DRESSER INDUSTRIES, INC., Edward R. Luter, Appellant,**

**United States, Intervenor.**

Nos. 78–1702, 78–1705.

United States Court of Appeals, District of Columbia Circuit.

Argued en banc April 15, 1980.

Decided July 16, 1980.

Certiorari Denied Nov. 17, 1980.
See 101 S.Ct. 529.

Corporation appealed from decision of the United States District Court for the

lenge the percentage disbursements of vending machine income to blind vendors determined by whether or not the vending machines are in direct competition with the blind vending facilities. 45 C.F.R. § 1369.32(b), (c), (d). However, these disbursements parallel those set in 20 U.S.C. § 107d–3(b)(1).

RPI 0162

District of Columbia, 453 F.Supp. 573, Thomas A. Flannery, J., requiring obedience to subpoena duces tecum issued by Securities and Exchange Commission and denying motion by the corporation to quash the subpoena. The Court of Appeals, J. Skelly Wright, Chief Judge, held that parallel investigation into alleged "questionable foreign payments" conducted by grand jury under guidance of Justice Department did not preclude Securities and Exchange Commission from being entitled to enforcement of subpoena issued in connection with investigation into use by corporation of funds to make such payments, contrary to claims that enforcement would improperly broaden right of Department of Justice to criminal litigation discovery and would infringe role of grand jury, and the corporation was not entitled to protective order prohibiting SEC from providing Justice Department with fruits of its civil discovery.

Affirmed.

Edwards, Circuit Judge, concurred specially and filed opinion.

**1. Federal Courts ⚖=1150**

Constitution does not ordinarily require stay of civil proceedings pending outcome of criminal proceedings; nevertheless, court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions when interests of justice seem to require such action. U.S.C.A.Const. Amend. 5.

**2. Administrative Law and Procedure ⚖=341**

Parallel investigations by Justice Department and other agencies should not be blocked in absence of "special circumstances" in which nature of the proceedings demonstrably prejudices substantial rights of investigated party or of government. U.S.C.A.Const. Amend. 5.

**3. Securities Regulation ⚖=86**

Parallel investigation into alleged "questionable foreign payments" conducted by grand jury under guidance of Justice Department did not preclude Securities and Exchange Commission from being entitled to enforcement of subpoena issued in connection with investigation into use by corporation of funds to make such payments, contrary to claims that enforcement would improperly broaden right of Department of Justice to criminal litigation discovery and would infringe role of grand jury, and the corporation was not entitled to protective order prohibiting SEC from providing Justice Department with fruits of its civil discovery. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**4. Grand Jury ⚖=36.4(1)**

Fact that grand jury has subpoenaed documents concerning particular matter does not insulate such matter from investigation in another forum. Fed.Rules Cr. Proc. Rule 6(e), 18 U.S.C.A.

**5. Securities Regulation ⚖=86**

Enforcing Securities and Exchange Commission subpoena issued in connection with SEC investigation into use by corporation of funds to make "questionable foreign payments" would not breach alleged agreement of confidentiality where the SEC, throughout "voluntary disclosure program," reserved its rights to pursue formal investigation and issue subpoenas. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**6. Federal Civil Procedure ⚖=1272**

Discovery may be available in some subpoena enforcement proceedings where circumstances indicate that further information is necessary for courts to discharge their duties; however, district court must be cautious in granting such discovery right, lest they transform subpoena enforcement proceedings into exhaustive inquisitions into practices of regulatory agencies; discovery should be permitted only where respondent is able to distinguish himself from class of ordinary subjects of subpoena. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as

RPI 0163

amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**7. Securities Regulation** ⟨⬡⟩86

District court acted within its discretion in denying corporation discovery in SEC subpoena enforcement proceedings. 26 U.S.C.A. (I.R.C.1954) § 7602; Securities Exchange Act of 1934, § 21(a) as amended 15 U.S.C.A. § 78u(a); Securities Act of 1933, § 19(b), 15 U.S.C.A. § 77s(b).

**8. Federal Civil Procedure** ⟨⬡⟩316, 321

Applicant to intervene need only show that representation of his interest may be inadequate; burden of proof rests on those resisting intervention.

**9. Securities Regulation** ⟨⬡⟩86

Individual corporate officer was not entitled to intervene in proceedings in which order enforcing Securities and Exchange Commission subpoena issued was sought where record established that the corporation adequately represented interests of its employees.

---

Appeals from the United States District Court for the District of Columbia (D.C. Miscellaneous No. 78–0141).

David R. MacDonald, Chicago, Ill., with whom Francis D. Morrissey, Chicago, Ill., and Edward E. Dyson, Washington, D. C., were on brief, for appellant Dresser Industries, Inc.

Raymond G. Larroca, Herbert J. Miller, Jr., and Thomas B. Carr, Washington, D. C., were on supplemental memorandum for appellant Edward R. Luter.

Paul Gonson, Principal Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Ralph C. Ferrara, Gen. Counsel, Michael K. Wolensky, Associate Gen. Counsel, and James H. Schropp and John P. Sweeney, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., were on brief, for appellee.

Irvin B. Nathan, Deputy Asst. Atty. Gen., Washington, D. C., with whom Phillip B. Heymann, Asst. Atty. Gen., Washington, D. C., and Stephen G. Milliken, Atty., Dept. of Justice, Providence, R. I., were on brief, for intervenor.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the court filed by Chief Judge WRIGHT.

**J. SKELLY WRIGHT, Chief Judge:**

Dresser Industries, Inc. (Dresser) appeals from a decision of the District Court[1] requiring obedience to a subpoena *duces tecum* issued by the Securities and Exchange Commission (SEC) on April 21, 1978, and denying Dresser's motion to quash the subpoena.[2] The subpoena was issued in connection with an SEC investigation into Dresser's use of corporate funds to make what are euphemistically called "questionable foreign payments," and into the adequacy of Dresser's disclosures of such payments under the securities laws.

The principal issue facing this *en banc* court is whether Dresser is entitled to special protection against this SEC subpoena because of a parallel investigation into the same questionable foreign payments now being conducted by a federal grand jury under the guidance of the United States Department of Justice (Justice). Dresser argues principally that the SEC subpoena abuses the civil discovery process of the SEC for the purpose of criminal discovery and infringes the role of the grand jury in independently investigating allegations of criminal wrongdoing. On November 19, 1979 a panel of this court issued a decision affirming the District Court but, with Judge Robb dissenting, attaching a condition prohibiting the SEC from providing

---

1. *Reported at* 453 F.Supp. 573 (D.D.C.1978).

2. In No. 78–1705 Mr. Edward R. Luter, a senior vice president of Dresser, appeals from an order denying his motion to intervene in the subpoena enforcement proceeding. *See* text *infra*, 628 F.2d at 1384.

Justice with the information received from Dresser under this subpoena. Because of the importance of this issue to enforcement of the regulatory laws of the United States, this court voted to vacate the panel opinions and rehear the case *en banc.*

## I. BACKGROUND

### A. *Origin of the Investigations*

Illegal and questionable corporate payments surfaced as a major public problem in late 1973, when several major scandals implicated prominent American corporations in improper use of corporate funds to influence government officials in the United States and foreign countries. The exposure of these activities disrupted public faith in the integrity of our political system and eroded international trust in the legitimacy of American corporate operations abroad.[3] SEC investigation revealed that many corporate officials were falsifying financial records to shield questionable foreign and domestic payments from exposure to the public and even, in many cases, to corporate directors and accountants. Since the completeness and accuracy of corporate financial reporting is the cornerstone of federal regulation of the securities markets, such falsification became a matter of grave concern to the SEC.[4]

Beginning in the spring of 1974 the SEC brought a series of injunctive actions against certain American corporations. It obtained consent decrees prohibiting future violations of the securities laws and establishing internal corporate procedures for investigation, disclosure, and prevention of illegal corporate payments. However, the problem of questionable foreign payments proved so widespread that the SEC devised a "Voluntary Disclosure Program" to encourage corporations to conduct investigations of their past conduct and make appropriate disclosures without direct SEC coercion.[5] Participation in the Voluntary Disclosure Program would not insulate a corporation from an SEC enforcement action, but the Commission would be less likely to exercise its discretion to initiate enforcement actions against participants.[6] The most important elements of the Voluntary Disclosure Program were (1) an independent committee of the corporation would conduct a thorough investigation into questionable foreign and domestic payments made by the corporation; (2) the committee would disclose the results of this investigation to the board of directors in full; (3) the corporation would disclose the substance of the report to the public and the SEC on Form 8–K; and (4) the corporation would issue a policy statement prohibiting future questionable and illegal payments and maintenance of false or incomplete records in connection with them.[7] Except in "egregious cases" the SEC would not require that public disclosures include specific names, dates, and places. Rather, the disclosures might be "generic" in form.[8] Thus companies participating in the Voluntary Disclosure Program would ordinarily be spared the conse-

---

3. The Senate Committee on Banking, Housing, and Urban Affairs reported in May 1977:

   Recent investigations by the SEC have revealed corrupt foreign payments by over 300 U.S. companies involving hundreds of millions of dollars. These revelations have had severe adverse effects. Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people. The image of American democracy abroad has been tarnished. Confidence in the financial integrity of our corporations has been impaired. The efficient functioning of our capital markets has been hampered.

   S.Rep.No. 114, 95th Cong., 1st Sess. 3 (1977).

4. The history of the SEC's involvement with questionable and illegal foreign payments is recounted briefly in *Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices,* submitted to the Senate Committee on Banking, Housing, and Urban Affairs, 94th Cong., 2d Sess. (Comm.Print 1976), *reprinted in* CCH Federal Securities Law Reports, No. 642 (May 19, 1976) (hereinafter cited as Report).

5. The Voluntary Disclosure Program is described in *id.* at 8–13.

6. *Id.* at 8 n.7.

7. *See id.* at 8–10.

8. *Id.* at 32.

RPI 0165

quences to their employees, property, and business that might result from public disclosure of specific instances of foreign bribery or kickbacks. However, companies participating in the Voluntary Disclosure Program had to agree to grant SEC requests for access to the final report and to the unexpurgated underlying documentations.[9]

### B. *The Dresser Investigations*

On January 27, 1976 an attorney and other representatives of Dresser met with members of the SEC staff to discuss a proposed filing. At the meeting Dresser agreed to conduct an internal inquiry into questionable foreign payments, in accordance with the terms of the Voluntary Disclosure Program.[10] The next day Dresser submitted a Form 8–K describing, in generic terms, one questionable foreign payment. Joint Appendix (JA) 100–102. On November 11, 1976 Dresser filed a second Form 8–K reporting the results of the internal investigation. JA 103–108. On February 10, 1977 the company supplemented this report with a third Form 8–K concerning a questionable payment not reported in the earlier reports. JA 109–113. The reports concerned Dresser's foreign activities after November 1, 1973. All disclosures were in generic, not specific, terms.

As part of its general monitoring program the SEC staff requested access to the documents underlying Dresser's report. On July 15, 1977 Dresser refused to grant such access. The company argued that allowing the staff to make notes or copies might subject its documents to public disclosure through the Freedom of Information Act.[11] Dresser stated that such disclosure could endanger certain of its employees working abroad.[12] During the ensuing discussions with the staff Dresser attempted to impose conditions of confidentiality upon any SEC

examination of its documents, but the staff did not agree.[13] Instead, it issued a recommendation to the Commission for a formal order of investigation in the Dresser case. This recommendation was predicated on the staff's conclusions that Dresser:

1. may have used corporate funds for non-corporate purposes;

2. may have made false and misleading statements concerning the existence of and circumstances surrounding material obligations of Dresser to certain foreign governments and to other entities; and

3. may have made false entries and caused false entries to be made upon the books and records of Dresser, and its affiliates and subsidiaries with respect to, among other things, payments to foreign government officials.

JA 7–8 (order directing private investigation and designating officers to take testimony). Moreover, the staff reported that Dresser's proxy soliciting materials, reports, and statements may have been misleading with respect to the potential risks involved in its conduct of business through questionable foreign payments, and may have included false statements in connection with such payments. JA 8. Dresser vigorously opposed issuance of an order of investigation.[14]

Meanwhile, the Department of Justice had established a task force on transnational payments to investigate possible criminal violations arising from illegal foreign payments. Two SEC attorneys participated in the task force. In the summer of 1977 the Justice task force requested access to SEC files on the approximately 400 companies, including Dresser, that had participated in

9. *Id.* at 9 n.8.

10. The meeting is described by Mr. W. Lyall Milde in a deposition *reprinted in* Joint Appendix (JA) 64–66.

11. JA 71–76.

12. JA 74.

13. The staff offered to give Dresser 10 days notice before releasing any Dresser documents to the public, to enable the company to challenge such release in court. JA 12.

14. *See* JA 77 *et seq.*

RPI 0166

the Voluntary Disclosure Program.[15] Pursuant to Commission authorization the SEC staff transmitted all such files to the Justice task force in August 1977.[16] After its preliminary investigation of the Form 8-K's submitted by Dresser under the Voluntary Disclosure Program, Justice presented Dresser's case to a grand jury in the District of Columbia on January 25, 1978.

Before any summons or subpoena had issued in either the SEC or the grand jury investigation, Dresser filed suit in the Southern District of Texas against the SEC and Justice to enjoin any further investigation of it by either agency.[17] While Dresser's suit was pending in the Southern District of Texas, the District of Columbia grand jury subpoenaed Dresser's documents on April 21, 1978. At roughly the same time the SEC issued a formal order of private investigation, authorizing the staff to subpoena the documents and to obtain other relevant evidence. JA 7–9 (April 11, 1978). Pursuant to that order the staff issued a subpoena *duces tecum*, returnable on May 4, 1978. JA 14–16 (April 21, 1978). This subpoena covered substantially the same documents and materials subpoenaed by the grand jury, and more. Dresser did not respond to the subpoena.[18]

On May 1, 1978 the District Court in Houston, Texas dismissed Dresser's suit against Justice without opinion. Three days later, after the period for compliance with its subpoena had lapsed, the SEC applied to the District Court for the District of Columbia for enforcement. In the meantime, Dresser had appealed the adverse judgment in the Texas action to the Fifth Circuit, and sought interim relief. On May 5 Judge Coleman of the Fifth Circuit enjoined further prosecution of the SEC subpoena enforcement action until after the District Court for the Southern District of Texas had ruled on Dresser's action against

the SEC. Judge Coleman also obtained a stipulation from Justice that Justice would not require Dresser or its agents to appear before the grand jury until after the Company had filed a motion to quash the grand jury subpoena in the District of Columbia and had received a ruling on such motion.

On May 8, 1978 Dresser filed a motion to quash the grand jury subpoena in the District Court for the District of Columbia. On May 19 the District Court (Parker, J.) denied Dresser's motion to quash, but imposed a protective order requiring strict confidentiality in accordance with Rule 6(e) of the Federal Rules of Criminal Procedure. In imposing the protective order the court stated that the "concern of Dresser and especially its employees is not illusory and should not be lightly considered." *See* JA 163. This was in reference to Dresser's argument that public disclosures of the names, places, and dates connected with its questionable foreign payments could endanger the lives of its employees in certain turbulent foreign countries. Dresser thereafter complied with this grand jury subpoena.

On May 26, 1978 the Southern District of Texas dismissed Dresser's action against the SEC without reaching the merits. Dresser appealed to the Fifth Circuit and on June 8 obtained an order from the court that:

> Until the appeal in this case shall have been decided in this court, and except for proceedings before the Grand Jury in the District of Columbia, the Securities and Exchange Commission, its officers and employees, are enjoined to preserve inviolate the confidentiality of any information obtained by the subpoena here in issue. This order is not intended to interfere with pending proceedings in the District of Columbia to enforce the SEC subpoenas.

15. JA 295–296 (statement by Marvin G. Pickholz).

16. *Id.*

17. *Dresser Industries, Inc. v. United States,* Civil Action No. H–78–405 (S.D.Tex.).

18. The procedural history of this case is recounted in Dresser's motion to quash the SEC subpoena, JA 160–163.

RPI 0167

JA 202. On June 2, 1978 the District Court for the District of Columbia issued an order to Dresser to show cause why it should not be required to appear, give testimony, and produce records in obedience to the SEC subpoena. JA 141. On June 7 Dresser filed a motion for leave to obtain discovery from the SEC concerning the agency's alleged bad faith and attempted abuse of the judicial process, JA 27, and on June 13 filed a motion to quash the SEC subpoena. JA 160.

The District Court (Flannery, J.) denied Dresser's motion to compel discovery on June 16, without opinion. Judge Flannery explained in court that he had carefully examined the papers filed by Dresser, that discovery is rarely necessary in subpoena enforcement cases, and that he did not think this was an appropriate case for it. JA 256. Then, on June 30, 1978, the District Court (Flannery, J.) issued a memorandum opinion and order rejecting all of Dresser's objections to the SEC subpoena and requiring Dresser to comply with the subpoena within ten days after notice from the SEC. JA 301, *reported at* 453 F.Supp. 573 (D.D.C.1978). Rehearing was denied on July 15. This appeal followed.

Meanwhile, the United States Court of Appeals for the Fifth Circuit affirmed the decisions of the District Court for the Southern District of Texas dismissing Dresser's actions against Justice and the SEC in that court, largely on ripeness grounds. *Dresser Industries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980). Accordingly, the interlocutory injunction requiring the SEC to preserve inviolate the confidentiality of Dresser's materials pending a decision on appeal was dissolved.

Having set forth the complicated procedural history of this case, we turn now to the principles that govern parallel administrative and criminal proceedings concerning the same conduct.

19. *See generally* Note, *Concurrent Civil and Criminal Proceedings*, 67 Colum.L.Rev. 1277 (1967).

## II. GENERAL PRINCIPLES

### A. *Parallel Investigations*

The civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous.[19] In the absence of substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable under our jurisprudence. As long ago as 1912 the Supreme Court recognized that under one statutory scheme—that of the Sherman Act—a transaction or course of conduct could give rise to both criminal proceedings and civil suits. *Standard Sanitary Manufacturing Co. v. United States*, 226 U.S. 20, 52, 33 S.Ct. 9, 16, 57 L.Ed. 107 (1912). The Court held that the government could initiate such proceedings either "simultaneously or successively," with discretion in the courts to prevent injury in particular cases. *Id.* It explained:

> The Sherman Act provides for a criminal proceeding to punish violations and suits in equity to restrain such violations, and the suits may be brought simultaneously or successively. The order of their bringing must depend upon the Government; the dependence of their trials cannot be fixed by a hard and fast rule or made imperatively to turn upon the character of the suit. Circumstances may determine and are for the consideration of the court. An imperative rule that the civil suit must await the trial of the criminal action might result in injustice or take from the statute a great deal of its power. * * *

*Id.*

The Supreme Court returned to this theme in *United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). In that case the Food and Drug Administration (FDA) investigated a company and certain of its officers in connection with possible

RPI 0168

violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* Early in the investigation the FDA recommended and the United States Attorney filed an *in rem* action in federal district court seeking civil seizure of certain products. In connection with this suit the FDA filed extensive interrogatories with the company. Before the company had responded the FDA notified it that the agency was contemplating a criminal proceeding against it in connection with the same alleged violations of the statute. The company therefore moved to stay civil proceedings or, in the alternative, to extend the time for answering the interrogatories until after disposition of the criminal proceedings. The District Court denied this motion. Thereafter, but still before the company had filed its answers to the interrogatories, the regional and divisional offices of the FDA formally recommended criminal prosecution to the General Counsel. After it received the answers, the Department of Health, Education, and Welfare formally recommended criminal prosecution to the Justice Department. Justice obtained an indictment, and subsequently convictions. The case reached the Supreme Court upon appeal of the convictions of several of the company's officers.

The officers in *Kordel* argued that use of the civil discovery process to compel answers to interrogatories that could be used to build the government's case in a parallel criminal proceeding "reflected such unfairness and want of consideration for justice" as to require reversal. 397 U.S. at 11, 90 S.Ct. at 769. The Supreme Court did not agree. The Court noted that the government had not brought the civil action "solely to obtain evidence for its criminal prosecution," *id.* at 11–12, 90 S.Ct. at 769, or without notice to the defendants that it contemplated a criminal action, *id.* at 12, 90 S.Ct. at 769. Moreover, the defendant was not unrepresented by counsel, *id.*, and had no reason to fear "prejudice from adverse pretrial publicity or other unfair injury," *id.* Nor were there any other "special circumstances" suggesting that the parallel pro-

ceedings were unconstitutional or improper. *Id.* In the absence of such "special circumstances" the Court recognized that prompt investigation of both civil and criminal claims can be necessary to the public interest. It said:

> The public interest in protecting consumers throughout the Nation from misbranded drugs requires prompt action by the agency charged with responsibility for administration of the federal food and drug laws. But a rational decision whether to proceed criminally against those responsible for the misbranding may have to await consideration of a fuller record than that before the agency at the time of the civil seizure of the offending products. It would stultify enforcement of federal law to require a governmental agency such as the FDA invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial.

*Id.* at 11, 90 S.Ct. at 769 (footnote omitted).

[1] The Constitution, therefore, does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings. *See Baxter v. Palmigiano*, 425 U.S. 308, 98 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *DeVita v. Sills*, 422 F.2d 1172, 1181 (3d Cir. 1970). Nevertheless, a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions "when the interests of justice seem[ ] to require such action, sometimes at the request of the prosecution, * * * sometimes at the request of the defense[.]" *United States v. Kordel, supra*, 397 U.S. at 12 n.27, 90 S.Ct. at 770 (citations omitted); *see Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271–1272 (D.C.Cir.1972). The court must make such determinations in the light of the particular circumstances of the case.

Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for

RPI 0169

deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case.[20] If delay of the noncriminal proceeding would not seriously injure the public interest, a court may be justified in deferring it. *See, e.g., United States v. Henry*, 491 F.2d 702 (6th Cir. 1974); *Texaco, Inc. v. Borda*, 383 F.2d 607, 608–609 (3d Cir. 1967); *Silver v. McCamey*, 221 F.2d 873, 874–875 (D.C.Cir. 1955).[21] Such cases have frequently arisen in the tax field, following the leading case of *United States v. O'Connor*, 118 F.Supp. 248 (D.Mass.1953). *Cf. Boren v. Tucker*, 239 F.2d 767, 772–773 (9th Cir. 1956) (distinguishing IRS summons enforcement before and after indictment). In some such cases, however, the courts may adequately protect the government and the private party by merely deferring civil discovery or entering an appropriate protective order. *Gordon v. FDIC*, 427 F.2d 578, 580–581 (D.C.Cir.1970). The case at bar is a far weaker one for staying the administrative investigation. No indictment has been returned; no Fifth Amendment privilege is threatened; Rule 16(b) has not come into effect; and the SEC subpoena does not require Dresser to reveal the basis for its defense.

**B.  *SEC Investigations***

The case at bar concerns enforcement of the securities laws of the United States, especially the Securities Act of 1933 ('33 Act), 48 Stat. 74, 15 U.S.C. § 77a *et seq.* (1976), and the Securities Exchange Act of 1934 ('34 Act), 48 Stat. 881, 15 U.S.C. § 78a *et seq.* (1976). These statutes explicitly empower the SEC to investigate possible infractions of the securities laws with a view to both civil and criminal enforcement, and to transmit the fruits of its investigations to Justice in the event of potential criminal proceedings. The '34 Act provides in relevant part: "The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter[.]" Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976). This investigative authority includes the power to administer oaths and affirmations, subpoena witnesses, take evidence, and require production of any books, papers, correspondence, memoranda, or other records which the SEC deems relevant or material. *Id.*, Section 21(b), 15 U.S.C. § 78u(b). If it determines that a person "is engaged or is about to engage in acts or practices constituting a violation" of the Act, the SEC may bring an action in federal district court to enjoin such acts or practices. *Id.*, Section 21(d), 15 U.S.C. § 78u(d). Under the same subsection of the '34 Act the SEC may "transmit such evidence as may be available concerning such acts or practices * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter." *Id.* The '33 Act is to similar effect. *See* Sections 19(b), 20(a), (b)

20. In some cases the government seeks postponement of the noncriminal proceeding, to prevent the criminal defendant from broadening his rights of criminal discovery against the government. *E.g., Campbell v. Eastland*, 307 F.2d 478 (5th Cir. 1962), *cert. denied*, 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963).

21. *Silver v. McCamey*, 221 F.2d 873 (D.C.Cir. 1955), held that "due process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him." *Id.* at 874–875. As we have noted in

text, cases decided since *Silver* have established that, as a general matter, due process is not infringed merely because an accused person is subjected, without his consent, to an administrative hearing concerning matters involved in a pending criminal proceeding. Nevertheless, as *Silver* recognized and more recent cases have affirmed, such an administrative proceeding can in some circumstances prejudice the rights of a citizen or the government. In such cases the agencies and courts may have a duty to take appropriate corrective action.

RPI 0170

of the '33 Act, 15 U.S.C. §§ 77s(b), 77t(a), (b) (1976).[22]

[2] Effective enforcement of the securities laws requires that the SEC and Justice be able to investigate possible violations simultaneously. Dissemination of false or misleading information by companies to members of the investing public may distort the efficient workings of the securities markets and injure investors who rely on the accuracy and completeness of the company's public disclosures. If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions. If Justice moves too slowly the statute of limitations may run, witnesses may die or move away, memories may fade, or enforcement resources may be diverted. *See United States v. Fields*, 592 F.2d 638, 646 (2d Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). The SEC cannot always wait for Justice to complete the criminal proceedings if it is to obtain the necessary prompt civil remedy; neither can Justice always await the conclusion of the civil proceeding without endangering its criminal case. Thus we should not block parallel investigations by these agencies in the absence of "special circumstances" in which the nature of the proceedings demonstrably prejudices substantial rights of the investigated party or of the government. *See United States v. Kordel, supra*, 397 U.S. at 11–13, 90 S.Ct. at 769–770.

## III. APPLICABILITY OF
### *United States v. LaSalle Nat'l Bank*

[3] Dresser principally relies on an analogy to *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978),[23] in which the Supreme Court said in dictum that the Internal Revenue Service (IRS) may not use its summons authority to investigate possible violations of the tax laws after it has referred those violations to

---

22. Sections 20(a) and 19(b) of the '33 Act provide the basis for the SEC's investigative authority:

> Whenever it shall appear to the Commission, either upon complaint or otherwise, that the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, have been or are about to be violated, it may, in its discretion, either require or permit such person to file with it a statement in writing, under oath, or otherwise, as to all the facts and circumstances concerning the subject matter which it believes to be in the public interest to investigate, and may investigate such facts.

Section 20(a) of the '33 Act, 15 U.S.C. § 77t(a) (1976).

> For the purpose of all investigations which, in the opinion of the Commission, are necessary and proper for the enforcement of this subchapter, any member of the Commission or any officer or officers designated by it are empowered to administer oaths and affirmations, subpena witnesses, take evidence, and require the production of any books, papers, or other documents which the Commission deems relevant or material to the inquiry. * * *

*Id.* § 19(b), 15 U.S.C. § 77s(b). From § 20(b) derives the authority to initiate civil injunctive actions and to transmit evidence to Justice:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may[,] in its discretion, bring an action in any district court of the United States or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General who may, in his discretion, institute the necessary criminal proceedings under this subchapter. * * *

*Id.* § 20(b), 15 U.S.C. § 77t(b).

23. Dresser's other arguments, in summary, are (1) that the SEC subpoena breached an enforceable agreement of confidentiality with Dresser; (2) Dresser was erroneously denied certain discovery rights; and (3) enforcement of the subpoena might violate Dresser's attorney-client privilege. *See* brief of respondent-appellant at 11–12. These arguments are discussed in Part V *infra*.

RPI 0171

Justice for criminal prosecution. *See id.* at 311–313, 98 S.Ct. at 2365.[24] Dresser argues that the SEC's transmittal of Dresser's file to Justice was equivalent to a "referral" under *LaSalle*, and thus that the SEC's power to enforce investigative subpoenas against Dresser in connection with that file lapsed at that time. Alternatively, Dresser suggests that, even if transmittal of the file was not analogous to a "referral" under *LaSalle*, initiation of the grand jury investigation precluded subsequent enforcement of SEC investigative subpoenas into the same matters.

These two alternatives are vulnerable to the same objection: the *LaSalle* rule applies solely to the statutory scheme of the Internal Revenue Code, in which the IRS's civil authority ceases for all practical purposes upon referral of a taxpayer's case to Justice; it does not apply to the securities laws, in which the SEC's civil enforcement authority continues undiminished after Justice initiates a criminal investigation by the grand jury.[25]

The IRS summons authority derives from Section 7602 of the Internal Revenue Code, 26 U.S.C. § 7602 (1976). Its authority is restricted to the terms and purposes of that provision. The Supreme Court said in *LaSalle*:

> In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability." Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. * *

---

**24.** This portion of *LaSalle* is properly characterized as dictum, because the controversy concerned investigation of a taxpayer *prior* to referral to Justice. The Court held that a taxpayer challenging an IRS summons prior to such referral bears the heavy burden of showing that the summons was issued in "bad faith," 437 U.S. at 316, 98 S.Ct. at 2367, which the Court interpreted as being "solely [for] criminal purposes." *Id.* The Supreme Court has never decided a case concerning an IRS summons issued after referral to Justice but before indictment. *See* note 25 *infra*.

**25.** The *LaSalle* rule—prohibiting enforcement of an IRS summons after the IRS had referred the case to Justice for criminal prosecution— derives from *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed. 580 (1971). In *Donaldson* the Court said:

> We hold that under § 7602 [of the Internal Revenue Code, 26 U.S.C. § 7602 (1970)] an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution.

*Id.* at 536, 91 S.Ct. at 545. The *Donaldson* Court recognized that under prior precedent the limitation on the IRS summons authority came into effect only in "the situation of a *pending criminal charge* or, at most, of an investigation solely for criminal purposes." *Id.* at 533, 91 S.Ct. at 544 (emphasis added). *See Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964) (*citing Boren v. Tucker*, 239 F.2d 767, 772–773 (9th Cir. 1956)). "Any other holding," according to the *Donald-*

son Court, "would thwart and defeat the appropriate investigatory powers that the Congress has placed in 'the Secretary or his delegate.'" 400 U.S. at 533, 91 S.Ct. at 544. Nevertheless, after a detailed discussion of the enforcement scheme of the Internal Revenue Code, the Court reiterated the rule in modified form: instead of prohibiting enforcement of an IRS summons if there is a *pending criminal charge*, the Court prohibited such enforcement if there had been a *referral to Justice for criminal prosecution*. *Compare* 400 U.S. at 533, 91 S.Ct. at 543, *with id.* at 536, 91 S.Ct. at 545. Obviously, the difference between these two formulations is substantial. The Court did not explicitly state why it shifted from the one to the other, but the best available explanation lies in its discussion of the statutory scheme, which appears between the two conflicting statements of the rule. In *LaSalle* Justice Blackmun, who also wrote the opinion for the Court in *Donaldson*, explained that the decision in *Donaldson* was not predicated on its analysis of precedent. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 307, 98 S.Ct. 2357, 2362, 57 L.Ed.2d 221 (1978). Rather, the decision relied on its review of the statutory scheme. *Id.* "The validity of the summonses depended ultimately on whether they were among those authorized by Congress," the Justice said. *Id.* This emphasizes that the rule espoused in *LaSalle* and *Donaldson* is not based on principles generally applicable to parallel civil and criminal proceedings, but on limitations unique to the IRS.

RPI 0172

*United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316–317 n.18, 98 S.Ct. at 2367 n.18 (first ellipsis in original).

In the pre-referral stage of an IRS investigation the civil and criminal elements of the investigation are intertwined. *Id.* at 308–311, 98 S.Ct. at 2363–2364. The same information is useful in negotiating with the taxpayer, in suing in court for additional taxes, or in deciding whether to recommend criminal prosecution. Thus the IRS at that stage is empowered to issue investigative summonses under Section 7602, even though the fruits of such summonses may be useful for the illegitimate purpose of "filing criminal charges against citizens" as well as the legitimate purposes of determining and collecting taxes.

However, upon referral of the case to Justice with a recommendation for criminal prosecution, "the criminal and civil aspects of a tax fraud case begin to diverge." *Id.* at 311, 98 S.Ct. at 2365. After that point the IRS loses its ability to compromise the case, either criminally or civilly. All such authority devolves upon Justice. *Id.* at 312, 98 S.Ct. at 2365. Although theoretically the IRS might use its summons power during the pendency of the criminal proceeding to discover information for the purpose of a future civil tax suit, *id.* at 311–312, 98 S.Ct. at 2364–2365, in practice the IRS holds all civil action in abeyance until the criminal proceeding is completed.[26] Only then does the IRS turn its attention again to the civil aspects of the case.

Thus, in the *LaSalle* Court's view, the authorized purposes for summonses under Section 7602 cease as a practical matter during the pendency of the criminal proceeding. Because of this the Court was willing to impose a "prophylactic" rule flatly forbidding *any* use of the Section 7602 authority once a case has been referred to Justice for criminal prosecution. *Id.* at 312, 98 S.Ct. at 2365. This rule restricts the IRS within the confines of its statutory authority and also "safeguards * * * two poli-

cy interests," *id.* at 313, 98 S.Ct. at 2365. These interests are to avoid broadening the Justice Department's right of criminal litigation discovery and to avoid infringing on the role of the grand jury as a principal tool of criminal accusation. *Id.* at 312, 98 S.Ct. at 2365.

Dresser asks this court to extend the reasoning of *LaSalle* to govern the conduct of the SEC under the securities laws. But IRS investigative and enforcement proceedings are not analogous to those of the SEC. The language of the securities laws and the nature of the SEC's civil enforcement responsibilities require that the SEC retain full powers of investigation and civil enforcement action, even after Justice has begun a criminal investigation into the same alleged violations.

The investigative provisions of the securities laws are far broader than Section 7602 of the Internal Revenue Code, as interpreted in *LaSalle.* See *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1022–1024 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). SEC investigations are not confined to "four purposes only." *Cf. United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316 n.18, 98 S.Ct. at 2367 n.18. Rather, the SEC may, "*in its discretion,* make such investigations as *it deems necessary* to determine whether any person has violated, is violating, or is about to violate any provision" of the '34 Act, Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976) (emphasis added). Moreover, the SEC is "authorized *in its discretion* * * * to investigate *any* facts, conditions, practices, or matters which *it may deem necessary or proper* to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning matters to which this chapter relates." *Id.* (emphasis added). See also Section 19(b) of the '33 Act, 15 U.S.C. § 77s(b) (1976). Given this broad statutory mandate, there is

---

26. *See* Policies of the IRS Handbook, P–4–84, *reprinted in* 1 CCH Internal Revenue Manual 1305–1310 (1978); Office of the Chief Counsel, IRS, Civil Considerations in Pending Criminal Matters, Order No. 3050.1 (March 23, 1978).

RPI 0173

virtually no possibility that in issuing this subpoena the SEC was acting *ultra vires.* The investigation of Dresser—based as it was on the staff's conclusion that Dresser may have engaged in conduct seriously contravening the securities laws [27]—falls squarely within the Commission's explicit investigatory authority.[28] Unlike the Internal Revenue Code as interpreted in *LaSalle,* the securities laws offer no suggestion that the scope of the SEC's investigative authority shrinks when a grand jury begins to investigate the same matters. Since the validity of summonses or subpoenas "depend[s] ultimately on whether they were among those authorized by Congress," *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 307, 98 S.Ct. at 2362, we conclude that this subpoena is enforceable under the rule of that case.[29]

Fulfillment of the SEC's civil enforcement responsibilities requires this conclusion. Unlike the IRS, which can postpone collection of taxes for the duration of parallel criminal proceedings without seriously injuring the public, the SEC must often act quickly, lest the false or incomplete statements of corporations mislead investors and infect the markets. Thus the Commission must be able to investigate possible securities infractions and undertake civil enforcement actions even after Justice has begun a criminal investigation. For the SEC to stay its hand might well defeat its purpose.

Dresser attempts to prevent enforcement of this subpoena by invoking the "policy interests" identified by the *LaSalle* Court: to avoid broadening Justice's right of criminal litigation discovery and to avoid infringing the role of the grand jury as a principal tool of criminal accusation. Brief of respondent-appellant at 21–23; supplemental brief of appellant Dresser Industries, Inc. at 10–21; *see United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 312, 98 S.Ct. at 2365. We reject this argument for two reasons.

First, Dresser disregards the context in which these "policy interests" arose in *LaSalle.* Only after the Court had determined that the IRS had no practical authorized purpose for issuing a summons after referral of a case to Justice did it direct its attention to these "policy interests." Then it did so solely to explain its imposition of a "prophylactic" rule forbidding *any use* of the IRS summons authority after referral to Justice, as opposed to forbidding only such uses as are unrelated to the purposes of Section 7602.[30] The Court did not impose such a "prophylactic" rule in any situation where it would significantly restrict the legitimate investigative authority of the

---

27. *See* text at note 14 *supra.*

28. Dresser argued unsuccessfully in the District Court that the SEC had exceeded its authority by issuing the subpoena where there was no likelihood that a violation had been or was about to be committed. 453 F.Supp. at 575. On appeal Dresser makes this argument only obliquely, in the form of an objection to the denial of discovery. Brief of respondent-appellant at 39–42. In any event, the argument is without merit. Our task is merely to ensure that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1024 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979) (*quoting United States v. Morton Salt Co.,* 338 U.S. 632, 652–653, 70 S.Ct. 357, 368–369, 94 L.Ed. 401 (1950)); *see also SEC v. Howatt,* 525 F.2d 226, 229 (1st Cir. 1975). We agree with the District Court that "[t]his investigation has a

legitimate purpose and the inquiry is relevant to that purpose." 453 F.Supp. at 576.

29. *Cf. SEC v. OKC Corp.,* 474 F.Supp. 1031, 1038 (N.D.Tex.1979) (SEC subpoena enforced although Department of Energy had made criminal reference to Justice in related matter).

30. *See United States v. LaSalle Nat'l Bank, supra* note 25, 437 U.S. at 311–312, 98 S.Ct. at 2365:

We recognize, of course, that even upon recommendation to the Justice Department, the civil and criminal elements do not separate completely. The Government does not sacrifice its interest in unpaid taxes just because a criminal prosecution begins. Logically, then, the IRS could use its summons authority under § 7602 to uncover information about the tax liability created by a fraud regardless of the status of the criminal case. But the rule forbidding such is a prophylactic intended to safeguard the following policy interests.

RPI 0174

IRS.[31] In the case of an SEC investigation there is no call for a "prophylactic rule," and thus no need to ponder the import of these "policy interests," because the SEC's authority to issue the subpoena remains undiminished after the start of a grand jury investigation.

Second, the "policy interests" of *LaSalle* have little practical significance in this context. The first—to avoid broadening Justice's right to criminal discovery—is flatly inapplicable, as Dresser admits.[32] The strict limitations on discovery in criminal cases, embodied in Federal Rules of Criminal Procedure 15–17, do not take effect until after a grand jury has returned an indictment. Until then there is no danger that Justice might broaden its discovery rights, because the subpoena power of the grand jury is as broad as—perhaps broader than—that of the SEC. Justice can procure from Dresser directly whatever materials it might procure indirectly through the SEC.[33] In fact, a party investigated under SEC rules instead of grand jury procedures is accorded far greater procedural protection, and has no cause to complain. *See* 17 C.F.R. §§ 203.6–203.7 (1979).[34]

In its brief Dresser has concentrated upon the second "policy interest" identified in *LaSalle*: avoiding infringement upon the role of the grand jury. Dresser sug-

31. The *LaSalle* Court underscored, in a footnote, its belief that a "prophylactic" rule need not be imposed in every circumstance presenting the potentiality for infringement of the grand jury's role or broadening of Justice's right to criminal discovery. The Court disapproved the position adopted by the Third Circuit in *United States v. Lafko*, 520 F.2d 622, 625 (3d Cir. 1975), which it characterized as holding that the IRS summons authority must cease at the point when the special agent recommends prosecution to the district office, rather than at the point when the IRS recommends prosecution to Justice. 437 U.S. at 313 n.15, 98 S.Ct. at 2365 n.15. The Supreme Court admitted that "the potential for expanding the criminal discovery rights of the Justice Department or for the usurping the role of the grand jury exists at the point of the recommendation by the special agent." *Id.* But it called the possibilities of abuse "remote," *id.*, and stated that they "do not justify imposing an absolute ban on the use of the summons before that point." *Id.*

32. Supplemental brief of appellant Dresser Industries, Inc. at 19 n.16.

33. *See Developments in the Law—Corporate Crime: Regulating Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1312–1313 (1979). Obtaining the approval of the grand jury itself is not a serious impediment to Justice's efforts; indeed, the common practice is for grand jury subpoenas to be issued in blank, with the contents to be filled in by the prosecutor. *See In re Grand Jury Proceedings*, 486 F.2d 85, 87 (3d Cir. 1973).

34. 17 C.F.R. §§ 203.6–203.7 (1979) provide in relevant part:

§ 203.6 Transcripts.

* * * A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

§ 203.7 Rights of witnesses.

(a) Any person who is compelled or requested to furnish documentary evidence or testimony at a formal investigative proceeding shall upon request be shown the Commission's order of investigation. * * *

(b) Any person compelled to appear, or who appears by request or permission of the Commission, in person at a formal investigative proceeding may be accompanied, represented and advised by counsel * * *.

(c) The right to be accompanied, represented and advised by counsel shall mean the right of a person testifying to have an attorney present with him during any formal investigative proceeding and to have this attorney (1) advise such person before, during and after the conclusion of such examination, (2) question such person briefly at the conclusion of the examination to clarify any of the answers such person has given, and (3) make summary notes during such examination solely for the use of such person.

(d) Unless otherwise ordered by the Commission, in any public formal investigative proceeding, if the record shall contain implications of wrongdoing by any person, such person shall have the right to appear on the record; and in addition to the rights afforded other witnesses hereby, he shall have a reasonable opportunity of cross-examination and production of rebuttal testimony or documentary evidence. * * *

RPI 0175

gests two ways in which the SEC civil investigation might infringe the role of the grand jury. First, it argues that enforcement of the SEC subpoena would undermine the secrecy protections of the grand jury because the SEC subpoena covers many or all of the Dresser documents that have already been subpoenaed by the grand jury.[35] In this argument Dresser misconceives the nature of the secrecy protections of the grand jury.

[4] Federal Rule of Criminal Procedure 6(e) provides in relevant part:

(e) *Secrecy of Proceedings and Disclosure*

(1) *General rule.* A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the Government, or any person to whom disclosure is made under paragraph (2)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secre-

cy may be imposed on any person except in accordance with this rule. * * *

We note that the Rule prohibits disclosure of "matters occurring before the grand jury[.]" This serves to protect the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like. It does not require, however, that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.[36] It is well established that

when testimony or data is sought for its own sake—for its intrinsic value in the furtherance of a lawful investigation—rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same information was revealed to a grand jury or that the same documents had been, or were presently being, examined by a grand jury. * * *

*United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Cir. 1960).[37] Dress-

---

35. Supplemental brief of appellant Dresser Industries, Inc. at 13–17.

36. The rationales for grand jury secrecy are well established:

"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

*Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219 n.10, 99 S.Ct. 1667, 1673 n.10, 60 L.Ed. 156 (1979) (brackets in original) (*quoting United States v. Rose,* 215 F.2d 617, 628–629 (3d Cir. 1954), *approved in United States v. Proctor & Gamble Co.,* 356 U.S. 677, 681 n.6, 78 S.Ct. 983, 986 n.6, 2 L.Ed.2d 1077 (1958)). *See also* Note, *Administrative Agency Access to Grand Jury Materials,* 75 Colum.L.Rev. 162, 166 (1975) (suggesting a further rationale: "to prevent the grand jury from being diverted

from its primary concern—the investigation of criminal activity"). None of these rationales has any application to an independent agency subpoena of corporate documents. No witnesses or targets will be frightened from testifying fully, no grand jurors will be threatened or suborned, no target will be embarrassed—any more than it might be embarrassed by any other SEC subpoena. Since the fact that Dresser is the target of a grand jury investigation is already public knowledge—as witness this case—there is no danger of exposing the identity of an innocent grand jury target.

37. *Accord, United States v. Stanford,* 589 F.2d 285, 290–291 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); *In re Search Warrant for Second Floor Bedroom,* 489 F.Supp. 207 (D.R.I.1980); *In re Grand Jury Investigation of Ven-Fuel,* 441 F.Supp. 1299, 1302–1303 (M.D.Fla.1977); *Brink v. DaLesio,* 82 F.R.D. 664, 668–669 (D.Md. 1979); *Michelin Tire Corp. v. United States,* 453 F.Supp. 897, 898 (Cust.Ct.1978); *see also In re Grand Jury Investigation (Lance),* 610 F.2d 202, 217 (5th Cir. 1980); *State of Illinois v. Sarbaugh,* 552 F.2d 768, 771–772 (7th Cir.), *cert. denied,* 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977). Some courts have adopted a broad interpretation of "matters occurring before the grand jury" as documents that "may tend to reveal what transpired before the grand jury." *United States v. Armco Steel Corp.,* 458

RPI 0176

er's documents at issue here were created for an independent corporate purpose, not directly related to the prospect of a grand jury investigation. The SEC has subpoenaed them directly from Dresser, without mention of the grand jury. They do not reveal what has occurred before the grand jury; they reveal only what has occurred in Dresser's foreign operations. *See United States v. Stanford*, 589 F.2d 285, 291 (7th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). The fact that a grand jury has subpoenaed documents concerning a particular matter does not insulate that matter from investigation in another forum.[38] In fact, if the grand jury proceedings are genuinely secret, other agencies and courts will not know the subject matter of the grand jury investigation and thus will not be able to determine whether their own inquiry would overlap that of the grand jury.

In this case Dresser is obligated under the securities laws to provide documents to the SEC in obedience to a lawful subpoena. The existence of a grand jury proceeding neither adds to nor detracts from Dresser's rights before the SEC. Whatever rights to secrecy or confidentiality Dresser may have are the product solely of the laws governing the SEC; they are unaffected by the parallel grand jury proceeding.

The second way in which Dresser argues that enforcement of this subpoena might infringe the role of the grand jury is that the SEC could interpret and selectively disclose parts of the subpoenaed information to the grand jury through Justice, thereby undermining the independence of the grand jury's inquiry.[39] Of course, this argument is purely speculative since, as Dresser is well aware,[40] the SEC's general policy is to

grant Justice continuing access to the entirety of a given investigative file once the Commission formally grants access.[41] As of now the SEC has not received any confidential documents from Dresser, and thus we have had no opportunity to see how this policy operates in practice. It would be altogether inappropriate for this court to presume that the SEC will pre-select documents for release to Justice in order to prejudice the grand jury.

In another sense Dresser's complaint on this score has little practical significance. No one would suggest that the grand jurors, unassisted by accountants, lawyers, or others schooled in the arcana of corporate financial accounting, could sift through the masses of Dresser's corporate documents and arrive at a coherent picture of the company's foreign payments and disclosure practices. In this area, as in many areas of great complexity, the grand jurors are assisted—guided and influenced, in fact—not only by the United States Attorneys assigned to the investigation, but also by experts provided by the federal regulatory agencies with experience in the particular subject areas. This expert assistance is permitted under Rule 6(e), and it promotes the efficiency and rationality of the criminal investigative process. *See In re Perlin*, 589 F.2d 260 (7th Cir. 1978); *Robert Hawthorne, Inc. v. Director of IRS*, 406 F.Supp. 1098, 1106–1107 (E.D.Pa.1975); *Developments in the Law—Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1314–1315 (1979). In this case two SEC agents have been assigned to Justice's task force on transnational payments to assist in the investigation of companies possibly involved

F.Supp. 784, 790 (W.D.Mo.1978); *accord, In re Grand Jury Investigation (Lance), supra*, 610 F.2d at 216. Even under this test courts should permit disclosure of documents in the hands of private parties, independently identified and sought for a lawful and independent purpose.

38. We recognize that in some circumstances the courts have protected materials not technically within the range of Rule 6(e) where disclosure would jeopardize the effective functioning of the grand jury. *See In re Search War-*

*rant for Second Floor Bedroom, supra* note 37, 489 F.Supp. at 211. This case presents no such problem.

39. Supplemental brief of appellant Dresser Industries, Inc. at 17–18.

40. *See id.* at 5 n.10.

41. *See* letter from James H. Schropp to this court dated April 3, 1979.

RPI 0177

in illegal foreign payments.[42] There can be little doubt that the grand jury's deliberations will be influenced by the work of these SEC agents. Any additional influence that might arise as a result of enforcement of the SEC subpoena and transmittal of documents to Justice thereafter is likely to be inconsequential.[43]

Finally, we note that if Dresser is genuinely worried that the SEC might disclose only those documents prejudicial to the company, it may provide the grand jury with copies of *all* the documents it provides to the SEC, thereby obviating the danger. Alternatively, if Dresser obtains evidence that the SEC is in fact abusing its power to transmit documents to Justice, and is thereby distorting the grand jury's perception of the case, Dresser may apply to the courts at that time for appropriate relief.

We conclude that the danger that enforcement of this subpoena might infringe the role of the grand jury is too speculative and remote at this point to justify so extreme an action as denying enforcement of this subpoena.[44]

In essence, Dresser has launched this attack on the parallel SEC and Justice proceedings in order to obtain protection against the bare SEC proceeding, which it fears will result in public disclosure of sensitive corporate documents. The prejudice Dresser claims it will suffer from the parallel nature of the proceedings is speculative and undefined—if indeed Dresser would suffer any prejudice from it at all.[45] Any entitlement to confidential treatment of its documents must arise under the laws pertaining to the SEC; the fortuity of a parallel grand jury investigation cannot expand Dresser's rights in this SEC enforcement action. Thus Dresser's invocation of *LaSalle* can avail the company nothing.

## IV. COOPERATION BETWEEN SEC AND JUSTICE

In its initial decision in this case a panel of this court ruled that "the broad prophy-

---

42. *See* text following note 14 *supra.*

43. Dresser implicitly admits that it would be proper for the SEC to conduct and complete a civil investigation, and then to transmit all relevant materials to Justice for possible criminal prosecution. *See* supplemental brief of appellant Dresser Industries, Inc. at 22–24. Yet such a procedure would create as severe a problem of grand jury infringement as the procedure complained of in this case.

44. Dresser seeks to minimize the effect an order denying enforcement of this subpoena would have on the SEC's ability to carry out its mandate by suggesting that the SEC could continue its civil enforcement efforts through obtaining access to the grand jury materials under Rule 6(e)(2)(C)(i), which permits disclosure "when so directed by a court preliminarily to or in connection with a judicial proceeding[.]" This disregards the fact that some courts have held that the SEC must demonstrate a "particularized need" for grand jury materials in order to obtain access to them, *e.g., In re Grand Jury Investigation,* 414 F.Supp. 74, 76 (S.D.N.Y. 1976), and that administrative investigative proceedings may not be considered preliminary to or in connection with a judicial proceeding for purposes of the Rule. *See United States v. Bates,* — F.2d — (D.C.Cir. No. 79–1930, decided April 18, 1980) (*per curiam*) (concerning a Federal Maritime Commission investigation).

45. During oral argument before the panel Dresser's attorney was asked what prejudice the company suffered from the parallel proceedings. Transcript of oral argument at 49 (Dec. 11, 1978). He responded that Dresser was prejudiced in two ways. First, he complained that "the SEC does not have anywhere near the confidentiality protection that Rule 6(e) provides." Of course, this complaint is properly addressed to Congress, which explicitly granted the SEC the power to "publish" the results of its investigations. Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976). We do not express any opinion on whether the SEC would be justified in exercising the power to publish in this case; we merely note that the Commission is not governed, and is not intended to be governed, by Rule 6(e). Second, the attorney invoked Dresser's "right to a fair criminal investigation, including the fact that the Rules of Discovery of the Federal Rules of Criminal Procedure apply to it." Transcript of oral argument at 49 (Dec. 11, 1978). If he was referring to Rule 16(b), then he was mistaken, for Rule 16(b) comes into play only after indictment. In fact, the grand jury's investigative powers are as broad as or broader than those of the SEC. Dresser cannot claim to be prejudiced by the breadth of the SEC investigative authority.

RPI 0178

lactic rule enunciated in *LaSalle* is inappropriate where the SEC and the Justice Department are simultaneously pursuing civil and criminal investigations." Slip opinion at 18. The panel therefore affirmed the District Court and ordered enforcement of the SEC subpoena. Out of a concern that the SEC subpoena might somehow "subvert the limitations of criminal discovery," *id.*, however, the panel, with one judge dissenting, modified the terms of the subpoena enforcement order. It required that "once the Justice Department initiates criminal proceedings by means of a grand jury, the SEC may not provide the Justice Department with the fruits of the Commission's civil discovery gathered after the decision to prosecute." *Id.* at 22.[46] We affirm the judgment of the District Court and reject the panel's modification.

First, we note that no party to this case had suggested or requested a modification such as that imposed by the panel majority, either in the District Court or in this court.[47] In supplemental briefs submitted to the *en banc* court both the SEC and Justice vigorously oppose the modification, while Dresser's support for it is lukewarm at most. Dresser had argued that the SEC investigation is flatly prohibited by the rule of *LaSalle*; the panel's modification, according to Dresser, "may have had a similar effect" to that of *LaSalle*—"though not as assured in its operation." Supplemental brief of appellant Dresser Industries, Inc. at 30. Dresser characterized the panel's decision to "relax" the *LaSalle* rule as "unsound," *id.* at 29, and described the motivating factor in the panel's decision—the supposed need to protect the "criminal discovery process * * * of the grand jury," slip opinion at 22—as "irrelevant to

this litigation." Supplemental brief of appellant Dresser Industries, Inc. at 9 n.16. The reactions of the parties, therefore, suggest that the panel's modification might serve more to impede securities law enforcement than to protect the interests of Dresser.

Second, we note that there is no support for the panel's modification in either the relevant statutes or legislative history. Both the '33 Act and the '34 Act—and other statutes related to securities law enforcement as well[48]—expressly authorize the SEC to "transmit such evidence as may be available * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this subchapter." Section 20(b) of the '33 Act, 15 U.S.C. § 77t(b) (1976); Section 21(d) of the '34 Act, 15 U.S.C. § 78u(d) (1976). The statutes impose no limitation on when this transmittal may occur. The parties have not cited any portions of the legislative histories of these Acts relevant to this question, nor have we found any. But the SEC and Justice find considerable support for their interpretation in the legislative history of the Foreign Corrupt Practices Act of 1977, 91 Stat. 1494, Title I, 15 U.S.C. §§ 78a, 78m, 78dd-1, 78dd-2, 78ff (Supp. I 1977).

The Foreign Corrupt Practices Act outlaws corporate bribery of foreign officials and associated inaccurate or misleading financial recordkeeping. In passing the statute Congress recognized the role of the SEC in combatting such practices under the '33 and '34 Acts, and sought to "strengthen the Commission's ability to enforce compliance with the existing reguirements [sic] of the securities laws[.]" S.Rep.No. 114, 95th Cong., 1st Sess. 12 (1977). Both the Senate and the House reports on the bill acknowl-

---

46. Under the panel's terminology the decision to prosecute and the beginning of "criminal discovery" occur at the time when Justice begins to present its case to the grand jury. *See* slip op. at 21. After indictment by the grand jury, when genuine criminal discovery under Rule 16(b) begins, different considerations would govern. *See* text and notes at notes 20–21 *supra*; supplemental brief of the SEC at 23–24; supplemental brief of appellant Dresser Industries, Inc. at 9 n.16.

47. Mr. Luter, appellant in No. 78–1705, has taken no position regarding the panel's modification of the District Court's order.

48. Investment Company Act of 1940, § 42(e), 15 U.S.C. § 80a–41(e) (1976); Investment Advisers Act of 1940, § 209(e), 15 U.S.C. § 80b–9(e) (1976); Public Utility Holding Company Act of 1935, § 18(f), 15 U.S.C. § 79r(f) (1976).

RPI 0179

edged the SEC's dual investigative role in preparing cases for civil and criminal enforcement actions. They also recognize the necessity of close cooperation between the SEC and Justice in preparing such cases. The Senate Committee said:

> The committee expects that close cooperation will develop between the SEC and the Justice Department at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale. * * *

*Id.* at 12. It stated that it expected the SEC and Justice to "work out" between themselves certain "arrangements * * * on criminal matters" that would preserve the authority of each within its jurisdiction. *Id.* The House Committee said:

> Traditionally, there has been a close working relationship between the Justice Department and the SEC. The Committee fully expects that this cooperation between the two agencies will continue with respect to the enforcement of the provisions of this bill.

H.R.Rep.No: 640, 95th Cong., 1st Sess. 10 (1977).

Although the legislative history of the Foreign Corrupt Practices Act is not directly probative of congressional intent governing the '33 and '34 Acts, these statements by the 95th Congress are nevertheless entitled to some weight. The remarks in the committee reports concerning the investigative practices of the SEC and Justice were not intended to change, but to reaffirm, past practice. This indicates that Congress understands and approves of the "close working relationship" between the agencies in their investigative capacities. Since such a "close working relationship" will govern the activities of the agencies in enforcing the laws against questionable foreign payments under the new statute, it would be impractical for us to attempt to screen the agencies from each other when they are investigating the same sort of offense under the former statutes.

Congress manifestly did not intend that the SEC be forbidden to share information with Justice at this stage of the investigation. Under the panel majority's theory of the case the SEC would be foreclosed from sharing the fruits of its investigation with Justice as soon as Justice begins its own investigation through a grand jury. Only by waiting until the close of the SEC proceeding before initiating its own grand jury investigation could Justice obtain access to the evidence procured by the SEC. In view of Congress' concern that the agencies share information "at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale," S.Rep.No. 114, *supra*, at 12, and that the agencies avoid "a costly duplication of effort," H.R.Rep.No. 640, *supra*, at 9, it would be unreasonable to prevent a sharing of information at this point in the investigation.

Third, we note that there is little or no judicial precedent for the panel's modification. The only support adduced by the panel opinion is a District Court opinion in *SEC v. Gilbert*, 79 F.R.D. 683 (S.D.N.Y.1978). In that case, which arose on the defendant's request for a protective order under the discovery rules of the Federal Rules of Civil Procedure—as contrasted to an investigative subpoena enforcement proceeding as in this case—the court ordered the SEC "not to furnish the U.S. Attorney specially with any information procured in the course of discovery in this case." *Id.* at 687. The court offered no authority for this order nor, indeed, any reason for its application. While we recognize the similarity of *Gilbert* to this case in many respects, its lack of reasoning and its distinguishable procedural posture make it but weak authority.[49]

In fact, the reasoning of the Supreme Court in *LaSalle* is contrary to that of the panel in two respects, and should govern this case in lieu of *Gilbert*. The *LaSalle*

---

49. The panel majority did not deal directly with two decisions much closer to the instant case on their facts. Both were decided in favor of the SEC without modification. *SEC v. Druck-* er, [Transfer Binder 1979] Fed.Sec.L.Rep. (CCH) ⸿ 96,821 (S.D.N.Y. March 30, 1979); *Gellis v. Casey*, 338 F.Supp. 651 (S.D.N.Y. 1972). *See* panel slip op. at 12 n.29, 14 n.31.

Court considered, and explicitly rejected, the course adopted by the panel majority: "[I]t is unrealistic to attempt to build a partial information barrier between the two branches of the executive." *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 312, 98 S.Ct. at 2365. More fundamentally, the *LaSalle* Court conceived of the controversy before it as an analysis of the good or bad faith of the IRS investigation. A bad faith investigation, in the Court's conception, is one conducted solely for criminal enforcement purposes. *See id.* at 307–308, 316, & 316 n.18, 98 S.Ct. at 2362–2363, 2367 & 2367 n.18. Where the agency has a legitimate noncriminal purpose for the investigation, it acts in good faith under the *LaSalle* conception even if it might use the information gained in the investigation for criminal enforcement purposes as well.[50] In the present case the SEC plainly has a legitimate noncriminal purpose for its investigation of Dresser. It follows that the investigation is in good faith, in the absence of complicating factors. There is, therefore, no reason to impose a protective order such as that imposed by the panel majority.

Finally, we note that the panel's modification would serve no compelling purpose, and might interfere with enforcement of the securities laws by the SEC and Justice. As the Second Circuit has said, the procedure permitting the SEC to communicate with Justice during the preliminary stages of an investigation has "significant advantages." *United States v. Fields, supra,* 592 F.2d at 646.

Allowing early participation in the case by the United States Attorney minimizes statute of limitations problems. The more time a United States Attorney has, the easier it is for him to become familiar with the complex facts of a securities fraud case, to prepare the case, and to present it to a grand jury before expiration of the applicable statute of limitations. Earlier initiation of criminal proceedings moreover is consistent with a defendant's right to a speedy trial. * *

*Id.* The panel's modification would "interfere with this commendable example of inter-agency cooperation," *id.,* to the detriment of securities law enforcement and in contravention of the will of Congress.[51] On the other side of the balance, the panel's concern for preserving the limitations on criminal discovery is largely irrelevant at this stage of the proceedings, as Dresser agrees.[52] Thus this would be an inappropriate situation to impose a "prophylactic" rule against cooperation between the agencies. We believe the courts can prevent any injustice that may arise in the particular circumstances of parallel investigations in the future. We decline to adopt the position of the panel majority.

## V. OTHER ISSUES

Several issues remain.

[5] First, Dresser argues that enforcing the SEC subpoena would breach an agreement of confidentiality made at the January 27, 1976 meeting between SEC and Dresser representatives. The District Court held that "[t]hroughout the voluntary disclosure program the SEC reserved its

---

50. So long as the Commission evinces no other indicium of bad faith. *See United States v. LaSalle Nat'l Bank, supra* note 25, 437 U.S. at 317 n.19, 98 S.Ct. at 2368 n.19.

51. In its brief Justice suggests a number of practical problems that might ensue from the panel's modification: (1) that Justice might have to forego any assistance from the SEC in enforcing the Foreign Corrupt Practices Act or other regulatory laws involving parallel investigations; (2) that agency attorneys might not be legitimately appointed as special assistant United States Attorneys to assist in preparing cases for grand juries; (3) that a grand jury witness might gain effective immunity from criminal prosecution by providing sole, original copies of inculpatory documents to the SEC; (4) that prosecutors might be unable to learn of prior testimony by grand jury witnesses; (5) that prosecutors might be denied access to exculpatory information, evidence of perjury, or a prior inculpatory statement; and (6) that the prosecutor might find it impossible to comply with his responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

52. *See* text at notes 33–34 *supra.*

RPI 0181

rights to pursue a formal investigation and issue subpoenas if necessary. It is readily apparent that the SEC never agreed to completely forego its rights to subpoena the material in question." 453 F.Supp. at 575. We have examined the record and do not find that the District Court's determination on this point was clearly erroneous.

Second, Dresser argues that the District Court erred in granting judgment for the SEC without permitting Dresser to conduct discovery into the propriety of the SEC investigation. Although the precise nature of Dresser's desired discovery is not clear, the company apparently would investigate: (1) the SEC criminal referral and the concurrent criminal investigation, with a view to the possibility that the SEC has proceeded in bad faith; (2) the ethical propriety of SEC agents' participation in the criminal investigation; (3) the existence of an SEC commitment of confidentiality; and (4) the basis for the SEC staff's decision to request a formal investigation of Dresser. *See* brief of respondent-appellant at 36–42.

[6] We recognize that discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty. *United States v. Fensterwald*, 553 F.2d 231 (D.C.Cir.1977) (*per curiam*); *United States v. Wright Motor Co.*, 536 F.2d 1090 (5th Cir. 1976). For example, the Supreme Court in *LaSalle* apparently contemplated some degree of discovery in IRS summons cases to determine the institutional good faith of the IRS in issuing such summonses. *United States v. LaSalle Nat'l Bank, supra*, 437 U.S. at 316–317, 98 S.Ct. at 2367; *id.* at 320, 98 S.Ct. at 2369 (dissenting opinion); *United States v. Marine Midland Bank*, 585 F.2d 36, 38–39 (2d Cir. 1978) (*per curiam*). However, district courts must be cautious in granting such discovery rights, lest they transform subpoena enforcement proceedings into exhaustive inquisitions into the practices of the regulatory agencies. *See FTC v. Anderson*, 631 F.2d 741, at 747 (D.C.Cir. 1979). Discovery should be per-

mitted only where the respondent is able to distinguish himself from "the class of the ordinary [respondent]," *United States v. Fensterwald, supra*, 553 F.2d at 231–232, by citing special circumstances that raise doubts about the agency's good faith. Even then, district courts must limit discovery to the minimum necessary in the interests of justice by requiring specific interrogatories or affidavits rather than "full-dress discovery and trial." *United States v. Marine Midland Bank, supra*, 585 F.2d at 39; *see United States v. Fensterwald, supra*, 553 F.2d at 232–233.

[7] We conclude that the District Court acted within its discretion in denying Dresser discovery in this case, and that it properly granted judgment to the SEC on the record before it. There was nothing improper about the SEC's decision to transmit \ the files of the participants in the Voluntary Disclosure Program to Justice, or about the subsequent concurrent investigations by the two agencies. Nor does the participation of two SEC attorneys in the Justice task force cast doubt upon the good faith of the Commission. Dresser's allegations of an agreement by the SEC not to subpoena the documents underlying its voluntary report are not substantiated by any writing, and are directly contrary to the published terms of the Voluntary Disclosure Program.[53] Finally, Dresser's suggestion that the order of investigation is improper because there was no "likelihood that a violation has been or is about to be committed," *see* 17 C.F.R. § 202.5 (1979), does not distinguish Dresser from any other recalcitrant subpoena respondent. At this stage of the investigation neither this court nor the SEC could know whether Dresser has violated the law. The Commission's discretion concerning which potential violators to investigate is, while not unbounded, extremely broad. Dresser has suggested no improper motive for the SEC investigation, *cf. United States v. Fensterwald, supra*, 553 F.2d at 232 (respondent's political and pro-

---

53. Report, *supra* note 4, at 32; *see* text at note 8 *supra*.

RPI 0182

fessional activities "could easily have spurred the Internal Revenue Service to take an extraordinary interest in this particular taxpayer"). Dresser's bare protestations of innocence do not suffice to call the SEC's bona fides into question.[54]. We therefore affirm the District Court's decision on this point.

Two remaining substantive issues raised by Dresser do not require decision by this court at this time. Those issues are: the asserted right of Dresser or its employees to protect portions of the documents from public disclosure because of the possibility of hostile and injurious foreign reaction, and the asserted attorney-client privilege of Dresser or its employees with respect to some of the documents. Despite Dresser's suggestion to the contrary, see brief of respondent-appellant at 42–47, we conclude that the District Court did not reach the merits of Dresser's claims on these points.

With respect to confidentiality, the court noted that the SEC had offered to give Dresser ten days notice in advance of disclosure of the documents to the public, to enable the company to challenge the decision to disclose. This offer the court found to be "adequate" to protect Dresser's interests at this stage of the proceeding. 453 F.Supp. at 576.[55] With respect to the attorney-client privilege, the District Court properly declined to evaluate Dresser's claims in generality, stating that such claims at this point are "vague and conclusory." Id. The court further said that "[c]ertainly not all of the material sought is privileged," and indicated that the investigative report prepared by Dresser as part of the Voluntary Disclosure Program is not privileged. Id. Dresser apparently does not dispute either

of these specific conclusions. Brief of respondent-appellant at 43, 44.

We agree with the District Court that Dresser's claims of confidentiality and of attorney-client privilege cannot be judged by the courts on this record at this stage of the proceeding. Rather, once the subpoena has been enforced the SEC will have the opportunity to rule on specific requests for confidential treatment and assertions of attorney-client privilege. This procedure will follow the outlines described by this court in FTC v. Texaco, Inc., 55 F.2d 862, 883–885 (D.C.Cir.) (en banc), cert. denied, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), and the Supreme Court in FCC v. Schreiber, 381 U.S. 279, 290–291, 295–296, 85 S.Ct. 1459, 1467–1468, 1470, 14 L.Ed.2d 383 (1965).

We recognize that Judge Parker in the grand jury investigation of Dresser said that Dresser's concern for the lives of its employees and their families and property abroad in the event of public disclosure of portions of the documents is "not illusory and should not be lightly considered," see JA 163, but we believe that the SEC will be in a better position to evaluate this claim than the courts are now. This court has commented before that the danger that confidential materials might be wrongfully released to the public through the Freedom of Information Act is "by no means frivolous," FTC v. Anderson, supra, 631 F.2d at 748 n.11. Courts have held an offer of ten days notice before release of information to be adequate protection in several cases involving business information. Id., 631 F.2d at 748; FTC v. Texaco, Inc., supra, 555 F.2d at 884–885; SEC v. Wheeling-Pittsburgh Steel Corp., 482 F.Supp. 555,

---

54. Dresser's allegation that the staff "repeatedly told Dresser that it knew of no securities violation," brief of respondent-appellant at 41, does not alter the case. By the time the Commission decided to issue the order of investigation, the staff had officially concluded otherwise. See order directing private investigation and designating officers to take testimony, JA 7–9.

55. The court said:
Furthermore, the Commission has offered to give Dresser ten days notice in the event that

there is a FOIA request and the SEC determines the material is not exempt and must be disclosed. These assurances of confidentiality are adequate and Dresser is entitled to no more. * * *

453 F.Supp. at 576. We interpret the SEC's offer as encompassing any decision to release the documents, whether or not pursuant to the FOIA. Moreover, we assume that, upon examination of particular documents or groups of documents, the SEC has the authority to stiffen the confidentiality or notice agreement.

RPI 0183

563 (W.D.Pa.1979). The District Court approved a similar arrangement in this case with respect to Dresser's subpoenaed documents in general. We do not read the opinion as approving such a procedure with respect to all documents in this case, no matter how sensitive they may prove to be. The decision whether to accord greater protection to certain documents where release might endanger employees' lives abroad must be made in the first instance by the Commission, which will be able to inspect the documents and hear argument on the issue.[56]

The question of the attorney-client privilege must be resolved in a similar manner: viewed initially by the Commission with later review in the courts if necessary.

We see no ground for reversal in the District Court's determinations on the confidentiality and attorney-client privilege issues.

The final issue in this case is that raised in No. 78–1705: whether the District Court erred in its decision of June 23, 1978, JA 532, *reconsideration denied*, JA 559, denying Mr. Edward R. Luter, a senior vice president of Dresser, the right to intervene in this enforcement proceeding on behalf of himself and other employees of Dresser. Mr. Luter claims an interest in the proceeding on bases of an alleged confidentiality interest on the part of the employees in certain documents and an alleged attorney-client privilege. The District Court rejected Mr. Luter's motion to intervene, saying:

> Mr. Luter has failed to demonstrate any proper basis for reconsideration, for intervention as a matter of right, or for intervention as a matter of discretion. Even if there was an attorney-client privilege to be invoked in this case, it would be the corporation's and not the employees'. In addition, the employees had no constitutional right of privacy concerning the communications in question. * * *

JA 559 (order denying reconsideration).

[8] We are somewhat troubled by the District Court's treatment of Mr. Luter's motion. It appears that the court rejected his claim on the merits without first allowing him to pass the threshold. In this circuit an applicant to intervene need only show that the representation of his interest may be inadequate; the burden of proof rests on those resisting intervention. *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C.Cir. 1967). In cases of alleged corporate misconduct it is especially important for the courts to be alert to the possibilities of conflict between the interests of the corporation and those of its employees.

[9] In this case, however, we need not judge whether the court was correct in its conclusion that Mr. Luter has asserted no cognizable interest in the proceedings. With the benefit of hindsight, and informed by the arguments Mr. Luter has made on his behalf in this appeal, we are able to conclude that Dresser has adequately represented the interests of its employees through this stage of the litigation. So far, the disputes have centered on the enforceability of the SEC subpoena, not on particular questions of confidentiality or privilege pertaining to individual documents. We do not understand the District Court as having rejected the right of Mr. Luter or any other Dresser employees to intervene in future proceedings concerning this investigation. On the understanding that Mr. Luter or his fellow employees may seek to intervene in future SEC proceedings concerning confidentiality and the attorney-client privilege, and in any court proceedings that might follow, and that the SEC and the courts will evaluate any such motions to intervene afresh and on their merits, we affirm the judgment of the District Court in No. 78–1705. As previously indicated we affirm the judgment of the District Court in No. 78–1702 as well.

The judgments of the District Court are

*Affirmed.*

---

56. We note that, except in "egregious cases," the SEC has stated it would not require more than "generic" disclosure to the public of questionable foreign payments. Report, *supra* note 4, at 9 n.8.

EDWARDS, Circuit Judge, concurring:

I concur in the opinion of the court in this case. I wish to point out, however, that I do not read the court's opinion as expressing any view as to the proper outcome in a case of this sort *once an indictment has issued. See* text of opinion at notes 33–34, *supra.* Once an indictment has issued, the policy interest expressed in *United States v. LaSalle National Bank,* 437 U.S. 298, 312, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978), concerning the impermissibility of broadening the scope of criminal discovery through the summons authority of an agency, may come into play. I express no opinion as to whether or not the summons authority of a government agency may continue once an indictment has been issued or, if it may, whether protective conditions need be placed on the exercise of that power. These issues raise questions which are not presented here. The resolution of these questions, therefore, must await another day.



tablish that she falls within the protected class: a handicapped person who was not hired because of her handicap. It is not sufficient for the plaintiff to merely establish that she was denied employment "because of handicap" under article 5221k. *Id.* The explanation of the term "because of handicap" is contained in section 1.04(b) of article 5221k, under the heading "Specific Rules of Construction." *Id.* "This 'rule of construction' simply adds the requirement that before any 'handicap' can be the basis of a discrimination action, it must not impair the person's ability to reasonably perform the job." *Id.* However, the plaintiff must still be "handicapped." *Id.*

Because Brunner has not alleged that she was handicapped, we cannot hold that she has established that appellees discriminated against her "because of handicap."

We overrule point of error two.

The judgment is affirmed.



Patricia L. JACKSON, Appellant,

v.

SMITH SECURITY SERVICE, INC., and T.J.X. Companies, Inc., d/b/a T.J. Maxx, Appellees.

No. 01-89-00395-CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 22, 1990.

Customer brought action against store based on conduct including allegedly false accusation of shoplifting, seeking damages for assault and battery, false imprisonment, slander, invasion of privacy, and violation of civil rights under federal civil rights statute. The 234th District Court, Harris County, rendered take-nothing summary judgment for store, and customer appealed. The Court of Appeals, Evans, C.J., held that appeal in civil suit would be held in abeyance pending determination of customer's petition for discretionary review of shoplifting conviction arising out of same incident.

Ordered accordingly.

Action ⚖=69(5)

Appeal from take-nothing judgment rendered for store in action based on store's conduct including allegedly false accusation of shoplifting would be held in abeyance pending determination of plaintiff's petition for discretionary review with respect to shoplifting conviction arising out of same incident, to avoid unjust consequences of giving preclusive effect to criminal judgment if it were later reversed on appeal.

Robert G. Miller, O'Donnell & Ferebee, Houston, for appellant.

Robert C. Scruggs and Jeffrey Lee Hoffman, Whittington, Pfeiffer & Vacek, Houston, for appellees.

Before EVANS, C.J., and COHEN and HUGHES, JJ.

ORDER

EVANS, Chief Justice.

ORDER ON MOTION FOR REHEARING

This Court's former order of December 21, 1989, is withdrawn, and the following order is substituted.

This is an appeal from a take-nothing summary judgment.

The plaintiff, Patricia L. Jackson, sued defendants, T.J.X. Companies, Inc. (T.J. Maxx) and Smith Security Services, Inc. (Smith Security), alleging that they had falsely accused her of shoplifting, placed her under physical restraint, and threatened to handcuff her to force her to remain at the T.J. Maxx store. Jackson alleged that her purse was forcibly taken from her, and that she was questioned for at least

RPI 0186

two hours despite her continuing protestations of innocence and her demands to be released. Thereafter, she alleged that the sheriff's department, based solely on the defendant's accusations, placed her under arrest, shackled her in handcuffs, and led her through the store in full view of the general public. She also alleged that she was then fingerprinted and placed in a cell, and that she was not released from custody for seven more hours. Because of these alleged wrongs, Jackson sought damages for assault and battery, false imprisonment, slander, invasion of privacy, and violation of her civil rights under 42 U.S.C. sec. 1983 (1989). She also sought exemplary damages on the grounds that the defendants had engaged in a malicious and unjustified civil conspiracy and had intentionally and negligently caused her emotional distress.

The record indicates that the court entered an interlocutory summary judgment in favor of defendant, Smith Security, based upon its conclusive showing that it was a stranger to the transaction and had no relationship with the other defendant, T.J. Maxx. Evidently, Jackson does not complain of that ruling, and this appeal relates solely to the take-nothing summary judgment entered in favor of T.J. Maxx.

In its motion for summary judgment, T.J. Maxx asserted that it had a legal right to engage in the conduct of which it was charged, and that Jackson's criminal conviction for shoplifting should be given preclusive effect with respect to each theory of recovery asserted by Jackson in her petition. In support of its motion, T.J. Maxx attached copies of the criminal complaint charging Jackson with the misdemeanor offense of price-tag switching, an affidavit of one of its employees identifying Jackson as the same person named in the complaint, and a copy of the judgment entered by the County Criminal Court at Law No. 7 of Harris County, showing that a jury found Jackson guilty of the offense charged in the information.

On oral submission, both parties agree that Jackson's appeal from the criminal conviction is pending Petition for Discretionary Review before the Court of Criminal Appeals, and that only one issue has been presented to that court for its determination. Here, Jackson's sole contention is that because of her pending criminal appeal, her conviction cannot yet be given preclusive effect. Jackson asks this Court to either stay the trial court's judgment or abate the appeal in this case until the Court of Criminal Appeals has decided her criminal appeal and issues a mandate.

The Texas Supreme Court has held that "a judgment is final for the purposes of issue and claim preclusion despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo." *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 6–7 (Tex.1986); *see also CLS Assoc., Ltd. v. A—B—,* 762 S.W.2d 221, 223 (Tex. App.—Dallas 1988, no writ); *McCormick v. Texas Commerce Bank Nat'l Ass'n,* 751 S.W.2d 887, 889–90 (Tex.App.—Houston [14th Dist.] 1988, writ denied); *Federal Sav. & Loan Ins. Corp. v. Kennedy,* 732 S.W.2d 1, 3 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). This holding, which adopts the established rule in the federal courts, is based on the Restatement (Second) of Judgments section 16 (1982).

In *Scurlock,* the Texas Supreme Court recognized the "manifest risk" in resting preclusion on a judgment's being appealed. *Scurlock,* 724 S.W.2d at 6. The court further noted that the second judgment should not be allowed to stand if the first judgment is later reversed. *Id.*

Several alternatives have been suggested to avoid the unjust consequences of giving preclusive effect to a judgment that is later reversed on appeal. One suggested option is to stay the proceedings in the second action until the determination of the appeal in the first action. Another alternative is to hold open the appeal in the second action until the determination of the appeal in the first action. A third possibility is to proceed to a final determination in the second action, on the premise that any inequity could be remedied by an equitable bill of review in the event the first judgment is later set aside. *See* 18 C. Wright, A. Miller

RPI 0187

& E. Cooper, *Federal Practice & Procedure* sec. 4433 (1981).

Here, Jackson urges the adoption of one of the first two alternatives suggested, and she asks this Court either to stay the proceedings in the trial court or to hold this appeal in abeyance pending determination of her criminal appeal by the decision of the Court of Criminal Appeals. T.J. Maxx argues the adoption of the third alternative, contending that it will suffer undue hardship, delay, and inconvenience if the dispute is not expeditiously determined.

Recognizing the disadvantages inherent in each of the methods suggested, we adopt the second alternative, urged by appellant, and hold the appeal in abeyance pending a determination by the Court of Criminal Appeals of Appellant's Petition for Discretionary Review. This method, we believe, will best meet the interests of the courts and the litigants, and will avoid the more drastic consequences that could follow our adoption of some other course of action.

We accordingly order the appeal stayed pending the issuance of a mandate by the Court of Criminal Appeals in appellant's criminal case. If appellant's criminal conviction is upheld by the decision of the Court of Criminal Appeals, the trial court's take-nothing summary judgment in this case will be affirmed; otherwise, the trial court's summary judgment will be reversed and the cause remanded.

It is so ORDERED.



LAMAR BUILDERS, INC., Appellant,

v.

GUARDIAN SAVINGS & LOAN ASSOCIATION, Appellee.

No. 01-90-00092-CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 26, 1990.

Motion was filed to stay presentment of letters of credit which were subject of pending appeal from denial of temporary injunction. The 333rd District Court, Harris County, granted motion for temporary order. Appeal was taken. The Court of Appeals, Evans, C.J., held that motion failed to provide showing required for requested relief to be granted.

Vacated.

1. Appeal and Error ⟜458(3)
   Injunction ⟜139
   While appeal from order denying interlocutory relief may not be suspended by filing supersedeas bond, Court of Appeals has authority to issue such temporary orders as it finds necessary to preserve rights of parties until disposition of appeal and may require such security as it deems appropriate. Rules App.Proc., Rule 43(a, c).

2. Banks and Banking ⟜191.30
   Two issues generally before a Court of Appeals in determining whether to extend temporary order enjoining presentation of letters of credit are whether it is necessary to preserve rights of parties pending disposition of appeal of denial of temporary injunction, and if injunction is necessary, what the appropriate security is.

3. Injunction ⟜140
   There is no necessity for party moving for temporary order in an appeal to follow formal prerequisites of rule governing original proceedings for writ of mandamus, prohibition, and injunction. Rules App. Proc., Rules 43, 121.

4. Injunction ⟜140
   Movant seeking temporary order pending disposition of interlocutory appeal should meet same standards for presentation of motion and evidence as relators seeking relief through original proceeding to protect jurisdiction. Rules App.Proc., Rules 43, 121.

5. Injunction ⟜140
   To obtain injunctive relief under rule providing for temporary orders, movant

RPI 0188

purposes of the constitutional privilege, and which may reasonably be expected to serve important public interests. We are not entitled to assume that discharges will be used either to vindicate impermissible inferences of guilt or to penalize privileged silence, but must instead presume that this procedure is only intended and will only be used to establish and enforce standards of conduct for public employees.[2] As such, it does not minimize or endanger the petitioners' constitutional privilege against self-incrimination.[3]

510

I would therefore conclude that the sanction provided by the State is constitutionally permissible. From this, it surely follows that the warning given of the possibility of discharge is constitutionally unobjectionable. Given the constitutionality both of the sanction and of the warning of its application, the petitioners would be constitutionally entitled to exclude the use of their statements as evidence in a criminal prosecution against them only if it is found that the statements were, when given, involuntary in fact. For the reasons stated above, I cannot agree that these statements were involuntary in fact.

I would affirm the judgments of the Supreme Court of New Jersey.

2. The legislative history of N.J.Rev.Stat. 2A:81-17.1, N.J.S.A. provides nothing which clearly indicates the purposes of the statute, beyond what is to be inferred from its face. In any event, the New Jersey Supreme Court noted below that the State would be entitled, even without the statutory authorization, to discharge state employees who declined to provide information relevant to their official responsibilities. There is therefore nothing to which this Court could properly now look to forecast the purposes for which or circumstances in which New Jersey might discharge those who have invoked the constitutional privilege.

3. The late Judge Jerome Frank thus once noted, in the course of a spirited defense of the privilege, that it would be entirely permissible to discharge police officers

385 U.S. 511

Samuel SPEVACK, Petitioner,

v.

Solomon A. KLEIN.

No. 62.

Argued Nov. 7, 1966.

Decided Jan. 16, 1967.

Disciplinary proceeding against attorney. The New York Supreme Court, Appellate Division, Second Department, entered order confirming report of referee and directing that attorney be disbarred and attorney appealed and moved for stay of operation of order of disbarment. The Court of Appeals, 16 N.Y.2d 1048, 266 N.Y.S.2d 126, 213 N.E.2d 457, denied motion for stay and affirmed order of disbarment. A motion was made to amend the remittitur. The Court of Appeals, 17 N.Y.2d 490, 267 N.Y.S.2d 210, 214 N.E.2d 373, granted the motion to amend remittitur and certiorari was granted. The Supreme Court, Mr. Justice Douglas, held that refusal of attorney to produce demanded financial records or to testify at judicial inquiry on basis that production of records and his

who decline, on grounds of the privilege, to disclose information pertinent to their public responsibilities. Judge Frank quoted the following with approval:

"'Duty required them to answer. Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers. They claim that they had a constitutional right to refuse to answer under the circumstances, but * * * they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them.' Christal v. Police Commission of San Francisco". Citing 33 Cal.App.2d 564, 92 P.2d 416. (Emphasis added by Judge Frank.) United States v. Field, 2 Cir., 193 F.2d 92, 106 (separate opinion).

testimony would tend to incriminate him was not ground for disbarment.

Reversed.

Mr. Justice Harlan, Mr. Justice Clark, Mr. Justice Stewart, and Mr. Justice White dissented.

For dissenting opinion of Mr. Justice White see 87 S.Ct. 636.

**1. Constitutional Law ☞251**

Self-incrimination clause of Fifth Amendment has been absorbed in Fourteenth Amendment and applies to states; overruling Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156. U.S.C.A. Const. Amends. 5, 14.

**2. Constitutional Law ☞306**

Self-incrimination clause of Fifth Amendment as absorbed in Fourteenth Amendment extends its protection to lawyers and should not be watered down by imposing dishonor of disbarment and deprivation of livelihood as price for asserting it; overruling Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156. U.S.C.A.Const. Amends. 5, 14.

**3. Attorney and Client ☞45**

Refusal of attorney in disciplinary proceeding to produce demanded financial records and to testify at judicial inquiry on basis that production of records and his testimony would tend to incriminate him was not ground for disbarment. U.S.C.A.Const. Amends. 5, 14.

**4. Constitutional Law ☞251**

Within rule that Fourteenth Amendment secures against state invasion the same privilege that Fifth Amendment guarantees against federal infringement, that is, right of person to remain silent unless he chooses to speak in unfettered exercise of his own will, without suffering penalty for such silence, "penalty" is not restricted to fine or imprisonment but means imposition of any sanction which makes assertion of Fifth Amendment privilege costly. U.S.C.A.Const. Amends. 5, 14.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Witnesses ☞297(1)**

Privilege against self-incrimination should be accorded a liberal construction. U.S.C.A.Const. Amend. 5.

**6. Witnesses ☞306**

Lawyers are not excepted from words of Fifth Amendment that no person shall be compelled in any case to be witness against himself and no exception can be implied. U.S.C.A.Const. Amend. 5.

**7. Attorney and Client ☞57**

Where, in New York disciplinary proceeding, applicability of privilege against self-incrimination to records of attorney was not questioned and attorney was disbarred on theory that privilege was applicable to records but that invocation of privilege could lead to disbarment, disbarment could not be affirmed on ground that privilege was not applicable in first place. U.S.C.A.Const. Amend. 5; Supreme Court Rules, App. Div., 2nd Dept., N.Y., Part 3, rule 4(6).

———◆———

**512**

Lawrence J. Latto, Washington, D. C., for petitioner.

Solomon A. Klein, for respondent, pro se.

Mr. Justice DOUGLAS announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur.

This is a proceeding to discipline petitioner, a member of the New York Bar, for professional misconduct. Of the various charges made, only one survived, viz., the refusal of petitioner to honor a *subpoena duces tecum* served on him in that he refused to produce the demanded financial records and refused to testify at

RPI 0190

the judicial inquiry. Petitioner's sole defense was that the production of the records and his testimony would tend

**513**

to incriminate him. The Appellate Division of the New York Supreme Court ordered petitioner disbarred, holding that the constitutional privilege against self-incrimination was not available to him in light of our decision in Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156. See 24 A.D.2d 653. The Court of Appeals affirmed, 16 N.Y.2d 1048, 266 N.Y.S.2d 126, 213 N.E.2d 457, 17 N.Y.2d 490, 267 N.Y.S.2d 210, 214 N.E.2d 373. The case is here on certiorari which we granted to determine whether Cohen v. Hurley, supra, had survived Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653.

Cohen v. Hurley was a five-to-four decision rendered in 1961. It is practically on all fours with the present case. There, as here, an attorney relying on his privilege against self-incrimination refused to testify and was disbarred. The majority of the Court allowed New York to construe her own privilege against self-incrimination so as not to make it available in judicial inquiries of this character (366 U.S., at 125-127, 81 S.Ct., at 959, 960) and went on to hold that the Self-Incrimination Clause of the Fifth Amendment was not applicable to the States by reason of the Fourteenth. Id., 366 U.S. at 127-129, 81 S.Ct. at 960-962. The minority took the view that the full sweep of the Fifth Amendment had been absorbed into the Fourteenth and extended its protection to lawyers as well as other persons.

In 1964 the Court in another five-to-four decision held that the Self-Incrimination Clause of the Fifth Amendment was applicable to the States by reason of the Fourteenth. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653. While Cohen v. Hurley was not overruled, the majority indicated that the principle on which it rested had been seriously eroded. 378 U.S., at 11, 84 S.Ct., at 1495. One minority view espoused by Mr. Justice Harlan and Mr. Justice Clark stated that Cohen v. Hurley flatly decided that the Self-Incrimination Clause of the Fifth Amendment was not applicable against the States (id., 378 U.S. at 17, 84 S.Ct. at 1498) and urged that it be followed.

**514**

The others in dissent—Mr. Justice White and Mr. Justice Stewart—thought that on the facts of the case the privilege was not properly invoked and that the state trial judge should have been sustained in ruling that the answers would not tend to incriminate. Id., 378 U.S. at 33-38, 84 S.Ct. 1506-1509.

The Appellate Division distinguished Malloy v. Hogan on the ground that there the petitioner was not a member of the Bar. 24 A.D.2d, at 654. And the Court of Appeals rested squarely on Cohen v. Hurley as one of the two grounds for affirmance.[1]

[1-3] And so the question emerges whether the principle of Malloy v. Hogan is inapplicable because petitioner is a member of the Bar. We conclude that Cohen v. Hurley should be overruled, that the Self-Incrimination Clause of the Fifth Amendment has been absorbed in the Fourteenth, that it extends its protection to lawyers as well as to other individuals, and that it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it. These views, expounded in the dissents in Cohen v. Hurley, need not be elaborated again.

---

1. "Order affirmed on the authority of Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156, and on the further ground that the Fifth Amendment privilege does not apply to a demand, not for oral testimony, but that an attorney produce records required by law to be kept by him. Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787." 16 N.Y.2d 1048, 1050, 266 N.Y.S.2d 126, 127, 213 N.E.2d 457-458.

RPI 0191

We said in Malloy v. Hogan:

"The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty * * * for such silence." 378 U.S., at 8, 84 S.Ct., at 1493.[2]

515

[4] In this context "penalty" is not restricted to fine or imprisonment. It means, as we said in Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the imposition of any sanction which makes assertion of the Fifth Amendment privilege "costly." Id., 380 U.S. at 614, 85 S.Ct. at 1233. We held in that case that the Fifth Amendment, operating through the Fourteenth, "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id., 380 U.S. at 615, 85 S.Ct. at 1233. What we said in *Malloy* and *Griffin* is in the tradition of the broad protection given the privilege at least since Boyd v. United States, 116 U.S. 616, 634–635, 6 S.Ct. 524, 534–535, 29 L.Ed. 746, where compulsory production of books and papers of the owner of goods sought to be forfeited was held to be compelling him to be a witness against himself.

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." 116 U.S., at 635, 6 S.Ct., at 535.

516

[5, 6] The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege. That threat is indeed as powerful an instrument of compulsion as "the use of legal process to force from the lips of the accused individual the evidence necessary to convict him * * *." United States v. White, 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542. As we recently stated in Miranda v. State of Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694, "In this Court, the privilege has consistently been accorded a liberal construction." It is in that tradition that we overrule Cohen v. Hurley. We find no room in the privilege against self-incrimination for classifications of people so as to deny it to some and extend it to others. Lawyers are not excepted from the words "No person * * * shall be compelled in any criminal case to be a witness against himself"; and we can imply no exception. Like the school teacher in Slochower v. Board of Higher Education of City of New York, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, and the

---

2. Kimm v. Rosenberg, 363 U.S. 405, 80 S.Ct. 1139, 4 L.Ed.2d 1299, much relied on here, was a five-to-four decision the other way and accurately reflected the pre-Malloy v. Hogan, construction of the Fifth Amendment. We do not stop to reexamine all the other prior decisions of that vintage to determine which of them, if any, would be decided the other way because of "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and *to suffer no penalty * * * for such silence*," as declared in Malloy v. Hogan, supra, 378 U.S. at 8, 84 S.Ct. 1493. (Italics added.)

RPI 0192

policemen in Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L. Ed.2d 562,[3] lawyers also enjoy first-class citizenship.

The Court of Appeals alternately affirmed the judgment disbarring petitioner on the ground that under Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787, and the required records doctrine he was under a duty to produce the withheld records. The Court of Appeals did not elaborate on the point; nor did the Appellate Division advert to it. At the time in question the only Rule governing the matter was entitled "Preservation of records of actions, claims and proceedings."[4] It provided that in cases involving "contingent fee compensation" attorneys

for all the parties shall preserve "the pleadings, records and other papers pertaining to such action, claim and proceeding, and also all data and memoranda of the disposition thereof, for the period of at least five years after any settlement or satisfaction of the action, claim or proceeding or judgment or final order thereon, or after the dismissal or discontinuance of any action or proceeding brought."

The documents sought in the subpoena were petitioner's daybook, cash receipts book, cash disbursements book, checkbook stubs, petty cashbook and vouchers, general ledger and journal, canceled checks and bank statements, passbooks and other evidences of accounts, record of loans made, payroll records, and state and federal tax returns and worksheets relative thereto.

The Shapiro case dealt with a federal price control regulation requiring merchants to keep sales records. The Court called them records with "public aspects," as distinguished from private papers (335 U.S., at 34, 68 S.Ct., at 1393); and concluded by a divided vote that their compelled production did not violate the Fifth Amendment. We are asked to overrule Shapiro. But we find it unnecessary to reach it.

[7] Rule 5, requiring the keeping of records, was broad and general—"the pleadings, records and other papers pertaining to such action, claim and proceeding, and also all data and memoranda of the disposition thereof." The detailed financial aspects of contingent-fee litigation demanded might possibly by a broad, generous construction of the Rule be brought within its intendment. Our problem, however, is different. Neither the referee of the inquiry, nor counsel for the inquiry, nor the Appellate Division of the New York Supreme Court questioned the applicability of the privilege against self-incrimination *to the records*. All proceeded on the basis that petitioner could invoke the privilege with respect to the

records, but that the price he might have to pay was disbarment. The Court of Appeals was the first to suggest that the privilege against self-incrimination was not applicable *to the records*. Petitioner, however, had been disbarred on the theory that the privilege was applicable *to the records*, but that the invocation of the privilege could lead to disbarment. His disbarment cannot be affirmed on the ground that the privilege was not applicable in the first place. Cole v. State of Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644. For that procedure would deny him all opportunity at the trial to show that the Rule, fairly construed and understood, should not be

---

3. Whether a policeman, who invokes the privilege when his conduct as a police officer is questioned in disciplinary proceedings, may be discharged for refusing to testify is a question we did not reach.

4. Rule 5 of the Special Rules of the Second Dept., Appellate Division. Rule 5 was subsequently amended and renumbered as Special Rule IV (6). See Civil Practice Annual of New York 9-24 (1964).

RPI 0193

given a broad sweep[5] and to make a record that the documents demanded by the subpoena had no "public aspects" within the required records rule but were private papers.

Reversed.

Mr. Justice FORTAS, concurring in the judgment.

I agree that Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961), should be overruled. But I would distinguish between a lawyer's right to remain silent and that of a public employee who is asked questions specifically, directly, and narrowly relating to the performance of his official duties as distinguished from his beliefs or other matters that are not within the scope of the specific duties which he undertook faithfully to perform as part of his employment by the State. This Court has never held, for example, that a policeman may not be discharged for refusal in disciplinary proceedings to testify as to his conduct as a police officer. It is quite a different matter if the State seeks to use the testimony given under this lash in a subsequent criminal proceeding. Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562.

But a lawyer is not an employee of the State. He does not have the responsibility of an employee to account to the State for his actions because he does not perform them as agent of the State. His responsibility to the State is to obey its laws and the rules of conduct that it has generally laid down as part of its licensing procedures. The special responsibilities that he assumes as licensee of the State and officer of the court do not

---

5. Counsel for respondent conceded on oral argument that the subpoena was broader than Rule 5:

"Q. Is this subpoena coextensive with the provisions of the order about keeping the financial records or does the subpoena go beyond?

"A. I would say in my judgment it goes beyond. * * * There is room for reasonable argument that some of the items called for in the subpoena might perhaps be argued to not come within the required records I am talking about.

"Q. Would you mind relating those to us? Tell us what those are. * * * Cash disbursements?

"A. I would say do come under the records. * * * I would exclude as not coming within the statute the federal and state tax returns for example. * * *

"Q. How about worksheets * * * ?

"A. Worksheets? Out. * * *

"Q. You mean all of item 12 * * * would be out?

"A. Item 12—copies of federal and state tax returns, accountants' worksheets, and all other * * * I do not include them.

"Q. They would all be outside the rules?

"A. Yes.

*     *     *     *     *

"Q. But the demand was for records beyond the records that he was required to keep.

*     *     *     *     *

"A. [T]he New York Court of Appeals, speaking for the State of New York, says these are required records.

"Q. I suppose that if he produced just the records that were required—that he was required to keep—that that might very well constitute a waiver as to other records.

"A. No, no it would not. * * *

"Q. Why not?

"A. Because if the other records were held not to come within the required records doctrine he would have the privilege to do that, but he has no privilege.

"Q. I am not sure. Are you sure about that? * * * I would say that the common understanding is that if he produces some of the records relating to a given subject matter, that is a waiver of privilege as to the balance of the records relating to the subject matter. Am I wrong about that?

"A. I would not agree with that. It is an argument that could be made but I would disagree with it for this reason. Under the doctrine of Shapiro v. United States, he has no Fifth Amendment privilege as to records that are required to be kept. He does have Fifth Amendment privilege as to records he is not required to keep and also as to refusal to give oral testimony."

RPI 0194

carry with them a diminution, however limited, of his Fifth Amendment rights. Accordingly, I agree that Spevack could not be disbarred for asserting his privilege against self-incrimination.

If this case presented the question whether a lawyer might be disbarred for refusal to keep or to produce, upon properly authorized and particularized demand, records which the lawyer was lawfully and properly required to keep by the State as a proper part of its functions in relation to him as licensor of his high calling, I should feel compelled to vote to affirm, although I would be prepared in an appropriate case to re-examine the scope of the principle announced in Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). I am not prepared to indicate doubt as to the essential validity of *Shapiro*. However, I agree that the required records issue is not appropriately presented here, for the reasons stated by my Brother DOUGLAS. On this basis I join in the judgment of the Court.

Mr. Justice HARLAN, whom Mr. Justice CLARK and Mr. Justice STEWART join, dissenting.

This decision, made in the name of the Constitution, permits a lawyer suspected of professional misconduct to thwart direct official inquiry of him without fear of disciplinary action. What is done today will be disheartening and frustrating to courts and bar associations throughout the country in their efforts to maintain high standards at the bar.

It exposes this Court itself to the possible indignity that it may one day have to admit to its own bar such a lawyer unless it can somehow get at the truth of suspicions, the investigation of which the applicant has previously succeeded in blocking. For I can perceive no distinction between "admission" and "disbarment" in the rationale of what is now held. The decision might even lend some color of support for justifying the appointment to the bench of a lawyer who,

like petitioner, prevents full inquiry into his professional behavior. And, still more pervasively, this decision can hardly fail to encourage oncoming generations of lawyers to think of their calling as imposing on them no higher standards of behavior than might be acceptable in the general market-place. The soundness of a constitutional doctrine carrying such denigrating import for our profession is surely suspect on its face.

Six years ago a majority of this Court, in Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156, set its face against the doctrine that now prevails, bringing to bear in support of the Court's holding, among other things, the then-established constitutional proposition that the Fourteenth Amendment did not make applicable to the States the Fifth Amendment as such. Three years later another majority of the Court, in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, decided to make the Fifth Amendment applicable to the States and in doing so cast doubt on the continuing vitality of Cohen v. Hurley. The question now is whether *Malloy* requires the overruling of *Cohen* in its entirety. For reasons that follow I think it clear that it does not.

It should first be emphasized that the issue here is plainly not whether lawyers may "enjoy first-class citizenship."

Nor is the issue whether lawyers may be deprived of their federal privilege against self-incrimination, whether or not criminal prosecution is undertaken against them. These diversionary questions have of course not been presented or even remotely suggested by this case either here or in the courts of New York. The plurality opinion's vivid rhetoric thus serves only to obscure the issues with which we are actually confronted, and to hinder their serious consideration. The true question here is instead the proper scope and effect of the privilege against self-incrimination under the Fourteenth Amendment in state disciplinary proceed-

RPI 0195

ings against attorneys.[1] In particular, we are required to determine whether petitioner's disbarment for his failure to provide information relevant to charges of misconduct in carrying on his law practice impermissibly vitiated the protection afforded by the privilege. This important question warrants more complete and discriminating analysis than that given to it by the plurality opinion.

This Court reiterated only last Term that the constitutional privilege against self-incrimination "has never been given the full scope which the values it helps to protect suggest." Schmerber v. State of California, 384 U.S. 757, 762, 86 S.Ct. 1826, 1831, 16 L.Ed.2d 908. The Constitution contains no formulae with which we can calculate the areas within this "full scope" to which the privilege should extend, and the Court has therefore been obliged to fashion for itself standards for the application of the privilege. In federal cases stemming from Fifth Amendment claims, the Court has chiefly derived its standards from consideration of two factors: the history and purposes of the privilege, and the character and urgency of the other public interests

523

involved. See, e. g., Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842; Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787. If, as Malloy v. Hogan, supra, suggests, the federal standards imposed by the Fifth Amendment are now to be extended to the States through the Fourteenth Amendment, see also Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, it would follow that these same factors must be no less relevant in cases centering on Fourteenth Amendment claims. In any event, the construction consistently given to the Fourteenth Amendment by this

Court would require their consideration. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480. I therefore first turn to these factors to assess the validity under the Fourteenth Amendment of petitioner's disbarment.

It cannot be claimed that the purposes served by the New York rules at issue here, compendiously aimed at "ambulance chasing" and its attendant evils, are unimportant or unrelated to the protection of legitimate state interests. This Court has often held that the States have broad authority to devise both requirements for admission and standards of practice for those who wish to enter the professions. E. g., Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002; Dent v. State of West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623; Barsky v. Board of Regents of University of State of New York, 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829. The States may demand any qualifications which have "a rational connection with the applicant's fitness or capacity," Schware v. Board of Bar Examiners of State of New Mexico, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, and may exclude any applicant who fails to satisfy them. In particular, a State may require evidence of good character, and may place the onus of its production upon the applicant. Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105. Finally, a State may without constitutional objection require in the same fashion continuing evidence of professional and moral fitness as a condition of the retention of the right to practice. Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156. All this is in no way questioned by today's decision.

524

As one prerequisite of continued practice in New York, the Appellate Division,

1. No claim has been made either here or in the state courts that the underlying facts representing petitioner's alleged conduct were not such as to entitle him to claim the privilege against self-incrimination. We therefore deal with the case on the premise that his claim of privilege was properly asserted.

RPI 0196

Second Department, of the Supreme Court of New York has determined that attorneys must actively assist the courts and the appropriate professional groups in the prevention and detection of unethical legal activities. The Second Department demands that attorneys maintain various records, file statements of retainer in certain kinds of cases, and upon request provide information, all relevant to the use by the attorneys of contingent fee arrangements in such cases. These rules are intended to protect the public from the abuses revealed by a lengthy series of investigations of malpractices in the geographical area represented by the Second Department. It cannot be said that these conditions are arbitrary or unreasonable, or that they are unrelated to an attorney's continued fitness to practice. English courts since Edward I have endeavored to regulate the qualification and practice of lawyers, always in hope that this might better assure the integrity and evenhandedness of the administration of justice.[2] Very similar efforts have been made in the United States since the 17th century.[3] These efforts have protected the systems of justice in both countries from abuse, and have directly contributed to public confidence in those systems. Such efforts give appropriate recognition to the principle accepted both here and in England that lawyers are officers of the court who perform a fundamental role in the administration of justice.[4] The rules at issue here are in form and spirit a continuation of these efforts, and accordingly are reasonably calculated to serve the most enduring interests of the citizens of New York.

Without denying the urgency or significance of the public purposes served by these rules, the plurality opinion has seemingly concluded that they may not be enforced because any consequence of a claim of the privilege against self-incrimination which renders that claim "costly" is an "instrument of compulsion" which impermissibly infringes on the protection offered by the privilege. Apart from brief *obiter dicta* in recent opinions of this Court, this broad proposition is entirely without support in the construction hitherto given to the privilege, and is directly inconsistent with a series of cases in which this Court has indicated the principles which are properly applicable here. The Court has not before held that the Federal Government and the States are forbidden to permit any consequences to result from a claim of the privilege; it has instead recognized that such consequences may vary widely in kind and intensity, and that these differences warrant individual examination both of the hazard, if any, offered to the essential purposes of the privilege, and of the public interests protected by the consequence. This process is far better calculated than the broad prohibition embraced by the plurality to serve both the purposes of the privilege and the other important public values which are often at stake in such cases. It would assure the integrity of the privilege, and yet guarantee the most generous opportunities for the pursuit of other public values, by selecting the rule or standard most appropriate for the hazards and characteristics of each consequence.

One such rule has already been plainly approved by this Court. It seems clear to me that this rule is applicable to the situation now before us. The Court has repeatedly recognized that it is permissible to deny a status or authority to

---

2. The history of these efforts is outlined in Cohen, A History of the English Bar and *Attornatus* to 1450, 277 et seq., 2 Holdsworth, A History of English Law 317, 504 et seq.; 6 id., 431 et seq.

3. These efforts are traced in Warren, History of the American Bar, *passim*.

87 S.Ct.—40½

4. Evidences of this principle may be found in the opinions of this Court. See, e. g., Ex parte Bradley, 7 Wall. 364, 19 L.Ed. 214; Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

RPI 0197

a claimant of the privilege against self-incrimination if his claim has prevented full assessment of his qualifications for the status or authority. Under this rule, the applicant may not both decline to disclose information necessary to demonstrate his fitness, and yet demand that he receive the benefits of the status. He may not by his interjection of the privilege either diminish his obligation to establish his qualifications, or escape the consequences exacted by the State for a failure to satisfy that obligation.

This rule was established by this Court in Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842. The Court there held that a doctor who refused, under a claim of the privilege against self-incrimination, to divulge whether he was a Communist was not entitled by right to receive a commission as an Army officer, although he had apparently satisfied every other prerequisite for a commission. The Court expressly noted that "[n]o one believes he can be punished" for asserting the privilege, but said that it had "no hesitation" in holding that the petitioner nonetheless could not both rely on the privilege to deny relevant information to the commissioning authorities and demand that he be appointed to a position of "honor and trust." 345 U.S., at 91, 73 S.Ct., at 539. The Court concluded that "we cannot doubt that the President of the United States, before certifying his confidence in an officer and appointing him to a commissioned rank, has the right to learn whatever facts the President thinks may affect his fitness." Ibid.

Analogous problems were involved in Kimm v. Rosenberg, 363 U.S. 405, 80 S.Ct. 1139, 4 L.Ed.2d 1299, in which the Court held that an alien whose deportation had been ordered was ineligible for a discretionary order permitting his voluntary departure. The alien was held to be ineligible because he had failed to establish that he was not affiliated with the Communist Party, in that he refused to answer questions about membership in the Party on grounds that the answers might incriminate him. The petitioner could not prevent the application of a sanction imposed as a result of his silence by interposing the privilege against self-incrimination as a basis for that silence.

These principles have also been employed by this Court to hold that failure to incriminate one's self can result in denial of the removal of one's case from a state to a federal court, Maryland v. Soper (No. 1), 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449, and by the Fourth Circuit to hold that a bankrupt's failure to disclose the disposition of his property, although disclosure might incriminate him, requires the denial of a discharge in bankruptcy. Kaufman v. Hurwitz, 4 Cir., 176 F.2d 210.

This Court has applied similar principles in a series of cases involving claims under the Fourteenth Amendment. These cases all antedate Malloy v. Hogan, and thus are presumably now subject to the "federal standards," but until today those standards included the principles of Orloff v. Willoughby, and Malloy v. Hogan therefore could not alone require a different result. The fulcrum of these cases has been Slochower v. Board of Higher Education of City of New York, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692. The appellant there was an associate professor at Brooklyn College who invoked the Fifth Amendment privilege before an investigating committee of the United States Senate, and was subsequently discharged from his position at the college by reason of that occurrence. The Court held that his removal was a denial of the due process demanded by the Fourteenth Amendment. Its reasons were apparently two: first, the Board had attached a "sinister meaning," in the form of an imputation of guilt, to Slochower's invocation of the privilege; and second, the Board was not engaged in a bona fide effort to elicit information relevant to assess the "qualifications of its employees." The state authorities "had possessed the pertinent information for 12 years," and

RPI 0198

in any event the questions put to Slochower

by the committee were "wholly unrelated" to his university functions. 350 U.S., at 558.

The elements of the holding in *Slochower* have subsequently been carefully considered on several occasions by this Court. See, e. g., Beilan v. Board of Public Education, School Dist. of Philadelphia, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414; Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423; Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494. These cases, when read with *Slochower*, make plain that so long as state authorities do not derive any imputation of guilt from a claim of the privilege, they may in the course of a bona fide assessment of an employee's fitness for public employment require that the employee disclose information reasonably related to his fitness, and may order his discharge if he declines. Identical principles have been applied by this Court to applicants for admission to the bar who have refused to produce information pertinent to their professional and moral qualifications. Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105; In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135. In sum, all these cases adopted principles under the Fourteenth Amendment which are plainly congruent with those applied in Orloff v. Willoughby, supra, and other federal cases to Fifth Amendment claims.

The petitioner here does not contend, and the plurality opinion does not suggest, that the state courts have derived any inference of guilt from petitioner's claim of the privilege. The state courts have expressly disclaimed all such inferences. 24 A.D.2d 653, 654. Nor is it suggested that the proceedings against petitioner were not an effort in good faith to assess his qualifications for continued practice in New York, or that the information sought from petitioner was not reasonably relevant to those qualifications. It would therefore follow that under the construction consistently given by this Court both to the privilege under the Fifth Amendment and to the Due Process Clause of the Fourteenth Amendment, petitioner's disbarment is constitutionally permissible.

The plurality opinion does not pause either to acknowledge the previous handling of these issues or to explain why the privilege must now be supposed to forbid all consequences which may result from privileged silence. This is scarcely surprising, for the plurality opinion would create a novel and entirely unnecessary extension of the privilege which would exceed the needs of the privilege's purpose and seriously inhibit the protection of other public interests. The petitioner was not denied his privilege against self-incrimination, nor was he penalized for its use; he was denied his authority to practice law within the State of New York by reason of his failure to satisfy valid obligations imposed by the State as a condition of that authority. The only hazard in this process to the integrity of the privilege is the possibility that it might induce involuntary disclosures of incriminating materials; the sanction precisely calculated to eliminate that hazard is to exclude the use by prosecuting authorities of such materials and of their fruits. This Court has, upon proof of involuntariness, consistently forbidden their use since Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, and now, as my Brother WHITE has emphasized, the plurality has intensified this protection still further with the broad prohibitory rule it has announced today in Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. It is true that this Court has on occasion gone a step further, and forbidden the practices likely to produce involuntary disclosures, but those cases are readily distinguishable. They have uniformly involved either situations in which the entire process was thought both to present excessive risks of coercion and to be foreign to our accusatorial

RPI 0199

system, as in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, or situations in which the only possible purpose of the practice was thought to be to penalize the accused for his use of the constitutional privilege, as in Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. Both situations are plainly remote from that in issue here. None of the reasons thought to require the prohibitions estab-

lished in those cases have any relevance in the situation now before us; nothing in New York's efforts in good faith to assure the integrity of its judicial system destroys, inhibits, or even minimizes the petitioner's constitutional privilege. There is therefore no need to speculate whether lawyers, or those in any other profession or occupation, have waived in some unspecified fashion a measure of the protection afforded by the constitutional privilege; it suffices that the State is earnestly concerned with an urgent public interest, and that it has selected methods for the pursuit of that interest which do not prevent attainment of the privilege's purposes.

I think it manifest that this Court is required neither by the logic of the privilege against self-incrimination nor by previous authority to invalidate these state rules, and thus to overturn the disbarment of the petitioner. Today's application of the privilege serves only to hamper appropriate protection of other fundamental public values.[5]

In view of these conclusions, I find it unnecessary to reach the alternative basis of the Court of Appeals' decision, the "required records doctrine." See Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787.

I would affirm the judgment of disbarment.

---

5. It should be noted that the principle that a license or status may be denied to one who refuses, under the shelter of the constitutional privilege, to disclose information pertinent to that status or privilege, has been adopted in a variety of situations by statute. See, e. g., 12 U.S.C. § 481; 47 U.S.C. §§ 308(b), 312 (a) (4); 5 U.S.C. § 2283.

---

385 U.S. 511

Edward J. GARRITY et al., Appellants,

v.

**STATE OF NEW JERSEY.**

Samuel SPEVACK, Petitioner,

v.

Solomon A. KLEIN.

Nos. 13, 62.

Jan. 16, 1967.

Dissenting opinion.

For majority opinions see 87 S.Ct. 616, 625.

Mr. Justice WHITE, dissenting.

In No. 13, Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, the Court apparently holds that in every imaginable circumstance the threat

of discharge issued by one public officer to another will be impermissible compulsion sufficient to render subsequent answers to questions inadmissible in a criminal proceeding. I would agree that in some, if not in most, cases this would be the proper result. But the circumstances of such confrontations are of infinite variety. Rather than the Court's inflexible, *per se* rule, the matter should be decided on the facts of each particular case. In the situation before us now, I agree with my Brother HARLAN that the findings of the two courts below should not be overturned.

However that may be, with *Garrity* on the books, the Court compounds its error in Spevack v. Klein, No. 62, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574. The petitioner in that case refused to testify and to produce any of his records. He incriminated himself in no way whatsoever. The Court nevertheless holds that he may not be disbarred for his refusal to do so. Such a rule would seem justifiable only on the ground that it is an es-

RPI 0200

on double jeopardy, to treat the verdict of a nonunanimous jury as a nullity rather than as an acquittal. On retrial, the prosecutor may be given the opportunity to make a stronger case if he can: new evidence may be available, old evidence may have disappeared, and even the same evidence may appear in a different light if, for example, the demeanor of witnesses is different. Because the second trial may vary substantially from the first, the doubts of the dissenting jurors at the first trial do not necessarily impeach the verdict of a new jury on retrial. But that conclusion is wholly consistent with the view that the doubts of dissenting jurors create a constitutional bar to conviction at the trial that produced those doubts. Until today, I had thought that was the law.

I respectfully reject the suggestion of my Brother POWELL that the doubts of minority jurors may be attributable to "irrationality" against which some protection is needed. For if the jury has been selected properly, and every juror is a competent and rational person, then the "irrationality" that enters into the deliberation process is precisely the essence of the right to a jury trial. Each time this Court has approved a change in the familiar characteristics of the jury, we have reaffirmed the principle that its fundamental characteristic is its capacity to render a commonsense, laymen's judgment, as a representative body drawn from the community. To fence out a dissenting juror fences out a voice from the community, and undermines the principle on which our whole notion of the jury now rests. My dissenting Brothers have pointed to the danger, under a less-than-unanimous rule, of excluding from the process members of minority groups, whose participation we have elsewhere recognized as a constitutional requirement. It should be emphasized, however, that the fencing-out problem goes beyond the problem of identifiable minority groups. The juror whose dissenting voice is unheard may be a spokesman, not for any minority viewpoint, but simply for himself—and that, in my view, is enough. The doubts of a single juror are in my view evidence that the government has failed to carry its burden of proving guilt beyond a reasonable doubt. I dissent.



406 U.S. 441, 32 L.Ed.2d 212

Charles Joseph KASTIGAR and Michael Gorean Stewart, Petitioners,

v.

UNITED STATES.

No. 70-117.

Argued Jan. 11, 1972.

Decided May 22, 1972.

Rehearing Denied June 26, 1972.
See 408 U.S. 931, 92 S.Ct. 2478.

Petitioners were ordered to appear before a grand jury and to answer questions under grant of immunity and, on refusal of the petitioners to answer questions, after asserting their privilege against compulsory self-incrimination, the United States District Court for the Central District of California adjudged petitioners to be in civil contempt and ordered them confined. The Court of Appeals, Ninth Circuit, affirmed, 440 F.2d 954. The Supreme Court granted certiorari, and, speaking through Mr. Justice Powell, held that although a grant of immunity must afford protection commensurate with that afforded by the privilege against compulsory self-incrimination, it need not be broader, and immunity from use and derivative use is coextensive with the scope of the privilege and is sufficient to compel testimony over claim of privilege. The Court also held that in any subsequent criminal prosecution of a person who has been granted immunity to testify, the prosecution has the burden of proving affirmatively that evidence proposed to be used is derived from a legitimate source

RPI 0201

wholly independent of compelled testimony.

Affirmed.

Mr. Justice Douglas and Mr. Justice Marshall dissented and filed opinions.

Mr. Justice Brennan and Mr. Justice Rehnquist took no part in consideration or decision.

**1. Criminal Law ☞393(1)**

Fifth Amendment privilege against compulsory self-incrimination can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory. U.S.C.A.Const. Amend. 5.

**2. Criminal Law ☞393(1)**

Fifth Amendment privilege against compulsory self-incrimination protects against any disclosures which witness reasonably believes could be used in criminal prosecution or could lead to other evidence which might be so used. U.S. C.A.Const. Amend. 5.

**3. Criminal Law ☞393(1)**

Fifth Amendment privilege against compulsory self-incrimination does not deprive Congress of power to enact properly drawn laws that compel self-incrimination through grant of immunity from prosecution. U.S.C.A.Const. Amends. 5, 6; 18 U.S.C.A. §§ 6001–6005, 6002, 6003.

**4. Witnesses ☞304(3)**

Grant of immunity, to supplant privilege against compulsory self-incrimination, must be coextensive with scope of privilege. U.S.C.A.Const. Amend. 5; 18 U.S.C.A. §§ 6001–6005, 6002, 6003; 49 U.S.C.A. § 46.

**5. Witnesses ☞304(3)**

Though grant of immunity must afford protection commensurate with that afforded by privilege against compulsory self-incrimination, it need not be broad-

er, and immunity from use and derivative use is coextensive with scope of privilege and is sufficient to compel testimony over claim of privilege; transactional immunity is not required. U.S.C.A.Const. Amend. 5; 18 U.S.C.A. §§ 6001–6005, 6002, 6003; 49 U.S.C.A. § 46.

**6. Courts ☞92**

Broad language of opinion which was unnecessary to court's decision could not be considered binding authority.

**7. Criminal Law ☞327**

In subsequent criminal prosecution of person who has been compelled to testify under grant of immunity, prosecution has burden of proving affirmatively that evidence proposed to be used is derived from legitimate source wholly independent of compelled testimony. U.S.C.A.Const. Amend. 5; 18 U.S.C.A. §§ 6001–6005, 6002, 6003.

*Syllabus* *

The United States can compel testimony from an unwilling witness who invokes the Fifth Amendment privilege against compulsory self-incrimination by conferring immunity, as provided by 18 U.S.C. § 6002, from use of the compelled testimony and evidence derived therefrom in subsequent criminal proceedings, as such immunity from use and derivative use is coextensive with the scope of the privilege and is sufficient to compel testimony over a claim of the privilege. Transactional immunity would afford broader protection than the Fifth Amendment privilege, and is not constitutionally required. In a subsequent criminal prosecution, the prosecution has the burden of proving affirmatively that evidence proposed to be used is derived from a legitimate source wholly independent of the compelled testimony. Pp. 1655–1666.

440 F.2d 954, affirmed.

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United

States v. Detroit, Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

RPI 0202

Hugh R. Manes, Los Angeles, Cal., for petitioners.

Sol. Gen. Erwin N. Griswold, for respondent.

Mr. Justice POWELL delivered the opinion of the Court.

This case presents the question whether the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony.

Petitioners were subpoenaed to appear before a United States grand jury in the Central District of California on February 4, 1971. The Government believed that petitioners were likely to assert their Fifth Amendment privilege. Prior to the scheduled appearances, the Government applied to the District Court for an order directing petitioners to answer questions and produce evidence before the grand jury under a grant of immunity conferred pursuant to 18 U.S.C. §§ 6002, 6003. Petitioners opposed issuance of the order, contending primarily that the scope of the immunity provided by the statute was not coextensive with the scope of the privilege against self-incrimination, and therefore was not sufficient to supplant the privilege and compel their testimony. The District Court rejected this contention, and ordered petitioners to appear before the grand jury and answer its questions under the grant of immunity.

Petitioners appeared but refused to answer questions, asserting their privilege against compulsory self-incrimination. They were brought before the District Court, and each persisted in his refusal to answer the grand jury's questions, notwithstanding the grant of immunity. The court found both in contempt, and committed them to the custody of the Attorney General until either they answered the grand jury's questions or the term of the grand jury expired.[1] The Court of Appeals for the Ninth Circuit affirmed. Stewart v. United States, 440 F.2d 954 (CA9 1971). This Court granted certiorari to resolve the important question whether testimony may be compelled by granting immunity from the use of compelled testimony and evidence derived therefrom ("use and derivative use" immunity), or whether it is necessary to grant immunity from prosecution for offenses to which compelled testimony relates ("transactional" immunity). 402 U.S. 971, 91 S.Ct. 1668, 29 L.Ed.2d 135 (1971).

I

The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence.[2] The power with respect to courts was established by statute in England as early as 1562,[3] and Lord Bacon observed in 1612 that all subjects owed the King their "knowledge and discovery."[4] While it is not clear when grand juries first resorted to compulsory process to secure the attendance and testimony of witnesses, the general common-law principle that "the public has a right to every man's evidence" was considered an "indubitable certainty" that "cannot be denied" by 1742.[5] The

1. The contempt order was issued pursuant to 28 U.S.C. § 1826.

2. For a concise history of testimonial compulsion prior to the adoption of our Constitution, see 8 J. Wigmore, Evidence § 2190 (J. McNaughton rev. 1961). See Ullmann v. United States, 350 U.S. 422, 439 n. 15, 76 S.Ct. 497, 507, 100 L.Ed. 511 (1956); Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

3. Statute of Elizabeth, 5 Eliz. 1, c. 9, § 12 (1562).

4. Countess of Shrewsbury's Case, 2 How.St.Tr. 769, 778 (1612).

5. See the parliamentary debate on the Bill to Indemnify Evidence, particularly the remarks of the Duke of Argyle and Lord Chancellor Hardwicke, reported in 12 T. Hansard, Parliamentary History of Eng-

RPI 0203

power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor. The first Congress recognized the testimonial duty in the Judiciary Act of 1789, which provided for compulsory attendance of witnesses in the federal courts.[6] Mr. Justice White noted the importance of this essential power of government in his concurring opinion in Murphy v. Waterfront Comm'n, 378 U.S. 52, 93–94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964):

"Among the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies. See Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979. Such testimony constitutes one of the Government's primary sources of information."

[1, 2] But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty,[7] the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations,[8] and marks an important advance in the development of our liberty.[9] It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory;[10] and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.[11] This Court has been zealous to safeguard the values which underlie the privilege.[12]

Immunity statutes, which have historical roots deep in Anglo-American jurisprudence,[13] are not incompatible with

land 675, 693 (1812). See also Piemonte v. United States, 367 U.S. 556, 559 n. 2, 81 S.Ct. 1720, 1722, 6 L.Ed.2d 1028 (1961); Ullmann v. United States, *supra,* 350 U.S., at 439 n. 15, 76 S.Ct., at 507; Brown v. Walker, 161 U.S. 591, 600, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896).

6. 1 Stat. 73, 88–89.

7. See Blair v. United States, *supra,* 250 U.S., at 281, 39 S.Ct., at 471; 8 Wigmore, *supra,* n. 2, §§ 2192, 2197.

8. See Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

9. See Ullmann v. United States, 350 U.S., at 426, 76 S.Ct., at 500; E. Griswold, The Fifth Amendment Today 7 (1955).

10. Murphy v. Waterfront Comm'n, *supra,* 378 U.S., at 94, 84 S.Ct., at 1611 (White, J., concurring); McCarthy v. Arndstein, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924); United States v. Saline Bank, 1 Pet. 100, 7 L.Ed. 69 (1828); cf. Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

11. Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950); Mason v. United States, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917).

12. See, *e. g.,* Miranda v. Arizona, 384 U.S. 436, 443–444, 86 S.Ct. 1602, 1611–1612, 16 L.Ed.2d 694 (1966); Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886).

13. Soon after the privilege against compulsory self-incrimination became firmly established in law, it was recognized that the privilege did not apply when immunity, or "indemnity," in the English usage, had been granted. See L. Levy, Origins of the Fifth Amendment 328, 495 (1968). Parliament enacted in immunity statute in 1710 directed against illegal gambling, 9 Anne, c. 14, §§ 3–4, which became the model for an identical immunity statute enacted in 1774 by the Colonial Legislature of New York. Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York 621, 623 (1894). These statutes provided that the loser could sue the winner, who was compelled to answer the loser's charges. After the winner responded and returned his ill-

RPI 0204

these values. Rather, they seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify. The existence of these statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime. Indeed, their origins were in the context of such offenses,[14] and their primary use has been to investigate such offenses.[15] Congress included immunity statutes in many of the regulatory measures adopted in the first half of this century.[16] Indeed, prior to the enactment of the statute under consideration in

gotten gains, he was "acquitted, indemnified [immunized] and discharged from any further or other Punishment, Forfeiture or Penalty, which he . . . may have incurred by the playing for, and winning such Money . . . ." 9 Anne, c. 14, § 4 (1710); Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York, at 623.

Another notable instance of the early use of immunity legislation is the 1725 impeachment trial of Lord Chancellor Macclesfield. The Lord Chancellor was accused by the House of Commons of the sale of public offices and appointments. In order to compel the testimony of Masters in Chancery who had allegedly purchased their offices from the Lord Chancellor, and who could incriminate themselves by so testifying. Parliament enacted a statute granting immunity to persons then holding office as Masters in Chancery. Lord Chancellor Macclesfield's Trial, 16 How.St.Tr. 767, 1147 (1725). See 8 Wigmore, supra, n. 2, § 2281, at 492. See also Bishop Atterbury's Trial, 16 How.St.Tr. 323, 604–605 (1723). The legislatures in colonial Pennsylvania and New York enacted immunity legislation in the 18th century. See, e. g., Resolution of Jan. 6, 1758, in Votes and Proceedings of the House of Representatives of the Province of Pennsylvania (1682–1776), 6 Pennsylvania Archives (8th series) 4679 (C. Hoban ed. 1935); Law of Mar. 24, 1772, c. 1542, 5 Colonial Laws of New York 351, 353–354; Law of Mar. 9, 1774, c. 1651, id., at 621, 623; Law of Mar. 9, 1774, c. 1655, id., at 639, 641–642. See generally L. Levy, Origins of the Fifth Amendment 359, 384–385, 389, 402–403 (1968). Federal immunity statutes have existed since 1857. Act of Jan. 24, 1857, 11 Stat. 155. For a history of the various federal immunity statutes, see Comment, The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope, 72 Yale L.J. 1568 (1963); Wendel,

Compulsory Immunity Legislation and the Fifth Amendment Privilege: New Developments and New Confusion, 10 St. Louis U.L.Rev. 327 (1966); and National Commission on Reform of Federal Criminal Laws, Working Papers, 1406–1411 (1970).

14. See, e. g., Resolution of Jan. 6, 1758, n. 13, supra, 6 Pennsylvania Archives (8th series) 4679 (C. Hoban ed. 1935); Law of Mar. 24, 1772, c. 1542, 5 Colonial Laws of New York 351, 354; Law of Mar. 9, 1774, c. 1655, id., at 639, 642. Bishop Atterbury's Trial, supra, for which the House of Commons passed immunity legislation, was a prosecution for treasonable conspiracy. See id., at 604–605; 8 Wigmore, supra, n. 2, § 2281, at 492 n. 2. Lord Chancellor Macclesfield's Trial, supra, for which Parliament passed immunity legislation, was a prosecution for political bribery involving the sale of public offices and appointments. See id., at 1147. The first federal immunity statute was enacted to facilitate an investigation of charges of corruption and vote buying in the House of Representatives. See Comment, n. 13, supra, 72 Yale L.J., at 1571.

15. See 8 Wigmore, supra, n. 2, § 2281, at 492. Mr. Justice White noted in his concurring opinion in Murphy v. Waterfront Comm'n, 378 U.S., at 92, 84 S.Ct., at 1610, that immunity statutes "have for more than a century been resorted to for the investigation of many offenses, chiefly those whose proof and punishment were otherwise impracticable, such as political bribery, extortion, gambling, consumer frauds, liquor violations, commercial larceny, and various forms of racketeering." Id., at 94–95, 84 S.Ct., at 1611. See n. 14, supra.

16. See Comment, n. 13, supra, 72 Yale L.J., at 1576.

RPI 0205

this case, there were in force over 50 federal immunity statutes.[17] In addition, every State in the Union, as well as the District of Columbia and Puerto Rico, has one or more such statutes.[18] The commentators,[19] and this Court on several occasions,[20] have characterized immunity statutes as essential to the effective enforcement of various criminal statutes. As Mr. Justice Frankfurter observed, speaking for the Court in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), such statutes have "become part of our constitutional fabric." [21] *Id.*, at 438, 76 S.Ct., at 506.

## II

[3] Petitioners contend, first, that the Fifth Amendment's privilege against compulsory self-incrimination, which is that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," deprives Congress of power to enact laws that compel self-incrimination, even if complete immunity from prosecution is granted prior to the compulsion of the incriminatory testimony. In other words, petitioners assert that no immunity statute, however drawn, can afford a lawful basis for compelling incriminatory testimony. They ask us to reconsider and overrule Brown v. Walker, 161 U.S. 591, 16 S.Ct.

644, 40 L.Ed. 819 (1896), and Ullmann v. United States, *supra*, decisions that uphold the constitutionality of immunity statutes.[22]

We find no merit to this contention and reaffirm the decisions in *Brown* and *Ullmann*.

## III

[4] Petitioners' second contention is that the scope of immunity provided by the federal witness immunity statute, 18 U.S.C. § 6002, is not coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination, and therefore is not sufficient to supplant the privilege and compel testimony over a claim of the privilege. The statute provides that when a witness is compelled by district court order to testify over a claim of the privilege:

> "the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." [23]   18 U.S.C. § 6002.

17. For a listing of these statutes, see National Commission on Reform of Federal Criminal Laws, Working Papers, 1444–1445 (1970).

18. For a listing of these statutes, see 8 Wigmore, *supra*, n. 2, § 2281, at 495 n. 11.

19. See, e. g., 8 J. Wigmore, Evidence § 2281, at 501 (3d ed. 1940) ; 8 Wigmore, *supra*, n. 2, § 2281, at 496.

20. See Hale v. Henkel, 201 U.S. 43, 70, 26 S.Ct. 370, 377, 50 L.Ed. 652 (1906) ; Brown v. Walker, 161 U.S., at 610, 16 S.Ct., at 652.

21. This statement was made with specific reference to the Compulsory Testimony

Act of 1893, 27 Stat. 443, the model for almost all federal immunity statutes prior to the enactment of the statute under consideration in this case. See Murphy v. Waterfront Comm'n, 378 U.S., at 95, 84 S.Ct., at 1612 (White, J., concurring).

22. Accord, Gardner v. Broderick, 392 U.S., at 276, 88 S.Ct., at 1915 ; Murphy v. Waterfront Comm'n, *supra*; McCarthy v. Arndstein, 266 U.S., at 42, 45 S.Ct., at 17 (Brandeis, J.) ; Heike v. United States, 227 U.S. 131, 142, 33 S.Ct. 226, 228, 57 L.Ed. 450 (1913) (Holmes, J.).

23. For other provisions of the 1970 Act relative to immunity of witnesses, see 18 U.S.C. §§ 6001–6005.

RPI 0206

The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under this statute is coextensive with the scope of the privilege.[24] If so, petitioners' refusals to answer based on the privilege were unjustified, and the judgments of contempt were proper, for the grant of immunity has removed the dangers against which the privilege protects. Brown v. Walker, *supra*. If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the privilege, petitioners were justified in refusing to answer, and the judgments of contempt must be vacated. McCarthy v. Arndstein, 266 U.S. 34, 42, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924).

Petitioners draw a distinction between statutes that provide transactional immunity and those that provide, as does the statute before us, immunity from use and derivative use.[25] They contend that a statute must at a minimum grant full transactional immunity in order to be coextensive with the scope of the privilege. In support of this contention, they rely on Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), the first case in which this Court considered a constitutional challenge to an immunity statute. The statute, a reenactment of the Immunity Act of 1868,[26] provided that no "evidence obtained from a party or witness by means of a judicial proceeding . . . shall be given in evidence, or in any manner used against him . . . in any court of the United States . . . ."[27] Notwithstanding a grant of immunity and order to testify under the revised 1868 Act, the witness, asserting his privilege against compulsory self-incrimination, refused to testify before a federal grand jury. He was consequently adjudged in contempt of court.[28] On appeal, this Court construed the statute as affording a witness protection only against the use of the specific testimony compelled from him under the grant of immunity. This construction meant that the statute "could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him."[29] Since the revised 1868 Act, as construed by the Court, would permit the use against the immunized witness of evidence derived from his compelled testimony, it did not protect the witness to the same extent that a claim of the privilege would protect him. Accordingly, under the principle that a grant of immunity cannot supplant the privilege, and is not sufficient to compel testimony over a claim of the privilege, unless the scope of the grant of immunity is coextensive with the scope of the privilege,[30] the witness' refusal to testify was held proper. In the course of its opinion, the Court made the following statement, on which petitioners heavily rely:

"We are clearly of opinion that no statute which leaves the party or wit-

---

24. See, *e. g.*, Murphy v. Waterfront Comm'n, *supra*, 378 U.S. at 54, 78, 84 S.Ct., at 1596, 1609, 12 L.Ed.2d 678; Counselman v. Hitchcock, 142 U.S. 547, 585, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892).

25. See Piccirillo v. New York, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971).

26. 15 Stat. 37.

27. See Counselman v. Hitchcock, *supra*, 142 U.S., at 560, 12 S.Ct., at 197.

28. In re Counselman, 44 F. 268 (CCND Ill. 1890).

29. Counselman v. Hitchcock, *supra*, 142 U.S., at 564, 12 S.Ct., at 198–199.

30. Precisely, the Court held "that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply [*sic*] one, at least unless it is so broad as to have the same extent in scope and effect." *Id.*, at 585, 12 S.Ct., at 206. See Murphy v. Waterfront Comm'n, *supra*, 378 U.S., at 54, 78, 84 S.Ct., at 1596, 1609.

RPI 0207

ness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. [The immunity statute under consideration] does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates." 142 U.S., at 585–586, 12 S.Ct., at 206.

Sixteen days after the *Counselman* decision, a new immunity bill was introduced by Senator Cullom,[31] who urged that enforcement of the Interstate Commerce Act would be impossible in the absence of an effective immunity

statute.[32] The bill, which became the Compulsory Testimony Act of 1893,[33] was drafted specifically to meet the broad language in *Counselman* set forth above.[34] The new Act removed the privilege against self-incrimination in hearings before the Interstate Commerce Commission and provided that:

"no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise . . ."
Act of Feb. 11, 1893, 27 Stat. 444.

This transactional immunity statute became the basic form for the numerous federal immunity statutes[35] until 1970, when, after re-examining applicable constitutional principles and the adequacy of existing law, Congress enacted the statute here under consideration.[36] The

---

31. *Counselman* was decided Jan. 11, 1892. Senator Cullom introduced the new bill on Jan. 27, 1892. 23 Cong.Rec. 573.

32. 23 Cong.Rec. 6333.

33. Act of February 11, 1893, 27 Stat. 443, repealed by the Organized Crime Control Act of 1970, Pub.L.No. 91–452, § 245, 84 Stat. 931.

34. See the remarks of Senator Cullom, 23 Cong.Rec. 573, 6333, and Congressman Wise, who introduced the bill in the House. 24 Cong.Rec. 503. See Shapiro v. United States, 335 U.S. 1, 28–29 and n. 36, 68 S.Ct. 1375, 1389–1390, 92 L.Ed. 1787 (1948).

35. Ullmann v. United States, 350 U.S., at 438, 76 S.Ct., at 506; Shapiro v. United States, *supra*, 335 U.S., at 6, 68 S.Ct., at 1378. There was one minor exception. See Piccirillo v. New York, 400 U.S., at 571 and n. 11, 91 S.Ct., at 532 (Brennan, J., dissenting); Arndstein v. McCarthy, 254 U.S. 71, 73, 41 S.Ct. 26, 27, 65 L.Ed. 138 (1920).

36. The statute is a product of careful study and consideration by the National

Commission on Reform of Federal Criminal Laws, as well as by Congress. The Commission recommended legislation to reform the federal immunity laws. The recommendation served as the model for this statute. In commenting on its proposal in a special report to the President, the Commission said:
"We are satisfied that our substitution of immunity from use for immunity from prosecution meets constitutional requirements for overcoming the claim of privilege. Immunity from use is the only consequence flowing from a violation of the individual's constitutional right to be protected from unreasonable searches and seizures, his constitutional right to counsel, and his constitutional right not to be coerced into confessing. The proposed immunity is thus of the same scope as that frequently, even though unintentionally, conferred as the result of constitutional violations by law enforcement officers." Second Interim Report of the National Commission on Reform of Federal Criminal Laws, Mar. 17, 1969, Working Papers of the Commission, 1446 (1970).
The Commission's recommendation was based in large part on a comprehensive study of immunity and the relevant decisions of this Court prepared for the Commission by Prof. Robert G. Dixon, Jr., of the George Washington University Law

RPI 0208

new statute, which does not "afford [the] absolute immunity against future prosecution" referred to in *Counselman*, was drafted to meet what Congress judged to be the conceptual basis of *Counselman*, as elaborated in subsequent decisions of the Court, namely, that immunity from the use of compelled testimony and evidence derived therefrom is coextensive with the scope of the privilege.[37]

[5] The statute's explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.' "[38] Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

[6] Our holding is consistent with the conceptual basis of *Counselman*. The *Counselman* statute, as construed by the Court, was plainly deficient in its failure to prohibit the use against the immunized witness of evidence derived from his compelled testimony. The Court repeatedly emphasized this deficiency, noting that the statute:

"could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding . . ." 142 U.S., at 564, 12 S.Ct., at 198–199;

that it:

"could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted," *ibid.*;

and that it:

"affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party." 142 U.S., at 586, 12 S.Ct., at 206.

The basis of the Court's decision was recognized in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), in which the Court reiterated

Center, and transmitted to the President with the recommendations of the Commission. See National Commission on Reform of Federal Criminal Laws, Working Papers, 1405–1444 (1970).

37. See S.Rep.No.91-617, pp. 51-56, 145 (1969); H.R.Rep.No.91-1549, p. 42 (1970).

38. Ullmann v. United States, 350 U.S., at 438-439, 76 S.Ct., at 507, quoting Boyd v. United States, 116 U.S., at 634, 6 S.Ct., at 534. See Knapp v. Schweitzer, 357 U.S. 371, 380, 78 S.Ct. 1302, 1308, 2 L.Ed.2d 1393 (1958).

RPI 0209

that the *Counselman* statute was insufficient:

"because the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution *based on knowledge and sources of information obtained from the compelled testimony.*" *Id.,* at 437, 76 S.Ct., at 506. (Emphasis supplied.)

See also Arndstein v. McCarthy, 254 U.S. 71, 73, 41 S.Ct. 26, 27, 65 L.Ed. 138 (1920). The broad language in *Counselman* relied upon by petitioners was unnecessary to the Court's decision, and cannot be considered binding authority.[39]

In Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Court carefully considered immunity from use of compelled testimony and evidence derived therefrom. The *Murphy* petitioners were subpoenaed to testify at a hearing conducted by the Waterfront Commission of New York Harbor. After refusing to answer certain questions on the ground that the answers might tend to incriminate them, petitioners were granted immunity from prosecution under the laws of New Jersey and New York.[40] They continued to refuse to testify, however, on the ground that their answers might tend to incriminate them under federal law, to which the immunity did not purport to extend. They were adjudged in civil contempt, and that judgment was affirmed by the New Jersey Supreme Court.[41]

The issue before the Court in *Murphy* was whether New Jersey and New York could compel the witnesses, whom these States had immunized from prosecution under their laws, to give testimony that might then be used to convict them of a federal crime. Since New Jersey and New York had not purported to confer immunity from federal prosecution, the Court was faced with the question what

---

39. Cf. The Supreme Court, 1963 Term, 78 Harv.L.Rev. 179, 230 (1964). Language similar to the *Counselman* dictum can be found in Brown v. Walker, 161 U.S., at 594–595, 16 S.Ct., at 645–646, and Hale v. Henkel, 201 U.S., at 67, 26 S.Ct., at 376. *Brown* and *Hale,* however, involved statutes that were clearly sufficient to supplant the privilege against self-incrimination, as they provided full immunity from prosecution "for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence . . . ." 161 U.S., at 594, 16 S.Ct., at 645; 201 U.S., at 66, 26 S.Ct., at 375. The same is true of Smith v. United States, 337 U.S. 137, 141, 146, 69 S.Ct. 1000, 1002, 1005, 93 L.Ed. 1264 (1949), and United States v. Monia, 317 U.S. 424, 425, 428, 63 S.Ct. 409, 410, 411, 87 L.Ed. 376 (1943). In Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), some of the *Counselman* language urged upon us by petitioners was again quoted. But *Albertson,* like *Counselman,* involved an immunity statute that was held insufficient for failure to prohibit the use of evidence derived from compelled admissions and the use of compelled admissions as an "investigatory lead." *Id.,* at 80, 86 S.Ct., at 199.

In Adams v. Maryland, 347 U.S. 179, 182, 74 S.Ct. 442, 445, 98 L.Ed. 608 (1954), and in United States v. Murdock, 284 U.S. 141, 149, 52 S.Ct. 63, 64, 76 L.Ed. 210 (1931), the *Counselman* dictum was referred to as the principle of *Counselman.* The references were in the context of ancillary points not essential to the decisions of the Court. The *Adams* Court did note, however, that the Fifth Amendment privilege prohibits the "use" of compelled self-incriminatory testimony. 347 U.S., at 181, 74 S.Ct., at 445. In any event, the Court in Ullmann v. United States, 350 U.S., at 436–437, 76 S.Ct., at 505–506, recognized that the rationale of *Counselman* was that the *Counselman* statute was insufficient for failure to prohibit the use of evidence derived from compelled testimony. See also Arndstein v. McCarthy, 254 U.S., at 73, 41 S.Ct., at 27.

40. The Waterfront Commission of New York Harbor is a bistate body established under an interstate compact approved by Congress. 67 Stat. 541.

41. In re Application of Waterfront Comm'n of N. Y. Harbor, 39 N.J. 436, 189 A.2d 36 (1963).

RPI 0210

limitations the Fifth Amendment privilege imposed on the prosecutorial powers of the Federal Government, a nonimmunizing sovereign. After undertaking an examination of the policies and purposes of the privilege, the Court overturned the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction.[42] The Court held that the privilege protects state witnesses against incrimination under federal as well as state law, and federal witnesses against incrimination under state as well as federal law. Applying this principle to the state immunity legislation before it, the Court held the constitutional rule to be that:

"[A] state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Government in investigating and prosecuting crime, the

Federal Governments must be prohibited from making any such use of compelled testimony and its fruits."[43] 378 U.S., at 79, 84 S.Ct., at 1609.

The Court emphasized that this rule left the state witness and the Federal Government, against which the witness had immunity only from the *use* of the compelled testimony and evidence derived therefrom, "in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *Id.*, at 79, 84 S.Ct., at 1610.

It is true that in *Murphy* the Court was not presented with the precise question presented by this case, whether a jurisdiction seeking to compel testimony may do so by granting only use and derivative-use immunity, for New Jersey and New York had granted petitioners transactional immunity. The Court heretofore has not squarely confronted this question,[44] because post-*Counselman* immunity statutes reaching the Court either have followed the pattern of the 1893 Act in providing transactional immunity,[45] or have been found deficient for failure to prohibit the use of all evidence derived from compelled testi-

---

42. Reconsideration of the rule that the Fifth Amendment privilege does not protect a witness in one jurisdiction against being compelled to give testimony that could be used to convict him in another jurisdiction was made necessary by the decision in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), in which the Court held the Fifth Amendment privilege applicable to the States through the Fourteenth Amendment. Murphy v. Waterfront Comm'n, 378 U.S., at 57, 84 S.Ct., at 1597.

43. At this point the Court added the following note: "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *Id.*, at 79 n. 18, 84 S.Ct., at 1609. If transactional immunity had been

deemed to be the "constitutional rule" there could be no federal prosecution.

44. See, *e. g.*, California v. Byers, 402 U.S. 424, 442, n. 3, 91 S.Ct. 1535, 1545, 29 L. Ed.2d 9 (1971) (Harlan, J., concurring in judgment); United States v. Freed, 401 U.S. 601, 606 n. 11, 91 S.Ct. 1112, 1116, 28 L.Ed.2d 356 (1971); Piccirillo v. New York, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971); Stevens v. Marks, 383 U.S. 234, 244–245, 86 S.Ct. 788, 793–794 (1966).

45. *E. g.*, Murphy v. Waterfront Comm'n, *supra*; Ullmann v. United States, *supra*; Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264 (1949); United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Jack v. Kansas, 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234 (1905); Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). See also n. 35, *supra*.

RPI 0211

mony.[46] But both the reasoning of the Court in *Murphy* and the result reached compel the conclusion that use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the privilege. Since the privilege is fully applicable and its scope is the same whether invoked in a state or in a federal jurisdiction,[47] the *Murphy* conclusion that a prohibition on use and derivative use secures a witness' Fifth Amendment privilege against infringement by the Federal Government demonstrates that immunity from use and derivative use is coextensive with the scope of the privilege. As the *Murphy* Court noted, immunity from use and derivative use "leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege" [48] in the absence of a grant of immunity. The *Murphy* Court was concerned solely with the danger of incrimination under federal law, and held that immunity from use and derivative use was sufficient to displace the danger. This protection coextensive with the privilege is the degree of protection that the Constitution requires, and is all that the Constitution requires even against the jurisdiction compelling testimony by granting immunity.[49]

### IV

Although an analysis of prior decisions and the purpose of the Fifth Amendment privilege indicates that use and derivative-use immunity is coextensive with the privilege, we must consider

additional arguments advanced by petitioners against the sufficiency of such immunity. We start from the premise, repeatedly affirmed by this Court, that an appropriately broad immunity grant is compatible with the Constitution.

Petitioners argue that use and derivative-use immunity will not adequately protect a witness from various possible incriminating uses of the compelled testimony: for example, the prosecutor or other law enforcement officials may obtain leads, names of witnesses, or other information not otherwise available that might result in a prosecution. It will be difficult and perhaps impossible, the argument goes, to identify, by testimony or cross-examination, the subtle ways in which the compelled testimony may disadvantage a witness, especially in the jurisdiction granting the immunity.

This argument presupposes that the statute's prohibition will prove impossible to enforce. The statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom:

> "[N]o testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case . . . ." 18 U.S.C. § 6002.

This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "in-

---

46. *E. g.*, Albertson v. Subversive Activities Control Board, 382 U.S., at 80, 86 S.Ct., at 199; Arndstein v. McCarthy, 254 U.S., at 73, 41 S.Ct., at 27.

47. In Malloy v. Hogan, 378 U.S., at 10-11, 84 S.Ct., at 1494–1495 the Court held that the same standards would determine the extent or scope of the privilege in state and in federal proceedings, because the same substantive guarantee of the Bill of Rights is involved. The *Murphy* Court emphasized that the scope of the privilege

is the same in state and in federal proceedings. Murphy v. Waterfront Comm'n, 378 U.S., at 79, 84 S.Ct., at 1609–1610.

48. *Ibid.*

49. As the Court noted in Gardner v. Broderick, 392 U.S., at 276, 88 S.Ct., at 1915, "[a]nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying."

RPI 0212

vestigatory lead," [50] and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

[7]   A person accorded this immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities.   As stated in *Murphy:*

> "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."   378 U.S., at 79 n. 18, 84 S.Ct., at 1609.

This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

This is very substantial protection,[51] commensurate with that resulting from invoking the privilege itself.   The privilege assures that a citizen is not compelled to incriminate himself by his own testimony.   It usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer.   This statute, which operates after a witness has given incriminatory testimony, affords the same protection by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties.   The statute, like the Fifth Amendment, grants neither pardon nor amnesty.   Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.

The statutory proscription is analogous to the Fifth Amendment requirement in cases of coerced confessions.[52] A coerced confession, as revealing of leads as testimony given in exchange for immunity,[53] is inadmissible in a criminal trial, but it does not bar prosecution.[54] Moreover, a defendant against whom incriminating evidence has been obtained through a grant of immunity may be in a stronger position at trial than a defendant who asserts a Fifth Amendment coerced-confession claim.   One raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.[55]   On the other hand, a defendant raising a coerced-confession claim under the Fifth Amendment must first prevail in a voluntariness hearing before his confession and evidence derived from it become inadmissible.[56]

50.  See, *e. g.*, Albertson v. Subversive Activities Control Board, 382 U.S., at 80, 86 S.Ct., at 199.

51.  See Murphy v. Waterfront Comm'n, 378 U.S., at 102–104, 84 S.Ct., at 1615–1617 (White, J., concurring).

52.  Adams v. Maryland, 347 U.S., at 181, 74 S.Ct., at 444; Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897).

53.  As Mr. Justice White, concurring in *Murphy*, pointed out:
"A coerced confession is as revealing of leads as testimony given in exchange for immunity and indeed is excluded in part

because it is compelled incrimination in violation of the privilege.   Malloy v. Hogan [378 U.S. 1, 7–8, 84 S.Ct. 1489, at 1493–1494, 12 L.Ed.2d 653]; Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568."   378 U.S., at 103, 84 S.Ct., at 1616.

54.  Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

55.  See *supra*, at 1664; Brief the United States 37; Cf. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

56.  Jackson v. Denno, *supra*.

RPI 0213

There can be no justification in reason or policy for holding that the Constitution requires an amnesty grant where, acting pursuant to statute and accompanying safeguards, testimony is compelled in exchange for immunity from use and derivative use when no such amnesty is required where the government, acting without colorable right, coerces a defendant into incriminating himself.

We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it. The judgment of the Court of Appeals for the Ninth Circuit accordingly is

Affirmed.

Mr. Justice BRENNAN and Mr. Justice REHNQUIST took no part in the consideration or decision of this case.

Mr. Justice DOUGLAS, dissenting.

The Self-Incrimination Clause says: "No person . . . shall be compelled in any criminal case to be a witness against himself." I see no answer to the proposition that he is such a witness when only "use" immunity is granted.

My views on the question of the scope of immunity that is necessary to force a witness to give up his guarantee against self-incrimination contained in the Fifth Amendment are so well known, see Ullmann v. United States, 350 U.S. 422, 440, 76 S.Ct. 497, 507, 100 L.Ed. 511 (dissenting), and Piccirillo v. New York, 400 U.S. 548, 549, 91 S.Ct. 520, 521, 27 L.Ed. 2d 596 (dissenting), that I need not write at length.

In Counselman v. Hitchcock, 142 U.S. 547, 586, 12 S.Ct. 195, 206, 35 L.Ed. 1110, the Court adopted the transactional immunity test: "In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the

offense to which the question relates." *Id.*, at 586, 12 S.Ct., at 206. In Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L. Ed. 819, a case involving another federal prosecution, the immunity statute provided that the witness would be protected "on account of any transaction . . . concerning which he may testify." *Id.*, at 594, 16 S.Ct., at 645. The Court held that the immunity offered was coterminous with the privilege and that the witness could therefore be compelled to testify, a ruling that made "transactional immunity" part of the fabric of our constitutional law. Ullmann v. United States, *supra*, 350 U.S., at 438, 76 S.Ct., at 50.

This Court, however, apparently believes that *Counselman* and its progeny were overruled *sub silentio* in Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, *Murphy* involved state witnesses, granted transactional immunity under state law, who refused to testify for fear of subsequent federal prosecution. We held that the testimony in question could be compelled, but that the Federal Government would be barred from using any of the testimony, or its fruits, in a subsequent federal prosecution.

*Murphy* overruled, not *Counselman*, but Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408, which had held "that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction." Murphy v. Waterfront Comm'n, *supra*, 378 U.S., at 77, 84 S. Ct., at 1608. But *Counselman*, as the *Murphy* Court recognized, "said nothing about the problem of incrimination under the law of another sovereign." *Id.*, at 72, 84 S.Ct., at 1606. That problem is one of federalism, as to require transactional immunity between jurisdictions might

"deprive a state of the right to prosecute a violation of its criminal law on the basis of another state's grant of immunity [a result which] would be gravely in derogation of its sovereignty and obstructive of its administra-

tion of justice." United States ex rel. Catena v. Elias, 449 F.2d 40, 44 (CA3 1971).

Moreover, as Mr. Justice Brennan has pointed out, the threat of future prosecution

"substantial when a single jurisdiction both compels incriminating testimony and brings a later prosecution, may fade when the jurisdiction bringing the prosecution differs from the jurisdiction that compelled the testimony. Concern over informal and undetected exchange of information is also correspondingly less when two different jurisdictions are involved." Piccirillo v. New York, 400 U.S., at 568, 91 S.Ct., at 531 (dissenting).

None of these factors apply when the threat of prosecution is from the jurisdiction seeking to compel the testimony, which is the situation we faced in *Counselman*, and which we face today. The irrelevance of *Murphy* to such a situation was made clear in Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165, in which the Court struck down an immunity statute because it failed to measure up to the standards set forth in *Counselman*. Inasmuch as no interjurisdictional problems presented themselves, *Murphy* was not even cited. That is further proof that *Murphy* was not thought significantly to undercut *Counselman*.[1] See

Stevens v. Marks, 383 U.S. 234, 244–245, 86 S.Ct. 788, 793–794, 15 L.Ed.2d 724; id., at 249–250, 86 S.Ct., at 796–797 (Harlan, J., concurring and dissenting); Mansfield, The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information, 1966 Sup.Ct.Rev. 103, 164.

If, as some have thought, the Bill of Rights contained only "counsels of moderation" from which courts and legislatures could deviate according to their conscience or discretion, then today's contraction of the Self-Incrimination Clause of the Fifth Amendment would be understandable. But that has not been true, starting with Chief Justice Marshall's opinion in United States v. Burr, 25 F. Cas. p. 38 (No. 14,692e) (CC Va.), where he ruled that the reach of the Fifth Amendment was so broad as to make the privilege applicable when there was a mere possibility of a criminal charge being made.

The Court said in Hale v. Henkel, 201 U.S. 43, 67, 26 S.Ct. 370, 376, 50 L.Ed. 652 that "if the criminality has already been taken away, the Amendment ceases to apply." In other words, the immunity granted is adequate if it operates as a complete pardon for the offense. Brown v. Walker, 161 U.S., at 595, 16 S.Ct., at 646. That is the true measure of the Self-Incrimination Clause. As Mr. Jus-

---

1. In Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165, the Court was faced with a Fifth Amendment challenge to the Communist registration provision of the Subversive Activities Control Act of 1950, 64 Stat. 987. We held that the provision violated the prospective registrant's privilege against self-incrimination, and that the registration provision was not saved by a so-called "immunity statute" (§ 4 (f)) which prohibited the introduction into evidence in any criminal prosecution of the fact of registration under the Act. The Court's analysis of this immunity provision rested solely on *Counselman*:

"In Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, decided in 1892, the Court held 'that no [immunity] statute which leaves the party or witness subject to prosecution after he an-

swers the criminating question put to him, can have the effect of supplanting the privilege . . . ,' and that such a statute is valid only if it supplies 'a complete protection from all the perils against which the constitutional prohibition was designed to guard . . .' by affording 'absolute immunity against future prosecution for the offence to which the question relates.' *Id.*, at 585–586, 12 S.Ct., at 206. *Measured by these standards*, the immunity granted by § 4(f) is not complete." 382 U.S., at 80, 86 S.Ct., at 199. (Emphasis added.)

Thus, the *Albertson* Court, which could have struck the statute by employing the test approved today, went well beyond, and measured the statute solely against the more restrictive standards of *Counselman*.

RPI 0215

tice Brennan has stated: "[U]se immunity literally misses half the point of the privilege, for it permits the compulsion without removing the criminality." Piccirillo v. New York, *supra,* 400 U.S., at 567, 91 S.Ct., at 530 (dissenting).

As Mr. Justice Brennan has also said:

"Transactional immunity . . . provides the individual with an assurance that he is not testifying about matters for which he may later be prosecuted. No question arises of tracing the use or non-use of information gleaned from the witness' compelled testimony. The sole question presented to a court is whether the subsequent prosecution is related to the substance of the compelled testimony. Both witness and government know precisely where they stand. Respect for law is furthered when the individual knows his position and is not left suspicious that a later prosecution was actually the fruit of his compelled testimony." 400 U.S., at 568–569, 91 S.Ct. at 531 (dissenting).

When we allow the prosecution to offer only "use" immunity we allow it to grant far less than it has taken away. For while the precise testimony that is compelled may not be used, leads from that testimony may be pursued and used to convict the witness.[2] My view is that the framers put it beyond the power of Congress to *compel* anyone to confess his crimes. The Self-Incrimination Clause creates, as I have said before, "the federally protected right of silence," making it unconstitutional to use a law "to pry open one's lips and make him a witness against himself." Ullmann v. United

States, 350 U.S., at 446, 76 S.Ct., at 511 (dissenting). That is indeed one of the chief procedural guarantees in our accusatorial system. Government acts in an ignoble way when it stoops to the end which we authorize today.

I would adhere to Counselman v. Hitchcock and hold that this attempt to dilute the Self-Incrimination Clause is unconstitutional.

Mr. Justice MARSHALL, dissenting.

Today the Court holds that the United States may compel a witness to give incriminating testimony, and subsequently prosecute him for crimes to which that testimony relates. I cannot believe the Fifth Amendment permits that result. See Piccirillo v. New York, 400 U.S. 548, 552, 91 S.Ct. 520, 522, 27 L.Ed.2d 596 (1971) (Brennan, J., dissenting from dismissal of certiorari).

The Fifth Amendment gives a witness an absolute right to resist interrogation, if the testimony sought would tend to incriminate him. A grant of immunity may strip the witness of the right to refuse to testify, but only if it is broad enough to eliminate all possibility that the testimony will in fact operate to incriminate him. It must put him in precisely the same position, *vis-à-vis* the government that has compelled his testimony,[*] as he would have been in had he remained silent in reliance on the privilege. Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956); McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819

---

2. As Mr. Justice Marshall points out, *post,* at 1669, it is futile to expect that a ban on use or derivative use of compelled testimony can be enforced.

It is also possible that use immunity might actually have an adverse impact on the administration of justice rather than promote law enforcement. A witness might believe, with good reason, that his "immunized" testimony will inevitably lead to a felony conviction. Under such circumstances, rather than testify and aid

the investigation, the witness might decide he would be better off remaining silent even if he is jailed for contempt.

* This case does not, of course, involve the special considerations that come into play when the prosecuting government is different from the government that has compelled the testimony. See Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

RPI 0216

(1896); Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

The Court recognizes that an immunity statute must be tested by that standard, that the relevant inquiry is whether it "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Ante,* at 1666. I assume, moreover, that in theory that test would be met by a complete ban on the use of the compelled testimony, including all derivative use, however remote and indirect. But I cannot agree that a ban on use will in practice be total, if it remains open for the government to convict the witness on the basis of evidence derived from a legitimate independent source. The Court asserts that the witness is adequately protected by a rule imposing on the government a heavy burden of proof if it would establish the independent character of evidence to be used against the witness. But in light of the inevitable uncertainties of the fact-finding process, see Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958), a greater margin of protection is required in order to provide a reliable guarantee that the witness is in exactly the same position as if he had not testified. That margin can be provided only by immunity from prosecution for the offenses to which the testimony relates, *i. e.,* transactional immunity.

I do not see how it can suffice merely to put the burden of proof on the government. First, contrary to the Court's assertion, the Court's rule does leave the witness "dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." *Ante,* at 1665. For the information relevant to the question of taint is uniquely within the knowledge of the prosecuting authorities. They alone are in a position to trace the chains of information and investigation that lead to the evidence to be used in a criminal prosecution. A witness who suspects that his compelled testimony was used to develop a lead will be hard pressed indeed to ferret out the evidence necessary to prove it. And of course it is no answer to say he need not prove it, for though the Court puts the burden of proof on the government, the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence. The good faith of the prosecuting authorities is thus the sole safeguard of the witness' rights. Second, even their good faith is not a sufficient safeguard. For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony. Cf. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The Court today sets out a loose net to trap tainted evidence and prevent its use against the witness, but it accepts an intolerably great risk that tainted evidence will in fact slip through that net.

In my view the Court turns reason on its head when it compares a statutory grant of immunity to the "immunity" that is inadvertently conferred by an unconstitutional interrogation. The exclusionary rule of evidence that applies in that situation has nothing whatever to do with this case. Evidence obtained through a coercive interrogation, like evidence obtained through an illegal search, is excluded at trial because the Constitution prohibits such methods of gathering evidence. The exclusionary rules provide a partial and inadequate remedy to some victims of illegal police conduct, and a similarly partial and inadequate deterrent to police officers. An immunity statute, on the other hand, is much more ambitious than any exclusionary rule. It does not merely attempt to provide a remedy for past police mis-

RPI 0217

conduct, which never should have occurred. An immunity statute operates in advance of the event, and it authorizes—even encourages—interrogation that would otherwise be prohibited by the Fifth Amendment. An immunity statute thus differs from an exclusionary rule of evidence in at least two critical respects.

First, because an immunity statute gives constitutional approval to the resulting interrogation, the government is under an obligation here to remove the danger of incrimination completely and absolutely, whereas in the case of the exclusionary rules it may be sufficient to shield the witness from the fruits of the illegal search or interrogation in a partial and reasonably adequate manner. For when illegal police conduct has occurred, the exclusion of evidence does not purport to purge the conduct of its unconstitutional character. The constitutional violation remains, and may provide the basis for other relief, such as a civil action for damages (see 42 U.S.C. § 1983 and Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)), or a criminal prosecution of the responsible officers (see 18 U.S.C. §§ 241, 242). The Constitution does not authorize police officers to coerce confessions or to invade privacy without cause, so long as no use is made of the evidence they obtain. But this Court has held that the Constitution does authorize the government to compel a witness to give potentially incriminating testimony, so long as no incriminating use is made of the resulting evidence. Before the government puts its seal of approval on such an interrogation, it must provide an absolutely reliable guarantee that it will not use the testimony in any way at all in aid of prosecution of the witness. The only way to provide that guarantee is to give the witness immunity from prosecution for crimes to which his testimony relates.

Second, because an immunity statute operates in advance of the interrogation, there is room to require a broad grant of transactional immunity without imperiling large numbers of otherwise valid convictions. An exclusionary rule comes into play after the interrogation or search has occurred; and the decision to question or to search is often made in haste, under pressure, by an officer who is not a lawyer. If an unconstitutional interrogation or search were held to create transactional immunity, that might well be regarded as an excessively high price to pay for the "constable's blunder." An immunity statute, on the other hand, creates a framework in which the prosecuting attorney can make a calm and reasoned decision whether to compel testimony and suffer the resulting ban on prosecution, or to forgo the testimony.

For both these reasons it is clear to me that an immunity statute must be tested by a standard far more demanding than that appropriate for an exclusionary rule fashioned to deal with past constitutional violations. Measured by that standard, the statute approved today by the Court fails miserably. I respectfully dissent.



406 U.S. 472, 32 L.Ed.2d 234

Joseph Arthur ZICARELLI, Appellant,

v.

The NEW JERSEY STATE COMMISSION OF INVESTIGATION.

No. 69-4.

Argued Jan. 11, 1972.

Decided May 22, 1972.

Witness who refused to answer questions before New Jersey State Commission of Investigation despite grant of immunity was ordered incarcerated until such time as he testified as ordered. The Supreme Court of New Jersey, 55 N.J. 249, 261 A.2d 129, affirmed, and witness appealed. The Supreme Court, Mr. Justice Powell, held that New Jersey statute which provides immunity to wit-

RPI 0218

turer giving rise to the liability creating this claim occurred prior to the existence of either statute. It is well established in the State of Florida that the former statute, that is, section 48.182, may not be given retrospective application. *Gordon v. John Deere Co.*, 264 So.2d 419 (Fla.1972).

[3] Plaintiff here argues that section 48.193 is not an implied consent statute and, therefore, that it can be given retrospective application. Plaintiff further argues that the states other than Florida have applied retrospectively long arm statutes similar to section 48.193. Nevertheless, this court must apply the law of the State of Florida. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). It is the law of Florida that section 48.193 may not be applied retroactively to causes of action which accrued prior to July 1, 1973. *Barton v. Keyes Co.*, 305 So.2d 269 (Fla.Dist.Ct.App.1974); *Hoffmann v. Three Thousand South Association, Inc.*, 318 So.2d 486 (Fla.Dist.Ct.App.1975).

As relates to the issue concerning breach of warranty, *AB CTC v. Morejon*, 324 So.2d 625 (Fla.1975), supports and affirms the position of *Gordon v. John Deere Co., supra.*

It appears that the Florida courts have not changed their view in regard to retroactivity. While a final decision under section 48.193 has not been decided by the Supreme Court of Florida, several district courts of appeal have applied the *Gordon v. John Deere* principle to that statute. This court is sufficiently convinced that under those cases the long arm statute should not be retroactively applied. Having so found, the opinion of the court below is affirmed.



UNITED STATES of America, Plaintiff-Appellee,

v.

Ivan MELCHOR MORENO and Rigoberto Melchor Moreno, Defendants-Appellants.

No. 75–2957.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1976.

By judgment of the United States District Court for the Western District of Texas, at El Paso, William S. Sessions, J., the defendants were convicted on four narcotics charges and they appealed. The Court of Appeals, Godbold, Circuit Judge, held that where informer was subpoenaed by defendants as witness and claimed privilege against self-incrimination trial judge after holding an in camera hearing sustained privilege too broadly when he excused informer, since record did not show that such informer could legitimately refuse to answer essentially all relevant questions; informer should have been placed on witness stand and directed to give at least part of testimony sought by defense and allowed to assert privilege only as to genuinely threatening questions.

Conviction reversed.

1. Witnesses ⟷2(2)

If district court's refusal to allow defendants to call a material witness to stand lacked some affirmative justification, it was a violation of defendants' constitutional rights. U.S.C.A.Const. Amend. 6.

2. Witnesses ⟷2(2)

Sixth Amendment embraces not only the right to bring witnesses to courtroom but also at appropriate circumstances to put them on the stand. U.S.C.A.Const. Amend. 6.

3. Witnesses ⟷2(2)

Sixth Amendment's policy of granting accused right for compulsory process to ob-

RPI 0219

tain witnesses in his favor is reinforced by broad requirements of fundamental fairness that due process clause of Fourteenth Amendment imposes. U.S.C.A.Const. Amends. 6, 14.

**4. Witnesses ⟐308**

Determination by trial court that prospective witness, a government informer, who had been subpoenaed by defendants, could not testify without incriminating himself, if correct, would provide the requisite justification for excluding such informer's testimony, since defense would have no right to put informer on the stand merely so jury could see him assert his claim of privilege. U.S.C.A.Const. Amends. 5, 6.

**5. Witnesses ⟐308**

Courts cannot accept Fifth Amendment claims at face value and applicability of privilege is ultimately a matter for the court to decide. U.S.C.A.Const. Amend. 5.

**6. Witnesses ⟐308**

Where subpoenaed witness indicates that he cannot testify without incriminating himself, practice has developed whereby outside presence of jury witness will allude in very general, circumstantial terms the reason why he feels he might be incriminated by answering a given question and judge examines him only so far as to determine whether there are reasonable grounds to apprehend a danger to witness from his being compelled to answer; if danger might exist, court must uphold privilege without requiring witness to demonstrate that response would incriminate. U.S.C.A.Const. Amend. 5.

**7. Witnesses ⟐297(1), 308**

To sustain privilege against self-incrimination it need only be evident from implications of question, in setting in which it is asked, that responsive answer to question or explanation of why it cannot be answered might be dangerous because injurious disclosure could result; trial judge must be governed as much by his personal perception of peculiarities of case as by the facts actually in evidence. U.S.C.A.Const. Amend. 5.

**8. Witnesses ⟐297(1)**

Witness may not withhold all of the evidence demanded of him merely because some of it is protected from disclosure by the Fifth Amendment. U.S.C.A.Const. Amend. 5.

**9. Witnesses ⟐308**

Where witness asserts privilege against self-incrimination court must make a particularized inquiry, deciding in connection with each specific area that the questioning party wishes to explore, whether or not privilege is well-founded, and as to each question the test is whether witness is confronted with substantial and real and not merely trifling or imaginary hazards of incrimination. U.S.C.A.Const. Amend. 5.

**10. Witnesses ⟐297(1)**

Government informers subpoenaed by defendants as witness and claiming privilege against self-incrimination could properly be excused from testifying at all only if court found that informer could legitimately refuse to answer essentially all relevant questions. U.S.C.A.Const. Amend. 5.

**11. Witnesses ⟐297(1)**

Subpoenaed defense witness, examined in camera proceeding conducted by trial judge with respect to claim of privilege against self-incrimination, failed to show that he should be entirely excused from testifying on ground that he could legitimately refuse to answer essentially all relevant questions, and such witness, a government informer should be directed to give at least part of testimony sought by defense and privilege sustained only as to genuinely threatening questions. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(a)(1), 406, 1002(a), 1010(a)(1), 1013, 21 U.S.C.A. §§ 841(a)(1), 846, 952(a), 960(a)(1), 963; U.S.C.A.Const. Amend. 5.

**12. Witnesses ⟐308**

Witness claiming privilege against self-incrimination had burden of establishing his entitlement to the privilege. U.S.C.A. Const. Amend. 5.

**13. Witnesses ⟐308**

While trial courts must enjoy wide discretion in resolving self-incrimination

RPI 0220

claims, that discretion is not unlimited. U.S.C.A.Const. Amend. 5.

**14. Criminal Law ⟜37(2)**

Entrapment occurs when criminal conduct was the product of creative activity of law enforcement officials or those working closely with law enforcement officials; entrapment defense does not require proof of threats or coercion and presupposes deceit.

**15. Criminal Law ⟜37(2)**

Entrapment defense does not require that the entrapping individual must have stayed at hand until the sale was completed, and if government agent truly implants criminal design in mind of defendant and then disappears requirements of entrapment can still be met.

**16. Criminal Law ⟜1170½(1)**

Evidence against defendants in prosecution on narcotics charges was not so overwhelming as to show beyond reasonable doubt that the infringement of defendants' constitutional rights to compel testimony of informer, whose privilege against self-incrimination was upheld in its entirety, was harmless. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(a)(1), 406, 1002(a), 1010(a)(1), 1013, 21 U.S.C.A. §§ 841(a)(1), 846, 952(a), 960(a)(1), 963; U.S.C.A.Const. Amend. 5.

**17. Criminal Law ⟜772(6)**

Attempt to draw a distinction in instruction between lawful entrapment and unlawful entrapment is confusing.

---

Wayne Windle, El Paso, Tex., for Roberto Moreno.

Dan L. Armstrong, El Paso, Tex., for Ivan Moreno.

John Clark, U. S. Atty., San Antonio, Tex., Ronald F. Ederer, Mike Milligan, Asst.

U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Appeal from the United States District Court for the Western District of Texas.

Before WISDOM,[*] GODBOLD and LIVELY,[**] Circuit Judges.

GODBOLD, Circuit Judge:

Rigoberto Melchor Moreno and his brother Ivan Melchor Moreno appeal from convictions on four narcotics charges. The principal issue they raise is a novel one. The prosecution informed the court that an individual subpoenaed by the defense, and called as a witness by the defense, would assert his Fifth Amendment privilege. In passing on the validity of the privilege, the trial judge held an *in camera* conference with the prospective witness, refusing to allow defense attorneys to attend. After the conference the judge announced in open court that he would sustain the privilege and bar all testimony by the witness. The defendants ask us to hold that this procedure deprived them of a fair trial. We decline to do so but nevertheless reverse because we find that the privilege was sustained too broadly.

I

The Melchor brothers are Mexican nationals. In 1974 Rigoberto was living as a rancher, farmer, and trucker in Mexico. On September 16, Guillermo Botello, Rigoberto's partner in various ventures, including the ownership of an aircraft, introduced him to an individual whom we will call Roe.[1] The three made arrangements to bring a large shipment of marijuana into the United States. Rigoberto was to obtain the marijuana from local growers, and Botello was to bring it across the border in the jointly-owned airplane and make delivery to Roe in the United States. Rigoberto per-

---

[*] Judge Wisdom was a member of the panel that heard oral arguments but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

[**] Of the Sixth Circuit, sitting by designation.

[1] Throughout this case the prosecution has sought to conceal Roe's identity because of his service to the government as an informer. The trial court cooperated, and we see no reason to use the name here.

RPI 0221

formed his agreed part in the deal, but the transaction was aborted in October. The marijuana was seized near Ft. Worth, and Roe and others were arrested.

In January 1975, according to the testimony of government agents at the Melchors' trial, Roe began to work closely with the Drug Enforcement Administration (DEA) as an informer. DEA agents promised him that whatever assistance he gave the agency would be made known to the sentencing judge when the Ft. Worth episode came up for trial.

Roe contacted Rigoberto on March 25, 1975, to propose a heroin transaction. Rigoberto said that he would send his brother Ivan to discuss the matter. Ivan met with Roe several times on the following day. During these meetings Roe introduced Ivan to Joaquin Legaretta, an undercover agent for the DEA. A deal was struck, and on March 29 Rigoberto arranged to send to El Paso 2000 grams of heroin concealed under the dashboard of a station wagon driven by Ivan.[2] That day Rigoberto and Ivan met with Legaretta and John Comey, another DEA agent, at a hotel in El Paso. Legaretta displayed a large quantity of government cash, Rigoberto produced the heroin, and an arrest followed.

A grand jury returned a four-count indictment against the brothers, charging them with conspiring to import heroin (21 U.S.C. § 963), importing heroin (id. §§ 952(a), 960(a)(1)), conspiring to possess heroin with intent to distribute (id. § 846), and possessing heroin with intent to distribute (id. § 841(a)(1)).

At trial the Melchors raised an entrapment defense and sought to call Roe as their first witness. The defendants were acquainted with Roe, of course, having had dealings with him for several months. At the time of trial, according to undisputed evidence, they had his telephone number and the numbers of persons who knew him. Although Roe had responded to the defense's subpoena and was available for testimony, the government informed the court that Roe would assert his self-incrimination privilege and should not be called to the stand. The District Judge ruled that he would conduct an *in camera* hearing to determine whether or not Roe's Fifth Amendment claims were valid. The defense attorneys asked permission to attend this hearing to participate in the court's determination, but the request was denied. The District Judge conducted a lengthy interview with Roe. A transcript thereof was made and preserved under seal for review by this court. After the interview the District Judge announced in open court his decision that Roe could not testify without incriminating himself and thus would not have to take the stand.

In Roe's absence, the principal defense witnesses were the brothers themselves. With the support of character witnesses, they attempted to portray themselves as basically honest men who had obeyed the law all their lives, with the above described exceptions. Rigoberto testified that after the marijuana deal had fallen through he had felt depressed and ashamed and had resolved to avoid any further involvement with the drug traffic. He testified that he had put aside his reluctance and participated in the heroin transaction only because of Roe's persistent requests and pleas of hardship.

Ivan's story was that he had had little understanding of what was happening and that he had participated in the activities noted above solely because his brother had asked him to.

The jury found Rigoberto and Ivan guilty on all counts. The judge imposed partly consecutive and partly concurrent sentences totalling 30 years' imprisonment for each defendant.

## II

[1–3] If the District Court's refusal to allow the defendants to call a material witness to the stand lacked some affirmative

---

2. Both brothers testified that Ivan did not know the drugs were in the car. Evidently the jury did not believe them.

RPI 0222

justification, it was a violation of the defendants' constitutional rights. In *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967), the Supreme Court spelled out the significance of the Sixth Amendment right of the accused "to have compulsory process for obtaining witnesses in his favor." The Court noted: "The right to offer testimony of witnesses, and compel their attendance, if necessary, is in plain terms the right to present a defense."[3] The Sixth Amendment's policy is reinforced by the broad requirement of fundamental fairness that the due process clause of the Fourteenth Amendment imposes. In *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297, 312 (1973), the Supreme Court said, in the course of a discussion of due process: "Few rights are more fundamental than that of an accused to present witnesses in his own defense."

[4] The District Court's Fifth Amendment decision, if correct, would provide the requisite justification for excluding Roe's testimony. *U. S. v. Gloria*, 494 F.2d 477 (CA5), *cert. denied*, 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974); *U. S. v. Lacouture*, 495 F.2d 1237 (CA5), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974).[4] But the defendants are in a difficult position. They cannot challenge the substance of the Fifth Amendment ruling because they did not hear what the judge heard. Thus they take the position that they should have been allowed to participate in the Fifth Amendment hearing, cross-examining Roe if necessary and urging the judge to overrule the privilege claim to the extent, if any, that it was frivolous.

[5-7] The District Judge's method of deciding the privilege claim must be evaluat-ed within the context of the broad approach outlined by the Supreme Court in *Hoffman v. U. S.*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). *Hoffman* attempts to resolve a dilemma that arises in many privilege situations. The courts cannot accept Fifth Amendment claims at face value, because that would allow witnesses to assert the privilege where the risk of self-incrimination was remote or even nonexistent, thus obstructing the functions of the courts. The applicability of the privilege is ultimately a matter for the court to decide. On the other hand, "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman*, 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1124. Thus a practice has developed whereby, outside the presence of the jury, the witness will allude in very general, circumstantial terms to the reasons why he feels he might be incriminated by answering a given question. The judge examines him only far enough to determine whether there is reasonable ground to apprehend danger to the witness from his being compelled to answer. If the danger *might* exist, the court must uphold the privilege without requiring the witness to demonstrate that a response *would* incriminate him, the latter inquiry being barred by the privilege itself. As the Court in *Hoffman* phrased it:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial

---

3. Despite the limitations of its wording, the Amendment is held to embrace not only the right to bring witnesses to the courtroom, but also, in appropriate circumstances, the right to put them on the stand. As the Court in *Washington* said, "[t]he Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." 388 U.S. at 23, 87 S.Ct. at 1925, 18 L.Ed.2d at 1025.

4. *Lacouture* held that where a witness's self-incrimination privilege protected her from having to give any of the testimony the defense wanted, the defense had no right to put her on the stand merely so that the jury could see her assert her claim of privilege.

RPI 0223

judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."

341 U.S. at 486–87, 71 S.Ct. at 818, 95 L.Ed. at 1124. This general approach to adjudication of the self-incrimination privilege has been followed by this circuit in numerous opinions.[5]

It is clear that the District Judge here was correct in passing upon Roe's privilege claim in the absence of the jury, U. S. v. Gomez-Rojas, 507 F.2d 1213, 1220 (CA5, 1975), but it is by no means clear that he was correct in excluding everyone else as well. There is very little authority on this question. In a few reported cases an individual has been directed to make the showing contemplated by Hoffman through an in camera presentation. U. S. v. Curcio, 234 F.2d 470 (CA2, 1956), rev'd on other grounds, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); In re John Lakis, Inc., 228 F.Supp. 918 (S.D.N.Y., 1964); In re Mutual Security Savings & Loan Ass'n, 214 F.Supp. 877 (D.Md., 1963). These cases, however, contain little or no analysis of the pros and cons of the procedure involved.[6]

On the other hand, the Third Circuit has expressed fears that in camera proceedings could violate the witness's Fifth Amendment rights. In re U. S. Hoffman Can Corp., 373 F.2d 622 (CA3, 1967). The appellants in U. S. Hoffman Can Corp. had resisted, on Fifth Amendment grounds, disclosure of financial information. The District Court ordered them to submit a sealed statement explaining the basis for their claim. The Court of Appeals held that in circumstances where the appellants proved that a direct answer might be incriminating, the judge could make no further inquiry. A procedure involving sealed statements, the court said, "is bound ultimately to beget a requirement of maximum disclosure to prove the right to the privilege, in contrast to a proceeding in open court where the disclosure may be [interrupted] at the point where the right to the privilege becomes clear to the judge. In any event, the history of the privilege itself contains its own condemnation of a procedure in camera." Id. at 629.

The issue is not a simple one.[7] This case does not require that we decide it, and we leave it for another day. Pretermitting the

5. See, e. g., U. S. v. Malnick, 489 F.2d 682 (CA5, 1974); U. S. v. Wilcox, 450 F.2d 1131, 1136–37 (CA5, 1971), cert. denied, 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 787 (1972); Kiewel v. U. S., 204 F.2d 1 (CA5, 1953).

6. Decades ago individuals asserting a self-incrimination privilege in regard to documents would sometimes be ordered or furnish the documents themselves to the court for an in camera inspection. Contempt convictions for refusal to comply with such orders were upheld on appeal. Brown v. U. S., 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500 (1928); Consolidated Rendering Co. v. Vermont, 207 U.S. 541, 28 S.Ct. 178, 52 L.Ed. 327 (1908); Corretjer v. Draughon, 88 F.2d 116 (CA1, 1937). It would seem that the authority of these early cases has been weakened by Hoffman v. U. S. All of them expressly proceeded on the premise that tolerating the witness's behavior would have totally precluded the court from passing on the privilege issues. Hoffman v. U. S. authoritatively promulgated a less drastic method of resolving such issues without full disclosure.

7. There are tensions in several directions:

(1) Roe was induced by the judge to discuss his fears of self-incrimination more freely than the judge could have required in open court.

Arguably, as U. S. Hoffman Can Corp. suggests, this may have infringed Roe's Fifth Amendment rights. But compare cases sustaining immunity statutes on the ground that the Fifth Amendment does not confer an absolute right not to testify about one's crimes but only a right not to be placed in danger of prosecution as the result of such testimony. Kastigar v. U. S., 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Ullman v. U. S., 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). Possibly the confidentiality of the in camera hearing would be deemed to afford security comparable to statutory immunity. In any event, parties ordinarily may "rely only upon constitutional rights which are personal to themselves." NAACP v. Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). A procedure whereby statements are improperly elicited from a witness in camera would not necessarily injure the defendants who seek his testimony.

(2) There is a general antipathy in our legal system to judicial proceedings behind closed doors. The due process clause embraces to some extent "[t]his nation's accepted practice of guaranteeing a public trial to an accused," In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); see also Fed.R.Crim.P. 26; 6 Wigmore, Evidence § 1834 (3d ed. 1940). But it

RPI 0224

propriety of the procedure, we conclude that the court gave too broad a scope to the privilege as applied to Roe.

### III

In *U. S. v. Gomez-Rojas,* 507 F.2d 1213 (CA5, 1975), this court set forth the basic standards against which the substance of Roe's self-incrimination privilege claim

has never been the law that a person cannot be convicted unless every element of his trial is conducted in public. The courts have recognized that the broad requirement of public judicial proceedings is a flexible one, influenced by particular circumstances. Judges inspect prosecution evidence privately in order to determine whether the Jencks Act, 18 U.S.C. § 3500, or the Constitutions requires the government to release that evidence to the defense. *See U. S. v. Rivero,* 532 F.2d 450 (CA5, 1976). Judges make an *in camera* determination of whether an informant's identity should be disclosed to the defense. *U. S. v. Freund,* 525 F.2d 873 (CA5, 1976).

Parenthetically, we do not agree with the government's argument that *Freund* and its companion case, *U. S. v. Doe,* 525 F.2d 878 (CA5, 1976), "conclusively establish that the trial judge need not allow either the defendant or his lawyer to be present at the in camera hearing with the confidential informant." *Freund* and *Doe* did not establish blanket procedural rules to govern all judicial interviews with informers. Instead, they were concerned with procedures for determining whether the so-called "informer's privilege" should be sustained. We have recently held in *U. S. v. Godkins,* 527 F.2d 1321 (CA5, 1976), that this privilege (which actually is a privilege of the government) may be invoked only when the government seeks to avoid disclosure of an informer's identity; when an accused person wishes to subpoena an individual already known to him, the privilege is irrelevant. "If the identity of the informer is *admitted or known,* then there is no reason for pretended concealment of his identity, and the privilege of secrecy would be merely an artificial obstacle to proof." 8 Wigmore, Evidence § 2374 at 766 (rev. ed. 1961). As we have already pointed out, the defendants knew Roe's identity.

(3) Extraordinary complexity of subject matter and the need to avoid placing a substantial burden on judicial resources may call for the participation of counsel in a determination otherwise suitable for *in camera* inquiry. *See Alderman v. U. S.,* 394 U.S. 165, 182 n. 14, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

(4) Defendants here say that they were entitled to cross-examine Roe to expose possible omissions and flaws in the submission he made to support his privilege. But they cite no case,

must be measured. In that case the defendant Sutherlin pleaded that he had been entrapped by government informer Smith. The informer resisted a defense subpoena by claiming his Fifth Amendment privilege, which the District Court upheld without making any inquiry into the validity of the claim. We held that the court had erred by accepting the informer's assurances at face

and we find none, establishing that they would have had a right to cross-examine Roe if the District Court had passed on his claim in the normal way, in open court. In *U. S. v. Lacouture,* 495 F.2d 1237 (CA5), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974), on which defendants rely, a reluctant witness was examined at a hearing in the judge's chambers, with defense counsel present. But so far as the opinion reveals, the only questions the defense was permitted to ask related to matters at issue in Lacouture's trial, not matters concerning the witness's Fifth Amendment claim. In fact, the opinion narrates how the witness's privilege was invoked and sustained, and in that account the only participants in the discussion were the witness, her own attorney, and the judge.

The usual Sixth Amendment rights of cross-examination were only peripherally at stake here, since the hearing did not relate to guilt but to the collateral issue of whether Roe's privilege was properly invoked. *Cf. U. S. v. Pollard,* 509 F.2d 601, 604 (CA5, 1975). And defendants were not unfairly deprived of a chance to discredit an adverse witness in the jury's eyes, since the jury did not hear Roe testify.

(5) Considered solely from the standpoint of its utility in eliciting relevant testimony, the *in camera* method has both advantages and disadvantages when compared with an inquiry in open court. It perhaps allows an unusually searching inquiry into the proper bounds of the witness's privilege. Under the ordinary procedure a judge is often placed in the position of excluding testimony that would not really incriminate the witness, because he does not know what the witness's answer would be if given. *See Kiewel v. U. S.,* 204 F.2d 1, 4, 6 (CA5, 1953). Behind closed doors, the judge has no need to make such allowance for ignorance. On the other hand, the *in camera* approach tends to deprive courts of the perspective that can be contributed by parties seeking the testimony. The attorneys in the case, having greater familiarity with the details of their clients' evidentiary needs, and also possessing the viewpoint of advocates, may draw the judge's attention to considerations that he himself would have overlooked. *See Dennis v. U. S.,* 384 U.S. 855, 874–75, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

RPI 0225

value and sent the case back for a new trial, directing:

On remand, the trial court must hold a hearing to determine whether Smith's fear of self-incrimination is well-founded and what the parameters of his Fifth Amendment rights are in the context of the testimony that Sutherlin wishes to obtain from him. If the court finds that Smith cannot properly invoke the Fifth Amendment with respect to any relevant and material questions which Sutherlin proposes to ask him, then Smith must testify at the new trial. If, on the other hand, the court finds that Smith may legitimately refuse to answer essentially all relevant questions, then the district court must decide in its informed discretion whether, in light of Sutherlin's entrapment defense, Sutherlin should be allowed to elicit Smith's refusal to testify before the jury or to comment on that refusal.

507 F.2d at 1220. In a companion case with virtually identical facts, we remanded for a new trial with instructions that the judge should conduct a "searching inquiry into the validity and extent of [the informer's] Fifth Amendment claims." *U. S. v. Waddell*, 507 F.2d 1226 (CA5, 1975).

[8-10] A witness may not withhold all of the evidence demanded of him merely because some of it is protected from disclosure by the Fifth Amendment. A blanket refusal to testify is unacceptable. A court must make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded. See, e. g., *U. S. v. Malnick*, 489 F.2d 682 (CA5, 1974); *Daly v. U. S.*, 393 F.2d 873 (CA8, 1968); *Warnell v. U. S.*, 291 F.2d 687 (CA5, 1961). As to each question, the test is whether the witness is confronted with substantial and "real," and not merely trifling or imaginary hazards of incrimination. *Marchetti v. U. S.*, 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Rogers v. U. S.*, 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344 (1941); *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212

(CA8, 1973), *cert. denied*, 414 U.S. 1162, 89 L.Ed.2d 116 (1974). As *Gomez-Rojas* and *Waddell* clearly contemplated, Roe could properly have been excluded from testifying only if the court had found that Roe could "legitimately refuse to answer *essentially all* relevant questions." *Gomez-Rojas*, 507 F.2d at 1220 (emphasis added).

[11, 12] The record here does not support any such finding. The sealed transcript indicates that Roe's fears of self-incrimination centered on the possibility that the defense, while probing his motives for becoming an informer, would ask him to discuss circumstances as they existed prior to the heroin transaction underlying the instant prosecution. Such testimony, we may assume for present purposes, might have aided prosecutors in marshalling charges against him. Roe did not, however, explain why the testimony he could give about his negotiations with the Melchors over the heroin sale—the testimony most critical to the Melchors' entrapment contention—would expose him to a risk of prosecution. Since there is a great deal of evidence to suggest that with respect to the heroin deal he was acting in cooperation with DEA agents at least part of the time, we surmise that such a showing would have been difficult to make. In any event, the burden of establishing entitlement to the privilege was his, and he did not carry it as to the entire subject matter of his prospective testimony. Accordingly he should have been called to the witness stand and directed to give at least part of the testimony sought by the defense. Only as to genuinely threatening questions should his silence have been sustained. See *U. S. v. Stephens*, 492 F.2d 1367 (CA6, 1974); *Warnell v. U. S.*, *supra*.

The Second Circuit was recently faced with a situation much like the one before us. *U. S. v. Anglada*, 524 F.2d 296 (CA2, 1976). Anglada was unable to obtain testimony from the informer, who had allegedly entrapped him, because the informer, Santana, had asserted his Fifth Amendment privilege. On appeal the defendant raised a number of arguments against the exclusion,

RPI 0226

most if not all of them equally pertinent to the Melchors' situation. He pointed to

the unique nature of Santana's testimony in establishing the entrapment defense (he was the only other participant in the critical conversation), the protection afforded Santana against a criminal charge in the Anglada transaction because Santana was acting at the Government's request, the lack of connection between the Anglada sale and the state charge [underlying the self-incrimination claim], the possible waiver of his fifth amendment rights by his conversations with the prosecutor, and the possibility that his reluctance to testify was based upon fear of Anglada's retaliation rather than on the fifth amendment.

*Id.* at 300 (footnote omitted). In response the appellate court, which had already decided to reverse the case on unrelated grounds, advised the District Judge that if the situation arose again at Anglada's new trial, he should "take a harder look at any blanket assertion of privilege and also at the possibility of allowing some carefully phrased, limited questions by Anglada's counsel." *Id.*[8]

To complete our analysis of the defendants' compulsory process contention, we look to the materiality and relevancy of the excluded testimony. See *U. S. v. Joseph,* 533 F.2d 282, 284–85 (CA5, 1976). Rigoberto alleged that Roe had tried on numerous occasions to entice him into a heroin transaction, although Rigoberto had at first declared several times that he was uninterest-

ed. Roe was the only person who could corroborate or discredit this story. He also played a central role in Ivan's story.[9] The District Judge, after his *in camera* meeting with Roe, expressed the view that Roe's answers "would not be of assistance to the Defendants in their defense of entrapment." It is true that Roe's *in camera* account of his dealings with the Melchors differed in some respects from the brothers' own testimony. But one cannot assume that Roe's account would have stood up under defense examination. And the jury might have given greater credence to the brothers' story if Roe's testimony had corroborated it to some extent.

[13] Trial courts must enjoy wide discretion in resolving a self-incrimination claim,[10] but their discretion is not unlimited. Cf. *U. S. v. Chase,* 281 F.2d 225, 228–29 (CA7, 1960). In this instance the exclusion of Roe's testimony in its entirety rose to the level of constitutional error.

## IV

[14, 15] The government makes what is, in effect, a harmless error contention. As a matter of law, the argument runs, there was no entrapment, so it makes no difference whether or not the exclusion of Roe's testimony was wrong. The government emphasizes (1) that there were no threats and no real coercion directed against the defendants, and (2) that Roe merely set up the transaction and played no part in the events occurring on the day of the arrest.

---

8. The District Judge's remarks during his *in camera* conference indicated a belief that Roe might be placed in physical danger if he were to testify. Of course, there is authority to support the proposition that a court may protect a witness by forbidding a defendant from asking his address or like information, if there is a substantial showing of danger. *Smith v. Illinois,* 390 U.S. 129, 133–34, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) (White, J., concurring); *U. S. v. Harris,* 501 F.2d 1, 7 (CA9, 1974); *U. S. v. Alston,* 460 F.2d 48, 52 (CA5, 1972). Like the informer's privilege (*see* point (2) within n. 7, *supra*), these authorities are of doubtful application if the defendant already knows the witness and how to contact him. In any event, we are not aware that the rationale of these cases

has ever been extended to the point of allowing the exclusion of evidence at a criminal trial with a direct bearing on the guilt or innocence of the accused.

9. Although Agent Legaretta participated in and testified about some of the preliminary negotiations between Ivan and Roe, his story contradicted Ivan's in important particulars, and Roe was the only person whose testimony could resolve the inconsistency.

10. This discretion is implicit in the Supreme Court's admonition that the judge must rely on " 'his personal perception of the peculiarities of the case.' " *See* text accompanying n. 5, *supra.*

RPI 0227

In simple terms, entrapment occurs "when the criminal conduct was 'the product of the creative activity' of law-enforcement officials," *Sherman v. U. S.*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) (emphasis omitted), or of those working closely with law-enforcement officials, *Gomez-Rojas*, 507 F.2d at 1220. The entrapment defense does not require proof of threats or coercion. It presupposes deceit, not force. Nor does the defense require that the entrapping individual must have stayed at hand until the sale was completed. If a government agent truly "implants the criminal design in the mind of the defendant," *U. S. v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973), and then disappears, the requirements of entrapment can still be met. In any event, the defendants' theory did not assume that entrapment had to be attributed to Roe alone. Instead the defendants blamed Roe, Legaretta and Comey jointly.

[16, 17] In short, the evidence against Rigoberto and Ivan was not so overwhelming as to show, beyond reasonable doubt, that the infringement at trial of defendants' constitutional rights was harmless.[11] *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The convictions must be, and are, REVERSED.[12]



Robert Vernon BRUCE,
Petitioner-Appellant.

v.

W. J. ESTELLE, Director, Texas Department of Corrections, Respondent-Appellee.

No. 75-3284.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1976.

After remand from a prior appeal in habeas corpus proceedings brought by a convicted murderer, 483 F.2d 1031, the United States District Court for the Northern District of Texas, at Dallas, Eldon B. Mahon, J., conducted a nunc pro tunc competency hearing and concluded that the petitioner did not suffer from any mental illness which would interfere with his ability to assist in his own defense and factually and rationally understand the proceedings against him, and petitioner again appealed. The Court of Appeals, Clark, Circuit Judge, held, inter alia, that the trial court's finding that petitioner was a sociopath and was not schizophrenic was clearly erroneous and that, under the "hard look" standard of appellate review, the trial court's ultimate conclusion that the petitioner was competent to stand trial was in error.

Reversed with directions.

**1. Habeas Corpus ⚖50**

In habeas corpus proceeding brought by convicted murderer, mere fact that there was gap of more than nine years between petitioner's murder trial and later nunc pro tunc competency hearing in habeas proceeding did not, per se, preclude intelligent retrospective resolution of competency issue;

---

11. The government did not come forward with independent evidence that the defendants were predisposed to commit narcotics offenses. It simply relied on the facts of the transaction and the Melchors' testimony to argue that entrapment had not occurred.

12. Because of this disposition of the case, we need not dwell on defendants' other assignments of error. In his instructions to the jury the District Court drew a distinction between "lawful entrapment" and "unlawful entrapment." We have often criticized that usage as confusing. *See, e. g., U. S. v. Oquendo*, 490 F.2d 161, 165 n. 9 (CA5, 1974).

RPI 0228

Plaintiff's motion for a temporary injunction should have been granted.

Decree reversed.

---

(266 U. S. 34)

## McCARTHY v. ARNDSTEIN.

(Reargued Nov. 27, 1923. Decided Oct. 20, 1924.)

No. 404.

1. **Bankruptcy ☞241(1)—General rules of evidence applicable to examination of bankrupt and wife under Bankruptcy Act.**

The general rules governing admissibility of evidence and competency and compellability of witnesses are applicable to examination of bankrupt and wife, under Bankruptcy Act, July 1, 1898, § 21a, as amended by Act Feb. 5, 1903, § 7 (Comp. St. § 9605).

2. **Witnesses ☞293½—Constitutional privilege against self-incrimination applicable to civil as well as criminal proceedings.**

Constitutional privilege against self-incrimination applies to civil as well as criminal proceedings.

3. **Witnesses ☞293—Privilege against self-incrimination applies to witness not party defendant.**

Constitutional privilege against self-incrimination is available to witness who is not a party defendant.

4. **Witnesses ☞293½—Constitutional privilege available to owner of goods which may be forfeited in penal proceeding.**

Constitutional privilege against self-incrimination protects owner of goods which may be forfeited in penal proceeding.

5. **Bankruptcy ☞242(2)—Constitutional privilege against self-incrimination available to bankrupt examined as to assets under Bankruptcy Act.**

Constitutional privilege against self-incrimination is available to bankrupt being examined before commissioner as to assets under Bankruptcy Act, July 1, 1898, § 21a, as amended by Act Feb. 5, 1903, § 7 (Comp. St. § 9605), though information is sought for purpose of discovering estate.

6. **Bankruptcy ☞242(2)—Privilege against self-incrimination does not relieve bankrupt of duty to surrender books and papers as part of estate.**

Constitutional privilege against self-incrimination does not relieve bankrupt from duty of surrendering books and papers as part of his estate, under Bankruptcy Act July 1, 1898, § 70a (1), being Comp. St. § 9654.

7. **Bankruptcy ☞242(2)—Congress can confer power of unrestricted examination of bankrupt as to assets by providing complete immunity.**

Congress can confer power of unrestricted examination of bankrupt, being examined before commissioner as to assets, under Bankruptcy Act July 1, 1898, § 21a, as amended by Act, Feb. 5, 1903, § 7 (Comp. St. § 9605), and make privilege against self-incrimination not available, by providing complete immunity.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

[1] In re Tobias, Greenthal & Mendelson (D. C.) 215 Fed. 515.

Appeal from the District Court of the United States for the Southern District of New York.

On rehearing. Judgment reaffirmed.

For former opinion, see 262 U. S. 355, 43 S. Ct. 562, 67 L. Ed. 1023.

Messrs. Solicitor General Beck, of Washington, D. C., and Saul S. Myers and Walter H. Pollak, both of New York City, for appellant.

*35

*Mr. Selden Bacon, of New York City, for National Surety Co.

*36

*Mr. Lindley M. Garrison, of New York City, for American Surety Co. and others.

Mr. W. Randolph Montgomery, of New York City, for National Ass'n of Credit Men.

Mr. Wm. J. Fallon, of White Plains, N. Y., for appellee.

Mr. Justice BRANDEIS delivered the opinion of the Court.

In 1920, Arndstein was adjudged an involuntary bankrupt in the Southern district of New York. Pursuant to a subpœna, he appeared before a special commissioner for examination as to his assets under section 21a of the Bankruptcy Act of July 1, 1898, c. 541, 30 Stat. 544, 552, as amended by Act Feb. 5, 1903, § 7 (Comp. St. § 9605), was sworn as a witness, and freely answered some questions. Others he refused to answer on the ground that to do so might tend to incriminate him. Having persisted in this refusal, after the District Judge ordered him to answer, Arndstein was committed for contempt. He did not appeal from the order or file a petition to revise. Instead he applied to another judge sitting in the same court for a writ of habeas corpus. The petition was denied, on the ground that the bank-
*39
rupt had *waived his privilege by complying without objection to the order that he file a schedule of his assets.[1] The judgment denying the writ was reversed by this court, but the mandate required merely that the lower court issue the writ and then proceed as usual. Arndstein v. McCarthy, 254 U. S. 71, 41 S. Ct. 136, 65 L. Ed. 138; Id., 254 U. S. 379, 41 S. Ct. 136, 65 L. Ed. 314.

Thereupon the District Court issued the writ of habeas corpus. The marshal made a return which included a transcript of the entire proceedings. The court held that, despite certain oral answers given, the bankrupt was entitled to cease disclosure. The judgment, which discharged the bankrupt from custody, was affirmed by this court. McCarthy v. Arndstein, 262 U. S. 355, 357, 358, 43 S. Ct. 562, 67 L. Ed. 1023. The case is now before us on rehearing, granted in order to permit argument of the proposition, not presented by counsel before, that the

RPI 0229

privilege against self-incrimination does not extend to an examination of the bankrupt made for the purpose of obtaining possession of property belonging to his estate. 263 U. S. 676, 44 S. Ct. 83, 68 L. Ed. 501.

[1] The right to examine the bankrupt, here in question, rests wholly on section 21a. This section provides that the court may "require any designated person, including the bankrupt and his wife, to appear in court * * * to be examined concerning the acts, conduct, or property of a bankrupt whose estate is in process of administration. * * *" The subject-matter of the examination is thus specifically prescribed by the act. There is no provision prescribing the rules by which the examination is to be governed. These are, impliedly, the general rules governing the admissibility of evidence and the competency and compellability of *40 witnesses.[1] The section contains no in*dication of an intention, on the part of Congress, to take from any witness the privilege against self-incrimination. Moreover, the section makes clear the purpose not to differentiate between the bankrupt and other witnesses, nor to differentiate examinations which relate to the property from those which relate to the acts or the conduct of the bankrupt.[2] This court has already decided that the privilege was not waived, either by the bankrupt's filing the schedule or by his answering orally certain questions. The contention now is that the privilege against self-incrimination ought to have been disallowed because, under the Constitution, it does not extend to the examination of a bankrupt in a bankruptcy proceeding.

[2-4] The government insists, broadly, that the constitutional privilege against self-incrimination does not apply in any civil proceeding. The contrary must be accepted as settled. The privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant. It protects, likewise, the owner of goods which may be forfeited in a penal proceeding. See Counselman v. Hitchcock, 142 U. S. 547, 563, 564, 12 S. Ct. 195, 35 L. Ed. 1110.

*41

[5] *The government urges more strongly a narrower contention. It claims that the constitutional privilege does not relieve a bankrupt from the duty to give information which is sought for the purpose of discovering his estate. It asserts that in England such an exception to the common law privilege prevails, and that the exception had been established there prior to the Declaration of Independence.[4] Whatever may be the rule in England, it is clear that in America the constitutional prohibition of compulsory self-incrimination has not been so limited.[5]

[6] The cases which hold that a bankrupt must surrender books and papers, although they contain incriminating evidence, rest upon a principle different from that here involved. Matter of Harris, 221 U. S. 274, 31 S. Ct. 557, 55 L. Ed. 732; Johnson v. United States, 228 U. S. 457, 33 S. Ct. 572, 57 L. Ed. 919, 47 L. R. A. (N. S.) 263; Ex parte Fuller, 262 U. S. 91, 43 S. Ct. 496, 67 L. Ed. 881; Dier v. Banton, 262 U. S. 147, 43 S. Ct. 533, 67 L. Ed. 915. The law requires a bankrupt to surrender his property. The books and papers of a business are a part of the bankrupt estate. Section 70a (1) being Comp. St. § 9654. To permit him to retain possession, because surrender might involve disclosure of a crime, would destroy a property right. The constitutional privilege relates to the adjective law. It does not relieve one from compliance with the substantive obligation to surrender property.

*42

[7] *Section 21a, on the other hand, deals specifically and solely with the adjective law—with evidence and witnesses. When the bankrupt appears before a commissioner under this section, he comes, like any other person, merely to testify. In that connection he may, like any other witness, assert the constitutional privilege; because the present statute fails to afford complete immunity from prosecution. If Congress should hereafter conclude that a full disclosure of the

---

[1] See People's Bank of Buffalo v. Brown, 112 F. 652, 50 C. C. A. 411; In re Pursell (D. C.) 114 F. 371; In re Josephson (D. C.) 121 F. 142; Brown v. Person, 122 F. 212, 58 C. C. A. 653; In re Hooks Smelting Co. (D. C.) 138 F. 954, 956; In re Ruos (D. C.) 159 F. 252.

[2] Substantially the same provision was made in Act April 4, 1800, c. 19, §§ 14, 18, 24, 2 Stat. 25, 26, 28; in Act Aug. 19, 1841, c. 9, § 4, 5 Stat. 440 (in part); in Act March 2, 1867, c. 176, § 26, 14 Stat. 517, 529. See, also, Act Feb. 5, 1903, c. 487, § 7, 32 Stat. 797, 798. The purpose may have been, in part, to render the bankrupt and others competent as witnesses. Compare Ex parte Haes, [1902] 1 K. B. 98. The bankrupt (and many other witnesses) would, under the rules prevailing in the common law court at the time the earlier bankrupt laws were enacted, have been incompetent as witnesses, on the ground of interest, but for such a provision, and the wife would have been incompetent because of her particular relationship.

[4] See Ex parte Meymot, 1 Atk. 196, 198, 200; Ex parte Cossens, Buck's Cases, 531, 540; In re Heath, 2 D. & Ch. 214. The requirement under the English practice referred to is, perhaps, more like the American requirement of the filing of a schedule of assets under section 7a(8), being Comp. St. § 9591, than the submission to examination as a witness provided for in section 21a.

[5] In re Scott (D. C.) 95 F. 815; In re Rosser (D. C.) 96 F. 305; In re Franklin Syndicate (D. C.) 114 F. 205; United States v. Goldstein (D. C.) 132 F. 789; In re Bendheim (D. C.) 180 F. 913; In re Tobias, etc. (D. C.) 215 F. 815; In re Naletsky (D. C.) 280 F. 437. Compare In re Feldstein (D. C.) 103 F. 269; In re Walsh (D. C.) 104 F. 518; In re Shera (D. C.) 114 F. 207; In re Nachman (D. C.) 114 F. 995; In re Levin (D. C.) 131 F. 388. But see Mackel v. Rochester, 102 F. 314, 42 C. C. A. 427.

RPI 0230

bankrupt estate by the witnesses is of greater importance than the possibility of punishing them for some crime in the past, it can, as in other cases, confer the power of unrestricted examination by providing complete immunity. Compare Brown v. Walker, 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819; Glickstein v. United States, 222 U. S. 139, 142, 32 S. Ct. 71, 56 L. Ed. 128; Ensign v. Pennsylvania, 227 U. S. 592, 33 S. Ct. 221, 57 L. Ed. 658.

Judgment reaffirmed.

═══

(266 U. S. 42)

**MICHAELSON et al. v. UNITED STATES ex rel. CHICAGO, ST. P., M. & O. RY. CO.**

**SANDEFUR v. CANOE CREEK COAL CO.**

(Argued April 9 and 10, 1924. Decided Oct. 20, 1924.)

Nos. 246 and 232.

1. **Injunction ⚎230(1)—Proceeding for violation of injunction under Clayton Act is for criminal and not civil contempt.**

Proceeding for violation of injunction, under Clayton Act, §§ 21, 22 (Comp. St. §§ 1245a, 1245b), is a proceeding for criminal and not for civil contempt, and is an independent proceeding at law between the public and defendant, and no part of the original cause.

2. **Contempt ⚎30—Power to punish for contempt inherent in all courts.**

The power to punish for contempt is inherent in all courts.

3. **Contempt ⚎60(1)—Presumption of innocence obtains in criminal contempt proceedings.**

Presumption of innocence obtains in proceedings for criminal contempt.

4. **Contempt ⚎60(3)—Proof of guilt of criminal contempt must be beyond reasonable doubt.**

In contempt proceedings, proof of guilt of criminal intent must be beyond reasonable doubt.

5. **Witnesses ⚎293½—Defendant, accused of criminal contempt, cannot be compelled to testify against himself.**

Defendant may not be compelled to testify against himself in criminal contempt proceeding.

6. **Jury ⚎13(21)—Provision of Clayton Act, providing for jury trial in certain contempt proceedings, held constitutional.**

Clayton Act, §§ 21, 22 (Comp. St. §§ 1245a, 1245b), providing for jury trial in contempt proceedings where act complained of is also a crime, on demand of accused, held not unconstitutional impairment of inherent power of courts to punish for contempt; the proceeding being an independent proceeding at law for criminal contempt, based on act constituting crime.

7. **Jury ⚎13(21)—Provisions of Clayton Act providing for jury trial in contempt proceedings held available to railroad strikers, who had rejected decision of Railroad Labor Board.**

Striking employés of railroad, who had refused to abide by order of Railroad Labor Board, held entitled to jury trial, under Clayton Act, §§ 20–22 (Comp. St. §§ 1243d, 1245a, 1245b), in contempt proceedings for violation of injunction, since such statute does not require existence of status of employment at time acts constituting contempt are committed.

8. **Injunction ⚎223(2)—Violation of injunction against strikers held basis for contempt proceedings.**

Strikers, who used abusive language, assembled in numbers, and were guilty of picketing and other acts for purpose of intimidating prospective employés, could be convicted of contempt in proceedings under Clayton Act, §§ 20–22 (Comp. St. §§ 1243d, 1245a, 1245b), requiring the contempt to constitute a crime, since such acts prima facie, at least, violate St. Wis. 1921, § 4466c.

9. **Jury ⚎13(21)—Provision of Clayton Act providing for jury trial in contempt proceedings is mandatory.**

Clayton Act, §§ 21, 22 (Comp. St. §§ 1245a, 1245b), providing for jury trial on demand of accused in contempt proceeding, where the act constitutes a crime, is mandatory.

On Writ of Certiorari to the United States Circuit Court of Appeals for the Seventh Circuit.

On Certificate from the United States Circuit Court of Appeals for the Sixth Circuit.

Contempt proceeding by the United States, on the relation of the Chicago, St. Paul, Minneapolis & Omaha Railway Company, against Sam Michaelson and others, and suit by the Canoe Creek Coal Company against S. C. Sandefur and others. Judgments against defendants in the first described proceeding were affirmed by the Circuit Court of Appeals (291 F. 940), and they bring error. The named defendant in the second described action was fined for contempt, and the Circuit Court of Appeals, on error, certified the question involved to the United States Supreme Court (293 F. 379). Judgments reversed and cause remanded in first proceeding, and question answered in second action.

*44
*Messrs. Donald R. Richberg, of Chicago, Ill., John A. Cadigan, of Superior, Wis., and Jackson H. Ralston, of New York City, for petitioners Michaelson and others.

*50
*Messrs. Jackson H. Ralston, of New York City, and James W. Henson, of Henderson, Ky., for petitioner Sandefur.

*54
*Mr. Edward Porter Humphrey, of Louisville, Ky., for Canoe Creek Coal Co.

*55
*Mr. Richard L. Kennedy, of St. Paul, Minn., for respondent Chicago, St. P., M. & O. R. Co.

═══
⚎For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

RPI 0231

886 F.Supp. 1134
United States District Court,
S.D. New York.

TRUSTEES OF the PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND, et al., Plaintiffs,

v.

TRANSWORLD MECHANICAL,
INC., et al., Defendants.

No. 94 Civ. 6634 (DC). | May 25, 1995.

Trustees of employee benefit funds for local union brought action against employers for violating Employee Retirement Income Security Act (ERISA), Labor Management Relations Act, civil Racketeer Influenced Corrupt Organizations Act (RICO), and common-law fraud. On defendants' motion to stay case pending resolution of related criminal and civil cases and their motion to dismiss, the District Court, Chin, J., held that: (1) case would be stayed pending resolution of criminal case alleging same wrongful conduct; (2) complete stay would granted, rather than only partial stay as to individual defendants; (3) pending civil case on suspense calendar would not be stayed under "prior pending action" doctrine; (4) trustees alleged common-law and ERISA fraud claims with required particularity; and (5) trustees established pattern of racketeering activity sufficient to withstand motion to dismiss.

Motion to stay criminal case granted; motions to stay civil case and to dismiss denied.

West Headnotes (26)

[1]     **Action**
        Stay of Proceedings

        Court has discretionary authority to stay case if interests of justice so require.

        4 Cases that cite this headnote

[2]     **Action**
        Nature and subject matter of actions in general

Courts are afforded discretion to stay case if interests of justice so require because denial of stay could impair party's Fifth Amendment privilege against self-incrimination, extend criminal discovery beyond limits set forth in Federal Rule of Criminal Procedure, expose defense's theory to prosecution in advance of trial, or otherwise prejudice criminal case; however, stay of criminal case is extraordinary remedy. U.S.C.A. Const.Amend. 5; Fed.Rules Cr.Proc.Rule 16(b), 18 U.S.C.A.

30 Cases that cite this headnote

[3]     **Action**
        Nature and subject matter of actions in general

        Factors to be considered in determining whether stay of case is warranted in interests of justice include extent to which issues in criminal case overlap with those presented in civil case, status of case, including whether defendants have been indicted, private interests of plaintiffs in proceeding expeditiously weighed against prejudice to plaintiffs caused by delay, private interests of and burden on defendants, interests of courts, and public interest.

        94 Cases that cite this headnote

[4]     **Action**
        Nature and subject matter of actions in general

        Issues in criminal case overlap with those in civil case, supporting stay of civil case, where wrongful conduct alleged in both cases was that defendants, through their companies, failed to make contributions to union pension funds, failed to pay union assessments, and concealed employment of non-union employees, all in violation of collective bargaining agreement between defendants and union, and state and federal law.

        24 Cases that cite this headnote

[5]     **Action**

Nature and subject matter of actions in general

Indictment of defendants for defrauding union members of fringe benefit contributions weighed in favor of granting stay of civil action alleging same wrongful conduct.

2 Cases that cite this headnote

[6] **Action**

Nature and subject matter of actions in general

Stay of civil case is most appropriate where party to civil case has already been indicted for same conduct; likelihood that defendant may make incriminating statements is greatest after indictment has issued, and prejudice to plaintiffs in civil case is reduced since criminal case will likely be quickly resolved due to Speedy Trial Act considerations.

28 Cases that cite this headnote

[7] **Action**

Nature and subject matter of actions in general

Judicial efficiency weighed in favor of granting stay of civil case pending resolution of criminal case alleging same wrongful conduct; defendants have been indicted and will face trial within six months, resolution of criminal case may increase possibility of settlement of civil case due to high standard of proof required in criminal prosecution, and resolution of criminal case may reduce scope of discovery in civil case, since evidence gathered during criminal prosecution can later be used in civil case.

34 Cases that cite this headnote

[8] **Action**

Nature and subject matter of actions in general

Complete stay of civil case as to all defendants pending resolution of criminal case involving allegations of same wrongful conduct was warranted, since it would be more efficient than granting only partial stay as

to individual defendants; individual defendants were controlling officers of corporate defendants and responsible for correct reporting and payment of fringe benefit contributions and wages that defendants allegedly withheld.

4 Cases that cite this headnote

[9] **Action**

Nature and subject matter of actions in general

"Prior pending action" doctrine did not apply to support stay of case pending resolution of earlier filed civil case on suspense calendar.

Cases that cite this headnote

[10] **Federal Civil Procedure**

Fraud, mistake and condition of mind

Trustees of union pension fund alleged common law and Employee Retirement Income Security Act (ERISA) fraud claim with particularity required by Federal Rules of Civil Procedure. where they alleged that in monthly reports submitted to them, employers misrepresented identity of employees working for them and number of hours each employee worked. that employers were responsible for accuracy of reports, that trustees relied on misrepresentations to their detriment. and that trustees could not know identity of employees or hours actually worked, since they did not have access to employers' records. Employee Retirement Income Security Act of 1974, § 3(1, 3), 29 U.S.C.A. § 1002(1, 3); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

[11] **Federal Civil Procedure**

Fraud, mistake and condition of mind

Purpose behind particularity requirement for pleading fraud is to provide defendants with fair notice of plaintiffs' claims, protect defendants from harm to their reputation and reduce number of strike suits. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A

1 Cases that cite this headnote

**[12]   Federal Civil Procedure**

⊷ Fraud, mistake and condition of mind

To satisfy rule requiring fraud to be pleaded with particularity, plaintiffs must specify statements they claim were false or misleading and give particulars with respect to fraudulent statements, including when and where statements were made and identity of those responsible for statements. Fed Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

**[13]   Federal Civil Procedure**

⊷ Fraud, mistake and condition of mind

Allegation that certain facts are peculiarly within opposing party's knowledge justifies relaxation of requirement for pleading fraud claims with particularity. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

2 Cases that cite this headnote

**[14]   Racketeer Influenced and Corrupt Organizations**

⊷ Association with or participation in enterprise; control or intent

**Racketeer Influenced and Corrupt Organizations**

⊷ Business, property, or proprietary injury; personal injuries

To prevail on their civil RICO claim, plaintiffs must establish that defendants conducted or participated in conduct of enterprise's affairs through pattern of racketeering activity that caused injury to plaintiffs' business or property. 18 U.S.C.A. § 1962(c).

3 Cases that cite this headnote

**[15]   Racketeer Influenced and Corrupt Organizations**

⊷ Pattern of Activity

To allege adequately pattern of racketeering, plaintiffs must establish that defendants committed two or more predicate acts within ten years, which were related and continuous 18 U.S.C.A. § 1962.

1 Cases that cite this headnote

**[16]   Racketeer Influenced and Corrupt Organizations**

⊷ Continuity or relatedness; ongoing activity

Predicate acts are "related", for purposes of satisfying relatedness requirement for alleging pattern of racketeering activity, if they share similar purposes, participants, victims, methods, or other distinguishing characteristics; they must not be isolated or sporadic. 18 U.S.C.A. § 1962.

1 Cases that cite this headnote

**[17]   Racketeer Influenced and Corrupt Organizations**

⊷ Time and duration

"Continuity" required to allege pattern of racketeering can be shown either through series of related predicate acts extending over substantial period of time or by past conduct which by its nature extends into future. 18 U.S.C.A. § 1962.

3 Cases that cite this headnote

**[18]   Racketeer Influenced and Corrupt Organizations**

⊷ Pattern

Trustees of several employee benefit funds for local union established pattern of racketeering activity sufficient to withstand motion to dismiss, where they alleged that employers, from at least 1988 to present, mailed monthly reports to trustees containing intentional misrepresentations regarding number of persons employed by employers and number of hours worked by those employees for purposes of reaping financial gain at expense of trustees, and that they underreported amount of money owed to employee benefit funds on reports and retained money themselves. 18 U.S.C.A. § 1962.

Cases that cite this headnote

RPI 0234

**[19]    Racketeer Influenced and Corrupt Organizations**

  What constitutes enterprise in general

**Racketeer Influenced and Corrupt Organizations**

  Informal entities; associations-in-fact

"Enterprise" for RICO claim may either be ongoing organization or association-in-fact of individuals or entities acting as group for common purpose of engaging in racketeering activity. 18 U.S.C.A. § 1961(4).

Cases that cite this headnote

**[20]    Racketeer Influenced and Corrupt Organizations**

  Informal entities; associations-in-fact

**Racketeer Influenced and Corrupt Organizations**

  Separateness from predicate acts, pattern, or persons

To establish "association-in-fact enterprise" for RICO purposes. plaintiffs must show that members of enterprise function as continuing unit and that enterprise exists separate and apart from racketeering activity in which it is allegedly engaged. 18 U.S.C.A. § 1962.

4 Cases that cite this headnote

**[21]    Racketeer Influenced and Corrupt Organizations**

  Employers and employees

Trustees of employee benefit funds for local unions sufficiently alleged existence of RICO enterprise by alleging that defendants were employers of persons performing work covered under collective bargaining agreement and controlled by individual defendants, who had responsibility for accuracy and mailing of reports, and that two of corporate defendants were sham companies created by other defendants to defraud trustees. 18 U.S.C.A. §§ 1961(4), 1962.

Cases that cite this headnote

**[22]    Federal Civil Procedure**

  Fraud, mistake and condition of mind

RICO claim based on mail fraud must satisfy particularity requirement for pleading fraud under Federal Rules of Civil Procedure. 18 U.S.C.A. § 1962; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

**[23]    Racketeer Influenced and Corrupt Organizations**

  Racketeering or criminal activity; predicate acts

RICO mail fraud claim must also identify purpose of mailing within fraudulent scheme. 18 U.S.C.A. § 1962.

1 Cases that cite this headnote

**[24]    Federal Civil Procedure**

  Fraud, mistake and condition of mind

Trustees of employee benefit funds for local union pled RICO mail fraud claim with required particularity, where purpose of mailing was to underreport number of persons employed and hours worked by employees so that employers would pay fewer contributions and keep additional money, which was owed to trustees, for themselves; no specific connection between defendants and fraudulent mailing was necessary, since individual defendants were owners and controlling officers of corporate defendants, which were same entity with responsibility for accuracy of reports. 18 U.S.C.A. § 1962; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

Cases that cite this headnote

**[25]    Racketeer Influenced and Corrupt Organizations**

  Injury; causation

Allegations by trustees of employee benefits funds for local union that employers withheld contributions and other payments sufficiently stated RICO injury; trustees alleged non-

RPI 0235

speculative loss, but could not ascertain precise amount of that loss because information was peculiarly within defendants' knowledge. 18 U.S.C.A. § 1962.

3 Cases that cite this headnote

**[26]    Racketeer Influenced and Corrupt Organizations**
       Damages

RICO plaintiff may not recover for speculative losses or where amount of damages is unprovable, since purpose of civil RICO award is to return plaintiff to same financial position he would have enjoyed absent illegal conduct. 18 U.S.C.A. § 1961 et seq.

5 Cases that cite this headnote

**Attorneys and Law Firms**

*1137 Cohen, Weiss and Simon by Joseph J. Vitale and Tamir W. Rosenblum, New York City, for plaintiffs.

Schlam Stone & Dolan by James C. Sherwood, New York City, for defendants.

## OPINION

CHIN, District Judge

This is a case brought to collect contributions and other benefits allegedly owed to several employee benefit plans. Defendants Transworld Mechanical, Inc., Transworld Plumbing & Heating, Inc., Danica Plumbing & Heating Corp., Danica Mechanical, Inc., Thomas Andreadakis and Helen Andreadakis move 1) to stay this case pending the resolution of a related criminal matter in New York state court, 2) to stay this case pending the resolution of a related civil case in this Court, and 3) to dismiss certain claims. For the following reasons, the motion to stay this case until the resolution of the criminal matter is granted; the motion to stay pending the civil case, however, is denied. The motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

Plaintiffs are the Trustees of several employee benefit funds for Local No. 2, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (the "Local 2 Funds") and of the Plumbers and Pipefitters National Pension Fund (collectively, the "Pension Fund"). The Trustees administer multi-employer employee benefit funds as defined by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(1) and (3). Local 2, a labor organization affiliated with the AFL–CIO, is also a plaintiff in this action.

Defendants are corporations engaged in the plumbing and pipefitting industry.[2] Plaintiffs allege that defendants Transworld Mechanical and Danica Plumbing are bound by a collective bargaining agreement with Local 2 that sets forth the terms and conditions for plumbing and gas fitting work performed by defendants' employees in Manhattan and the Bronx (the "Agreement"). The Agreement provides that defendants will remit contributions to the Funds for every hour worked by an employee. Plaintiffs allege that defendants, from 1988 to the present, failed to make adequate contributions for the hours worked by their employees, concealed the identity of the individuals employed by them, and misrepresented the hours worked by the employees who were listed. Defendants allegedly made these misrepresentations on reports made to the Industry Board and the Pension Fund. In addition, defendants allegedly failed to pay their employees the contractual wage rates as set forth in the Agreement and failed to make union assessment payments or promotion fund contributions.

*1138 On or about October 15, 1993, the Andreadakises and the two Danica entities were indicted by the Grand Jury of the County of New York, *People of the State of New York v. Helen Andreadakis, et al.* The indictment charged that, among other things, defendants filed false reports to disguise violations of the Agreement, failed to make contributions to union pension funds, failed to pay union assessments, and concealed the employment of non-union workers who would otherwise be covered under the Agreement (the "Criminal Case"). The Criminal Case is scheduled to go to trial in late 1995.

Following the indictment, plaintiffs commenced this action (with an amended complaint filed on or about January 12, 1995), asserting violations of ERISA, the Labor Management

RPI 0236

Relations Act, 1947, 29 U.S.C. § 141 et seq., civil RICO, 18 U.S.C. § 1961 et seq., and common-law fraud. The wrongful conduct about which plaintiffs complain in this case is the same as in the Criminal Case.[3] Defendants move to stay this action pending resolution of the Criminal Case because, without a stay, they will be forced to choose between waiving their Fifth Amendment privilege and responding to discovery in the civil case, thereby risking self-incrimination, or invoking the privilege and facing a default in the civil case.

Defendants also move to stay this case pending the resolution of a related civil case that is currently before Judge Haight. That case, *Brenner v. Transworld Mechanical, Inc.*, 93 Civ. 2198 (CSH), which was commenced before the indictment was issued, is a delinquent contribution action brought by the Local 2 Funds against defendants Transworld Mechanical and Helen Andreadakis (the "*Brenner* case"). After the Local 2 Funds learned of the other defendants' roles in the alleged fraud and embezzlement, it joined in the instant lawsuit. The *Brenner* case is currently on the suspense calendar, and counsel for plaintiffs has represented that Local 2 Funds is willing to discontinue it. (Pl.Mem. at 4).

Finally, defendants move to dismiss the RICO and fraud claims for failure to state a claim and failure to plead fraud with particularity.

## DISCUSSION

### I. Motion for Stay

[1] [2] It is well-settled that a court has the discretionary authority to stay a case if the interests of justice so require. *See United States v. Kordel*, 397 U.S. 1, 12 n. 27, 90 S.Ct. 763, 770 n. 27, 25 L.Ed.2d 1 (1970); *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir.1986) (citing *SEC v. Dresser Industries*, 628 F.2d 1368, 1375 (D.C.Cir.) (*en banc*). *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)) (holding that although "the Constitution ... does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings ... a court may decide in its discretion to stay civil proceedings"); *Volmar Distributors, Inc. v. The New York Post Co., Inc.*, 152 F.R.D. 36, 39 (S.D.N.Y.1993).[4] Courts are afforded this discretion because the denial of a stay could impair a party's Fifth Amendment privilege against self-incrimination, extend criminal discovery beyond the limits set forth in Federal Rule of Criminal Procedure 16(b), expose the defense's theory to the prosecution in advance of trial, or otherwise prejudice the criminal case. *See In re Par*

*Pharmaceutical, Inc.*, 133 F.R.D. 12, 13 (S.D.N.Y.1990) (citing *Dresser*, 628 F.2d at 1376); *Brock v. Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y.1985). *1139 A stay of the civil case, however, is an extraordinary remedy. *In re Par Pharmaceutical*, 133 F.R.D. at 13.

[3] There are numerous factors that should be considered in determining whether a stay is warranted, including: 1) the extent to which the issues in the criminal case overlap with those presented in the civil case;[5] 2) the status of the case, including whether the defendants have been indicted;[6] 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.[7] Balancing these factors, I conclude that a stay is appropriate in this case as to Helen and Thomas Andreadakis so as not to interfere with their Fifth Amendment rights. To avoid duplication of discovery efforts, the case will also be stayed as to the corporate defendants until the Criminal Case is resolved with respect to the Andreadakises.

### A. Stay as to Helen and Thomas Andreadakis

#### 1. Overlap of Issues

[4] The first question to be resolved is the extent to which the issues in the criminal case overlap with those present in the civil case, since self-incrimination is more likely if there is a significant overlap. *See Volmar Distributors, Inc.*, 152 F.R.D. at 39 (quoting *Parallel Proceedings*, 129 F.R.D. at 203) ("The most important factor at the threshold is the degree to which the civil issues overlap with the criminal issues."). If there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay. *See Parallel Proceedings*, 129 F.R.D. at 203.

Reading the criminal indictment and the amended civil complaint together reveals that the wrongful conduct alleged in both cases is the same: defendants Helen and Thomas Andreadakis, through their companies, failed to make contributions to union pension funds, failed to pay union assessments, and concealed the employment of non-union employees, all in violation of the collective bargaining agreement between defendants and Local 2 and state and federal law. Indeed, plaintiffs concede that the indictment "obviously played a role in the Plaintiffs' decision to bring this action" since, according to the indictment, "the Funds have been defrauded out of thousands, if not millions, of dollars

RPI 0237

in fringe benefit contributions." (Pl.Mem. at 4). Accordingly, this factor weighs in favor of granting a stay.

### 2. *The Status of the Criminal Case*

[5]  [6]  The second factor to be considered is the status of the criminal case. A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to Speedy Trial Act considerations. *See In re Par Pharmaceutical, Inc.*, 133 F.R.D. at 13 ("The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment") (citing cases); *Parallel Proceedings*, 129 F.R.D. at 203–04; *Volmar*, 152 F.R.D. at 39 (citing *Dresser*, 628 F.2d at 1375–76); *Brock*, 109 F.R.D. at 119. Accordingly, stays will generally not be granted before an indictment is issued. *See, e.g., Citibank v. Hakim*, 1993 WL 481335 (S.D.N.Y.1993) ("Although defendant Hakim allegedly is a target of a continuing grand jury investigation, he does not *1140 claim to have been indicted. Accordingly, Hakim's pre-indictment motion to stay can be denied on this ground alone") (citations omitted); *Securities and Exchange Commission v. Musella*, 38 Fed.Rules Serv.2d 426 (S.D.N.Y.1983) (defendant's pre-indictment motion to stay civil case denied).

Here, Helen and Thomas Andreadakis, along with the two Danica entities, have been indicted. In addition, defendants' counsel has advised that the Criminal Case should be completed by the end of this year, which would not unreasonably prolong this case.[8] *See Twenty First Century Corp. v. LaBianca*, 801 F.Supp. 1007, 1010 (E.D.N.Y.1992) (motion for stay granted where civil case commenced in June 1992 and related criminal case was set for trial on November 30, 1992) Thus, this factor weighs in favor of granting a stay.

### 3. *The Private and Public Interests*

[7]  Examination of the various interests at stake here makes it clear that a stay is warranted in this case. First, the balance of the parties' divergent interests weighs in favor of a stay. Plaintiffs have a legitimate interest in the expeditious resolution of their case and their argument that they could face prejudice from a stay through loss of evidence is well-taken. These interests, however, are trumped by defendants' interests in avoiding the quandary of choosing between waiving their Fifth Amendment rights or effectively forfeiting the civil case. This is particularly true where the subject matter of both cases overlaps to a significant degree and the Criminal Case is expected to be resolved by the end of this year. In addition, the loss of evidence may not be as serious as plaintiffs believe since the resolution of the Criminal Case may reduce the scope of discovery in the civil case and the evidence gathered during the criminal prosecution can later be used in the civil action. *See Brock v. Tolkow*, 109 F.R.D. 116, 120 (E.D.N.Y.1985).

Judicial efficiency also weighs in favor of granting a stay. This is not an instance where criminal prosecution is merely conjectural; defendants have been indicted and will face trial within six months. *Cf. Citibank v. Hakim*, 1993 WL 481335, *2 (S.D.N.Y.1993) (pre-indictment motion for stay denied; the "convenience to the court weighs against a stay because it is unrealistic to postpone indefinitely the pending action until criminal charges are brought"). Thus, plaintiffs' concern that this Court will have to "rely upon fortuitous events to manage its dockets" is obviated.[9] In addition, resolution of the criminal case may increase the possibility of settlement of the civil case due to the high standard of proof required in a criminal prosecution. *See Parallel Proceedings*, 129 F.R.D. at 204.

Finally, a stay of this case would not cause serious harm to any public interest. Plaintiffs argue that the public interests in obtaining "prompt and effective redress from a contractor who allegedly has been a player in an ongoing scheme which has affected" New York city residents and in maintaining the "financial security of employee benefit funds," would be advanced by the civil case. (Pl. Mem. at 14). While the public interests enunciated by plaintiffs' counsel have merit, this is not a case where a stay of the case will cause serious or immediate injury to those interests. Because of the overlapping issues in the criminal and civil cases, the criminal prosecution will serve to advance the public interests at stake here. *See Volmar*, 152 F.R.D. at 40. In addition, as discussed above, the case should not be delayed longer than approximately six months.

The inconvenience and delay to plaintiffs that will unfortunately be caused by a stay *1141 are outweighed by the defendants' significant Fifth Amendment concerns, particularly where a stay will not inordinately prolong the civil case and where the criminal prosecution could provide some benefit to the civil case and advance public interests. Accordingly, the Andreadakises' motion for a stay

RPI 0238

is granted. Plaintiffs may move to vacate the stay, however, if the criminal prosecution does not proceed within the timetable presented by defense counsel or if other changes in circumstances warrant vacating the stay. *See id.; see also Certain Real Property*, 751 F.Supp. at 1063; *Brock*, 109 F.R.D. at 121.

### B. *Stay as to the Corporate Defendants*

[8] Plaintiffs argue that even if a stay is entered against the individual defendants, the case should not be stayed against the corporate defendants because the corporate defendants do not have a Fifth Amendment privilege against self-incrimination. *See Dreier v. United States*, 221 U.S. 394, 399–400, 31 S.Ct. 550, 550, 55 L.Ed. 784 (1911); *In re Grand Jury Subpoenas Issued to Thirteen Corps.*, 775 F.2d 43, 46 (2d Cir.1985). *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986). Plaintiffs also contend that the corporate defendants should not be permitted to hide behind the individual defendants' Fifth Amendment privilege. Defendants, on the other hand, contend that since the Andreadakises control the corporate defendants, the corporations cannot adequately defend themselves without the testimony of the individual defendants. Defendants further argue that judicial efficiency would be promoted by a stay as to the corporate defendants since discovery would not have to proceed in a piece-meal fashion but could proceed simultaneously against all defendants once the stay is lifted.

I do not have to resolve the issue of whether the corporate defendants would be prejudiced by the individual defendants' invocation of their Fifth Amendment rights since I find that it is more efficient to grant a complete stay as to all defendants rather than only a partial stay as to the individual ones. Plaintiffs themselves concede that the Andreadakises are the central figures in this case, as they are the "controlling officers of the corporate defendants and responsible for the correct reporting and payment of fringe benefits contributions and wages." Thus, because of the importance of their testimony, a partial stay could lead to duplicative discovery efforts. Plaintiffs might need to re-issue interrogatories or re-depose certain individuals in light of the testimony given by the Andreadakises.[10] Additionally, since the indictment against the Danica defendants is, as with the individual defendants, based on the same allegations as in the civil case, the evidence garnered in the criminal trial could reduce the scope of discovery in the civil case.[11] *See Volmar*, 152 F.R.D. at 41.

Furthermore, while a partial stay would permit plaintiffs to proceed with the civil case, even a partial stay would delay the case. To avoid duplication of effort and for judicial economy, this Court, in its discretion, grants the corporate defendants' motion to stay the civil case until the Criminal Case against the Andreadakises is resolved. Again, however, plaintiffs may move to vacate the stay if changes in circumstances so warrant.[12]

### *1142 C. *Stay Pending Brenner Case*

[9] Defendants move to stay this case pending the resolution of the *Brenner* case under the doctrine of the "prior pending action." (Def. Mem. at 13). That request is denied, in view of the fact that I have granted a stay pending the Criminal Case and also because the *Brenner* case is on the suspense calendar. I note that plaintiffs' counsel has represented that the Local 2 Funds is willing to discontinue the *Brenner* case. (Pl. Mem. at 4, 24). In the interest of judicial economy, it would make great sense for plaintiffs to discontinue the *Brenner* case.

### II. *Motion to Dismiss*

Defendants move to dismiss Counts IV, VII, and VIII, which are plaintiffs' claims for common law fraud, civil RICO, and ERISA fraud, respectively, for failure to state a claim and failure to plead fraud with particularity.

### A. *Standards for Motion to Dismiss*

In analyzing defendants' motion to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, I must view the amended complaint in the light most favorable to plaintiffs and accept all allegations contained in the complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Annis v. County of Westchester*, 36 F.3d 251, 253 (2d Cir.1994) (Rule 12(b)(6) motion); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989) (Rule 9(b) motion). Giving plaintiffs the benefit of the inferences in their favor, the complaint should not be dismissed unless it appears beyond a doubt that plaintiffs can prove no set of facts that would entitle them to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Christ Gatzonis Electrical Contractor, Inc. v. New York City School Construction Authority*, 23 F.3d 636, 639 (2d Cir.1994). With these standards in mind, I turn to defendants' motion to dismiss.

### B. *Counts IV and VIII—The Fraud Claims*

[10]    Defendants assail plaintiffs for not pleading their common law and ERISA fraud claims with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and move to dismiss the fraud claims. [13]    Specifically, defendants maintain that the fraud claims are deficient because they fail to provide such details as which defendant made which misrepresentation, or the date and time of the alleged misrepresentations.

[11]    [12]    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purpose behind the particularity requirement is to provide defendants with fair notice of plaintiffs' claims, protect defendants from harm to their reputation and reduce the number of strike suits. *See Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). To satisfy Rule 9(b), plaintiffs must specify the statements they claim were false or misleading and give particulars with respect to the fraudulent statements, including when and where the statements were made and the identity of those responsible for the statements. *Id.* at 11.

Rule 9(b)'s particularity requirement, however, must be read in concert with Rule 8 of the Federal Rules of Civil Procedure, which requires a short, plain statement of the facts upon which a claim is based. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990) (citing *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987)). In addition, Rule 9's strictures are relaxed where the alleged fraud concerns facts "peculiarly within the opposing party's knowledge." *See DiVittorio*, 822 F.2d at 1247.

In their common-law fraud claim, plaintiffs allege that, in monthly reports due on the 20th of each month and submitted to plaintiffs, defendants misrepresented the identity of the employees working for them and the number of hours each employee worked. *1143 Plaintiffs further allege that the Andreadakis defendants were responsible for the accuracy of the reports, that plaintiffs relied on the misrepresentations to their detriment, and that plaintiffs could not know the identity of the employees or the hours actually worked since they did not have access to defendants' records. (Cmplt. ¶¶ 37–41). With respect to their ERISA fraud claim, plaintiffs incorporate the allegations of their common-law fraud claim and also allege that the Andreadakises are controlling officers of the defendant corporations. (Cmplt. ¶¶ 57–62).

[13]    Plaintiffs have thus sufficiently pled their fraud claims with particularity: the amended complaint specifies the date,

place (origin and destination) and content of the allegedly fraudulent statements. In addition, plaintiffs' fraud claims allege certain facts "peculiarly within the opposing party's knowledge" (namely, the identity of the persons employed by defendants and the hours worked), which justifies a relaxation of Rule 9's standards. Since greater particularity could not reasonably be expected without further discovery, the complaint should not be dismissed. *See Solomon v. Saril Apparel, Ltd.*, 1993 WL 404177 (S.D.N.Y.1993) (motion to dismiss ERISA claim based on delinquent contributions for failing to plead fraud with particularity denied since facts concerning the alleged failure to contribute were within defendants' knowledge and discovery would provide additional information about the fraud). Finally, considering the circumstances of the alleged fraud, plaintiffs' allegations give defendants sufficient notice of the claims to prepare a defense. *Id.* (citing *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990)); *see also Center Cadillac*, 808 F.Supp. at 229 (where the complaint sufficiently detailed the nature and mechanics of the fraudulent scheme, plaintiffs not required to plead the exact time, place and content of each mail communication).

Accordingly, defendants' motion to dismiss Counts IV and VIII is denied.

### C. Count VII—The RICO Claim

[14]    To prevail on their civil RICO claim, plaintiffs must establish that: 1) defendants 2) conducted or participated in the conduct of 3) an enterprise's affairs 4) through a pattern 5) of racketeering activity 6) that caused injury to plaintiffs' business or property. *See* 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *McLaughlin v. Anderson*, 962 F.2d 187, 190 (2d Cir.1992). In their amended complaint, plaintiffs allege that defendants together constituted an "enterprise affecting commerce" and that they committed a pattern of racketeering activity by causing fraudulent reports and other items to be sent through the mail in violation of 18 U.S.C. § 1341 and by embezzling or converting funds and assets belonging to plaintiffs in violation of 18 U.S.C. § 664, all in furtherance of the enterprise and in violation of 18 U.S.C. § 1962(c). (Cmplt. ¶¶ 52–53). [14]

Defendants move to dismiss this claim, arguing that plaintiffs have failed to allege: 1) a pattern of racketeering activity, 2) an enterprise, 3) mail fraud with particularity, and 4) injury to

business or property. Because I conclude that plaintiffs have properly *1144 pled a RICO claim, defendants' motion is denied.

### 1. Pattern of Racketeering Activity

[15]  [16]  [17]  To allege adequately a pattern of racketeering, plaintiffs must establish that defendants committed two or more predicate acts within ten years, which acts were related and continuous. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237–243, 109 S.Ct. 2893, 2899–2902, 106 L.Ed.2d 195 (1989); *Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.1989), *cert. granted and judgment vacated*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *aff'd en banc*, 893 F.2d 1433 (2d Cir.), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). The relatedness requirement is the easier of the two to define: predicate acts are related if they share similar purposes, participants, victims, methods, or other distinguishing characteristics; in short, they must not be isolated or sporadic. *H.J. Inc.*, 492 U.S. at 239–41, 109 S.Ct. at 2901. Continuity, however, is a more fluid concept; it can be either open- or closed-ended in nature, *i.e.*, continuity can be shown either through a series of related predicate acts extending over a substantial period of time or by past conduct which by its nature extends into the future. *Id.* at 241–43, 109 S.Ct. at 2902. [15]

[18]  Plaintiffs assert that they have established a pattern of racketeering activity sufficient to withstand the motion to dismiss. I agree. Plaintiffs have alleged that defendants, from at least 1988 to the present, mailed monthly reports to plaintiffs containing intentional misrepresentations regarding the number of persons employed by defendants and the number of hours worked by those employees, for the purpose of "reaping financial gain at the expense of Plaintiffs." (Cmplt. ¶ 52). In addition, plaintiffs alleged that defendants, again on a monthly basis from 1988 to the present, underreported the amount of monies owed to the employee benefit funds on the reports and retained the money themselves instead. (Cmplt. ¶ 53). Thus, the predicate acts of mail fraud and embezzlement/conversion were related: each of them had similar purposes (to defraud plaintiffs for defendants' own financial gain), participants, victims and methods. The acts were also continuous; they extended over a substantial period of time and most likely would have continued into the future if defendants had not been indicted. *See H.J. Inc.*, 492 U.S. at 249–51, 109 S.Ct. at 2906 (allegations that defendants made bribes over a six year period

to members of a utility commission to approve unreasonably favorable rates for defendants stated a pattern of racketeering activity since the bribes had a common purpose and were frequent); *Koal Industries Corp. v. Asland, S.A.*, 808 F.Supp. 1143, 1161 (S.D.N.Y.1992) (pattern of racketeering activity sufficiently stated where defendants allegedly committed various acts of fraud over a period of two years that had a common purpose of defrauding plaintiffs of money and gaining control of a mine).

Plaintiffs have also alleged continuity by claiming that the Andreadakises set up "sham" corporations in an effort to defraud plaintiffs. These allegations plead continuity based on the predicate acts or offenses that are part of an ongoing entity's regular way of doing business. *See H.J. Inc.*, 492 U.S. at 241–43, 109 S.Ct. at 2902.

### 2. Enterprise

[19]  [20]  The existence of an enterprise is an essential element of a RICO claim. *See* 18 U.S.C. § 1961(4). An enterprise may either be an ongoing organization or an association-in-fact of individuals or entities acting as a group for the common purpose of engaging in racketeering activity. *See Procter & Gamble v. Big Apple Industry Buildings, Inc.*, 879 F.2d 10, 15 (2d Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990); *1145 Center Cadillac v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 234 (S.D.N.Y.1992). To establish an association-in-fact enterprise, plaintiffs must show that the members of the enterprise function as a continuing unit and that the enterprise exists separate and apart from the racketeering activity in which it is allegedly engaged. *Center Cadillac*, 808 F.Supp. at 235 (citing *Procter & Gamble*, 879 F.2d at 15).

[21]  Plaintiffs allege that all of the defendants together constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962. Defendants maintain that this allegation does not plead a RICO enterprise with particularity. Defendants' argument is rejected since the pleading of a RICO enterprise need only meet the requirements of Rule 8 of the Federal Rules of Civil Procedure: that is, plaintiffs need only provide a clear and concise statement of the enterprise. *See Center Cadillac*, 808 F.Supp. at 235 (association enterprise sufficiently alleged where plaintiffs claimed individual defendants functioned as a unit with a banking entity to perpetrate fraud and extortion on plaintiffs); *Azurite Corp. Ltd. v. Amster & Co.*, 730 F.Supp. 571, 577 (S.D.N.Y.1990).

Furthermore, the amended complaint does state the structure of the enterprise: plaintiffs allege that the corporate defendants were employers of persons performing work covered under the collective bargaining agreement and controlled by the Andreadakis defendants. who had responsibility for the accuracy and mailing of the reports. (Cmplt. ¶¶ 7–12, 52–53). Plaintiffs further allege that two of the corporate defendants were sham companies created by the other defendants to defraud plaintiffs. (See, e.g., Cmplt. ¶¶ 26, 32) Thus, keeping in mind that an enterprise need not be pled with particularity, plaintiffs have sufficiently alleged the existence of a RICO enterprise.[16]

### 3. Mail Fraud

[22]    [23]    A RICO claim based on mail fraud must satisfy the particularity requirement of Rule 9(b). McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir.1992). In addition, a RICO mail fraud claim must also identify the purpose of the mailing within the fraudulent scheme. Id.

[24]    As discussed above, I have already concluded that plaintiffs have pled fraud with sufficient particularity. Plaintiffs have also identified the purpose of defendants' mailings: to underreport the number of persons employed and the hours worked by defendants' employees so that defendants would pay fewer contributions and keep the additional money. which was owed to plaintiffs, for themselves. (Cmplt. ¶¶ 52 and 53).

The fact that plaintiffs do not specify which defendants made the fraudulent statements in the reports mailed to plaintiffs is more troubling. Defendants argue that plaintiffs do not tie any particular defendant to a specific act or omission. Keeping in mind, however, that the reason for the particularity requirement is to apprise each defendant of the facts surrounding the alleged fraud and that the complaint is to be read generously at this stage,[17] I conclude that the particularity requirement has been met given the circumstances of this case. The individual defendants are the owners and controlling officers of the corporate defendants which, plaintiffs allege, are the same entity and have responsibility for the accuracy of the reports. Thus, no specific connection between defendants and the fraudulent mailings is necessary. See Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir.1986) ("no specific connection between *1146 fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question"). Plaintiffs have therefore sufficiently pled mail fraud with particularity.

### 4. Injury to Business or Property

[25]    Defendants' third attack on plaintiffs' RICO claim concerns plaintiffs' alleged injury to business or property.[18] Defendants maintain that, since plaintiffs request an audit or accounting as to the amount of contributions which were withheld, plaintiffs' alleged injuries are speculative.

[26]    Defendants are correct in asserting that a RICO plaintiff may not recover for speculative losses or where the amount of damages is unprovable. See First Nationwide, 27 F.3d at 768 (citing Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir.1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989)). Specific damages are required because the purpose of a civil RICO award is to return the plaintiff to the same financial position he would have enjoyed absent the illegal conduct. See Bankers Trust Co., 859 F.2d at 1106.

Here, notwithstanding the fact that plaintiffs have not specified an exact dollar amount of damages, plaintiffs' allegations that defendants withheld contributions and other payments sufficiently state a RICO injury. This is not an instance where the RICO injury is mere conjecture because plaintiffs may ultimately recover their losses through alternate or independent means.[19] Rather, plaintiffs have alleged a non-speculative loss: they simply cannot ascertain the precise amount of that loss at this time because information is peculiarly within defendants' knowledge. The fact that plaintiffs have requested an audit and accounting does not render their losses speculative. See Gregory v. American Guild of Musical Artists, 1993 WL 179110 (S.D.N.Y.1993) (plaintiffs' allegations that they were induced to accept lower pension benefits than they could otherwise have obtained due to defendants' fraudulent concealment sufficiently stated a RICO injury). In addition, dismissing the RICO claim at this stage only to have plaintiffs move to reinstate the claim after the audit is completed does not promote judicial efficiency. Accordingly, the motion to dismiss the RICO claim is denied. Of course. defendants may move for summary judgment after the audit is completed if the audit shows that plaintiffs have not suffered any injury.

*CONCLUSION*

Defendants' motion to stay this case until the resolution of the Criminal Case is granted. The motion to stay until the resolution of the *Brenner* case is denied. The motion to dismiss is denied.

SO ORDERED.

**All Citations**

886 F.Supp. 1134, RICO Bus.Disp.Guide 8846

Footnotes

1    For purposes of deciding defendants' motion to dismiss, I will accept as true the allegations contained in plaintiff's amended complaint. References to "Cmplt." are to the amended complaint.

2    Plaintiffs allege that Transworld Plumbing and Danica Mechanical are alter egos of the other corporate defendants and share common ownership, management, facilities, equipment, employees, etc. Plaintiffs also allege that the Andreadakises are the controlling officers of the corporate defendants. (Cmplt. ¶¶ 11–12, 18 and 21).

3    Pursuant to a request made by my law clerk, counsel for defendants advised this Court that Judge Fried had issued an opinion in the Criminal Case dismissing 25 counts. The remaining counts, however, contain allegations that are similar to those present in the civil case.

4    Plaintiffs assert that defendants' interests in not being forced to choose between asserting their Fifth Amendment rights or defending the civil action are insufficient to warrant a stay. Plaintiffs argue that it is not unconstitutional to force a litigant to choose between invoking his Fifth Amendment rights and risking adverse consequences in a civil action, or engaging in discovery in the civil case and risking conviction. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *United States v. Rubinson*, 543 F.2d 951, 961 (2d Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976). Even if a court may constitutionally deny a request for a stay, however, a stay of a civil action may still be warranted in some instances.

5    *See Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201 (Pollack, J.) (hereafter, "Parallel Proceedings").

6    *See Volmar Distributors, Inc.*, 152 F.R.D. at 39; *In re Par Pharmaceutical, Inc.*, 133 F.R.D. at 13; *United States v. Certain Real Property*, 751 F.Supp. 1060 (E.D.N.Y.1989); *Parallel Proceedings*, 129 F.R.D. at 203.

7    *Volmar Distributors, Inc.*, 152 F.R.D. at 39 (citing *Arden Way Associates v. Boesky*, 660 F.Supp. 1494, 1497 (S.D.N.Y.1987)).
     A fifth factor often cited by courts in this Circuit, the interests of persons not party to the civil litigation, is not applicable here and has not been raised by the parties.

8    In response to an inquiry by my law clerk, plaintiffs' counsel cautioned that the trial might not commence before late 1995 or early 1996.

9    Most of the cases cited by plaintiffs for its assertion that judicial efficiency would not be achieved by a stay are inapplicable since they either concern a pre-indictment motion for stay, a motion for stay after the defendant has pleaded guilty in the criminal case, thereby eliminating any Fifth Amendment concerns, or a civil case involving different issues than those present in the criminal case. *See, e.g., United States v. Private Sanitation Industry Assoc.*, 811 F.Supp. 802 (S.D.N.Y.1992) (pre-indictment motion); *Arden Way Assoc. v. Boesky*, 660 F.Supp. 1494 (S.D.N.Y.1987) (motion for stay after guilty plea entered); *FDIC v. Renda*, 1987 U.S.Dist.LEXIS 8305 *13 (D.Kan.1987) (little overlap of issues between civil and criminal case).

10   Indeed, plaintiffs state in their memorandum of law that "it may well be necessary to eventually depose the indicted defendant officers." (Pl. Mem. at 21). Plaintiffs also assert that "it is not at all clear at this stage how significant [the indicted defendants'] depositions will be to the lawsuit." This argument, however, is rejected as the Andreadakises, as controlling officers of the corporate defendants, are principal characters in this case and their testimony will undoubtedly be critical.

11   The fact that the other two defendants, Transworld Mechanical and Transworld Plumbing & Heating, Inc., were not indicted does not weigh against a stay since plaintiffs themselves allege that all four entities are "affiliated business enterprises and alter ego of each other." (Cmplt. ¶ 26). *See United States v. Certain Real Property*, 751 F.Supp. 1060, 1063 (E.D.N.Y.1989) (staying case for both defendants although only one had been indicted).

12   Defendants maintain that a stay is also warranted because there is an issue as to whether this Court or the National Labor Relations Board has jurisdiction over this case which can only be resolved after substantial discovery has been completed. Plaintiffs counter that a "potential question" as to jurisdiction does not form the basis for a stay. As I have granted the stay pending the resolution of the Criminal Case, I do not need to resolve this issue.

RPI 0243

Defendants also attack plaintiffs' RICO claim, to the extent that it is based on mail fraud, for failure to plead with particularity. This argument will be considered in the RICO section below.

Section 1962 provides in relevant part:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such an enterprise's affairs through a pattern of racketeering activity or the collection of unlawful debt.

18 U.S.C. § 1341 prohibits the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The elements of a mail fraud violation are 1) a scheme to defraud someone of money or property and 2) use of the mails to further the scheme. *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991).

18 U.S.C. § 664 prohibits the embezzlement or conversion of any funds or assets of any employee welfare benefit plan or employee pension benefit plan or any fund connected to either plan.

The Supreme Court in *H.J. Inc.*, while recognizing that continuity would be analyzed on a case by case basis, nevertheless strove to give some guidance with respect to the concept of continuity, and stated that "continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes ... [or] where it is shown that the predicate acts are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.' " *H.J. Inc.*, 492 U.S. at 243, 109 S.Ct. at 2902.

Defendants' reliance on *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F.Supp. 89 (S.D.N.Y.1993), aff'd, 27 F.3d 763 (2d Cir.1994), is misplaced. The alleged enterprise in *First Nationwide* was simply the association of a mortgage broker and different borrowers who had engaged in a series of unrelated loan transactions. Not surprisingly, the district court held that plaintiff had not alleged an enterprise since he failed to specify the structure or personnel of the enterprise or how the various defendants came together as a group. *Id.* at 98.

Here, defendants are not unrelated entities, but are closely affiliated: plaintiffs have alleged that the individual defendants are the controlling officers of the corporate defendants and that the corporate defendants are alter egos of one another. Thus, plaintiffs have sufficiently alleged an enterprise.

*See Center Cadillac*, 808 F.Supp. at 230 (citation omitted).

Section 1964(c) of RICO provides that:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains ...

Thus, to have standing to bring a civil RICO claim, plaintiffs must show that defendants' violation of section 1962 caused an injury to their business or property. *See Sedima SPRL*, 473 U.S. 479, 105 S.Ct. 3275; *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir.1994) (citing *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990)).

*Cf. Bankers Trust*, 859 F.2d at 1105–06; *First Nationwide*, 27 F.3d at 768–69. The plaintiff in *Bankers Trust*, alleged that it was fraudulently induced by a bankrupt corporation's officers into accepting only 17.5% of its outstanding claim from the corporation. In dismissing the portion of the RICO claim seeking repayment of a lost debt, the appeals court held that the lost debt damages were too speculative to state a claim since the plaintiff's RICO injuries could be reduced or magnified depending on the outcome of the bankruptcy proceedings.

In *First Nationwide*, the plaintiff bank's RICO claim that borrowers fraudulently induced it to make nonrecourse loans was dismissed where the bank had not yet attempted to foreclose on the loans. The appeals court noted that any loss with respect to the loans could not be determined until the bank attempted foreclosure and "only when [the bank's] actual loss becomes clear and definite will the claims be ripe for suit". 27 F.3d at 768–69.

RPI 0244

Plaintiff's Response at 4 (emphasis added). Contrary to the assertions in McGirr's Supplemental Declaration, Ms. Tharp, Plaintiff's Vice President for Manufacturing testified, at her deposition in December 2002, that there were such contracts and that Defendant's conduct did indeed therefore "force" Plaintiff to buy prunes from available market sources. Exhibit A to Defendant's Motion at 120–21. Carefully read, Mr. McGirr's two declarations are not entirely inconsistent on this score. McGirr's latest recitation of how Plaintiff conducts its sales reveals that the contractual sales agreements, sought by Defendant, between Plaintiff and its private label customers are in the form of sales orders by e-mail and faxes received by Plaintiff from Plaintiff's customers and invoices issued by Plaintiff. Defendant's Document Request No. 5 requests *all* documents; thus, to the extent copies (including electronic storage) of such e-mails messages, faxes, and invoices are within Plaintiff's control, they should be produced. Fed.R.Civ.P. 34(a). Plaintiff does not state specifically such documents are unavailable to it, and it would be remarkable that a large manufacturer would conduct its business without a system for documenting its sales to facilitate applicable accounting, audit, banking, and collection requirements.

Plaintiff's arguments in opposition to Defendant's requests amount to telling Defendant how to conduct its defense. Defendant is entitled to learn for itself the basis, if any, for Plaintiff's unfair competition claim and, for that matter, Plaintiff's other contract claims. Plaintiff's efforts to deflect Defendant's requests by defining the issues to suit its own purpose of non-production cannot be countenanced. As such, Plaintiff's objections to Defendant's requests based on lack of relevance, overbreadth and burdensomeness are overruled, and Plaintiff shall answer fully Interrogatory No. 5 and provide all documents responsive to Document Request No. 5.

The court notes that Defendant, by letter dated August 20, 2003, has requested sanctions. However, as no sanctions, including costs, were sought in Defendant's motion, the court will not entertain such request at this time. Therefore, any request by Defendant for sanctions, available to a prevailing party pursuant to Fed.R.Civ.P. 37, shall be filed by Defendant *within 10 days of service of this Decision and Order*. Plaintiff shall file its response *within 10 days after service of such motion;* Defendant may reply *within five days thereafter.* Further oral argument shall be at the court's discretion.

### CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 13) is GRANTED. Plaintiff shall serve the requested answer to Interrogatory No. 5, and provide copies of all documents responsive to Document Request No. 5 *within 20 days of this Decision and Order.*

SO ORDERED.



JAVIER H., Hector H., Miguel P., S.R.C., Juventino C., Juan G., Jonas G., L.P.R., B.C.V., and Marcos C., Plaintiffs,

v.

Maria GARCIA–BOTELLO, Elias Botello, Jose J. Garcia, Rogelio Espinoza, Anthony Piedimonte, Bruce Kirby, David Piedmont, Rodney Winkstern, Francis Domoy, Stephen Howard, James Kirby, Philip Vigneri, Ron Weiler, Robert Vendetti and Jose I. Garcia, Defendants.

No. 02–CV–523S (SR).

United States District Court, W.D. New York.

Sept. 12, 2003.

Migrant farm workers filed complaint against growers and labor contractors, seeking damages and/or injunctive relief under the Fair Labor Standards Act (FLSA), the Migrant and Seasonal Agricultural Worker Protection Act (MSAWPA), the Racketeer Influenced and Corrupt Organizations Act (RICO), and New York statutes. United

RPI 0245

States moved to intervene to stay discovery until conclusion of the presentation of evidence in related criminal trial against contractor defendants. The District Court, Schroeder, United States Magistrate Judge, held that the United States would not be permitted to intervene, but a stay of civil discovery pending presentation of evidence in criminal case was appropriate.

Motion denied.

**1. Action ⟷69(5)**

When determining whether a stay of civil proceedings is appropriate pending a related criminal case, federal district courts generally weigh the following factors: (1) the extent to which the issues in the criminal case overlap with those in the civil case; (2) the status of the criminal case, including whether the defendants have been indicted; (3) the private interest of the plaintiffs in proceeding expeditiously with the civil litigation; (4) the private interests of, and the burden on, the defendant; (5) the interests of the courts; and (6) the public interest. Fed. Rules Civ.Proc.Rule 24, 28 U.S.C.A.

**2. Action ⟷69(5)**

Although the United States would not be permitted to intervene in civil case for purpose of staying discovery until evidence was presented in related criminal case against certain of the defendants, because it had no interest in the civil litigation, interests of justice militated in favor of such a stay, considering risk that civil discovery could be used to circumvent criminal discovery limitations, and that the civil proceeding could undermine the defendants' privilege against self-incrimination. Fed.Rules Civ.Proc.Rule 24(b)(2), 28 U.S.C.A.

---

Daniel Werner, Farmworker Legal Services of New York, Inc., New Paltz, NY, for Plaintiffs.

John J. Lavin, Sean Dennis Hill, Hill & McCready, Buffalo, NY, Monte B. Lake, Christine M. Cooper, Natalie K. Brouwer, McGuiness, Norris & Williams, LLP, Washington, DC, for Defendants.

Gretchen L. Wylegala, U.S. Attorney's Office, Buffalo, NY, for Movant.

## ORDER

SCHROEDER, United States Magistrate Judge.

### INTRODUCTION

This case was referred to the undersigned by the Hon. William M. Skretny, pursuant to 28 U.S.C. § 636(b)(1) for all pretrial matters. Dkt. # 29.

Presently before the Court is the United States' motion to intervene, pursuant to Federal Rule of Civil Procedure 24(b)(2), for the limited purpose of staying discovery until the conclusion of the presentation of evidence in a related criminal trial, *United States v. Maria Garcia at al.*, 02–CR–110–S. Dkt. # 40. Plaintiffs in the above-captioned civil case ("farm-worker plaintiffs") support a stay of civil discovery. Dkt. # 63. Defendants Anthony Piedimonte, Robert Vendetti, Bruce Kirby, David Piedmonte, Rodney Winkstern, Francis Domoy, Stephen Howard, James Kirby, Philip Vigneri, and Ron Weiler ("grower defendants") neither oppose nor support a stay of discovery. Dkt. # 58. Civil defendants Maria Garcia and Elias Botello, and Jose J. Garcia ("contractor defendants"), also defendants in the pending criminal case, oppose the government's motion. Dkt. # 57; Dkt. # 62. For the reasons stated herein, the Court denies the United States' motion to intervene but, nevertheless, orders a stay of all discovery in the above-captioned matter until the close of all evidence in *United States v. Maria Garcia et al.*, 02–CR–110–S.

### BACKGROUND

On June 12, 2002, a federal grand jury sitting in Buffalo, New York returned an eighteen-count indictment against Maria Garcia, Elias Botello, Jose I. Garcia, Jose J. Garcia and Rogelio Espinoza. On July 22, 2002, plaintiffs filed a complaint in district court alleging that these defendants and others violated plaintiffs' rights under the Fair Labor Standards Act, the Migrant and Seasonal Agricultural Workers Protection Act, and various state tort laws.

RPI 0246

The criminal and civil cases involve nearly identical questions of fact. The criminal charges and the civil complaint are predicated on the same alleged conduct. Both cases implicate the same contractor-farm-worker relationships during a shared time frame. The plaintiffs in the civil case are the alleged victims of the conduct charged in the criminal indictment. The overlapping questions of fact include whether the contractor defendants recruited the farm-worker plaintiffs near the Mexican border, transported them to Albion, New York, demanded payment for transportation, forced them to work for little or no money, and told them they were not free to leave. Several of the same witnesses and much of the same evidence will be produced to substantiate or refute these allegations. Five of the criminal defendants are defendants in the civil action. Moreover, three of these defendants have the same counsel representing them in both the criminal and civil cases.

## DISCUSSION

Rule 24(b)(2) of the Federal Rules of Civil Procedure permits anyone to intervene in an action, upon timely application, "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). In exercising its discretion to permit intervention, the Court is directed to "consider whether the intervention will unduly delay or prejudice the adjudication of the right of the original parties." *Id.* As a rule, federal district courts generally permit the United States to intervene for the narrow purpose of staying discovery pending the disposition of a related criminal matter. *See S.E.C. v. Credit Bancorp.*, 297 F.3d 127, 130 (2d Cir.2002); *S.E.C. v. Chestman*, 861 F.2d 49, 50 (2d Cir.1988). A trial court, however, is vested with broad discretion to grant or deny permissive intervention, *see United States v. New York*, 99 F.R.D. 130, 134 (N.D.N.Y.1983), particularly when a case involves multiple parties and claims. *See S.E.C. v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2d Cir.1972). Moreover, because a "federal district court has the inherent power, in the exercise of its discretion, to stay an action," *Twenty First Century Corp. v. LaBianca*, 801 F.Supp. 1007, 1010

(E.D.N.Y.1992); *Sidari v. Orleans County*, 180 F.R.D. 226, 228 (W.D.N.Y.1997), it may deny a motion to intervene, or decline to address the merits of such a motion, and nevertheless enter an order staying civil discovery. *See, e.g., In re Ahead by a Length*, 78 B.R. 708, 710 (Bankr.S.D.N.Y.1987) ("Because we ... have the power to stay discovery *sua sponte*, we decline to address the issue of intervention.").

[1] The Constitution does not require a stay of civil proceedings pending the outcome of criminal proceedings. "Nevertheless, a court may decide in its discretion to stay civil proceedings when the interests of justice seem to require such action." *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir.1986) (internal citations omitted); *see also S.E.C. v. Dresser Indus.*, 628 F.2d 1368, 1372 (D.C.Cir.1980). When determining whether a stay of civil proceedings is appropriate, federal district courts generally weigh the following factors: (1) the extent to which the issues in the criminal case overlap with those in the civil case; (2) the status of the criminal case, including whether the defendants have been indicted; (3) the private interest of the plaintiffs in proceeding expeditiously with the civil litigation; (4) the private interests of, and the burden on, the defendant; (5) the interests of the courts; and (6) the public interest. *See Sidari*, 180 F.R.D. at 228; *Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech.*, 886 F.Supp. 1134, 1139 (S.D.N.Y.1995); *LaBianca*, 801 F.Supp. at 1010. In the instant case, each of these factors weighs strongly in favor of granting a stay.

[2] The risk that civil discovery will be used to circumvent criminal discovery limitations becomes much greater where the same facts are at issue, as in the instant case. *See S.E.C. v. Chestman*, 861 F.2d 49, 50 (2d Cir.1988) (granting a stay of discovery because the same facts underlie the criminal and civil cases); *Brock v. Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y.1985) (reasoning that a "stay of discovery is most likely to be granted where the civil and criminal actions involve the same subject matter"). Allowing civil discovery to proceed would likely afford

RPI 0247

defendants access to evidence to which they are not entitled under the criminal discovery rules and, thereby, prejudice the proceedings. *LaBianca*, 801 F.Supp. at 1010.

"[T]he strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil action involving the same matter." *Dresser*, 628 F.2d at 1376; *see also LaBianca*, 801 F.Supp. at 1011 ("[C]ourts are more likely to grant [civil discovery] stays when an indictment has already been issued"); *In re Par Pharm., Inc. Sec. Litig.*, 133 F.R.D. 12, 13–14 (S.D.N.Y.1990) ("[C]ourts will stay a civil proceeding when the criminal investigation has ripened into an indictment."). If a grand jury indicts a party for conduct that is the subject of a civil action, as they have in the instant matter, the court is obligated to prevent that criminal defendant from "using parallel civil proceedings to gain premature access to evidence and information pertinent to the criminal case." *S.E.C. v. Doody*, 186 F.Supp.2d 379, 381 (S.D.N.Y.2002).

The private interests of the civil plaintiffs in this case do not outweigh the inherent risks in allowing civil discovery to proceed while a parallel criminal case is pending. The civil plaintiffs have waived their interest in proceeding expeditiously with this civil action by consenting to the government's motion to intervene and to stay discovery. In plaintiffs' reply to Garcia–Botello's response to the government's motion, plaintiffs explicitly request that the court grant a stay of discovery pending disposition of the criminal matter. Dkt. # 63.

Moreover, defendants' private interests weigh in favor of a stay. The civil proceedings, if not deferred, would undermine the defendants' privilege against self-incrimination under the Fifth Amendment of the United States Constitution. *Dresser*, 628 F.2d at 1376. It is likely that, if deposed in the civil case, the criminal defendants would invoke their Fifth Amendment privilege. Dkt. # 57, p. 5. If discovery moves forward, each defendant will be faced with the difficult choice

between asserting his or her right against self-incrimination, thereby inviting prejudice in the civil case, or waiving those rights, thereby courting liability in the criminal case.[1] *See LaBianca*, 801 F.Supp. at 1011; *Brock*, 109 F.R.D. at 120. "Where invocation of the fifth amendment imposes undue sanctions or penalties on a defendant, a court may in its discretion stay proceedings, [or] postpone civil discovery." *LaBianca*, 801 F.Supp. at 1011 (quoting *Arden Wuy Assocs. v. Boesky*, 660 F.Supp. 1494, 1498–1499 (S.D.N.Y.1987)). Moreover, the grower defendants, who are not defendants in the criminal case, will not be burdened by a stay of civil discovery as they will be afforded more complete discovery at the time they must defend the civil case. *See, e.g., In re Ahead by a Length, Inc.*, 78 B.R. at 713.

A stay of discovery pending resolution of the criminal case clearly serves both the interests of the Court and those of the public. By proceeding first with the criminal prosecution, the Court makes efficient use of judicial time and resources by insuring that common issues of fact will be resolved and subsequent civil discovery will proceed unobstructed by concerns regarding self-incrimination. *See, e.g., In re Ahead by a Length, Inc.*, 78 B.R. at 713. Moreover, the public's interest in the integrity of the criminal case is entitled to precedence over the civil litigant. *See In re Ivan F. Boesky Sec. Litig.*, 128 F.R.D. 47, 49 (S.D.N.Y.1989); *Integrated Generics v. Bowen*, 678 F.Supp. 1004, 1009 (E.D.N.Y.1988). "[A] trial judge should give substantial weight to [the public interest in law enforcement] in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities." *LaBianca*, 801 F.Supp. at 1010 (quoting *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir.1962)).

The government concedes that it has no interest in the civil litigation and is therefore unable to assert either a claim or a defense. Dkt. # 64, p. 2. For this reason, the government's motion to intervene is denied. However, the Court finds that the interests of justice militate in favor of a stay of discovery.

---

1. Defendants' choices are rendered no less difficult by the fact that certain indigent defendants

have been characterized by their attorney as "judgment proof." Dkt. # 57, p. 5.

RPI 0248

Accordingly, the Court orders a stay of discovery in this matter until the conclusion of evidence in the related criminal case, *United States v. Maria Garcia et al.*, 02–CR–110–S.

**SO ORDERED.**



**In re MERRILL LYNCH & CO., INC. RESEARCH REPORTS SECURITIES LITIGATION.**

No. 02 MDL 1484.

United States District Court, S.D. New York.

Oct. 22, 2003.

Shareholders in proprietary mutual fund brought suit against fund, controlling persons, and others, alleging that fund bought stocks in order to enhance related investment banking business in violation of securities laws. On defendants' motions to strike and to dismiss, the District Court, Pollack, Senior District Judge, held that: (1) complaint violated rule requiring short and plain statement of claim, and (2) immaterial references to administrative proceedings or other litigation would be stricken from any further amended pleadings.

Motions granted.

**1. Federal Civil Procedure ⬄1125.1, 1138, 1772, 1824**

When a complaint is not short and plain, or its averments are not concise and direct, the district court has the power, on motion or sua sponte, to dismiss the complaint or to strike such parts as are redundant or immaterial. Fed.Rules Civ.Proc.Rule 8(a)(2), (e)(1), 28 U.S.C.A.

**2. Federal Civil Procedure ⬄691**

Complaint encompassing 98 pages and 367 separate paragraphs violated rule requiring short and plain statement of claim where it contained redundant, argumentative, and disjoined assertions that merely stated conclusions, unsupported by facts, necessary to prevail on securities claim that proprietary mutual fund bought stocks in order to enhance controlling brokerage firm's investment banking business. Fed.Rules Civ.Proc. Rule 8(a)(2), (e)(1), 28 U.S.C.A.

**3. Federal Civil Procedure ⬄1104**

Generally, motions to strike are viewed with disfavor. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

**4. Federal Civil Procedure ⬄1125.1, 1127**

A motion to strike on grounds of impertinence and immateriality should be denied unless it can be shown that no evidence in support of the allegation would be admissible. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

**5. Federal Civil Procedure ⬄1125.1**

For purposes of rule permitting motion to strike on ground of immateriality, references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial. Fed.Rules Civ.Proc. Rule 12(f), 28 U.S.C.A.

**6. Federal Civil Procedure ⬄1126**

References to Securities and Exchange Commission (SEC) and National Association of Securities Dealers (NASD) administrative complaints, as well as to ongoing securities and antitrust litigation, were to be stricken as immaterial from amended complaint in securities litigation attacking operation of proprietary mutual fund. Fed.Rules Civ. Proc.Rule 12(f), 28 U.S.C.A.

Wolf Haldenstein Adler Freeman & Herz, LLP (by Daniel W. Krasner, Jeffrey G. Smith, Robert B. Weintraub, and Stefanie A. Lindeman), New York City, for Plaintiffs.

Kaplan Fox & Kilsheimer LLP (by Frederic S. Fox, Laurence D. King, and Donald R. Hall), New York City, for Plaintiffs.

RPI 0249

## ◆ Frierson v. City of Terrell, 2003 U.S. Dist. LEXIS 26443

Copy Citation

United States District Court for the Northern District of Texas, Dallas Division

June 5, 2003, Decided ; June 6, 2003, Filed

Civil Action No. 3:02-CV-2340-H

**Reporter**

**2003 U.S. Dist. LEXIS 26443** | 2003 WL 21355969

JESSICA FRIERSON Plaintiff, v. CITY OF TERRELL, and ALEJANDRO SUAREZ, Defendants.

**Subsequent History:** Motion granted by Frierson v. City of Terrell, 2003 U.S. Dist. LEXIS 15132 (N.D. Tex., Aug. 15, 2003)

**Prior History:** Frierson v. City of Terrell, 2003 U.S. Dist. LEXIS 1535 (N.D. Tex., Feb. 3, 2003)

## Core Terms

discovery, documents, implicate, labeled, in camera, indictment, responsive, criminal proceeding, internal affairs, investigators, terminates, subpoena, criminal case, weighs, protective order, civil discovery, civil case, privileged, portions, charges, overlap, staying, days, tape, harassment, sentencing, producing, questions, postpone, papers

## Case Summary

### Procedural Posture

In a civil rights action brought under 42 U.S.C.S. § 1983 by plaintiff police officer against defendants, a city and another officer, defendants submitted for in camera review items responsive to plaintiff officer's discovery request which allegedly implicated defendant officer's Fifth Amendment self-incrimination privilege. Defendant officer sought a stay of further discovery until the completion of criminal proceedings against him.

### Overview

Plaintiff officer claimed that defendant officer harassed her. Defendant officer was indicted on a misdemeanor charge of official oppression for the same alleged harassment. Defendant officer sought a stay of further discovery and a protective order shielding him from having to produce information that he believed would implicate his Fifth Amendment privilege. The city was willing to produce all responsive information, even that which might have implicated defendant officer's privilege. In granting defendant officer's request for a stay, the court held that several factors weighed in favor of a stay, including the degree to which the civil issues overlapped with the criminal issues and the fact that defendant officer had been indicted for the same conduct that was the subject of the civil case. The court held that, with respect to compelled statements made by defendant officer to the city's internal affairs investigators, if the statements were provided to the prosecution, allowing plaintiff officer to discover them would not have violated defendant officer's Fifth Amendment privilege because the privilege only guarded against the improper use of the compelled statements.

### Outcome

The court ordered defendants to produce, with exceptions, all documents that had been submitted for in camera review. The court stayed further discovery from defendant officer until he was convicted and sentenced, acquitted, or the charges were dropped in the state criminal proceeding.

▼ LexisNexis® Headnotes

RPI 0250

Civil Procedure > ... > Discovery ▾ > Privileged Communications ▾ > General Overview ▾

Constitutional Law > ... > Fundamental Rights ▾ > 📕 Procedural Due Process ▾ > Self-Incrimination Privilege ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > General Overview ▾

**HN1⬇** When the Fifth Amendment privilege is invoked in a civil proceeding to avoid discovery, a court must conduct a particularized inquiry, deciding in connection with each specific area that the questioning seeks to explore, whether or not the privilege is well-founded. Even where a party has a legitimate claim of privilege with respect to certain questions or lines of inquiry, that person may not be entitled to invoke his privilege to remain totally silent. Only where the court finds that he could legitimately refuse to answer essentially all relevant questions, because of the threat of incrimination from any relevant questioning is a person totally excused from responding to relevant inquiries. Otherwise, a person is entitled to invoke the privilege only as to genuinely threatening questions. A blanket assertion of the privilege without inquiry by the court is unacceptable. The court may conduct an in camera review of the items at issue to determine if the privilege applies. If, after such a review, the court finds that the privilege is well-founded, the court may stay or postpone civil discovery or issue a protective order. *Shepardize - Narrow by this Headnote*

Civil Procedure > Discovery & Disclosure ▾ > Discovery ▾ > 📕 Protective Orders ▾

Constitutional Law > ... > Fundamental Rights ▾ > 📕 Procedural Due Process ▾ > Self-Incrimination Privilege ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > General Overview ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > Elements ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > Scope ▾

**HN2⬇** In deciding whether to stay discovery in light of a party's Fifth Amendment privilege, a court must balance the interests of the party asserting the privilege against any prejudice resulting to the other parties. To achieve that balance, the court uses a six-factor test: (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the criminal case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously, weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest. *Shepardize - Narrow by this Headnote*

Civil Procedure > Discovery & Disclosure ▾ > Discovery ▾ > 📕 Protective Orders ▾

Constitutional Law > ... > Fundamental Rights ▾ > 📕 Procedural Due Process ▾ > Self-Incrimination Privilege ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > General Overview ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > Elements ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > Scope ▾

**HN3⬇** The most important factor in deciding whether to stay discovery in light of a party's Fifth Amendment privilege is the degree to which the civil issues overlap with the criminal issues. If there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay. *Shepardize - Narrow by this Headnote*

Civil Procedure > Discovery & Disclosure ▾ > Discovery ▾ > 📕 Protective Orders ▾

Constitutional Law > ... > Fundamental Rights ▾ > 📕 Procedural Due Process ▾ > Self-Incrimination Privilege ▾

Criminal Law & Procedure > Commencement of Criminal Proceedings ▾ > Accusatory Instruments ▾ > General Overview ▾

Criminal Law & Procedure > Preliminary Proceedings ▾ > Speedy Trial ▾ > General Overview ▾

Criminal Law & Procedure > Preliminary Proceedings ▾ > Speedy Trial ▾ > Statutory Right ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > General Overview ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > Elements ▾

**HN4⬇** The second factor to be considered in deciding whether to stay discovery in light of a party's Fifth Amendment privilege is the status of the criminal case. A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to Speedy Trial Act considerations. *Shepardize - Narrow by this Headnote*

Constitutional Law > ... > Fundamental Rights ▾ > 📕 Procedural Due Process ▾ > Self-Incrimination Privilege ▾

Evidence > Privileges ▾ > 📕 Self-Incrimination Privilege ▾ > General Overview ▾

Evidence > Relevance ▾ > Preservation of Relevant Evidence ▾ > Exclusion & Preservation by Prosecutors ▾

**HN5⬇** The Fifth Amendment privilege is intended to protect an individual from being compelled to furnish a link in the chain of evidence needed to prosecute him for a crime. In order to sustain the privilege, it need only be evident from the implications of the question that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. Such "injurious disclosure" is protected because it may provide or assist in the collection of evidence admissible in a prosecution for past or present offenses. *Shepardize - Narrow by this Headnote*

Constitutional Law > ... > Fundamental Rights ▾ > 📕 Procedural Due Process ▾ > Self-Incrimination Privilege ▾

**HN6⬇** Any statements made in the course of an internal affairs investigation are prevented from being used against police officers in subsequent criminal proceedings. *Shepardize - Narrow by this Headnote*

RPI 0251

*HN7* The protection of the Fifth Amendment privilege, when applied to statements by police officers in internal affairs files, must focus on the use of those statements against the officers who gave them. The statements are not privileged from production to a subpoenaing authority. But the Fifth Amendment guards against any improper use of them. The Fifth Amendment privilege is implicated by the prosecution's use, not possession, of an officer's statements. *Shepardize - Narrow by this Headnote*

*HN8* The act of producing documents in response to a subpoena may have a compelled testimonial aspect. The act of production itself may implicitly communicate statements of fact. By producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic. This "act of production" doctrine clarifies that the act of responding to a compelled request may have a privileged testimonial effect if it could provide a prosecutor with a lead to incriminating evidence, or a link in the chain of evidence needed to prosecute. *Shepardize - Narrow by this Headnote*

**Counsel:** [1] For Jessica Frierson, Plaintiff: Brenda H Collier ▾, Law Office of Brenda H Collier ▾, Austin, TX.

For City of Terrell, Defendant: Marigny A Lanier ▾, Jennifer L Carter ▾, Maris & Lanier, Dallas, TX.

For Alejandro Suarez, Defendant: Ronald E Harden ▾, Law Offices of Ronald E Harden, Terrell, TX.

**Judges:** IRMA CARRILLO RAMIREZ ▾, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** IRMA CARRILLO RAMIREZ ▾

## Opinion

### ORDER

Before the Court are *Defendant Alejandro Suarez's In Camera Submission Pursuant to Court's December 26, 2002 Order*, submitted on January 21, 2002, and *City of Terrell's Documents and Items Submitted for In Camera Inspection*, submitted on January 22, 2003.

### I. BACKGROUND

On October 24, 2002, Jessica Frierson (Plaintiff), an officer with the Terrell Police Department, initiated this civil action against the City of Terrell (City) and another officer, Alejandro Suarez (Officer), for alleged harassment under 42 U.S.C. § 1983. On or about October 10, 2001, Officer was indicted in state court on a class A misdemeanor charge of Official Oppression for the same alleged harassment.

[2] On December 3, 2002, Officer filed a *Motion for Protective Order and to Stay Discovery or Alternative Motion for Extension of Time to Serve Objections and Responses to Discovery* (Officer Mot). In that motion, he requested a stay of all discovery in this case under FED. R. CIV. P. 26(c) pending the outcome of the criminal proceedings. (Officer Mot. at 5.) Alternatively, Officer requested that the Court grant him an extension of thirty days to respond or object to Plaintiff's discovery requests, and that the Court issue a protective order shielding Officer from having to produce information that he believed would implicate his Fifth Amendment privilege against self-incrimination in the state criminal proceeding. *Id.* at 8-9. On the same day, City filed its *Motion and Brief to Strike Discovery Requests* (City Mot). City primarily requested that the Court strike Plaintiff's discovery requests because they were mailed prematurely. (City Mot. at 1-2.) Plaintiff responded to both motions on December 9, 2002, and sought an order compelling City to produce all requested items.

The Court held a hearing on this matter December 20, 2002. During [3] the hearing, City stated that it was willing to produce all responsive information, even that which might implicate Officer's privilege. Officer objected to City's production of documents that might implicate his Fifth Amendment privilege. Officer admitted, however, that some of the requested documents -- for instance, his regularly maintained personnel file and some internal investigative materials -- were discoverable and did not implicate his Fifth Amendment privilege. Based on the motions, the response, and the oral arguments, the Court orally ruled that it would be inappropriate to stay all discovery in this case. Officer and City were ordered to jointly review their respective discovery requests in order for Officer to determine which of City's responsive information implicated his privilege, and both defendants were ordered to submit to the Court for *in camera* review all responsive information that Officer believed would implicate his Fifth Amendment privilege. The submissions were to describe in detail, with supporting case law, how each item implicated Officer's privilege. *Id.* The Court also ordered City and Officer to produce all responsive non-objectionable documents [4] to Plaintiff within thirty days. On December 24, 2002, the Court issued a written Order to that effect. (Ord. at 1-2.)

RPI 0252

Officer and City timely submitted separate sets of items for *in camera* review. However, only Officer provided argument on how the requested items would implicate his Fifth Amendment privilege. Because City did not object to production, it saw no reason to present argument. The defendants' *in camera* submissions and Officer's argument are now before the Court and ripe for determination.

## II. ANALYSIS

HN1 When the Fifth Amendment privilege is invoked in a civil proceeding to avoid discovery, a court must conduct a "particularized inquiry, deciding in connection with each specific area that the questioning seeks to explore, whether or not the privilege is well-founded." *SEC v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 668 (5th Cir. 1981). "Even where a party has a legitimate claim of privilege with respect to certain questions or lines of inquiry, that person may not be entitled to invoke his privilege to remain totally silent. Only where the court finds that he could 'legitimately refuse to answer essentially all relevant questions, [5] ' because of the threat of incrimination from any relevant questioning is a person totally excused from responding to relevant inquiries. Otherwise, a person is entitled to invoke the privilege '(o)nly as to genuinely threatening questions . . . . '" *Id.* at 668-69 (quoting *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976)). "A blanket assertion of the privilege without inquiry by the court, is unacceptable." *United States v. Goodwin*, 625 F.2d 693, 701 (5th Cir. 1980). The court may conduct an *in camera* review of the items at issue to determine if the privilege applies. *See id.* If, after such a review, the court finds that the privilege is well-founded, the court may stay or postpone civil discovery or issue a protective order. *See United States v. Kordel*, 397 U.S. 1, 9, 25 L. Ed. 2d 1, 90 S. Ct. 763 (1970), *quoted in Gordon v. FDIC*, 138 U.S. App. D.C. 308, 427 F.2d 578, 580 n.4 (1970) (noting that the "appropriate remedy would be a protective order under Rule 30(b) 2" which would postpone civil discovery until termination of the criminal action.") (footnote added); *see also Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084, 1088-89 (5th Cir. 1980) [6] (staying civil discovery until termination of the criminal action); *accord Volmar Distribs., Inc. v. The New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) (stating choices and staying discovery entirely); *Nowaczyk v. Matingas*, 146 F.R.D. 169, 178-79 (N.D. Ill. 1993) (denying motion to stay civil discovery but granting protective order to restrict disclosure of items discovered).

### A. Stay of Discovery

HN2 In deciding whether to stay discovery in light of a [7] party's Fifth Amendment privilege, a court must balance the interests of the party asserting the privilege against any prejudice resulting to the other parties. *See Wehling*, 608 F.2d at 1089. To achieve that balance, this court uses a six-factor test: "(1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the criminal case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously, weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest. *Librado v. M.S. Carriers, Inc.*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, at * 1 (N.D. Tex. Nov. 05, 2002); *see also Heller Healthcare Finance, Inc. v. Boyes*, 2002 U.S. Dist. LEXIS 12743, 2002 WL 1558337, at * 2-3 (N.D. Tex. July 15, 2002). If these factors show that discovery implicates the party's privilege, a court may stay discovery. *See Librado*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, at * 3 (staying discovery from employee and any discovery that no "undue prejudice" to employer by reason of [8] employee's unavailability as witness or assistant in defense); *see also Heller*, 2002 U.S. Dist. LEXIS 12743, 2002 WL 1558337, at * 4 (staying one defendant's indemnification until acquitted or found guilty, in consistent criminal proceedings).

#### 1.

HN3 The most important factor is the degree to which the civil issues overlap with the criminal issues. *See Volmar Distribs., Inc.*, 152 F.R.D. at 39, cited in *Librado*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, at * 2. If there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay. *Librado*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, at * 2. In the instant case, Plaintiff concedes that Officer's civil and criminal issues overlap. (Resp. at 5.) Indeed, there is no question that issue of sexual harassment complained of in the instant suit overlaps the state charge of sexual harassment. This overlap weighs in favor of a stay.

#### 2.

HN4 The second factor to be considered is the status of the criminal case. *Librado*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, at * 2. "A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood [9] that a defendant may make incriminating statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to speedy Trial Act considerations." *Id.* Officer was indicted in the state criminal case on October 10, 2001. [3] Plaintiff assumes that, given the passage of time, Officer has waived his right to a speedy trial under Texas law. (Resp. at 5.) As of the date of the hearing, the case had not yet been set for trial. Officer's indictment and the pending status of the criminal case weigh in favor of a stay.

#### 3.

The Court also weighs Plaintiff's interests in proceeding expeditiously against the prejudice that will be caused by the delay that will result from the stay. *Librado*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, [10] at * 2. Plaintiff asserts that the criminal case has been pending for over a year and that it may be postponed indefinitely because there is no trial setting. (Resp. at 5.) While it is highly unlikely that the case would be postponed indefinitely, as of the date of this Order, there is no indication of when the criminal case would end. If Officer is convicted, his Fifth Amendment privilege may continue throughout the pendency of his direct appeal. *Cf. Librado*, 2002 U.S. Dist. LEXIS 21592, 2002 WL 31495988, at * 2. Because the issuance and duration of a stay are committed to the Court's sound discretion, and because the imposition of a stay lasting throughout the duration of Officer's direct appeal (if he is convicted) would likely be unduly burdensome to Plaintiff's interests, the Court contemplates that the stay granted today will remain in effect only through sentencing. *See id.* If he is acquitted, the stay will terminate upon the return of a not guilty verdict. *See id.* If the charges are dropped, the stay terminates on the dismissal of the charges.

It is worth noting that the majority of the information that Officer provided to the Court for *in camera* review was similar to the [11] information provided by City. Although Plaintiff may not proceed expeditiously against Officer while the stay is in place, Plaintiff's prejudice is mitigated by being able to discover most of the same information from City, with the exception of compelled statements as set forth below. *See* 2002 U.S. Dist. LEXIS 21592, [WL] at * 3. Therefore, this factor does not necessarily weigh against a stay.

#### 4.

The Court has also considered the private interest of Officer in securing the stay and the burden that would result if the stay were denied. *See id.* As discussed above, absent a stay, Officer faces a conflict between asserting his Fifth Amendment privilege and fulfilling his legal obligations in civil discovery. *See id.* The Court is not persuaded that the interests of justice require that all discovery be halted. However, *see* 2002 U.S. Dist. LEXIS 21592, [WL] at * 2. As noted above, some non-privileged information was discoverable from City and Officer. The Court discerns no substantial prejudice to Plaintiff from granting a partial stay to postpone the remainder of discovery from Officer alone, rather than staying all discovery. Accordingly, Officer's interest weighs in favor of a stay. *See id.*

#### 5.

RPI 0253

The Court concludes [12] that granting a stay will not unduly interfere with the management of its docket. The Court's interests do not weigh against a stay. See id.

The public's interest in the past and consequential resolution of litigation is obviously worth considering. See id. To promote orderly resolution of this case, while minimizing the inconvenience to the courts also ... the extent that Plaintiff is precluded from entering any remaining discovery from Officer until such time ... seek ... charges are dropped ... delayed ... to assure ... would allow for a consolidation/resolution of the ... See Wehling, 608 F.2d at 1089; citing Dienstag v. Bronson, 49 F.R.D. 327, 329 (S.D.N.Y. 1970); Paul Harrigan & Sons, Inc. v. Enterprise Animal Oil Co., 14 F.R.D. 333, 335 (E.D. Pa. 1953) (same); and Nankivel-Discount Corp. v. Holdsomb, 111 F.R.D. 216 (S.D. Md. 1952) (same). The public's interest [13] weighs in favor of a stay.

After due consideration of all factors, all remaining discovery from Officer shall be stayed pending resolution of the criminal proceedings.

## B. Protective Order

### 1. Documents Produced by City

City submitted six categories of materials for *in camera* review pursuant to Officer's objection that they implicate his Fifth Amendment privilege because the statements were compelled during the internal affairs investigation.

#### a. Applicability of Privilege to Compelled Statements

This case is unique in that it is a federal civil action against a police officer who is currently under indictment in state court and who has already provided compelled statements to internal affairs investigators. Officer objects to Plaintiff's discovery from City on grounds that his statements to the internal affairs investigators and City's act of producing those statements would implicate his privilege in the criminal proceeding if discovered. While it is clear that Officer's Fifth Amendment privilege would be implicated if discovery from him is not stayed, it is not clear that his privilege would be implicated by allowing Plaintiff to discover his statements [14] to the internal affairs investigators, City, or the Terrell Police Department in this civil case.

HN5 The Fifth Amendment privilege is intended to protect an individual from being compelled to "furnish a link in the chain of evidence needed to prosecute" him for a crime. Hoffman v. United States, 341 U.S. 479, 486-87, 95 L. Ed. 1118, 71 S. Ct. 814 (1951) (emphasis added). In order to "sustain the privilege, it need only be evident from the implications of the question . . . that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Id. at 486-87 (emphasis added). Such "injurious disclosure" is protected because it "may provide or assist in the collection of evidence admissible in a prosecution for past or present offenses." Marchetti v. United States, 390 U.S. 39, 52, 19 L. Ed. 2d 889, 88 S. Ct. 697, 1968-1 C.B. 500 (1968) (emphasis added). If the internal affairs investigators, City, or the Terrell Police Department have provided Officer's statements to the prosecution, then allowing the Plaintiff to discover them in this case would not unconstitutionally furnish or disclose them to prosecution.

Assuming that [15] the prosecution possesses or obtains Officer's statements, its use of those statements is restricted by the Supreme Court's decision in Garrity v. New Jersey, 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967), which "prevents HN6 any statements made in the course of the internal affairs investigation from being used against [police] officers in subsequent criminal proceedings." In re Federal Grand Jury Proceedings, 975 F.2d 1488, 1490 (11th Cir. 1992). Officer's statement to the internal affairs investigators reflects that it was given under a "Garity [sic] Warning," and that if he refused to answer, he could be subject to termination. (Off. Sub. at Ex. B-1.) This warning specifically advised Officer that his statement "cannot be used against [him] in any criminal proceeding." Id. In an analogous situation, the Ninth Circuit held "that HN7 the protection of the Fifth Amendment privilege, when applied to statements by police officers in internal affairs files, must focus on the use of those statements against the officers who gave them. The statements are not privileged from production to a subpoenaing authority. But the Fifth Amendment guards against any improper use of them. [16] " In re Grand Jury Subpoena, 75 F.3d 446, 448 (9th Cir. 1996); see also Grand Jury Subpoenas Dated Dec. 7 and 8, Issued to Bob Stover, Chief of Albuquerque Police Dept. v. U.S., 40 F.3d 1096, 1103 (10th Cir. 1994) ("The time for protection will come when, if ever, the government attempts to use the information against the defendant at trial. We are not willing to assume that the government will make such use, or if it does, that a court will allow it to do so."). According to these cases, the Fifth Amendment privilege is implicated by the prosecution's use, not possession, of Officer's statements.

Because neither side has had an opportunity to brief this issue, the parties shall be allowed ten days from the date on which this Order is filed to provide additional briefing supported by case law. Rather than provide additional briefing, City shall cooperate with Officer in detailing which items have been provided to or are available to the prosecution. After reviewing the briefs, and especially the authorities cited therein, the Court will determine whether production of Officer's compelled statements to the Plaintiff in this civil case implicates [17] his Fifth Amendment privilege.

#### b. Documents Which do not Contain Compelled Statements

The threshold issue in determining if the privilege is well-founded is whether or not the contents of these items contain Officer's compelled statements. See United States v. Doe, 465 U.S. 605, 610, 79 L. Ed. 2d 552, 104 S. Ct. 1237 (1984). The Court has made a "particularized inquiry" into Officer's objections and determined that not all of City's submissions contain Officer's compelled oral or written statements or compelled statements that were recorded or summarized by an internal affairs investigator. See First Financial Group of Texas, Inc., 659 F.2d at 668. Following is a table evidencing the documents submitted by City, and the specific items that contain Officer's compelled statements or statements that may implicate Officer's Fifth Amendment privilege:

| No. | Description of Category | Items Containing Officer's Compelled Statements |
|---|---|---|
| 1 | Internal Affairs Investigative File labeled COT0220-COT082 | 5th paragraph beginning "On 7/9/01. . ." of COT0223; COT0226; COT0229-30; COT0257-0263; COT0267-0268; COT0277-0278 |
| 2 | Various photographs labeled COT074-078; computer disks labeled COT079-080; videotape labeled COT0283 | COT0283 |
| 3 | Audio cassettes labeled | COT0285-0286 |

COT0284-0286

4    Documents to and from EEOC

     labeled COT081-COT0114

5    Suarez' payroll record

     covering administrative leave

     labeled COT0287

6    Dictaphone tape labeled

     ■■COT0228 ; Audio cassette

     labeled COT0289 for counter

     numbers 251-254;

     280-288;

     320-326;

     334-342; 411-412;

     459-466

[18]

The remainder of the items submitted by City are either documents or audio cassette tapes containing statements by others, portions of Texas's Local Government Code, Officer's activity log and the police department's daily call log for June 24, 2001, Officer's payroll record, surveillance photographs, documents sent to and received from the Equal Employment Opportunity Commission, an e-mail allegedly from Officer to Plaintiff, [19] or other non-compelled statements. These items do not implicate Officer's privilege because they do not contain Officer's compelled statements. Accordingly, these items shall be produced to Plaintiff within ten days of the date of this order.

c. Act of Production

Officer also objects that the City's act of responding to Plaintiff's request for production is a privileged "act of production" protected by the Supreme Court's decision in United States v. Hubbell, 530 U.S. 27, 147 L. Ed. 2d 24, 120 S. Ct. 2037 (2000). The Hubbell case arose out of the investigation by Independent Counsel Kenneth Starr into President Bill Clinton and Hillary Clinton's involvement in what was commonly called the "Whitewater investigation." Hubbell, 530 U.S. at 30-31. During the investigation, the government served Webster Hubbell, an attorney associated with the Clintons, with a broadly-worded subpoena duces tecum seeking production of eleven broad categories of documents. Id. at 31. The government did not describe the requested items with any particularity. Id. In his testimony before the grand jury, Mr. Hubbell asserted his Fifth Amendment privilege and refused "to state [20] whether there are documents within my possession, custody, or control responsive to the Subpoena." Id. The government granted immunity "to the extent allowed by law" to gain the responsive documents, but later used those same documents to obtain a second indictment against Mr. Hubbell. Id. On Mr. Hubbell's motion, the district determined that the government had violated its grant of immunity and dismissed the second indictment. Id. The government appealed. The appellate court reversed, deciding that the district court should have addressed "the extent of the Government's independent knowledge of the documents' existence and authenticity, and [Mr. Hubbell's] possession or control of them." The case was remanded, and the government petitioned the Supreme Court for certiorari.

In the meantime, on remand, the government entered into a plea agreement with Mr. Hubbell; portions of the agreement were contingent on the outcome of the petition for certiorari. Id. at 33-34. Despite the plea agreement, the Supreme Court granted the government's petition to "determine the precise scope of a grant of immunity with respect to the production of documents in response [21] to a subpoena." Id. at 34. The Supreme Court explained that HN8 "the act of producing documents in response to a subpoena may have a compelled testimonial aspect. We have held that 'the act of production' itself may implicitly communicate 'statements of fact.' By 'producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic'" Id. This "act of production" doctrine, as it is commonly referred to, clarifies that the act of responding to a compelled request may have a privileged testimonial effect if it "could provide a prosecutor with a lead to incriminating evidence,' or a 'link in the chain of evidence needed to prosecute." Id.

Officer analogizes his case to Hubbell, and argues that City's act of producing certain items gives the prosecutor a "lead to incriminating evidence' or a 'link in the chain of evidence need to prosecute." (Officer Sub. at 30-31.) Officer claims that the City's act of producing these items unconstitutionally compels his privileged testimony. In Hubbell, the privileged testimony arose out of the defendant's act of identifying and gathering [22] his documents responsive to a very broad subpoena directed to him. Plaintiff's relevant requests for production are directed to City, and City's response requires no act by Officer that could be construed as his testimony. Thus, the concern in Hubbell — the testimonial effect of a defendant's own actions -- is absent from Officer's case.

It is also determinative that City does not object to its own act of production as privileged. [5▲] In fact, City has repeatedly stated — at oral argument and in its in camera submission -- that it does not oppose Plaintiff's requests for production on Officer's Fifth Amendment grounds. As explained in Hubbell:

It is doubtful that implicitly admitting the existence and possession of the papers rises to the level of testimony within the protection of the Fifth Amendment. The papers belong to the accountant, were prepared by him, and are the kind usually prepared by an accountant working on the tax returns of his client. Surely the Government is in no way relying on the 'truthtelling' of the taxpayer to prove the existence of or his access to the documents. . . . The existence and location of the papers are a foregone [23] conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers.

Hubbell, 530 U.S. at 44 (emphasis added) (quoting Fisher v. United States, 425 U.S. 391, 394, 48 L. Ed. 2d 39, 96 S. Ct. 1569 (1976)). The items requested from City belong to City, were prepared by City, and are the kind usually prepared in an internal affairs investigation or day-to-day operations of the Terrell Police Department. Moreover, the existence and authenticity of the items requested from City may be independently confirmed by City or the Terrell Police Department. Thus, the prosecutor is not relying on Officer's "truthtelling" to prove the existence of or Officer's access to these items. Consequently, City's production does not implicate Officer's [24] Fifth Amendment privilege.

2. Production by Officer

Officer produced documents and items labeled Exhibits A, B1-12, and C. At this time, production of these documents will not be ordered because the documents either (1) contain compelled statements or statements which implicate or may implicate Officer's Fifth Amendment privilege; or (2) consist of identical copies of documents already

ordered to be produced by City.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that further discovery from Officer shall be stayed until Officer is convicted and sentenced, acquitted, or the charges are dropped in the state criminal proceeding. If he is sentenced, the stay terminates upon sentencing. If he is acquitted, the stay terminates upon the return of a not guilty verdict. If the charges are dropped, the stay terminates upon dismissal of the charges. This stay may be appropriately modified for good cause. It is further hereby

**ORDERED** that the Plaintiff and Officer (with the cooperation of City) shall file additional briefing within ten calendar days of the date of this Order regarding whether Officer's statements are available to the prosecution and **[25]** the impact of *Garrity* on statements made to internal affairs investigators that are later disclosed in a civil action.

**ORDERED** that City shall produce to Plaintiff within ten calendar days of the date of this Order all documents which it submitted for *in camera* review, with the exception of the following items: 5th paragraph beginning "On 7/9/01 . . ." of COT0223; COT0226; COT0229-0230; COT0257-0263;COT0267-0268; COT0277-0278; COT0283; and COT0285-0286.

**SO ORDERED** on this 5th day of June, 2003.

IRMA CARRILLO RAMIREZ ▾

UNITED STATES MAGISTRATE JUDGE

### Footnotes

 Officer is the defendant in State of Texas v. Alejandro Suarez, Cause No. 20,718, in the 86th Judicial District Court, Kaufman County, Texas. The relevant portion of the crime with which he is charged states "A public servant acting under color of his office or employment commits an offense if he: . . . (3) intentionally subjects another to sexual harassment." TEX. PEN. CODE ANN. § 39.03 (Vernon 1994).

 In 1970, the protection provisions of Rule 30(b) were transferred to Rule 26(c). Rule 26(c) now authorizes the Court to stay civil discovery as justice requires. *See* FED. R. CIV. P. 26(c); *see also Federal Open Market Committee of Federal Reserve System v. Merrill*, 443 U.S. 340, 350, 61 L. Ed. 2d 587, 99 S. Ct. 2800 (1979) ("Federal Rule Civ. Proc. 26(c)(7), which replaced former Rule 30(b) in 1970, was intended . . . to 'reflect existing law.'").

 A copy of the indictment was included as Exhibit C to Officer's *Motion for Protective Order and to Stay Discovery or Alternative Motion for Extension of Time to Serve Objections and Responses to Discovery*.

 Pursuant to the Court's Order, dated April 16, 2003, City was ordered to provide this Dictaphone tape to Officer in a format by which Officer could identify its objectionable portions. In lieu of resubmitting the entire Dictaphone tape, City was ordered to provide the Court with only the objectionable portions. City timely submitted the objectionable portions to the Court on one audio cassette tape labeled COT 0289. Concurrently, City submitted Officer's objections. Thus, the Court limits its review of the Dictaphone tape to only those portions of it that Officer found objectionable.

 Because it is unnecessary to this decision, the Court expresses no opinion as to the ability of municipalities such as City to assert Fifth Amendment objections based on the act of production doctrine.

Jump To ▾

● LexisNexis